**Docket Nos. 12-17502 (L), 12-17519, 12-17595, 13-15407 and 13-15473**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————— • ————————

FIFTY-SIX HOPE ROAD MUSIC, LTD. and ZION ROOTSWEAR, LLC,

*Plaintiffs-Appellees,*

v.

A.V.E.L.A., INC., X ONE X MOVIE ARCHIVE, INC., CENTRAL MILLS, INC. (FREEZE), LEO VALENCIA and JEM SPORTSWEAR, INC.,

*Defendants-Appellants.*

———————————————————

*Appeal from a Decision of the United States District Court for the District of Nevada,
No. 2:08-cv-00105-PMP-GWF · Honorable Philip M. Pro*

## APPELLANT JEM SPORTSWEAR, INC.'S
## FIRST BRIEF ON CROSS-APPEAL

JOHN R. YATES, ESQ.
GREENBERG & BASS LLP
16000 Ventura Boulevard
Suite 1000
Encino, California 91436
(818) 382-6200 Telephone
(818) 986-6534 Facsimile

*Attorney for Appellant,
Jem Sportswear, Inc.*



COUNSEL PRESS · (800) 3-APPEAL                    PRINTED ON RECYCLED PAPER



**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, defendant and appellant Jem Sportswear, Inc. hereby certifies that it has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

Page(s)

I.    STATEMENT OF JURISDICTION ............................................... - 1 -

II.   ISSUES PRESENTED ................................................................ - 2 -

III.  REVIEWABILITY AND STANDARD OF REVIEW ............................ - 3 -

    A.    Reviewability...................................................................... - 3 -

    B.    Standard Of Review ........................................................... - 4 -

IV.   STATEMENT OF THE CASE ..................................................... - 5 -

V.    STATEMENT OF FACTS ........................................................... - 6 -

    A.    Jem's Business Is Based On Licensing Many Images From Many Sources ........................................................ - 6 -

    B.    Vendors And Licensors Are Expected To Own The Rights To What They Sell And License .................................... - 7 -

    C.    Marley T-Shirts From Different Sources Are Indistinguishable To Consumers........................................ - 9 -

VI.   SUMMARY OF ARGUMENT ..................................................... - 10 -

    A.    The Field Survey Is Not Substantial Evidence Of Likelihood Of Confusion ....................................................... - 10 -

    B.    The Accused Marley T-Shirts Did Not Suggest Sponsorship Or Approval By Anyone ...................................... - 11 -

    C.    If Jem Infringed Zion's Rights Jem's Infringement Was Not Willful......................................................................... - 11 -

VII.  THE FIELD SURVEY IS NOT SUBSTANTIAL EVIDENCE OF A LIKELIHOOD OF CONFUSION ............................................. - 12 -

    A.    Overview Of The Field Survey ............................................ - 12 -

    B.    The First Primary Question Yielded Insignificant Results ............ - 14 -

        1.    A 7% difference is below the threshold of legal significance. .................................................... - 14 -

        2.    Dr. Jay testified that an 8% difference was "effectively neutral."............................................... - 15 -

        3.    The Avela neck label was persuasive as to source. ............. - 15 -

        4.    The first primary question is vague and ambiguous............ - 16 -

i

TABLE OF CONTENTS

Page(s)

C.    The Second Primary Question Produced No Results That Are Substantial Evidence Of A Likelihood Of Confusion .................. - 18 -

    1.    Survey questions phrased in terms of permission have often been rejected because such questions tend to generate survey respondents' legal conclusions. ................. - 20 -

    2.    A large majority of respondents to the second primary question stated their personal beliefs regarding the legal requirements for use of a person's image. ........................... - 23 -

VIII.    PLAINTIFFS HAVE NO FALSE ENDORSEMENT CLAIM UNDER 15 U.S.C. §1125(a) AND SHOULD NOT HAVE A CLAIM .. - 27 -

A.    The Finding Of §1125(a) Liability At Trial Means That Plaintiffs Can Now Exclude All Others From Using Any Image Of Marley ................................................................. - 27 -

B.    Ninth Circuit Precedent Rejects Use Of §1125(a) As A Means Of Creating A Market Monopoly .................................................. - 28 -

C.    There Is No Endorsement When There Is No Message, And There Is No Message When The Trademark Or Celebrity Image Is Not Used In Connection With A Separate Product Or Service .- 29 -

D.    The Sea Of Marley Merchandise Available From Many Sources Means That No Reasonable Consumer Will Be Confused That Plaintiffs Are The Source Of All Of It ............................................ - 34 -

IX.    THERE IS NO SUBSTANTIAL EVIDENCE THAT JEM WILLFULLY INFRINGED THE MARLEY *PERSONA* ........................ - 37 -

A.    There Was No Evidence That Jem Knew Of Or Exploited Any Consumer Confusion ................................................................ - 38 -

B.    Jem Was Entitled To Rely On Indemnity From Avela Without Being Found To Be A Willful Infringer ........................................ - 40 -

    1.    The information known to Jem was insufficient to put Jem on notice that a high probability existed that the Marley rights it licensed from Avela infringed plaintiffs' rights, and there is no evidence that Jem deliberately avoided confirming that the plaintiffs' rights were infringed. ........................................................................... - 41 -

ii

TABLE OF CONTENTS

Page(s)

X.     CONCLUSION AND SUMMARY OF REQUESTED RELIEF ............ - 44 -

XI.    CERTIFICATE OF COMPLIANCE ....................................................... - 45 -

XII.   STATEMENT OF RELATED CASES .................................................... - 46 -

ADDENDUM WITH TEXT OF 15 U.S.C. §1125(a)

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*Abdul-Jabbar v. General Motors Corp.*
  85 F.3d 407 (9th Cir. 1992)...................................................................- 31 -

*Adry v. Adry-Mart, Inc.*
  68 F.3d 362 (9th Cir. 1995), as amended,
  76 F.3d 984 (9th Cir. 1986)...................................................................- 37 -

*Allen v. National Video, Inc.*
  610 F.Supp. 612 (S.D.N.Y. 1985)........................................................- 31 -

*Cairns v. Franklin Mint Co.*
  107 F.Supp.2d 1212 (C.D. Cal. 2000)......................- 20 -, - 28 -, - 29 -, - 33 -, - 34 -

*Cairns v. Franklin Mint Co.*
  292 F.3d 1139 (9th Cir. 2002)..................................................- 33 -, - 36 -

*Dastar Corp. v. Twentieth Century Fox Film Corp.*
  539 U.S. 23,123 S. Ct. 2041(2003) ......................................... - 17 -, -29-

*Facenda v. N.F.L. Films, Inc.*
  542 F.3d 1007 (3rd Cir. 2008) ..............................................................- 31 -

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*
  688 F. Supp. 2d 1148 (D. Nev. 2010) .................................................- 28 -

*Fonovisa, Inc. v. Cherry Auction, Inc.*
  76 F.3d 259 (9th Cir. 1996)..................................................................- 42 -

*Global-Tech Appliances, Inc., v. SEB S.A.*
  131 S. Ct. 2060, 179 L. Ed. 2d 1167(2011) ....................- 40 -, - 41 -, - 42 -

*Hangarter v. Provident Life and Accident Ins. Co.*
  373 F.3d 998 (9th Cir. 2004)...............................................................- 4 -

*Hokto Kinoko Co. v. Concord Farms, Inc.*
  810 F. Supp. 2d 1013 (C.D. Cal. 2011)...............................................- 40 -

*International Order of Job's Daughters v. Lindeburg & Co.*
  633 F.2d 912 (9th Cir. 1980)............................- 28 -, - 32 -, - 33 -,  - 34 -

*Levi Strauss & Co. v. Blue Bell, Inc.*
  1982 U.S. Dist. LEXIS 17151 (N.D. Cal.)*, as amended,*
  76 F.3d 984 (9th Cir. 1986)...................................................................- 14 -

*Lindy Pen Co. v. Bic Pen Co.*
  982 F.2d 1400 (9th Cir. 1993).............................................................- 37 -

*Malletier v. Dooney & Bourke, Inc.*
  340 F.Supp.2d 415 (S.D.N.Y. 2004) , rev'd on other grounds,
  79 USPQ 2d 1481 (2nd Cir. 2006)........................................................- 21 -

iv

TABLE OF AUTHORITIES

Page(s)

*Mathews v. Chevron Corp.*
   362 F.3d 1172 (9th Cir. 2004)................................................................. - 4 -

*Motown Record Corp. George A. Hormel & Co.*
   657 F.Supp. 1236 (C.D. Cal. 1987)........................................................ - 31 -

*National Football League Properties, Inc. v. Prostyle, Inc.*
   16 F.Supp. 2d 1012 (ED Wisc. 2004) ..................................................... - 21 -

*Nitco Holding Corp. v. Boujikian*
   491 F.3d 1086 (9th Cir. 2007).................................................................. - 3 -

*Novo Nordisk of North America, Inc. v. Eli Lilly & Co.*
   1996 U.S. Dist. LEXIS 12807 (S.D.N.Y. Aug. 30, 1996) .................................. - 21 -

*Paco Sport, Ltd. V. Paco Rabanne Parfums*
   86 F.Supp.2d 305 (S.D.N.Y. 2000), aff'd,
   234 F.3d 1262 (2nd Cir. 2000)................................................ - 14 -, - 15 -

*Parks v. LaFace Records*
   329 F.3d 437 (6th Cir. 2003) ................................................................. - 31 -

*Pavao v. Pagay*
   307 F.3d 915 (9th Cir. 2002)................................................................... - 4 -

*Pebble Beach Co. v. Tour 18 I*
   155 F.3d 526 (5th Cir. 1998)....................................... - 22 -, - 29 -, - 30 -

*Pirone v. MacMillan, Inc.*
   894 F.2d 579 (2nd Cir. 1990)............................. - 31 -, - 32 -, - 33 -, - 34 -

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*
   868 F. Supp. 2d 415 (E.D. Pa. 2012) ..................................................... - 15 -

*Suzy's Zoo v. Commissioner*
   273 F.3d 875 (9th Cir. 2001)................................................................... - 4 -

*Tiffany (NJ) Inc. v. eBay, Inc.*
   600 F.3d 93 (2nd Cir. 2010)................................................................. - 42 -

*Waits v. Frito-Lay, Inc.*
   978 F.2d 1093 (9th Cir. 1992)............................................................... - 31 -

*Wendt v. Host International, Inc.*
   125 F.3d 806 (9th Cir. 1997)................................................................ - 31 -

*White v. Samsung Electronics America, Inc.*
   971 F.2d 1395 (9th Cir. 1992)............................................................... - 31 -

*Wuv's International, Inc. v. Love's Enterprises, Inc.*
   1980 WL 30296 (D. Colo. 1980) ........................................................... - 15 -

## TABLE OF AUTHORITIES

Page(s)

**Statutes**

15 U.S.C.

Section 1114 ............................................................................................ - 5 -

 -Section 1125(a) ................................................................................... *Passim*

28 U.S.C.

    Section 1291 ......................................................................................... - 1 -

    Section 1331 ......................................................................................... - 1 -

    Section 1338(a) ..................................................................................... - 1 -

Nevada Revised Statutes

    Section 597.770 .................................................................................... - 5 -

    Section 104.2312(3) .............................................................................. - 7 -

**Other Authorities**

Federal Rules of Appellate Procedure

    Rule 4(a)(1)(A) ..................................................................................... - 2 -

    Rule 4(a)(4)(A)(iii) ............................................................................... - 2 -

    Rule 4(a)(4)(A)(v) ................................................................................ - 2 -

Federal Rules of Civil Procedure

    Rule 50(a) ............................................................................................. - 3 -

    Rule 50(b) ............................................................................................. - 3 -

Ninth Circuit Rule 28-2.2 ....................................................................... - 1 -

Webster's New Collegiate Dictionary
    (G. & C. Merriam Co. 1979) ................................................................ - 20 -

## I.      STATEMENT OF JURISDICTION

Pursuant to Ninth Circuit Rule 28-2.2, defendant-appellant Jem Sportswear, Inc. ("Jem") submits the following statement of jurisdiction:

a.      The United States District Court for the District of Nevada (the "District Court") had subject matter jurisdiction over this action by plaintiffs and cross-appellants 56 Hope Road Music Ltd. and Zion Rootswear, LLC (collectively "Zion") pursuant to 28 U.S.C. §§1331 and 1338(a).

b.      The District Court entered a partial monetary judgment (Excerpts of the Record ["ER"] Vol. I, 25 – 31) against defendants A.V.E.L.A., Inc., Leo Valencia, Sci-Fi Productions, Inc. dba X One X Movie Archive, Inc. (collectively "Avela") on Zion's claim for interference with prospective business relationships, and a permanent injunction against all defendants pursuant to the jury's verdict [ER Vol. I, 32 - 39] that defendants Avela, Jem and Central Mills, Inc. ("Freeze") had violated 15 U.S.C. §1125(a), on February 14, 2011.

c.      The District Court entered final judgment against all defendants on Zion's claim for relief pursuant to 15 U.S.C. §1125(a) on July 3, 2012 and, as relevant to Jem's appeal, against Jem in the sum of $413,638.29. [ER Vol. I, 21 - 24] The District Court's judgment is final under Federal Rule of Civil Procedure Rule 54 and this Court has jurisdiction pursuant to 28 U.S.C. §1291.

- 1 -

d.      Jem appeals from the jury verdict in favor of Zion entered on January 21, 2011 [ER Vol. I, 32 - 39], and from the final judgment on the verdict entered by the District Court on July 3, 2012 [ER Vol. I, 21 - 24]. Jem filed its Notice of Appeal on November 9, 2012 [ER Vol. I, 1 - 20] and the Notice is timely pursuant to Federal Rules of Appellate Procedure Rules 4(a)(1)(A), 4(a)(4)(A)(iii) and 4(a)(4)(A)(v).

## II.    ISSUES PRESENTED

a.      Does substantial evidence support the jury's finding that there existed a likelihood of consumer confusion that Zion was the source of, or approved or sponsored, T-shirts bearing images of Robert Nesta Marley ("the accused Marley T-shirts") manufactured and sold by Jem (and Freeze) using designs licensed to Jem (and Freeze) by Avela?

b.      Does a false endorsement claim pursuant to 15 U.S.C. §1125(a) exist when the specific images allegedly creating the false endorsement were not used in connection with the marketing or sale of a separate product or service, and when plaintiffs have no copyrights, trademarks or publicity rights in the images?

c.      Does substantial evidence support the jury's finding that Jem willfully infringed Zion's rights under 15 U.S.C. §1125(a)?

## III.    REVIEWABILITY AND STANDARD OF REVIEW

### A.    Reviewability

All defendants made an oral motion for judgment as a matter of law pursuant to Fed.R.Civ.P. Rule 50(a) at the close of evidence on January 18, 2011. [ER Vol. I, 40 - 62] The oral motion included argument concerning the sufficiency of Zion's evidence of likelihood of confusion as presented by the Field survey, and the sufficiency of Zion's that Jem willfully infringed Zion's rights.

Jem subsequently argued to the District Court that this same evidence was not substantial evidence in Jem's Opposition to Plaintiffs' Motion for Award of Profits. [ER Vol. I, 63 - 72] The District Court's ruling and order expressly indicates that the Court considered and rejected Jem's argument concerning substantial evidence, stating that "[t]he Court rejects JEM's argument that the evidence at trial was insufficient to support the jury's verdicts." [ER Vol. I, 23]

Avela and Freeze moved pursuant to Fed.R.Civ.P. Rule 50(b) on July 31, 2012 for judgment notwithstanding the verdict or, alternatively, for a new trial. That motion was denied by the District Court on October 12, 2012. The requirement of Nitco Holding Corp. v. Boujikian, 491 F.3d 1086, 1089 (9th Cir. 2007), that the District Court be afforded the opportunity to review the sufficiency of the evidence in support of the verdict both prior to and after verdict has been satisfied by all defendants.

- 3 -

### B.    Standard Of Review

Jem contends that the jury's findings that (a) there existed a likelihood of consumer confusion that Zion was the source of, approved or sponsored, the accused Marley T-shirts, and (b) Jem's violation of 15 U.S.C. §1125(a)  was willful, were erroneous and should be vacated. The factual findings of the jury are reviewed by this Court using a "substantial evidence" standard. Hangarter v. Provident Life and Accident Ins. Co., 373 F.3d 998, 1008 (9th Cir. 2004). "Substantial evidence" is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw a contrary conclusion from the evidence. Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).

Jem also contends that under the specific factual circumstances of this action a claim pursuant to 15 U.S.C. §1125(a) should not have been available to Zion as a matter of law. The legal consequences following from a set of facts constituting substantial evidence is a mixed issue of fact and law. Suzy's Zoo v. Commissioner, 273 F.3d 875, 878 (9th Cir. 2001) (stating that a mixed question "exists when primary facts are undisputed and ultimate inferences and legal consequences are in dispute").  Mixed questions of law and fact are generally reviewed *de novo*, Mathews v. Chevron Corp., 362 F.3d 1172, 1180 (9th Cir. 2004).

## IV.    STATEMENT OF THE CASE

Zion filed suit on January 23, 2008 against A.V.E.L.A., Inc. and Leo Valencia, asserting claims for unfair competition under 15 U.S.C. §1125(a), trademark infringement under 15 U.S.C. §1114, common law trademark infringement, infringement of publicity rights under Nevada Revised Statutes (N.R.S.) 597.770, and intentional interference with prospective economic advantage. On December 29, 2008 Zion filed its First Amended Complaint which asserted the same claims for relief and identified three additional defendants: X One X Movie Archive, Inc., Jem Sportswear, Inc., and Central Mills, Inc. (Freeze). [ER Vol. I, 176 – 187]

Defendants' motion for summary judgment was granted in part on February 16 and on November 2, 2010 [ER Vol. II, 129 – 163.2], resulting in the elimination of Zion's claims for relief for trademark infringement and infringement of Marley's publicity rights under Nevada state law. The case went to trial on plaintiffs' claims for unfair competition under 15 U.S.C. §1125(a) and interference with prospective economic advantage under Nevada common law. On January 21, 2011 the jury returned its verdict, finding Avela liable for interference with Zion's prospective economic advantage, and all defendants, including Jem, liable to Zion for willful infringement of Zion's rights under 15 U.S.C. §1125(a). [ER Vol. I, 32 – 39]

Jem appeals from the jury's verdict and the final judgment entered thereon on July 3, 2012. [ER Vol. I, 21 – 24, 32 - 39]

## V.   STATEMENT OF FACTS

### A.   Jem's Business Is Based On Licensing Many Images From Many Sources

Jem designs, manufactures and sells graphic T-shirts to mass market retailers. [ER Vol. II, 302 – 305, 316 – 318] In order to create its products, Jem licenses designs from approximately 40 separate licensors. [ER Vol. II, 328] One of those licensors was Avela [ER Vol. II, 311 – 312], with which Jem first entered into a licensing agreement in 2005. [ER Vol. III, 338 – 365] From time to time, image sets were added to or removed from the images licensed from Avela by Jem. [ER Vol. II, 308, 318 – 319, 325] Bob Marley images were one of the sets added to Jem's license, and used by Jem to produce the accused Marley T-shirts bearing images of Marley. [ER Vol. II, 308, 315 – 317, 319 – 321; Vol. III, 331 – 337]

Under the license agreement, Avela had the right to approve and did approve all of Jem's Marley designs. [ER Vol. II, 314 - 316]

- 6 -

**B.     Vendors And Licensors Are Expected To Own The Rights To What They Sell And License**

Jem relied on Avela to have appropriate rights to the Marley images just as Jem relies on its other licensors to have the rights to other images they license. Jem does not investigate its licensors' representations that they do have rights to the images they license to Jem. [ER Vol. II, 309 – 314] Reliance is also the practice of other licensees such as defendant Freeze[1] [ER Vol. II, 293 – 294, 297 – 299], JGR Copa [ER Vol. II, 191 – 195], and Balzout. [ER Vol. II, 280 – 281]  Similarly, retailers such as Target [ER Vol. II, 283 – 287] and Ecko [ER Vol. II, 288, 292] rely on their vendors to have the rights to produce and sell the vendors' products to the retailers. Such reliance is codified in the Uniform Commercial Code as the warranty of non-infringement that runs in favor of vendees and licensees from their vendors and licensors. *See, e.g.,* Nevada Revised Statutes §104.2312(3) ("Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like . . ..")

---

[1] Unlike Jem, Freeze was contacted by plaintiff 56 Hope Road's licensing agent Doreen Crujeiras regarding Freeze's sale of T-shirts printed with Marley's image. Freeze brought up the issue with Leo Valencia, who assured Freeze that Avela did have right to license the Marley images. [ER Vol. II, 293, 300 – 301]

- 7 -

Jem's protection from licensors' misrepresentations concerning the rights they have to license lies in the "indemnity clause" that is a standard feature of every licensing agreement. [ER Vol. II, 43] The indemnity clause of the license agreement between Jem and Avela provides that: "Licensor will indemnify and hold harmless Licensee against all suits, losses, costs, damages, attorney's fees and expenses that Licensee may sustain or incur by reason of any breach of the representations and warranties made by Licensor herein . . .." Among the representations and warranties made was that Avela had the right to license the Marley images to Jem. [ER Vol. II, 344 – 345]

During the period in which Jem sold its Marley T-shirt products under its license from Avela Jem's Vice President of Licensing and Marketing, Randi Speiker, received an inquiry from retailer Wet Seal regarding Jem's rights to produce T-shirts bearing Marley's image. Speiker responded that Jem had the rights under its license with Avela and made no further investigation. [ER Vol. II, 302, 323 - 324] Inquiries about rights are not uncommon, and during her eight years as a Vice President of Jem, Speiker received 10 to 20 similar inquiries about other Jem products. [ER Vol. II, 302, 329]

No evidence was presented at trial that Jem had ever received a communication from Zion about Jem's or Zion's Marley T-shirt products. In fact, Speiker testified that until Jem was named as a defendant in this action, Speiker

had never heard of Zion, or noticed any of Zion's product offerings at a trade show. [ER Vol. II, 326 – 327]

**C.    Marley T-Shirts From Different Sources Are Indistinguishable To Consumers**

To consumers, one T-shirt bearing the image of Bob Marley looks much like any other T-shirt bearing an image of Marley; there is no way to determine from the image alone who made or licensed the T-shirt, and consumers don't know the difference between licensed and unlicensed products. [ER Vol. II, 323] Thus, many consumers assume that the person on the T-shirt licensed the product. Zion's counsel Jill Pietrini acknowledged this marketplace reality in her closing argument:

> "It's also – we touched upon a little bit before – it's common in the industry that Live Nation – and you saw the Madonna shirt – has a Live Nation tag in the back and it's Madonna on the front. That's licensed merchandise. There's nothing to suggest that that is or is not licensed by the artist. *The assumption for the consumer is of course it is.*" [ER Vol. II, 330]

Consumers' inability to distinguish Marley T-shirts from different sources is understandable given the vast amount of Marley merchandise, including but not limited to T-shirts, in the marketplace from sources other than Zion, over a period of at least two decades. Zion's trial exhibits 390, 391 and 393 together comprise over 400 cease and desist letters relating to unauthorized Marley products or services, sent by Zion's attorneys between 1990 and 2010. While many of the letters refer only to "Marley merchandise" generally, 120 of them refer specifically

to T-shirts, and additional letters were sent to locations identified as T-shirt shops or sellers. [ER Vol. III, 511 – 527.24; Vol. II, 111, 120]  Zion's owner Michael Conley acknowledged at trial the huge amount of bootleg Marley product in the marketplace. [ER Vol. II, 279.1 – 279.2] Distinguishing Zion's Marley merchandise in this very crowded Marley marketplace may be why Zion requires every Marley T-shirt product Zion licenses to bear both the Marley legal line "© 56 Hope Road, Ltd., official licensee Zion Rootswear" as well as a separate hang tag identifying Zion Rootswear. [ER Vol. II, 278 – 279]

## VI.    SUMMARY OF ARGUMENT

### A.    The Field Survey Is Not Substantial Evidence Of Likelihood Of Confusion

As Zion's counsel noted in closing argument, consumers assume that a T-shirt with a celebrity's image on it is licensed by the celebrity. That assumption is a legal conclusion, not evidence of confusion as to origin, approval or sponsorship under 15 U.S.C. §1125(a). The *verbatim* answers given to the "confusion questions" in the Field survey, and the reasons given by respondents for their answers, prove beyond doubt that the Field survey captured respondents' legal assumptions and conclusions about the legal requirements for using celebrity images. The Field survey did not present any evidence relevant to the issue of consumer confusion regarding the origin, sponsorship or approval of the accused

Marley T-shirts. The Field survey was the only evidence of likelihood of confusion presented by Zion. Without that evidence the jury's finding that a likelihood of confusion existed is unsupported, and the judgment supported only by that finding must be reversed.

**B.    The Accused Marley T-Shirts Did Not Suggest Sponsorship Or Approval By Anyone**

The handful of Marley images licensed by Avela and used by Jem to create the accused Marley T-shirts by Jem were not presented to the consumer in connection with a separate product or service. Such use is incapable as a matter of law of suggesting that plaintiffs or anyone else sponsored or approved the T-shirts. Additionally, as a matter of fact, the marketplace is so crowded with bootleg Marley T-shirts from dozens of sources that the mere use of the Marley image is incapable of suggesting that Zion or any other entity in particular is the source of any T-shirt bearing the Marley image, or sponsored or approved the T-shirt. In these circumstances no §1125(a) claim exists. The judgment against Jem on Zion's §1125(a) claim should be reversed.

**C.    If Jem Infringed Zion's Rights Jem's Infringement Was Not Willful**

The extent of Jem's willful behavior proven at trial was that Jem did not undertake an investigation of Avela's rights in the Marley images Avela had

- 11 -

licensed to Jem, after receiving an inquiry from retailer Wet Seal about the rights. A single inquiry is insufficient as a matter of law to cause Jem to believe there was a high probability that Avela did not have the rights Avela licensed. Jem's failure to respond with a full-scale investigation does not constitute a deliberate avoidance of learning the truth. The jury's finding that Jem's infringement was willful should be vacated, and the action remanded to the District Court for further proceedings regarding whether Jem may be required to disgorge net profits earned from non-willful infringement.

## VII.    THE FIELD SURVEY IS NOT SUBSTANTIAL EVIDENCE OF A LIKELIHOOD OF CONFUSION

### A.    Overview Of The Field Survey

The sole evidence of actual consumer confusion between the accused Marley T-shirts produced by Jem using images licensed from Avela and Zion's Marley T-shirts was the testimony of Doreen Crujeiras. Crujeiras testified that a friend or former employee of the Marley family, Tracy Secora, called Crujeiras and asked if Zion had T-shirts in Target. [ER Vol. II, 188 – 190] Recognizing that this snippet of conversation, if it indicated confusion at all, could not possibly amount to substantial evidence of either actual or likely confusion, Zion turned to survey evidence to address the confusion issue. E. Deborah Jay, Ph.D., the president of Field Research Corporation, designed the shopping mall survey that

Zion presented as its sole evidence of likelihood of consumer confusion that the accused Marley T-shirts were originated, approved of or sponsored by Marley, or his estate or heirs. [ER Vol. III, 366 – 510]

The Field survey consisted of three primary questions which Dr. Jay testified could be considered together or separately. [ER Vol. II, 236] Each question was asked to demographically similar test and control groups containing nearly an identical number of respondents. The test group answered the questions while viewing an example of the accused Marley T-shirts bearing Marley's image; the control group was presented with a T-shirt bearing the image of an anonymous black male with dreadlocks. Both shirts featured an Avela neck label on the inside of the collar and also stated that all designs were the property of X One X Archive. Both shirts also bore a copyright mark and the signature of Roberto Rabanne. [ER Vol. II, 213 – 217; Vol. III, 374 – 383]

The first primary question was "Who do you think made or put out this particular T-shirt?" [ER Vol. III, 383] The second primary question was "Who do you think gave their permission or approval for this particular T-shirt to be made or put out?" This question was asked only to the 151 of 256 (59%) test group respondents and the 104 of 253 (41%) control group respondents who had confirmed their belief that permission or approval was required to make or put out

the test and control T-shirts. [ER Vol. III, 384 – 385][2] The third and final primary

question was "What else do you think the makers of this particular T-shirt make or

put out?" [ER Vol. III, 385 – 386]

The results of the Field survey were not legally significant, and do not

support the jury's finding of likelihood of confusion.

### B.    The First Primary Question Yielded Insignificant Results

The first primary question of the Field survey was "Who do you think made

or put out this particular T-shirt?" Only 9% (23) of the test group answered that

Marley, his heirs, or "the person on the shirt" were the source of the accused

Marley T-shirt, while 2% (5) in the control group gave the same response. [ER

Vol. III, 383 – 384] This 7% difference is insignificant legally and factually.

### 1.    A 7% difference is below the threshold of legal significance.

Most published decisions that discuss survey results in Lanham Act cases

find that a mere single digit difference between test and control groups in a

consumer survey is not evidence of confusion and, in fact, such a small difference

is considered to be evidence of no confusion. Levi Strauss & Co. v. Blue Bell, Inc.,

1982 U.S. Dist. LEXIS 17151 (N.D. Cal.), *aff'd,* Levi Strauss & Co. v. Blue Bell,

---

[2] Respondents were asked whether the maker of the test and control T-shirts did or did not receive permission or approval from someone to make or put out the T-shirts, or whether the respondent had no opinion. [ER Vol. III, 384 - 387]

<u>Inc.</u>, 778 F.2d 1352 (9th Cir.1985) (2% test v. control difference is evidence of no confusion); <u>Paco Sport, Ltd. V. Paco Rabanne Parfums</u>, 86 F.Supp.2d 305, 321 - 322 (S.D.N.Y. 2000), *aff'd*, 234 F.3d 1262 (2nd Cir. 2000) (5% difference held insignificant and 14.5% difference described as "low"); <u>Wuv's International, Inc. v. Love's Enterprises, Inc.</u>, 1980 WL 30296 (D. Colo. 1980) (9% difference does not support likelihood of confusion); <u>Steak Umm Co., LLC v. Steak 'Em Up, Inc.</u>, 868 F. Supp. 2d 415, 429  (E.D. Pa. 2012) (12.9% difference insufficient to prove likelihood of confusion).

### 2.    Dr. Jay testified that an 8% difference was "effectively neutral."

The Field survey's third primary question produced an 8% difference between test and control groups. [ER Vol. II, 385 – 386] Dr. Jay testified that that 8% difference between the test and control groups was "effectively neutral." [ER Vol. III, 285] If an 8% difference is "effectively neutral" for the third question, then a 7% difference is also "effectively neutral" for the first.

### 3.    The Avela neck label was persuasive as to source.

While 9% of the test group responded that Marley made or put out the accused Marley T-shirt, 17% of the test group answered (correctly) that Avela "made or put out" the shirt. In the control group, without the image of Marley providing a ready cue for a guess that Marley made or put out the shirt, 22% of the

respondents also answered that Avela made or put out the control T-shirt. [ER Vol. III, 383 – 384] These results suggest that the Avela neck labels on the test and control T-shirts were somewhat persuasive, but that the presence of a celebrity image on the test T-shirt causes some respondents to guess that the celebrity depicted is the source of the shirt.

### 4.    The first primary question is vague and ambiguous.

The most striking result evident from the test group responses to the first primary question are that 91% of the survey respondents did not believe Marley was the source of the accused Marley T-shirt. Indeed, Marley wasn't even one of the dominant responses. Hot Topic and Spencer's were identified as many times as Marley, don't know / no answer was the single most common response at 29% of respondents, and various mass market retailers and clothing manufacturers claimed another 31% of the responses. [ER Vol. III, 383 - 384]

Control group results followed a very similar pattern. The overwhelming majority of the respondents – 98% -- did not identify Marley as the source of the accused Marley T-shirt. At the same time Avela, don't know / no answer, and various retailers and clothing manufacturers were the three dominant selections as the source, with 22%, 34% and 39% of the total responses respectively. [ER Vol. III, 383 - 384]

These results are strong evidence that the first primary question is vague and ambiguous rather than a tool for measuring confusion as to the origin of the accused Marley T-shirts. The terminology "made or put out" is very broad.[3] Additionally, there are at least four separate answer cues on both the test and control T-shirts: the image; the Avela neck label; the copyright mark adjacent to the Roberto Rabanne signature; and the neck label reference to the designs as the property of X One X. [ER Vol. III, 374 - 375] Finally, all respondents apparently were frequent shoppers, as they were interviewed in malls and were not eligible to participate in the survey unless they planned to buy a graphic T-shirt from a mass market retailer (Target, Walmart or Wet Seal) in the next six months. [ER Vol. III, 377 - 378] When these factors interact among respondents who don't actually know and therefore must necessarily guess at "who made or put out" the T-shirt, the result should be a large number of "don't knows" along with guesses corresponding to the visual cues available, and to the respondents' own retail experience. This is exactly the pattern demonstrated by the answers to the first primary question in both test and control groups.

_____

[3] Dr. Jay never explained why the survey does not use instead the term "origin" which is actually part of §1125(a), and which has been held by the unanimous U.S. Supreme Court to mean "the producer of the tangible product sold in the marketplace." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 31, 123 S. Ct. 2041, 2047 (2003).

The 7% difference between test and control group responses to the first primary question of the Field survey is not significant according to the survey's own designer. The question itself is ambiguous, and was not phrased using the statutory term "origin" or its judicially established meaning in §1125(a). The jury's finding that a likelihood of confusion existed gains no support from the responses to the first primary question.

### C. The Second Primary Question Produced No Results That Are Substantial Evidence Of A Likelihood Of Confusion

The Field survey's second primary question was "who do you think gave their permission or approval for this particular T-shirt to be made or put out?" This question was asked only to the 59% (151) of the test group and 41% (104) of the control group who had confirmed their belief that permission is necessary to use any person's image. [ER Vol. III, 384 - 385] [4]

37% (94) of all 256 test group respondents answered that Bob Marley or "the person on the shirt" gave permission or approval, while only 20% (51) of all 253 control group respondents responded similarly. This 17% difference between

---

[4] The number of remaining respondents after screening was determined by counting the respondent code numbers in Survey Appendices F and J for question 2b [ER Vol. III, 469 – 476, 506 – 510], as the percentages shown in Survey Table 4 add up to 102% and 104% for the test and control groups, respectively. [ER Vol. III, 384 – 385]

test and control group responses is the principal evidence on which Dr. Jay based her opinion that there was a likelihood of consumer confusion as to sponsorship or approval by plaintiffs because of the use of the Marley image on the accused Marley T-shirt. [ER Vol. III, 387 – 389]

Dr. Jay's conclusion was based on the factually unsupported assumption that, because Zion had nothing to do with producing, approving or sponsoring the accused test Marley T-shirt, a response that Marley or the person on the shirt gave permission or approval to make or put it out is incorrect, and an "incorrect response" is the same as "confusion." [ER Vol. III, 389] Dr. Jay's assumption that an incorrect response of "Marley" or "the person on the shirt" means confusion is refuted by the Field survey data. Review of the survey respondents' *verbatim* responses and the reasons for them shows that the supposedly confusion-indicating response that Marley or the person on the shirt gave permission is a statement about the respondents' legal beliefs concerning the legal requirements for use of a person's image, and not a statement reflecting confusion. Therefore, the 17% difference between test and control groups in response to the Field survey's second primary question is not substantial evidence of likelihood of confusion.

1.    **Survey questions phrased in terms of permission have often been rejected because such questions tend to generate respondents' legal conclusions.**

§1125(a) concerns confusion relating to "the origin, sponsorship, or approval" of goods, yet the second primary question asks about "permission or approval" of the test and control T-shirts. Use of the term "permission" was an error that ultimately made the responses to the second primary question irrelevant to consumer confusion.

District Judge Cooper observed over a decade ago that "[a] customer's assumption that large corporations get permission from families or estates before producing products is not evidence of actual confusion" and "[w]hether or not permission is necessary is a separate question from endorsement and sheds no light on whether the respondent believed the product was endorsed by the plaintiffs." Cairns v. Franklin Mint Co., 107 F.Supp.2d 1212, 1213 - 1214 (C.D. Cal. 2000), aff'd, 292 F.3d 1139 (9th Cir. 2002).

Judge Cooper's insight was correct. "Permission" is very different from approval, which means "to have or express a favorable opinion of" or "to view favorably." Webster's New Collegiate Dictionary, (G. & C. Merriam Co. 1979). "Permission" is also quite different than sponsoring, which means to "assume responsibility for some other person or thing." Id. In contrast, "permission" means

"formal consent or authorization" and suggests the need for a license, as "license" is defined as "permission to act." *Id*. Having a license or formal permission has nothing to do with having a favorable opinion, or assuming responsibility for another.

Several courts have held that questions about having permission or needing to get permission are leading, and have excluded the results of surveys using them. For example, in a case involving apparel allegedly infringing the trademarks of the Green Bay Packers football team, the survey respondents were asked "Do you think that, in order to put out this shirt, the company that put it out did need to get permission, did not need to get permission, or you have no thoughts about this?" This question was held to be leading because it requested the survey respondents to provide their legal conclusions, and the expert witness's entire survey was excluded from evidence. National Football League Properties, Inc. v. Prostyle, Inc., 16 F.Supp.2d 1012, 1018 (E.D. Wisc. 2004) (the court stating that it would not "accord trademark protection based upon the public's mistaken notion of the law. . ."); *cf.* Novo Nordisk of North America, Inc. v. Eli Lilly & Co., 1996 U.S. Dist. LEXIS 12807 (S.D.N.Y. Aug. 30, 1996) (survey rejected where respondents asked whether the maker "had to get authorization"); *see also,* Malletier v. Dooney & Bourke, Inc., 340 F.Supp.2d 415, 444 - 445 (S.D.N.Y. 2004), *rev'd on other grounds*, 79 USPQ 2d 1481 (2nd Cir. 2006) (responses to question "to come out

with this bag" the company "needed to get permission or a license from the company in the ad" rejected as evidence of actual confusion). The similarity of the questions rejected by these courts to the screening question in the Field survey is evident.

Even the leading case approving the use of the word "permission" in a consumer confusion survey cautions that questions containing the word often produce respondents' legal conclusions rather than respondents' interpretation of the message conveyed by the allegedly infringing use of the trademark, <u>Pebble Beach Co. v. Tour 18 I</u>, 155 F.3d 526, 544 (5th Cir. 1998):

> "The Plaintiffs' survey was conducted among golfers who had played a round of golf at Tour 18. Tour 18 argues that the survey was flawed because, by relying upon "permission," it created the possibility that those surveyed believed that permission was required, thereby skewing the result. But the survey asked whether Tour 18 "did get" or "did not get" permission to use the Plaintiffs' marks or to copy the Plaintiffs' golf holes. This question asks what message Tour 18's use of the Plaintiffs' marks and trade dress conveyed, rather than whether Tour 18 needed to get permission, which would focus on what those surveyed believed to be required. Although, this latter form is more problematic because it allows for the consumer's misunderstanding of the law, rather than the defendant's use the marks, to be the basis for his belief. . . ."

In this case there is no need for any abstract analysis to conclude that the pre-screened respondents to the second primary question were not interpreting any message sent by use of Marley's image on the accused test Marley T-shirt. On the contrary, the respondents believed they were being asked about the legal

- 22 -

requirements for use of a person's image and gave the interviewers their beliefs about the law. These responses are useless in assessing likelihood of confusion. The 17% difference generated by the structure of the survey itself is not evidence of likelihood of confusion.

> **2.      A large majority of respondents to the second primary question stated their personal beliefs regarding the legal requirements for use of a person's image.**

62% (58 of 94) of the test group respondents selecting Marley or "the person on the shirt" as the person who gave permission for the accused Marley T-shirt also expressly stated the need for permission to use any image, or referred to their beliefs about licensing, copyrights, patents, royalties, getting sued, and "the law" as the basis of their responses.[5] At least another 22 test group respondents not choosing Marley or the person on the shirt as the permission-giver also cited rights

---

[5] Appendix F, respondents 1001, 1005, 1006, 1008, 1011, 1012, 1013, 1023, 1027, 1031, 1036, 1038, 1041, 1042, 1043, 1045, 1048, 1053, 1057, 1060, 1061, 1062, 1070, 1080, 1081, 1087, 1090, 1111, 1128, 1130, 1132, 1134, 1138, 1140, 1145, 1148, 1153, 1157, 1162, 1169, 1175, 1180, 1195, 1196, 1201, 1206, 1208, 1218,1222, 1223, 1224, 1227, 1228, 1232, 1242, 1244, 1247 and 1251. [ER Vol. III, 469 – 476]

ownership, the need for permission generally, copyrights, and other legal reasons and conclusions as the basis for their responses.[6]

Typical reasons among those who selected Marley as the permission-giver include: "they have to have permission to put his face on the shirt" (1001); "Because he is on it" (1012); "Because if they didn't, they would probably get sued" (1031); "Because his picture is on the shirt" (1061); "I think that's a law, isn't it?" (1153); "Because it's illegal to use people's pictures without permission" (1195); "I'm sure there is a trademark and copyrights" (1251). (Survey Appendix F.) None of these responses even hint at confusion by respondents concerning sponsorship or approval of the accused Marley T-shirt by Zion.

This pattern was repeated by those in the test group who did not select Marley as the permission giver. [Appendix D, ER Vol. III, 448 – 457][7] Some examples include: "The patent owner. The law requires it." (1017); ". . . There is a copyright symbol. It's on the shirt." (1050); "The company that has the rights to this T-shirt." (1066); "The record company or whoever owns the rights to his marketing." (1086); "The company that owns this copyright image. I'm sure the

---

[6] Appendix F, respondents 1017, 1020, 1044, 1050, 1065, 1066, 1083, 1086, 1110, 1112, 1131, 1137, 1192, 1199, 1232, 1235, 1238, 1243, 1246, 1250, 1252 and 1255. [ER Vol. III, 469 - 476]

[7] By comparing all test group responses to the second primary question [ER Vol. III, 448 – 457] with those coded as selecting Marley as permission-giver [ER Vol. III, 469 – 476], it is possible to identify the responses of respondents not selecting Marley.

image is owned by someone, and they get permission from them." (1131); "The person on the shirt. Because his face is on it." (1180); "From the record company that produces his music. It's against the law to put out something that is not yours." (1243); and "Everyone needs permission. That's how it works." (1255). Overall, 80 of 151 test group respondents permitted to answer the second primary question gave their own legal conclusions or assumptions as their response or the reason for their response.

Similar results were generated in the control group. At least 32 of the 50 respondents (64%) selecting the person on the shirt or Marley as the permission-giver gave as the basis of their response legal reasons or their belief that all images of persons require permission to be used.[8] Typical responses include: "There is a copyright at the bottom" (2001); "they need to get permission from … the person whose picture is on the front" (2072); "Because his picture is on the shirt, so it's obvious they need his permission" (2099); "We live in litigious times." (2116); "Because he's on the T-shirt" (2131); "The person on the T-shirt . . . because that's what's legal." (2247). (Survey App. J). These responses are beliefs about the law, not statements of confusion.

---

[8] Appendix J, respondents 2001, 2003, 2006, 2009, 2015, 2022, 2057, 2071, 2072, 2073, 2082, 2091, 2103, 2106, 2116, 2123, 2125, 2130, 2131, 2133, 2144, 2145, 2164, 2180, 2185, 2195, 2199, 2203, 2208, 2236, 2238 and 2247. [ER Vol. III, 506 - 510]

As occurred in the test group, the control group respondents not selecting Marley or the person on the shirt as the permission-giver also gave their personal legal conclusions or assumptions as the reasons for their answers.[9] Some examples are: "It's a patented copyright design, so I think the federal government approved it. Because I see the copyright on it." (2054); "Probably whoever copyrighted the photographer." (2055); "Because there is a copyright logo at the bottom." (2114); "There's a copyright year and signature." (2158); "You can't sell anything without permission in the United States." (2170); "The X One X Movie Archive company. Looks like they have rights to all the graphics that A.V.E.L.A. would use on their T-shirts." (2194); and "It's the law." (2243). In total, at least 45 of 104 control group respondents specifically stated their own legal conclusions or assumptions as their answer or the basis for their answer.

The question presented by Zion's §1125(a) false endorsement claim was whether potential consumers were likely to be confused into believing that Marley, his heirs or someone acting on their behalf either viewed favorably ("approved") or were in some manner responsible for ("sponsored") the accused Marley T-shirt. These issues were not addressed by the second primary question of the Field survey. The *verbatim* responses demonstrate that the survey succeeded only in

---

[9] Appendix H, respondents 2054, 2055, 2084, 2089, 2114, 2134, 2158, 2170, 2188, 2194, 2201, 2243 and 2245. [ER Vol. III, 491 - 497]

eliciting the respondents' personal assumptions about the legal requirements for using a person's image on a product. The difference between test and control groups on this question is not probative of a likelihood of confusion and cannot support the jury's finding that such a likelihood existed as to approval or sponsorship of the accused Marley T-shirt. Because the results of the first primary question were also legally and factually insufficient to support the finding that there is a likelihood of confusion as to the origin of the accused Marley T-shirt, the jury's finding of likelihood of confusion should be vacated, and the judgment based upon it reversed.

## VIII. PLAINTIFFS HAVE NO FALSE ENDORSEMENT CLAIM UNDER 15 U.S.C. §1125(a) AND SHOULD NOT HAVE A CLAIM

### A. The Finding Of §1125(a) Liability At Trial Means That Plaintiffs Can Now Exclude All Others From Using Any Image Of Marley

The Field survey used one image of Bob Marley on the test T-shirt. There is no reason that a shopping mall survey conducted in exactly the same way but using other Marley images would not also produce the confusion evidence purportedly generated by the survey just examined.  Thus, if the finding of §1125(a) liability at trial is not reversed, plaintiffs will be able to exclude all others from using not just the handful of Marley images at issue in this action, but all images of Marley. This will be the result even though plaintiffs do not own registered trademarks, common

- 27 -

law trademarks, copyrights, or Nevada publicity rights in the Marley images at issue in this action,[10] and very likely do not have these rights in most Marley images. §1125(a) is not intended to be a statutory basis for obtaining a monopoly in the market for Marley merchandise, yet that will be the result if the jury's verdict stands.

## B.    Ninth Circuit Precedent Rejects Use Of §1125(a) As A Means Of Creating A Market Monopoly

In 1980 the Ninth Circuit rejected the claim that a trademark owner has the unlimited right to prevent use of its mark in all contexts. International Order of Job's Daughters v. Lindeburg & Co., 633 F.2d 912, 918 - 919 (9th Cir. 1980) (finding that defendant's use of a registered trademark as a functional part of its jewelry products did not infringe). This claim was rejected again in 2000, when District Judge Cooper ruled that §1125(a) may not be used to exclude all uses of a celebrity image, but instead only images that imply endorsement, Cairns v.

---

[10] The District Court ruled on February 25, 2010 that Zion had no trademark rights in the Marley images used by defendants, and granted defendants summary judgment on Zion's claims for federal and common law trademark infringement. Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 688 F. Supp. 2d 1148, 1160 (D. Nev. 2010) ("Plaintiffs did not use a single picture of Marley as a source indicator . . . .") See also, ER Vol. II, 129 – 163. The District Court subsequently ruled that Zion failed to timely register Marley's publicity rights under the Nevada publicity rights statute, and granted defendants summary judgment on Zion's state law right of publicity claim as well. [ER Vol. II, 163.1 – 163.2] Zion has never claimed copyrights in the Marley images used by defendants. [ER Vol. II, 176 – 187]

<u>Franklin Mint Co.</u>, 107 F.Supp.2d at1213 – 1214:

> "It is clear that not all uses of a celebrity's image are actionable under §1125(a). Only uses which suggest sponsorship or approval are prohibited. Unlike the broader right of publicity, which is infringed by the "unpermitted use of a person's identity" containing "no false inference that plaintiff endorses or approves the product," § 1125(a) prohibits only false endorsement, not mere use of an image or name. 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 28:14 (4th ed. 1996) (emphasis added). Indeed, "competitors may use a rival's trademark in advertising and other channels of communication if the use is not false or misleading." <u>New Kids on the Block v. News America Publishing, Inc.</u>, 971 F.2d 302, 307 (9th Cir. 1991); *see also* <u>Smith v. Chanel, Inc.</u> 402 F.2d 562, 563 (9th Cir. 1968) (use of a trademark to describe one's own product as a replica of the trademarked product does not constitute trademark infringement)."[11]

This court should follow these precedents here by reversing the jury's finding that a likelihood of confusion was created by use of the Avela Marley images on the accused Marley T-shirts.

## C.    There Is No Endorsement When There Is No Message, And There Is No Message When The Trademark Or The Celebrity Image Is Not Used In Connection With A Separate Product Or Service

As the Fifth Circuit Court of Appeal in <u>Pebble Beach</u> observed, a false endorsement or false association claim under §1125(a) requires that the

---

[11] The limits of §1125(a) have also been recognized by the Supreme Court, which refused to interpret the statute so that it would prevent the use of formerly copyrighted material now in the public domain through a claim under §1125(a) that proper attribution for the material was not given. <u>Dastar</u>, 539 U.S. 23 at 34.

defendant's use of the mark, in this case the image of Bob Marley, convey a message suggesting approval or sponsorship by the plaintiff. 155 F.3d at 544. In Pebble Beach, that message was conveyed by the defendant's extensive advertising and marketing efforts using plaintiff's trademarks in connection with defendant's replica hole golf course, *id*. at 535:

> "Tour 18 markets itself as 'America's Greatest 18 Holes.' It places advertisements in regional and national publications. In advertisements and promotional materials, Tour 18 identifies the golf holes that it has copied by using the trademarks of the original courses and refers to the golf holes by common nicknames like the 'Lighthouse Hole,' the 'Blue Monster,' and 'Amen Corner.' It uses the Plaintiffs' marks, 'Pebble Beach,' 'Pinehurst,' 'Harbour Town,' and depictions of the lighthouse, extensively in its advertisements and promotional materials. These materials regularly include pictures of Tour 18's replica lighthouse. The Tour 18 scorecard includes the Plaintiffs' marks to identify the replica golf holes. For example, "Pebble Beach 14" is printed next to the number 13. A picture of the replica lighthouse appears on the back of the scorecard. Tour 18's yardage guide has a picture of its replica lighthouse on the cover and contains descriptions of the golf holes and the history of each copied golf hole. Signage at each hole indicates the golf hole that has been copied and describes the original hole. The sign at the Harbour Town replica refers to it as 'The Lighthouse Hole.' Additionally, Tour 18 uses the Plaintiffs' marks on its menu at its restaurant, offering 'The Harbour Town' hamburger, 'The Pinehurst' tuna salad, and 'Pebble Beach' French toast."

The message of endorsement is sent by the juxtaposition of plaintiff's trademark and defendant's separate product or service, so that the trademark is used in connection with the product or service to suggest plaintiff as its source, approver, or sponsor. Every published §1125(a) false endorsement decision finding

- 30 -

liability or the potential for liability, except the one now appealed, features exactly this juxtaposition. Without it there is no message sent about approval or sponsorship and no §1125(a) claim. *See, e.g.,* <u>Wendt v. Host International, Inc.</u>, 125 F.3d 806, 812 (9th Cir. 1997) (use of figures recognizable as actors on a popular television show associated with defendant's chain of airport bars); <u>Abdul-Jabbar v. General Motors Corp.</u>, 85 F.3d 407, 410 (9th Cir. 1992) (use of Abdul-Jabbar's former name in automobile commercial); <u>Waits v. Frito-Lay, Inc.</u>, 978 F.2d 1093, 1110 (9th Cir. 1992) (Tom Waits' distinctive voice used in Fritos commercial); <u>White v. Samsung Electronics America, Inc.</u>, 971 F.2d 1395, 1399 (9th Cir. 1992) (use of robotic wheel turning figure suggesting Wheel of Fortune's Vanna White in connection with VCR commercial); <u>Parks v. LaFace Records</u>, 329 F.3d 437, 441 (6th Cir. 2003) (use of Rosa Park's name as a song title and as a sticker on CD cover when sold); <u>Facenda v. N.F.L. Films, Inc.</u>, 542 F.3d 1007, 1011 (3rd Cir. 2008) (use of announcer's distinctive voice in connection with marketing Madden NFL football video game); <u>Motown Record Corp. George A. Hormel & Co.</u>, 657 F.Supp. 1236, 1241 (C.D. Cal. 1987) (female singers resembling Supremes and singing Supremes hit "Baby Love" used in beef stew commercial); <u>Allen v. National Video, Inc.</u>, 610 F.Supp. 612, 626 (S.D.N.Y. 1985) (use of double for famous comedian in commercial for defendant's video rental card).

Conversely, cases in which the celebrity image or trademark is part of the product rather than used to promote a separate product – except this one – have found no basis for §1125(a) liability. In <u>Pirone v. MacMillan, Inc.</u>, 894 F.2d 579 (2nd Cir. 1990), one of Babe Ruth's heirs sought to impose §1125(a) liability on the maker of a calendar incorporating images of a dozen baseball stars of the past, including Ruth. The Court of Appeal rejected that attempt, finding that the images were descriptive of the product rather than indicators of origin, 894 F.2d at 584:

> "Pirone's unfair competition claim is broader, since Section 43(a) is violated by the use of any "symbol" as a "false designation of origin" or as any "false representation," whether or not a registered trademark is involved. 15 U.S.C. § 1125(a). While these pictures of Ruth are in a sense symbols, they in no way indicate origin or represent sponsorship.
>
> Photographs of baseball, its players and assorted memorabilia, are the subject matter of the calendar. The pictures of Ruth no more indicate origin than does the back cover's picture of Jackie Robinson stealing home plate. Both covers are merely descriptive of the calendar's subject matter. In neither case would any consumer reasonably believe that Ruth or Robinson sponsored the calendar. Instead, the photographs identify great ballplayers and by so doing indicate the contents of the calendar, not its source."

Similarly, the accused Marley T-shirts identify a great musician, and by doing so indicate the contents of the accused Marley T-shirts rather than sponsor or source.

The Ninth Circuit in <u>Job's Daughters</u>, 633 F.2d at 917, reached the same result as <u>Pirone</u>, finding that the use of a decorative registered trademark as a

functional part of some of defendant's jewelry products was not a trademark use

suggesting source, and thus a non-infringing use. Plaintiff's §1125(a) claim was

dismissed. The court explained its reasoning in terms very similar to the Second

Circuit in Pirone by noting that defendant's jewelry, just like the Babe Ruth

calendar, was the "actual benefit that the consumer wishes to purchase":

> "In general, trademark law is concerned only with identification of the maker, sponsor, or endorser of the product so as to avoid confusing consumers. Trademark law does not prevent a person from copying so-called "functional" features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product."

Obviously, the accused Marley T-shirts relevant to this case were also the "actual

benefit" purchased by consumers.

And finally, in Cairns v. Franklin Mint Co., 292 F.3d 1139, 1149 – 1150 (9th

Cir. 2002), this court held that images of Princess Diana incorporated into a wide

variety of defendant's memorabilia products did not indicate origin, sponsorship or

endorsement and dismissed plaintiff's §1125(a) claim. While the court did not use

the "functionality" or "actual benefit" language of Pirone or Job's Daughters, it

quite easily could have done so as the relevant factual circumstances were

identical.

 Factually, this case is identical to Cairns, Pirone and Job's Daughters. The

Marley images were not being used to advertise or market some other product or

service of defendants, or the retail store in which the accused Marley T-shirts were sold, or the brands of blank T-shirts upon which the Marley images were printed. The Marley images *were* the product -- the "actual benefit" -- the consumers wanted to purchase rather than a product purchased because it suggested any specific origin or sponsorship. The accused Marley T-shirts were no more suggestive of origin, approval or endorsement than the jewelry items in <u>Job's Daughters</u>, the Babe Ruth calendar in <u>Pirone</u>, or the memorabilia in <u>Cairns</u>. The legal result here should follow those precedents, and the judgment in plaintiffs' favor on their §1125(a) claim should be reversed.

### D. The Sea Of Marley Merchandise Available From Many Sources Means That No Reasonable Consumer Will Be Confused That Plaintiffs Are The Source Of All Of It

This court is permitted to draw legal lines limiting the scope of an §1125(a) claim. An excellent factual reason for the court to draw a bright legal line here is that the T-shirt, knick-knack and memorabilia market is already a sea of merchandise bearing the Marley name, Marley images, and other aspects of the Marley *persona*. There is no possibility that any adult consumer of Marley merchandise could reasonably believe that it all is produced, approved or sponsored by Marley or by Zion. Any such belief would be unreasonable, not reasonable.

Zion presented evidence at trial that it has made vigorous efforts to prevent others from using Marley's image and name for any purpose, whether Zion had any colorable claim or not. Zion's exhibits 390, 391 and 393 contain over 400 cease and desist letters sent over a 20 year period from Zion's attorneys to all manner of persons, businesses and public entities, and demanding the cessation of dozens of uses of the Marley name or image. At least 120 of those letters specifically reference unauthorized Marley T-shirts as an offending product. [ER Vol. III, 511 – 527.24] While Zion did not offer it as such, these exhibits are solid evidence of the enormous quantity of Marley-themed goods and services, and especially Marley T-shirts, in the marketplace that did not originate with Zion over a period of two decades. There is no reason to believe that time periods after Marley's death but not within the years covered by Zion's letter-writing campaign had any less unauthorized Marley product available to the consumer.

Zion's owner Michael Conley also testified to the enormous quantity of bootleg Marley product available. [ER Vol. II, 279.1 – 279.2] Conley p. 187 – 1/7/2012) Mr. Conley then explained that the distinguishing feature of the Zion's official Marley product is the Zion legal line and Zion tag on each of its Marley T-shirts, which serve to identify the shirts as officially licensed products. [ER Vol. II, 278 – 279] Plainly the legal line and tag are needed because Zion's official Marley T-shirts are indistinguishable to the consumer from any other supplier's unofficial

Marley T-shirts and none of the shirts – in contrast with the tags and labels on them – is sending any message about its source or sponsor.

This Court addressed exactly the same factual situation present here in Cairns, 292 F.3d at 1149 – 1150, and held that in a marketplace long full of Princess Diana merchandise from many sources, the defendant's incorporation of Diana's image into a variety of memorabilia products could not possibly cause consumers to incorrectly believe that Diana's heirs were the source of the Franklin Mint's Princess Diana merchandise:

> "Under the law of false endorsement, likelihood of customer confusion is the determinative issue. *See Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997) ("'Likelihood of Confusion' is the basic test for … trademark infringement."). Between 1981 and 1997, many products, including some that were largely indistinguishable from Franklin Mint products, bore the name and likeness of Princess Diana, who neither endorsed nor objected to any of these products[12]. Consumers, therefore, had no reason to believe Franklin Mint's Diana-related products were endorsed by the Princess. *This did not change when, following Princess Diana's death in 1997, the Fund endorsed approximately twenty products - but not Franklin Mint's - amidst a flood of unendorsed Diana-related memorabilia. Under these circumstances,*

---

[12] The District Court incorrectly considered Diana's failure to object to the use of her image prior to death as a significant factor relating to whether a message of source or sponsorship would be communicated by the use. [ER Vol. II, 16] In fact, Diana's vociferous objection, or failure to object at all, is unrelated to the message sent by the use of her image. The typical consumer of Diana memorabilia will have no knowledge concerning the enforcement or lack of enforcement of Diana's rights relating to her *persona*.

*there was no likelihood of confusion as to the origin of Franklin Mint's Diana-related products*." (italics added)

The above holding is directly on point here. No reasonable consumer is likely to assume that all Marley images and product originate from Zion, or are approved by, sponsored by or associated with Zion. There are too many sources and too much merchandise. In the commercial circumstances that actually exist, Zion does not have, and should not have, a §1125(a) false endorsement claim based on others' use of Marley images in which Zion has no trademark, copyright or publicity rights, and when the images are not being used to market or advertise products or services products or services separate from the images. The finding of §1125(a) liability against defendants should be vacated, and the judgment below reversed.

## IX.  THERE IS NO SUBSTANTIAL EVIDENCE THAT JEM WILLFULLY INFRINGED THE MARLEY *PERSONA*

Zion's claim that Jem caused it damages by interfering with its prospective economic advantage was rejected by the jury. [ER Vol. I, 32 – 39] Under Ninth Circuit precedent, in order to obtain disgorgement of Jem's profits earned by sale of the accused Marley T-shirts in this no damages case, Zion is required to demonstrate that Jem's infringement was willful. Adry v. Adry-Mart, Inc., 68 F.3d 362 (9th Cir. 1995), *as amended*, 76 F.3d 984, 988 (9th Cir. 1986); Lindy Pen Co. v. Bic Pen Co., 982 F.2d 1400, 1405 - 1409 (9th Cir. 1993).

Regarding willfulness, the jury was instructed as follows:

If you find that Defendants unfairly competed with Plaintiffs' rights to Bob Marley's identity or persona, you also must determine whether each Defendant did so willfully. Plaintiffs have the burden of proving willfulness by a preponderance of the evidence. Willful unfair competition carries a connotation of a deliberate intent to deceive. You therefore must determine whether each Defendant used Bob Marley's persona or identity intentionally, knowing it was likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association between Plaintiffs and Defendants, or to cause confusion as to Plaintiffs' participation in the origin, sponsorship, or approval of Defendants' goods or commercial activities with Plaintiffs.

A Defendant's knowledge may be proven by showing that Defendant was willfully blind. A Defendant is willfully blind if it suspects wrongdoing and deliberately fails to investigate or inquire further. Willful blindness may be inferred from the facts and circumstances of the case. [ER Vol. II, 329.1 – 329.2]

The jury's finding that Jem acted willfully in any of its meanings permitted in this instruction was not supported by substantial evidence.

## A.    There Was No Evidence That Jem Knew Of Or Exploited Any Consumer Confusion

The first meaning of "willful" in the jury instruction given is the intentional use of Marley's *persona*, "knowing it was likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association between Plaintiffs and Defendants, or to cause confusion as to Plaintiffs' participation in the origin, sponsorship, or approval of Defendants' goods or commercial activities with Plaintiffs." There is no question that Jem intentionally used the Marley

- 38 -

*persona* pursuant to the rights to do so that it licensed from Avela. There is also no question that Jem had no knowledge of any purported confusion that its licensed use of the Marley *persona* might by causing in the marketplace.

Plaintiffs' first bit of evidence at trial of actual or potential confusion was the telephone call received by Doreen Crujeiras from her friend Tracy Secora [ER Vol. II, 188 - 190], who asked Crujeiras if plaintiffs sold to Target. Even assuming the telephone call as described by Crujeiras is evidence of consumer confusion, deception or mistake, no evidence was presented that Jem had any knowledge of this call at any time during which it sold its licensed Marley T-shirts.

Plaintiffs' primary evidence of consumer confusion was the Field survey. [ER Vol. III, 366 – 510] The Field survey is useless as a measure of confusion because it elicited responses conveying the respondents' views of the legal requirements for use of a person's image instead of respondents' confusion as to origin, approval or sponsorship of the accused Marley T-shirts. Even if the Field survey had actually measured consumer confusion as claimed, no evidence was presented at trial that Jem had any knowledge of the Field survey or its results during any time in which Jem was selling the accused Marley T-shirts. Moreover, no evidence was presented at trial that Jem even knew that plaintiffs existed or sold products of any kind, Jem V.P. of Marketing and Licensing Randi Speiker testified

that she had never heard of plaintiffs during more than eight years in the apparel industry. [ER Vol. II, 326 – 327]

If the jury found that Jem willfully infringed because Jem sold its licensed Marley T-shirts, knowing that doing so was causing confusion, mistake or deception in the marketplace, then the jury's finding is not supported by any evidence and must be vacated.

The second basis in the jury instruction given for the jury to find that Jem willfully infringed is that Jem acted with "willful blindness," because it suspected wrongdoing and deliberately failed to investigate or inquire further. The evidence presented relevant to this issue is also manifestly insufficient to support the finding that Jem was "willfully blind."

## B.    Jem Was Entitled To Rely On Indemnity From Avela Without Being Found To Be A Willful Infringer

"[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." Global-Tech Appliances, Inc., v. SEB S.A., 131 S. Ct. 2060, 179 L. Ed. 2d 1167, 1179 (2011); Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013, 1043 (C.D. Cal. 2011). Willful blindness has two components: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to

avoid learning of that fact." <u>Rambus Inc. v. Nvidia Corp.</u>, 2011 U.S. Dist. LEXIS 156378*36, *citing*, <u>Global-Tech Appliances</u>, 131 S.Ct. at 2070. "Willful blindness" is a very high standard that, with regard to Jem, the evidence presented at trial completely fails to establish.

> **1.    The information known to Jem was insufficient to put Jem on notice that a high probability existed that the Marley rights it licensed from Avela infringed Zion's rights, and there is no evidence that Jem deliberately avoided confirming that the Zion's rights were infringed.**

Jem's trial witness Speiker testified that she received one inquiry from Wet Seal about rights to the Marley images, which she referred to Avela and its owner, Valencia. Such inquiries are not uncommon, and Speiker recalled 8 to 10 such inquiries regarding various products during her employment at Jem. [ER Vol. II, 302, 323 – 324, 329] A single inquiry in a business in which inquiries are not uncommon falls far short of type of evidence required to demonstrate that Jem should have suspected a high probability of the invalidity of the Marley rights Jem licensed from Avela.

For example, in <u>Global-Tech Appliances</u>, 179 L.Ed.2d at 1179, the Supreme Court found that an inventor's failure to disclose to a patent attorney from whom he sought a "right to use" opinion that the product at issue was a duplicate of a

competitor's successful and patented product was strong evidence of a high probability that the inventor suspected that the product would infringe the competitor's patent. The <u>Global-Tech</u> standard for "high probability" is very high, and there is no evidence suggesting that Jem's actions in connection with the accused Marley T-shirts came remotely close to satisfying that standard.

Actual knowledge by a swap meet owner of vendors' sales of counterfeit CDs based on two raids by the County Sheriff and a follow-up notice letter was found sufficient to establish willful blindness in <u>Fonovisa, Inc. v. Cherry Auction, Inc.</u>, 76 F.3d 259, 265 (9th Cir. 1996). No evidence like that found sufficient in <u>Fonovisa</u> was presented against Jem at the trial of this action. Specifically, there was no evidence that Jem had actual knowledge at any time that the rights it licensed from Avela were in any way deficient.

At most Jem had notice based on the Wet Seal inquiry that there might be an undefined claim of some type, by someone, relating to Jem's Marley T-shirts produced using the images licensed from Avela. Generalized non-specific knowledge of this nature is insufficient to support a finding of willful blindness. <u>Tiffany (NJ) Inc. v. eBay, Inc.</u>, 600 F.3d 93, 109 – 110 (2nd Cir. 2010) (generalized knowledge that counterfeit goods were sometimes sold via eBay does not prove willful blindness, and court noting that "willful blindness is equivalent to actual knowledge for purposes of the Lanham Act").

The other part of the trial evidence relating to whether Jem was willfully blind was Speiker's testimony regarding Avela's agreement to indemnify Jem if the licensed Marley rights were the subject of claims. Speiker testified that Jem did rely on its right to indemnity. [ER Vol. II, 309 - 314] Each other industry witness testified that their companies also relied on indemnity from their vendors or licensors. These industry witnesses were Freeze's Vice President of Licensing Kim Cauley, Avela licensee Jacob Goldsner from JGR Copa, Ecko Vice President Stephen Fefferman, and Target buyer Heather Vogel. [*See,* ER Vol. II 293 – 294, 297 – 299; 191 – 195; 280 – 281; 283 – 287] Reliance on indemnity clauses from licensors and vendors is, at the least, a widespread practice and likely standard practice. Jem's reliance on Avela's indemnity did not impart to Jem any subjective knowledge that a high probability existed that Jem's licensed Marley rights were invalid or that Jem's use of the licensed images infringed plaintiffs' rights. Jem's reliance also did not amount to a deliberate avoidance of pertinent fact-finding; it merely transferred the fact-finding to Avela.

There was no substantial evidence at trial that would support the jury's finding that Jem intentionally used the Marley *persona* to deceive consumers, or that Jem was willfully blind to obvious deficiencies in the rights it licensed from Avela. The jury's finding of willful infringement should be reversed, and the case remanded to the District Court for further proceedings to determine whether Jem

may be ordered to disgorge profits earned absent evidence of any willful infringement.

## X.    CONCLUSION AND SUMMARY OF REQUESTED RELIEF

Jem respectfully requests the court to vacate the jury's finding that Jem's use of the Avela-licensed Marley images on the accused Marley T-shirts created a likelihood of confusion as to the origin, approval or sponsorship of the T-shirts by Bob Marley or Zion. Because the judgment on Zion's 15 U.S.C. §1125(a) claim against Jem cannot be upheld absent a finding of likelihood of confusion, Jem further requests that the court reverse the judgment and enter judgment in favor of Jem on Zion's 15 U.S.C. §1125(a) claim.

Jem also requests that the court find that where, as here, Zion owns no rights to the Marley images at issue and those images were not used in association with or to suggest endorsement of a product or service separate from the accused Marley T-shirts, no claim exists in Zion's favor under 15 U.S.C. §1125(a).

Finally, should the court affirm the judgment on Zion's 15 U.S.C. §1125(a) claim, Jem requests that the court vacate the jury's finding that Jem's infringement of plaintiffs' rights was willful, and remand the action to the District Court for further proceedings to determine whether Jem must disgorge the net profits it

earned by sale of the accused Marley T-shirts even though Jem's infringement was not willful.

## XI.    CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief uses a proportional typeface and 14-point font, and contains 10,816 words.


DATED:  March 21, 2013            GREENBERG & BASS LLP
                                  A Registered Limited Liability Partnership

                                  By:  s/    John R. Yates
                                       JOHN R. YATES
                                       Attorneys for Defendant and Appellant
                                       Jem Sportswear, Inc.

## XII.  STATEMENT OF RELATED CASES

Jem is not aware of cases pending in this court that would be deemed related pursuant to Ninth Circuit Rule 28-2.6.

DATED:  March 21, 2013                GREENBERG & BASS LLP
                                      A Registered Limited Liability Partnership


                                      By:  s/    John R. Yates
                                           JOHN R. YATES
                                           Attorneys for Defendant and Appellant
                                           Jem Sportswear, Inc.

ADDENDUM

## ADDENDUM: TEXT OF 15 U.S.C. §1125(a)

**15 USC § 1125 - False designations of origin, false descriptions, and dilution forbidden**

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(2) As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

(3) In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

# CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


s/          Kirstin Largent