CONSOLIDATED CASE NOS. 12-17502 AND 13-15407

IN THE

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

FIFTY-SIX HOPE MUSIC ROAD, LTD., A BAHAMIAN CORPORATION, and
ZION ROOTSWEAR, LLC, A FLORIDA LIMITED LIABILITY COMPANY

Plaintiffs-Appellees-Cross-Appellants

v.

A.V.E.L.A., Inc. d/b/a/ ART & VINTAGE ENTERTAINMENT LICENSING
AGENCY, X ONE X MOVIE ARCHIVE, INC., CENTRAL MILLS, INC., and
LEO VALENCIA

Defendants-Cross-Appellants-Appellees

_____

APPEAL FROM THE UNITED STATES DISTIRCT COURT FOR THE
DISTRICT OF NEVADA
HON. PHILIP M. PRO, CASE NO. 2:08-CV-00105-PMP-GWF

_____

**BRIEF OF DEFENDANTS-CROSS-APPELLANTS-APPELLEES
A.V.E.L.A., INC., AND X ONE X MOVIE ARCHIVE, INC., AND
CENTRAL MILLS, INC., AND LEO VALENCIA**

_____

MELISSA W. WOO
2647 GATEWAY ROAD, SUITE 105-550
CARLSBAD, CA 92009
TELEPHONE: 877-787-4855
FACSIMILE: 877-787-6855

ATTORNEY FOR DEFENDANTS-CROSS-APPELLANTS-APPELLEES

## CORPORATE DISCLOSURE STATEMENT

[F.R.A.P. 26.1]

Defendant-Cross-Appellant-Appellee A.V.E.L.A., Inc. hereby certifies pursuant to Fed. R. 26.1 that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## CORPORATE DISCLOSURE STATEMENT

[F.R.A.P. 26.1]

Defendant-Cross-Appellant-Appellee X One X Movie Archive, Inc. hereby certifies pursuant to Fed. R. 26.1 that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## CORPORATE DISCLOSURE STATEMENT

[F.R.A.P. 26.1]

Defendant-Cross-Appellant-Appellee Central Mills, Inc. hereby certifies pursuant to Fed. R. 26.1 that it has no parent corporation and no publicly held corporation owns 10% or more of its stock

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................III

JURISDICTIONAL STATEMENT ..................................................... 1

INTRODUCTION ............................................................................. 5

STATEMENT OF FACTS................................................................. 7

  A.  THE PARTIES ....................................................................... 7

  B.  PROCEDURAL HISTORY ..................................................... 8

  C.  FACTUAL BACKGROUND.................................................. 11

STANDARD OF REVIEW ............................................................. 13

ARGUMENT................................................................................. 15

  A.  PLAINTIFFS DO NOT HAVE A VIABLE FALSE ENDORSEMENT CLAIM............. 15

    1.  *Plaintiffs Do Not Have A Legally Protectable Mark In Each and Every Image of Marley* .............................................................. 15

    2.  *Plaintiffs Cannot Demonstrate that Use of their Mark Was Likely to Cause Confusion Concerning Plaintiff's Sponsorship or Approval of Those Goods.* 18

    3.  *Defendants' Products Do Not Communicate an Endorsement*.................. 20

  B.  THE JUDGMENT OVEREXTENDS THE PARAMETERS OF A FALSE ENDORSEMENT CLAIM IN A MANNER NOT INTENDED BY CONGRESS........................................... 23

C.  DEFENDANTS' USE OF BOB MARLEY'S IMAGE IS PROTECTED BY THE FIRST AMENDMENT ...................................................... 28

D.  DEFENDANTS' USE OF BOB MARLEY IS AESTHETICALLY FUNCTIONAL......... 35

E.  PLAINTIFFS' LANHAM ACT CLAIM CONFLICTS WITH THE COPYRIGHT ACT ... 38

F.  THERE WAS INSUFFICIENT EVIDENCE IN THE RECORD TO SUBSTANTIATE ANY FINDING THAT AVELA DEFENDANTS INTERFERED WITH PLAINTIFFS' PROSPECTIVE ECONOMIC ADVANTAGE ................................................. 42

G.  THE DISTRICT COURT ERRED BY NOT PERMITTING AVELA DEFENDANTS TO DEDUCT CERTAIN EXPENSES IN DETERMINING ITS NET PROFITS ......................... 47

H.  THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING DEFENDANTS' MOTION FOR LEAVE TO REOPEN DISCOVERY ....................................................... 49

I.  THERE IS INSUFFICIENT EVIDENCE TO DEMONSTRATE THAT FREEZE WILLFULLY INFRINGED ON MARLEY'S INTELLECTUAL PROPERTY RIGHTS.......... 52

J.  THE DISTRICT ABUSED ITS DISCRETION IN AWARDING ATTORNEY'S FEES TO PLAINTIFFS ...................................................... 54

**CONCLUSION** ...................................................... **59**

# TABLE OF AUTHORITIES

## CASES

*Abdul-Jabbar v. General Motors Corp.*,

    85 F.3d 407 (9th Cir. 1996) ........................................................................ 20

*Allen v. Nat'l Video, Inc.*,

    610 F. Supp. 612 (S.D.N.Y. 1985) ............................................................. 24

*ALPO Petfoods, Inc. v. Ralston Purina Co.,*

    913 F.2d 958 (D.C. Cir.1990)..................................................................... 52

*Armstrong v. Eagle Rock Entm't, Inc.*,

    655 F. Supp. 2d 779 (E.D. Mich. 2009) ............................................... 39, 41

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,

    457 F.3d 1062 (9th Cir. 2006).................................................................... 36

*Bally Technologies, Inc. v. Bus. Intelligence Sys. Solutions, Inc.*,

    2:10-CV-00440-PMP, 2012 WL 3656498 (D. Nev. Aug. 23, 2012) ........... 43

*Blockbuster Videos, Inc. v. City of Tempe*,

    141 F.3d 1295 (9th Cir. 1998).................................................................... 58

*Cairns v. Franklin Mint Co.*,

    292 F.3d 1139 (9th Cir. 2002)............................................................... 21, 27

*Cairns, et al. v. Franklin Mint*,

    107 F. Supp. 2d 1212 (C.D. Cal. 2000)................................................ 21, 22

iii

*Cairns, et al. v. Franklin Mint*,

    24 F. Supp. 2d 1013 (C.D. Cal. 1998) .............................................. 21, 23, 55

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,

    95 F.3d 959 (10th Cir. 1996) ......................................................... 35

*Chance v. Pac-Tel Teletrac Inc.*,

    242 F.3d 1151 (9th Cir. 2001) ....................................................... 14

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,

    696 F.3d 206 (2d Cir. 2012) .......................................................... 36

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,

    259 F.3d 1186 (9th Cir. 2001) ....................................................... 14

*Crockett v. Sahara Realty Corp.*,

    95 Nev. 197 (1979) ...................................................................... 43

*Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*,

    254 F. Supp. 2d 1173 (D. Nev. 2003).......................................... 42, 43

*DaStar Corp. v. Twentieth Century Fox Film Corp.*,

    539 U.S. 23, 33, 123 S. Ct. 2041, 2047, 156 L. Ed. 2d 18 (2003)..... 38, 39, 41

*Davila v. Perelman*,

    112 F.3d 515 (9th Cir. 1990) ......................................................... 13

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*,

    547 F.3d 1095 (9th Cir. 2008) ....................................................... 33

*Earthquake Sound Corp. v. Bumper Indus.*,

    352 F.3d 1210 (9th Cir. 2003) ......................................................... 55

*Ellison v. Robertson*,

    357 F.3d 1072 (9th Cir. 2004) ....................................................... 13

*Estate of Presley v. Russen*,

    513 F.Supp. 1339 (D.N.J. 1981) ................................................... 16

*ETW Corp. v. Jireh Publ'g, Inc.*,

    332 F.3d 915 (6th Cir. 2003) ................................. 16, 18, 21, 26, 27, 30, 32, 39

*Facenda v. N.F.L. Films, Inc.,*

    542 F.3d 1007 (3d Cir. 2008) ....................................................... 15

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,

    688 F. Supp. 2d 1148 (D. Nev. 2010) ............................................ 33

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,

    CV 06-6229 ABC (MANx) (C. D. Cal., Nov. 14, 2012) .............................. 36

*Gaudiya Vaishnava Soc'y v. City & County of San Francisco,*

    952 F.2d 1059 (9th Cir. 1991) ....................................................... 30

*Hangarter v. Provident Life and Accident Ins. Co.,*

    373 F.3d 998 (9th Cir. 2004) ......................................................... 13

*Hebrew Univ. of Jerusalem v. Gen. Motors LLC,*

    CV10-03790 AHM JCX, 2012 WL 4868003 (C.D. Cal. Oct. 15, 2012) ........ 34

*Hoffman v. Capital Cities/ABC, Inc.,*

    255 F.3d 1180 (9th Cir. 2001)........................................................... 30

*Hudson v. Universal Studios, Inc.,*

    04 CIV 6997(GEL), 2008 WL 4701488 (S.D.N.Y. Oct. 23, 2008)............... 40

*In re Elvis Presley Enters. Inc.,*

    50 U.S.P.Q.2d 1632 (T.T.A.B. 1999) ............................................. 16

*International Order of Job's Daughters v. Lindeburg & Co.,*

    633 F.2d 912 (9th Cir. 1980).......................................... 31, 35, 36

*Juicy Couture, Inc. v. L'Oreal USA, Inc.,*

    No. 04 Civ. 7203, 2006 WL 1012939 (S.N.D.Y April 19, 2006).................. 30

*Lancer Ins. Co. v. D.W. Ferguson & Associates,*

    46 F.3d 1142 (9th Cir. 1995).......................................... 42, 44

*Landham v. Lewis Galoob Toys, Inc.,*

    227 F.3d 619 (6th Cir. 2000)........................................................ 28

*Leavitt v. Leisure Sports Inc.,*

    103 Nev. 81 (1987) ....................................................................... 42

*Lindy Pen Co., Inc. v. Bic Pen Corp.,*

    982 F.2d 1400 (9th Cir. 1993)................................................... 14, 52

*Maier Brewing Co. v. Fleischmann Distilling Corp.,*

    390 F.2d 117 (9th Cir. 1968)........................................................... 58

*Mathews v. Chevron Corp.*,

    362 F.3d 1172 (9th Cir. 2004) ........................................................ 13

*Mattel, Inc. v. MCA Records, Inc.*,

    296 F.3d 894 (9th Cir. 2002) ................................................... 32, 33

*Michael Grecco Photography, Inc. v. Everett Collection, Inc.*,

    589 F. Supp. 2d 375 (S.D.N.Y. 2008) ........................................... 40

*Milton H. Greene Archives, Inc. v. Marilyn Monroe, LLC*,

    692 F.3d 983 (9th Cir. 2012) ........................................................ 26

*Panatronic SA v. AT&T Corp.*,

    287 F.3d 840 (9th Cir. 2002) ........................................................ 14

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,

    469 U.S. 189, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985) ................ 31

*Parks v. LaFace Records*,

    329 F.3d 437 (6th Cir. 2003) ................................................... 25, 27

*Pebble Beach Co. v. Tour 18 I, Ltd.*,

    155 F.3d 526 (5th Cir. 1998) ........................................................ 18

*Pirone v. MacMillan*,

    894 F.2d 579 (2d Cir. 1990) .................................................... 17, 21

*Qualitex Co. v. Jacobson Products Co., Inc.*,

    514 U.S. 159, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995) ............ 36

*Rogers v. Grimaldi,*

    875 F.2d 994 (2d Cir. 1989)........................................................ 30, 32

*SecuraComm Consulting, Inc. v. Securacom, Inc.,*

    166 F.3d 182 (3d Cir. 1999)............................................................. 53

*Shaw v. Lindheim,*

    919 F.2d 1353 (9th Cir. 1990)......................................................... 13

*Stephen W. Boney, Inc. v. Boney Services, Inc.,*

    127 F.3d 821 (9th Cir. 1997).......................................................... 14

*Suzy's Zoo v. Commissioner,*

    273 F.3d 875 (9th Cir. 2001).......................................................... 13

*Sybersound Records, Inc. v. UAV Corp.,*

    517 F.3d 1137 (9th Cir. 2008)......................................................... 38

*Syufy Enterprises v. American Multi-cinema, Inc.,*

    793 F.2d 990 (9th Cir. 1986).......................................................... 42

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.,*

    532 U.S. 23, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001) ................................ 36

*Transgo, Inc. v. Ajac Transmission Parts Corp.,*

    768 F.2d 1001 (9th Cir. 1985)......................................................... 55

*Waits v. Frito-Lay, Inc.,*

    978 F.2d 1093 (9th Cir. 1992)......................................................... 20

*Wendt v. Host Int'l, Inc.,*

   197 F.3d 1284 (9th Cir. 1999)................................................................. 17, 20

*White v. Samsung Elec. Am., Inc.,*

   989 F.2d 1512 (9th Cir. 1993)............................................................. 5, 20, 26

*Wichinsky v. Mosa,*

   109 Nev. 84 (1993) ........................................................................... 42

*Williams v. UMG Recordings, Inc.,*

   281 F. Supp. 2d 1177 (C.D. Cal. 2003) .................................................. 38

*World Triatholon Corp. v. Hapai,*

   320 Fed. Appx. 778 (9th Cir. 2009)....................................................... 14

*Zuffa, LLC v. Justin.tv, Inc.,*

   838 F. Supp. 2d 1102 (D. Nev. 2012)..................................................... 41

## STATUTES

15 U.S.C. §1117(a) .................................................................... 54, 57

15 U.S.C. §1114.................................................................... 1, 2, 10, 56

15 U.S.C. §1125(a) 1, 2, 3, 6, 7, 9, 11, 15, 20, 21, 23, 24, 25, 26, 31, 34, 49, 50, 51,

   56, 57, 58, 59, 60

15 U.S.C. §1127.................................................................... 30

28 U.S.C. §1291.................................................................... 1

28 U.S.C. §1331.................................................................... 1

28 U.S.C. §1338 ............................................................................ 1

28 U.S.C. §1367 ............................................................................ 1

Cal. Civ. Code §3344 .................................................................. 25

Nev. Rev. Stat. §597.770 ........................................................ 2, 56

Nev. Rev. Stat. §597.790 ............................................................ 25

Nev. Rev. Stat. §597.800 .............................................................. 9

OTHER AUTHORITIES

145 Cong. Rec. H10823-01 (daily ed. Oct. 26, 1999) (statement of Rep. Coble) .. 25

John B. Thompson, *Ideology and Modern Culture: Critical Social Theory in the Era of Mass Communication* 163 (1990) ............................................................ 34

K.J Greene, *Intellectual Property Expansion: The Good, the Bad, and the Right of Publicity*, 11 CHAPMAN LAW REVIEW 521 (2008) ...................................... 27

K.J. Greene, *Abusive Trademark Litigation and the Incredible Shrinking Confusion Doctrine*, 27 HARV. J.L. & PUB. POL'Y 609 (2004) ...................................... 27

S.L. Dogan & M.A. Lemley, The Merchandising Right: Fragile Theory or Fait Accompli?, 54 Emory L.J. 461, 488-489 (2005). ................................................. 18

Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 STAN. L. REV. 1161 (2006) ............................................. 26

Trademark Law Revision Act of 1988, Pub. L. 100-667, 102 Stat. 3935 (1989) .. 24

<u>RULES</u>

Fed. R. Evid. 403 ................................................................... 52

<u>TREATISES</u>

1 McCarthy, Rights of Publicity and Privacy § 6:3 (2d ed.) .................................. 25

McCarthy on Trademarks and Unfair Competition (4th ed.) ............... 19, 27, 32, 52

McKenney and Long, Federal Unfair Competition: Lanham Act 43(a) ............... 51

<u>CONSTITUTIONAL PROVISIONS</u>

U.S. Const. amend. I ............................................................... 31

## JURISDICTIONAL STATEMENT

Original jurisdiction in the district court was properly premised on 28 U.S.C. §1331 and §1338 because the complaint alleged infringement of registered trademarks under 15 U.S.C. §1114 and §1125(a).  Jurisdiction of the state law claims arose under the district court's supplemental jurisdiction.  28 U.S.C. §1367.

Final judgment dismissing all claims was entered on July 3, 2102. (ER Vol.1, 4.)  Defendants-appellants A.V.E.L.A., Inc., X One X Movie Archive, Inc., Leo Valencia, and Central Mills, Inc. timely filed a notice of appeal on November 7, 2012.  (ER Vol.2, 103-148.)

Final judgment on an award of attorney's fees was entered against A.V.E.L.A., Inc., X One X Movie Archive, Inc. and Leo Valencia on January 30, 2013. (ER Vol.1, 2.)  A timely notice of appeal on the fee award was filed on February 28, 2013. (ER Vol.2, 123-129.)

This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

Defendants A.V.E.L.A., Inc., X One X Movie Archive, Inc., Leo Valencia, (sometimes collectively, "AVELA Defendants") and Central Mills, Inc. ("Freeze") (sometimes collectively, "Defendants") were sued by Plaintiffs Fifty-Six Hope Music Road, Ltd. ("Hope Road") and Zion Rootswear, Ltd. ("Zion") (sometimes

collectively, "Plaintiffs").   Appellees alleged that Defendants' use of certain photographs depicting the image of Bob Marley ("Marley") on apparel and other merchandise infringed on their intellectual property rights, namely, the word mark, BOB MARLEY and Marley's identity and persona under the Nevada Right of Publicity statute and the Lanham Act.  (ER Vol.3, 469-480.)

The district court dismissed Plaintiffs' claims for Trademark Infringement under 15 U.S.C. §1114, for Common Law Trademark Infringement, and for Unauthorized Commercial Use of Right of Publicity under Nev. Rev. Stat. §597.770 et seq. by summary judgment.   Defendants' request for summary judgment on Plaintiffs' False Endorsement claim under 15 U.S.C. §1125(a) and Interference With Prospective Economic Advantage was denied.  (ER Vol.1, 85-119.)

Following a jury trial on Plaintiffs' False Endorsement claim and for Interference With Prospective Economic Advantage, the district court entered judgment in favor of Plaintiffs and against AVELA Defendants $300,000 on the interference claim. After post-trial discovery proceedings and a post-trial hearing on the net profits earned by Defendants for use of their Bob Marley images, the court entered judgment against AVELA Defendants in the amount of $348,543 on the false endorsement claim.  (ER Vol.1, 5-11.)

Judgment was also entered in favor of Plaintiffs and against Freeze for $19,246 on Plaintiffs' false endorsement claim and was similarly determined by the district court to be the net profits realized by Freeze for its use of the Bob Marley images. (ER Vol.1, 5-11.)

The district court's denial of summary judgment on Plaintiffs' claims for False Endorsement based on 15 U.S.C. §1125(a) and Interference With Prospective Economic Advantage and the subsequent jury verdict against Defendants raises the following questions:

1.    Should the district court's order denying summary judgment and/or jury verdict on Plaintiffs' False Endorsement claim pursuant to 15 U.S.C. §1125(a) be reversed where:

(a)    Hope Road cannot demonstrate that it is the owner of a legally protectable mark;

(b)    There was insufficient evidence at trial to demonstrate that consumers would likely be confused as to whether Plaintiffs endorsed, sponsored or were associated with Defendants' Marley products;

(c)    The ruling overextends the Lanham Act in a manner unintended by Congress by creating a federal right of publicity;

(d)    The ruling impedes First Amendment principles;

(e)    The ruling conflicts with the Copyright Act; and

3

(f)     Defendants were prohibited from presenting a rebuttal to Plaintiffs' confusion survey.

2.     Should the judgment against AVELA Defendants awarding Plaintiffs $300,000 be reversed where:

(a)     There was insufficient evidence in the record to support the award; and

(b)     The only testimony offered by Plaintiffs was speculative.

3.     Should the determination of AVELA's "net profits" be reversed where the district court did not consider AVELA's business expenses in determining its net profits?

4.     Should the judgment requiring Freeze to disgorge its "net profits" be reversed where there was no evidence to demonstrate that Freeze willfully infringed on Plaintiffs' intellectual property rights?

Following the entry of judgment, Plaintiffs filed a motion for attorney's fees. The district court granted Plaintiffs motion and ordered that AVELA Defendants pay Plaintiffs' attorney's fees in the amount of $1,518,687.94 after determining that Plaintiffs were the prevailing party in an exceptional Lanham Act case.  The attorney's fee award raises the following questions:

4

1.    Should the award of attorney's fees in favor of Plaintiffs and against AVELA Defendants be reversed where the case was not exceptional for the purpose of the Lanham Act?

2.    Was the district court's award of attorney's fee an abuse of discretion even if the case is exceptional because the case presented issues of first impression?

**INTRODUCTION**

In his dissent in *White v. Samsung Elec. Am., Inc.,* 989 F.2d 1512 (9th Cir. 1993), Judge Kozinski warned that "overprotecting intellectual property is as harmful as under protecting it." This case is a classic example of litigant misuse and an overextension of trademark rights and related protections afforded to consumers under the Lanham Act.  In the underlying action, Plaintiffs used the Lanham Act as a vehicle to vindicate publicity rights in Bob Marley after their right of publicity claim under Nevada law was dismissed by the district court. Allowing Plaintiffs to use the Lanham Act for this purpose was tantamount to the creation of federal publicity rights, despite Congress' express intent not to promulgate such rights. Under the district court's ruling, Plaintiffs will have a perpetual right to exclude all others from using any and all images of Bob Marley even though Plaintiffs do not own registered trademarks, common law trademarks, copyrights or a right of publicity in all of Bob Marley's images.

As a further consequence, the district court's ruling effectively tramples upon individuals' First Amendment Rights to express their affinity and appreciation for Bob Marley's cultural, political and religious contributions to society through the use of his image and persona. Bob Marley was a 'political and cultural nexus' and Plaintiffs have successfully manipulated exclusive, perpetual control over Bob Marley's identity to the detriment of the public's freedom of expression. Thus, people who wish to express themselves through products displaying the image and persona of Bob Marley are denied the opportunity to do so without Plaintiffs' prior approval of the expressive material.

Futhermore, while permitting Plaintiffs' use of §1125(a) to vindicate their rights in Bob Marley's persona, the district court simultaneously refused to permit Defendants an opportunity to rebut and defend Plaintiffs §1125(a) claim as Defendants were neither allowed to obtain their own survey to rebut Plaintiffs' claim of endorsement, association, or sponsorship of Defendants' Marley products nor to conduct discovery on Bob Marley's enforcement of his merchandising rights during his lifetime.   Based on the aforementioned, this Court should enter summary judgment in favor of Defendants and reverse the verdict on Plaintiffs' §1125(a) claim.

The district court abused its discretion by denying AVELA Defendants' Motion for Judgment Notwithstanding the Verdict on Plaintiffs' claim for

Interference with Prospective Economic Advantage and subsequent renewed motion. The ultimate verdict was unsupported by the evidence and based on sheer speculation of Plaintiffs' primary witness. The district court further abused its discretion in determining AVELA Defendants' net profits by prohibiting AVELA Defendants from deducting their business expenses..

Finally, the evidence is insufficient to support Plaintiffs' claim of willful infringement against Freeze. Freeze was merely a licensee who relied on its license with AVELA, a standard practice in the licensing industry.

## STATEMENT OF FACTS

### A.    The Parties

Hope Road is composed of and owned by some of Bob Marley's children. (ER Vol.2, 374.) Hope Road was formed in 1995 for the purpose of acquiring and exploiting assets, rights and commercial interests in the late Bob Marley, a famous reggae musician and performer, who died in 1981. (ER Vol.1, 82; Vol.3, 413.)

In 1999, Hope Road granted Zion Rootswear ("Zion") an exclusive worldwide license to design, manufacture and sell T-shirts and other goods bearing Bob Marley's image and likeness. (ER Vol.3, 409.) Hope Road grants licenses for the production of many products bearing the Bob Marley intellectual property, including hats, posters, calendars, key chains, and beach towels. (ER Vol.2, 82;

ER Vol.3, 409.) Hope Road authorizes Zion to use three to five hundred different images of Bob Marley for use on T-shirts.  (ER Vol.2, 83.)

AVELA publishes and licenses photographs, images, movie posters and other artwork for use in the retail marketplace.  (ER Vol.3, 418.)  X One X is the copyright holder to the photographs, images, movie poster and other artwork licensed by AVELA.  (ER Vol.1, 83.)  Valencia is the owner of AVELA and X One X.  (ER Vol.1, 83.) Jem and Freeze are licensees of AVELA who design, manufacture and sell T-shirts and other apparel bearing images and artwork licensed by AVELA. (ER Vol.3, 419.)

### B.    Procedural History

On January 23, 2008, Plaintiffs initiated a lawsuit suit against AVELA Defendants and several of its licensees, including Freeze and JEM, for unfair competition and trademark infringement under federal statutes with pendent claims of common-law trademark infringement and unauthorized commercial use of statutory right of publicity.  (ER Vol.3, 481-505.)  Plaintiffs sought damages, attorney's fees, costs, a temporary restraining order and preliminary and permanent injunctive relief and their request was denied.  (ER Vol.3, 481-505, 421.) The complaint was amended on December 29, 2008.  (ER Vol.3, 469-480.)

The gravamen of Plaintiffs' lawsuit revolved around their claim that Defendants used the Marley Intellectual Property without permission or

authorization.  The Marley Intellectual Property is defined in the operative complaint as: (1) common-law rights in the name Bob Marley used in association with music and entertaining and merchandise which promote same; (2) U.S. Federal Trademark Registration 2349361 for the mark BOB MARLEY for *inter alia*, T-shirts, thermal shirts, jackets, hats, caps, sweatshirts, ties, and bandanas in International Class 025; (3) Nev. Registration for Right of Publicity for Robert Nesta Marley under Nev. Rev. Stat. 597.800 (Reg. Vol.1-89, Jan. 24, 2006).  (ER Vol.3, 469-480.)  Plaintiffs claimed that Defendants manufactured and offered for sale fashion-related merchandise that used the Marley Intellectual Property without authorization.  As such, Plaintiffs asserted claims for infringement of the word mark, BOB MARLEY; (2) false endorsement or association under 15 U.S.C. §1125(a); (3) common law trademark infringement; (4) violation of Nevada Right of Publicity statute and (5) interference with prospective economic advantage.  (ER Vol.3, 469-480.)

On November 30, 2009, the parties filed cross-motions for summary judgment.  (ER Vol.3, 407-415; Vol.3, 416-430.) Defendants' requested entry of judgment on all of Plaintiffs' claims and Plaintiffs' requested entry of judgment on their false endorsement claim.

On February 25, 2010, the district court granted summary judgment in favor of Defendants on Plaintiffs' claims for infringement of the word mark, BOB

MARLEY under 15 U.S.C. §1114 and common law trademark infringement, but denied Defendants' request for entry of judgment on the remaining claims. (ER Vol.1, 114-115.) Plaintiffs' motion was denied. (ER Vol.1, 115.)

On March 11, 2010, Defendant's filed a motion to re-open discovery for the limited purpose as to Plaintiff's §1125(a) claim. (ER Vol.3, 387-406.) The motion was denied. (ER Vol.1, 60-80.)

On October 1, 2010, Plaintiffs filed a request to submit additional evidence. (ER Vol.2, 355-358; ER Vol.2, 359-370.) The evidence included two letters that demonstrated that Plaintiffs knew of third-parties' use of Marley's publicity rights in Nevada more than six months before they registered for publicity rights in Nevada and summary judgment was entered in favor of Defendants. (ER Vol.2, 359-370, 351.354.)

Between January 4, 2011 and January 21, 2011, a jury trial was held on Plaintiffs' claims for False Endorsement under 15 U.S.C. §1125(a) and Interference with Prospective Economic Advantage.

On February 14, 2011, a partial judgment was entered against AVELA Defendants in the amount of $300,000 on the interference with prospective economic advantage claim. (ER Vol.1, 12-18.)

On July 3, 2012, judgment was entered against JEM in the amount of $413,638.29, Freeze in the amount of $19,246.54 and AVELA in the amount of $348,543.  (ER Vol.1, 5-11.)

On July 17, 2012, Plaintiffs filed a Motion for Attorney's Fees. (ER Vol.2, 354-356.)  The district court entered an order awarding Plaintiffs their attorney's fees in the amount of $1,518,687.94.  (ER Vol.1, 1.)

On July 31, 2012, AVELA Defendants and Freeze filed a Motion for Renewed Judgment as a Matter of Law, or in the alternative, Motion for New Trial or Amendment of Judgment and the motion was denied.  (ER Vol.2, 149-153, Vol.1, 3.)

Appeal of the judgment was timely filed on November 7, 2012. (ER Vol.1, 130-148.)

Appeal of the attorney's fees award was timely filed on February 28, 2013 (ER Vol.1, 123-129.)

The appeals were consolidated by order of this Court on March 12, 2013. (ER Vol.2, 120-122.)

## C.    Factual Background

In or about 2004, AVELA first acquired some photographs of Marley from a photographer named Roberto Rabanne.  (ER Vol.3, 418.) Mr. Rabanne represented

11

to Valencia that he was an acquaintance of Marley and had permission to take, sell and merchandise said images. (ER Vol.3, 418.)

AVELA added the Marley images to its portfolio and licensed various images of Marley to Jem, Freeze and others to utilize in their design, manufacture and sale of t-shirts and other apparel to retailers.  (ER Vol.3, 419.) AVELA prohibited licensees from selling apparel with the words MARLEY or BOB MARLEY because it was aware that Hope Road had a trademark registration for the words "BOB MARLEY." (ER Vol.3, 419.)  Neither AVELA nor its licensees ever received a complaint or other indication from anyone that there had been consumer confusion as to the source or sponsorship of any of the Defendants' products bearing Marley images.  (ER Vol.3, 424.)

## STANDARD OF REVIEW

Defendants appeal various rulings of the district court, all of which are governed by a different standard of review.

First, Defendants appeal from the district court's denial of summary judgment and the subsequent jury verdict on Plaintiffs' false endorsement claim. An appeal from a denial of summary judgment is reviewed de novo. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004); *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990). Defendants also appeal from the jury's findings as to whether there was likelihood of confusion that Plaintiffs were the source of, approved or sponsored Defendants' products. The jury's factual findings are reviewed under the substantial evidence standard. *Hangarter v. Provident Life and Accident Ins. Co.,* 373 F.3d 998, 1008 (9th Cir. 2004). Finally, Defendants contend that as a matter of law, Plaintiffs cannot state a viable false endorsement claim. The legal consequences following from a set of facts constituting substantial evidence is a mixed issue of fact and law. *Suzy's Zoo v. Commissioner*, 273 F.3d 875, 878 (9th Cir. 2001). Mixed questions of law and fact are generally reviewed de novo. *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004).

Second, AVELA Defendants appeal from the judgment entered against it for interference with prospective economic advantage. An appeal from a jury

13

determination of interference is governed by the substantial evidence standard. *Davila v. Perelman*, 112 F.3d 515 (9th Cir. 1990).

Third, AVELA Defendants appeal the district court's denial of leave to reopen discovery. Denial of a motion to reopen discovery is reviewed for abuse of discretion. *Panatronic SA v. AT&T Corp.,* 287 F.3d 840, 846 (9th Cir.2002); *Chance v. Pac-Tel Teletrac Inc.,* 242 F.3d 1151, 1161 n. 6 (9th Cir. 2001).

Fourth, AVELA Defendants appeal from the district court's refusal to consider AVELA Defendants' expenses in determining the amount of net profits realized by AVELA Defendants from their licensing activity. An appeal of a district court's accounting of profits is reviewed for abuse of discretion. *Lindy Pen Co., Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1405 (9th Cir. 1993).

Fifth, Freeze appeals from the jury determination that it willfully infringed on Plaintiffs' intellectual property rights to Marley. An appeal from the jury's finding of willful infringement is governed by the substantial evidence standard. *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,* 259 F.3d 1186, 1195 (9th Cir. 2001).

Finally, AVELA Defendants appeal from the district court's award of attorney's fees to Plaintiffs. An appeal from an attorney fee award is governed by the abuse of discretion standard. *See Stephen W. Boney, Inc. v. Boney Services,*

*Inc.,* 127 F.3d 821, 825 (9th Cir. 1997); *World Triatholon Corp. v. Hapai,* 320 Fed. Appx. 778, 779 (9th Cir. 2009).

## ARGUMENT

## A.     Plaintiffs Do Not Have A Viable False Endorsement Claim

Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any . . . symbol, or device . . . or false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which-
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person . . .shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

To prove a violation under section 43(a) of the Lanham Act a plaintiff must show that: (1) its mark is legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship or approval of those goods or services. *Facenda v. N.F.L. Films, Inc.,* 542 F.3d 1007, 1014 (3d Cir. 2008).

   1.   Plaintiffs Do Not Have A Legally Protectable Mark In Each and Every Image of Marley

15

In the underlying action, Plaintiffs argued that the terms "name, symbol, or device" includes any and all images of Marley or his "persona" or "identity." Something as amorphous as a "persona," however, cannot be a "name, symbol, or device." A persona changes all the time, in terms of height, weight, hair, apparel choices and multifarious psychological and personality traits. Thus, in this regard, a persona is a phantom mark, a concept or aura, and not a trademark.

Both the Trademark Trial and Appeal Board ("TTAB") and the courts have agreed with this logic. The TTAB denied registration of the likeness and image of Elvis Presley, when it was not limited to his dress, age or pose. *See In re Elvis Presley Enters. Inc*., 50 U.S.P.Q.2d 1632 (T.T.A.B. 1999). The same contention was rejected in *Estate of Presley v. Russen*, wherein the estate of Elvis Presley argued that Presley's "image and likeness" was a valid mark. 513 F.Supp. 1339 (D.N.J. 1981). In rejecting the estate's claim as "too broad," the TTAB held that only a particular image of Presley could be a valid mark because that image was consistently used in promotional and advertising materials and thus, had retained a "single and continuing commercial impression." *Id*. at 1363-64.

Similarly, in *ETW Corp. v. Jireh Publ'g, Inc*., the court did not allow a claim to protect Tiger Woods' image as a trademark. 332 F.3d 915, 922 (6th Cir. 2003). The court observed plaintiff claimed trademark infringement in "any and all images of Tiger Woods," yet under the Lanham Act every "image and likeness of

16

Woods [is] not protectable as a trademark because [Wood's image and likeness] does not distinguish and identify the source of the goods." *Id.* The court then claimed to hold otherwise "would turn a person into walking, talking trademark." *Id.*

Finally, in *Pirone v. MacMillan*, the court agreed with the analysis in *Estate of Pressley v. Russen*, noting that even if Pirone could show that it could establish a trademark in a particular pictorial representation of Ruth, the trademark would not cover any and all photos taken of Ruth during his career.  894 F.2d 579, 583 (2d Cir. 1990). In its ruling, the court further criticized the plaintiff's argument that consumers would be confused that Ruth's estate sponsored the calendar, stating "Pirone's position finds support on neither precedent nor common sense," and her "sweeping contention resembles that rejected in [the case where the estate of Elvis] argued that his image and likeness was a valid mark," which was determined to be "too broad."  *Id.* at 583.  As the court succinctly states, "while pictures of Ruth are in a sense symbols, they in no way indicate origin or represent sponsorship."  *Id.* at 584. The district court's ruling creates a trademark in each and every image of Bob Marley, a result that is in contravention to trademark law.[1]

---

[1]     Although the court in *Wendt v. Host Int'l, Inc.,* 197 F.3d 1284 (9th Cir. 1999) noted that a persona is capable of protection under the Lanham Act, this instant case is distinguishable. In *Wendt,* the robots at issue were modeled after the characters in "Cheers." The personas of the actors who portrayed those characters was fixed in the form of the characters they portrayed for the time period "Cheers"

2. <u>Plaintiffs Cannot Demonstrate that Use of their Mark Was Likely to Cause Confusion Concerning Plaintiff's Sponsorship or Approval of Those Goods</u>

In order to demonstrate confusion, Plaintiffs presented a confusion survey from E. Deoborah Jay, Ph.D. The primary questions asked by Dr. Jay included: (1) Who made or put out the T-shirt?; (2) Who gave permission or approval for the T-shirt to be made or put out?[2]; and (3) What else the makers of the T-shirts make or put out? (ER Vol.3, 529-530.)   In tabulating the survey responses to questions 1 and 2, Dr. Jay grouped together all respondents who answered "Bob Marley, his heirs, estate, agents or the person on the shirt, his heirs, estate, agents."  (ER Vol.3, 529-530.)   The survey questions were indefinite with respect to endorsement by Marley.  Rather, it grouped Marley with the Plaintiffs, his heirs, estate, agents and the person on the shirt.

---

was on the air. In contrast, at issue here is the "persona" of Bob Marley that has evolved over his lifetime. An application of the Lanham Act to protect each and every image of Bob Marley throughout his entire lifetime is unduly broad.

[2]     Courts have indicated that questions regarding whether a defendant "needed to get" permission is problematic as it is consumer perception that creates the law as to whether permission is needed.  *Pebble Beach Co. v. Tour 18 I, Ltd*., 155 F.3d 526 (5th Cir. 1998).  Professors Dogan and Lemley have also criticized case law that extends trademark protection to merchandise that consumers think requires permission to bear a well known mark: "We are inclined to believe that merchandising is a case in which the law should act as a norms creator, setting aspirational goals rather than responding to current consumer expectations . . . . We conclude, therefore, that the fact that consumers may believe trademark owners have a right to control merchandise bearing their brands does not itself justify a merchandising right." S.L. Dogan & M.A. Lemley, The Merchandising Right: Fragile Theory or Fait Accompli?, 54 Emory L.J. 461, 488-489 (2005).

18

A viable false endorsement claim should have an identifiable person as the putative endorser. A general belief that someone was endorsing the T-shirts is insufficient. *See ETW Corp.,* 332 F.3d at 925 ("false endorsement occurs when a celebrity's identity is connected with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service."); *see also* 4 McCarthy on Trademarks and Unfair Competition §28:15 (4th ed.)

In addition, the quantum of endorsement confusion was inadequate. In a consumer survey designed to probe public attitudes regarding wearing licensed apparel, well known survey expert Robert Sorenson determined that 91.2% of the public automatically believes that if a product bears the name of an entertainer or some other famous person, permission is given for its use. *See* 4 McCarthy on Trademarks and Unfair Competition §24:12 (4th ed.) According to Dr. Jay's survey, the net confusion on whether permission was needed for Defendants' T-shirt was only 17%.[3] (ER Vol.3, p. 530.) This is far lower than the benchmark

---

[3]     When asked whether the T-shirt maker received permission from someone to put out the T-shirt, 41% of the test group said no. Even of the group who said the manufacturer needed someone's permission, only thirty-seven percent of the test group answered Bob Marley or the person on the shirt. (ER Vol.3, 530.)

[4]     In the *Carins* cases, plaintiffs were the trustees of the Diana Princess of Wales Memorial Fund ("the Fund") and the executors of Princess Diana's estate. *Cairns v. Franklin Mint Co*., 292 F.3d 1139 (9th Cir. 2002). The Fund sued Franklin Mint, which used Diana's image on jewelry, plates, dolls, and in ads for

discussed in Sorensen's survey, and if accepted, would tortify virtually all products with images of famous persons. Thus, the jury verdict should be reversed because the survey is insufficient to support the finding of likelihood of confusion.

### 3.     Defendants' Products Do Not Communicate an Endorsement

While this Court has held that a false endorsement claim based on the unauthorized use of a celebrity's identity is a type of false association claim because it alleges the misuse of a trademark "which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product," these cases are distinguishable from the case at hand. *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 809 (9th Cir. 1997).

In each of those cases, an endorsement was communicated and the use of the celebrity's image was in connection with a product. *Id.* (use of actors' likenesses on animatronic figures in marketing "Cheers" bars); *see also Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 409 (9th Cir. 1996) (use of Abdul-Jabbar's given name in a car commercial); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1097 (9th Cir. 1992) (use of likeness of Waits' distinctive voice in Doritos commercial to advertise Doritos); *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1396 (9th Cir. 1992) (use of White's likeness as a robot in television commercials for the purpose of selling Samsung's VCRs).

Unlike the aforementioned false endorsement cases, Marley's image is not used to communicate an endorsement. Indeed, the Sixth Circuit has expressed grave concern with extending §1125(a) to encompass the use of a celebrity's image that did not constitute an endorsement, stating "ETW claims protection under the Lanham Act for any and all images of Tiger Woods. This is an untenable claim." *ETW Corp., Inc.,* 332 F.3d at 922.

As a further distinction, the celebrity trademark and image in the aforementioned cases were used to promote a separate product. The images of Marley, however, are the subject matter and a part of the goods. The facts are more akin to *Pirone or ETW*, where the court concluded that the use of Babe Ruth's image in a calendar or Tiger Woods as part of a painting did not render defendants liable on a §1125(a) claim. Similar to the image of Babe Ruth on a calendar or Tiger Woods as part of a painting, the use of Marley's image on the Defendants' goods does not indicate the source of the goods or that Plaintiffs sponsored the goods.

Finally, the parameters of a false endorsement claim brought by the estate of a celebrity have not been established. *Cairns, et al. v. Franklin Mint*, 24 F. Supp. 2d 1013, 1032 (C.D. Cal. 1998) ("*Cairns I*"). Indeed, because the parameters of such a claim have not been established, the court upon remand in *Cairns, et al. v. Franklin Mint*, 107 F. Supp. 2d 1212 (C.D. Cal. 2000) ("Cairns III") was reluctant

21

to apply celebrity endorsement case law to *Cairns III*.[4]    The court in *Cairns III* further distinguished defendants' use of Princess Diana's image from the false endorsement cases because the images of Princess Diana were used on products rather than in advertising to sell unrelated products. *Cairns III*, 107 F. Supp. 2d at 1216.

The *Cairns I* court recognizes that one could  "theoretically" assert a claim for false endorsement involving a deceased celebrity where it could be alleged and shown that the defendants falsely represented that the deceased celebrity had actually endorsed the products while he or she was alive. However, in *Cairns I* the court noted that this had not occurred:

> At the outset, it appears to the Court that one could theoretically assert a claim for false endorsement  by a deceased celebrity (e.g., advertising might falsely suggest a particular product was endorsed by the celebrity before his or her death), and that plaintiffs have adequately alleged that defendants'  advertising any products are likely to falsely suggest Princess Diana's endorsement of defendants' products.  Nonetheless, it seems unlikely that the public  would  be  confused  as  to  whether Princess

---

[4]    In the *Carins* cases, plaintiffs were the trustees of the Diana Princess of Wales Memorial Fund ("the Fund") and the executors of Princess Diana's estate. *Cairns v. Franklin Mint Co*., 292 F.3d 1139 (9th Cir. 2002).  The Fund sued Franklin Mint, which used Diana's image on jewelry, plates, dolls, and in ads for these products. *Id*. at 1144.  After Diana's death, her estate authorized the Fund to use Diana's name and likeness to accept donations for various charities with which Princess Diana was associated during her lifetime. *Id.*  The Fund in turn authorized certain other parties, but not the Mint, to use Diana's name and likeness to sell products in the United States.  *Id.* The Fund sued the Mint, alleging, among other things, false endorsement and false advertising under §1125(a).  *Id.*

> Diana endorsed the Franklin Mint's products in light of her premature and unexpected death. Presumably recognizing the fragility of such a claim, plaintiffs focus almost exclusively on their contention that defendants are falsely implying that plaintiffs endorse defendants' products....[T]he real question is ... whether use of a particular deceased celebrity's persona is likely to cause confusion "as to approval of [the defendants] goods, services, or commercial activities by another person [,]" here, the Estate or the Fund.

*Cairns I*, 24 F.Supp.2d at 1032.

The underlying claim at issue here is perhaps more fragile then the claim by the Estate in *Cairns*. At the time *Cairns I* was decided, Princess Diana had been deceased for one year. *Id.* Marley died 23 years before Defendants first used his image. (ER Vol.1, 86.) As such, it highly unlikely that the public would be confused as to whether Marley endorsed or approved the products at issue in light of his death many years ago. Bob Marley died 15 years before Hope Road was formed for the purpose of merchandising Bob Marley's interests, and nearly two decades before Hope Road first licensed Zion to sell such merchandise. (ER Vol.1, 86.) Indeed, many of the licensees in the industries had never even heard of Zion prior to the commencement of the litigation. (ER Vol.2, 408-409, 190.) Finally, Defendants never falsely implied or suggested that Marley or his estate endorsed or approved their products when he was alive. (ER Vol.3, 422-23.)

**B.    The Judgment Overextends The Parameters Of A False Endorsement Claim In A Manner Not Intended By Congress**

The district court's ruling yields the untenable result of allowing a deceased celebrity's estate to use the Lanham Act, and in particular, §1125(a), as a vehicle to vindicate publicity rights. As discussed above, this Court has applied the statute to protect against the unauthorized use of one's likeness where the use communicates an endorsement.  This Court, however, has not applied the statute to protect against the use of a person's likeness in a manner which does not communicate an endorsement. Consequently, Plaintiffs' assertion that their association claim is a "federal right of publicity" is inconsistent with this Court's previous opinions.

Absent from the legislative history is any indication that Congress intended to permit use of the Lanham Act as a vehicle for vindication of publicity rights.  A review of the Lanham Act's legislative history[5] and the 1988 revisions reveals no mention of deceased celebrities.  *See* Trademark Law Revision Act of 1988, Pub. L. 100-667, 102 Stat. 3935 (effective November 16, 1989). [6]

More importantly, Congress specifically rejected the lobbying efforts to amend Section 43(a) to include a right of publicity.  Both the American Bar

---

[5]     As Representative Fritz Lanham said in 1946 during initial consideration of the Act, "an essential purpose of the law is to "protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get."  H. Rep. No. 219, 79th Cong., 1st Sess. 2 (1945).

[6]     Indeed, although *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612 (S.D.N.Y. 1985) (use of look-alike's photograph in advertisement created likelihood of consumer confusion over celebrity's endorsement or involvement, thus violating the Lanham Act) was decided just years before the 1988 revision, Congress did not acknowledge any celebrity rights in its amendment or summary of Section 43(a).

Association and the International Trademark Association lobbied for a federal right of publicity. *See* Right of Publicity, ABA Sec. Intell. Prop. L. Ann. Rep. 202, 250 (1995-1996) and March 3, 1998 International Trademark Association Action Request: U.S. Federal Right of Publicity, *available at* www.inta.org/advocacy/pages/USFederalRightofPublicity.aspx; *see also* 1 McCarthy, Rights of Publicity and Privacy §6:3 (2d ed.) (describing the ABA's and INTA's lobbying efforts). Congress, however, has left the area for regulation by the states and has not enacted a federal publicity right.[7] Indeed, during discussions related to the enactment of the Trademark Cyberpiracy Prevention Act, Congress made clear that the legislation would not create a national right of publicity, noting that "[t]he creation of that form of intellectual protection is something that Congress must carefully explore before enactment." 145 Cong. Rec. H10823-01 (daily ed. Oct. 26, 1999) (statement of Rep. Coble).

Unless this Court reverses the district court's ruling, litigants will utilize §1125(a) to vindicate publicity rights despite the fact that Congress has declined to

---

[7]     States have enacted rights of publicity statutes to explicitly protect celebrities from the exploitation of their name, image, signature or likeness, whether living or deceased. *Parks v. LaFace Records*, 329 F.3d 437, 445 (6th Cir. 2003); Cal. Civ. Code §3344; Nev. Rev. Stat. §597.790. State right of publicity laws vary widely from state to state. For instance, California protects celebrities for 70 years after death in Cal. Civ. Code §3344.1, but New York only protects living celebrities in N.Y. CLS Civ. R. §50. Some states do not provide any statutory protection to celebrities.

create such rights. Indeed, during the underlying trial, Plaintiffs' counsel argued that §1125(a) is akin to a federal right of publicity. (ER Vol.1, 119.)  As discussed, *supra,* allowing a perpetual right of publicity via the Lanham Act raises considerable First Amendment concerns and creates a potentially infinite curb on expression.  *See White*, 989 F.3d at 1513.   Indeed, this Court has recognized that even an extended right of publicity under state law may interfere with or decrease the value of copyrighted works, such as photographs, thereby pitting one form of property against another.  *See Milton H. Greene Archives, Inc. v. Marilyn Monroe, LLC*, 692 F.3d 983, 1000  (9th Cir. 2012).

While Plaintiffs may assert that the difference between publicity rights and §1125(a) is the requirement of a plaintiff to show "confusion," it is difficult to fathom a consumer who would not associate the deceased celebrity's image with that of his or her estate if the celebrity was popular.  A consumer confusion test illustrates the obvious when a celebrity is popular, and thus the Lanham Act false association claim is essentially a federal right of publicity claim in disguise.  *C.f.* Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 STAN. L. REV. 1161, 1164 (2006) (remarking that "the right of publicity has more in common with trademark law than with copyright.").

The inherent flaw in the consumer confusion test was recognized by the Court in *ETW*.  In *ETW,* the court was concerned with a survey that showed 62%

of people believed "Tiger Woods has an affiliation or connection with [the] print or that he has given his approval or has sponsored it." *ETW Corp.,* 332 F.3d at 937. The court noted the survey was an inaccurate measure of consumer confusion because respondents could have thought that Wood's mere presence in the print was itself an affiliation or connection. *Id.* Finally, as discussed above, 91.2% of consumers believe that a product cannot bear the name of an entertainer, cartoon character, or some other famous person unless permission is given for its use of the owner of the name or character. *See* 4 McCarthy on Trademarks and Unfair Competition §24:12 (4th ed.)

As the underlying case demonstrates, Plaintiffs often rely on a Lanham Act false association claim when a right of publicity claim fails. Professor K.J. Greene observes, "a common abusive tactic is for companies to reach for trademark protection when other claims, such as copyright, *right of publicity,* or libel claims are unavailable" and " virtually every celebrity right of publicity case is co-joined with a Lanham Trademark act claim." K.J. Greene, *Abusive Trademark Litigation and the Incredible Shrinking Confusion Doctrine*, 27 HARV. J.L. & PUB. POL'Y 609, 632 (2004) (emphasis added); *See also* K.J Greene, *Intellectual Property Expansion: The Good, the Bad, and the Right of Publicity*, 11 CHAPMAN LAW REVIEW 521 (2008) (citing to *ETW Corp v. Jireh Publ'g, Inc.,* 332 F.3d 915 (6th Cir. 2009), *Parks v. LaFace Records,* 329 F.3d 437 (6th Cir. 2003), and *Cairns v.*

27

*Franklin Mint Co.,* 292 F.3d 1139 (9th Cir. 2002)).  This is not the result intended by Congress.  For such reasons, this Court should not permit the expansion of the Lanham Act to encompass deceased celebrity rights because the issue was neither fully contemplated by Congress nor supported by any of the case law relied upon by the Plaintiffs.

## C.  Defendants' Use Of Bob Marley's Image Is Protected By The First Amendment

Trademark law should be subjected to constitutional scrutiny where the defendant raises a First Amendment challenge. *See, e.g., Landham v. Lewis Galoob Toys, Inc*., 227 F.3d 619, 626 (6th Cir. 2000) (noting that the courts have constructed a careful balance between the First Amendment and intellectual property laws.") At issue herein are T-shirts sold by Defendants that feature Bob Marley, a political, cultural, and religious icon[8], and other expressive words.[9]  The

---

[8]      As [www.bobmarley.com](www.bobmarley.com) proclaims:

Bob's story is that of an archetype, which is why it continues to have such a powerful and ever growing resonance: it embodies political repression, metaphysical and artistic insights, gangland warfare and various periods of mystical wilderness.   And his audience continues to widen: to westerners Bob's apocalyptic truths prove inspirational and life-changing: in the Third-World his impact goes much further.   Not just among Jamaicans, but also the Hopi Indians of New Mexico and the Maoris of New Zealand, in Indonesian and India, and especially in those parts of West African from which slaves were plucked and taken to the New World.   Bob is

combination of Marley's image and the public's admiration for Marley's social,

political, and religious views[10] makes the T-shirts inherently expressive. Moreover,

---

seen as a redeemer figure returning to lead this." (ER
Vol.3, 538.)

[9]     For instance, one of the T-shirts at issue has the image of Bob Marley
combined with the text "True Rebels Always Walk Alone." (ER Vol.3, 536.) Many
people are inspired by Marley in that he stayed true to his religious and political
beliefs, even when it was not mainstream. This T-shirt conveys the message that
the greatest leaders are those who are not afraid to be the sole voice of a cause.
Another T-Shirt has the image of Bob Marley combined with peace symbols and
other graphic art, with the stylized text "Peace Love" on it. (ER Vol.3, 507.) As
discussed *supra*, many people considered Marley to be a promoter of peace and
social justice. This shirt proclaims this message.  There are many other examples
where Defendants' T-shirts proclaimed a social message, such as the T-shirt
featuring the words "Get Up, Stand Up" and the image of Marley. (ER Vol.3, 508-
509; 506, and 510.) Marley's song "Get Up, Stand Up" had a message of social
change as it inspires individuals to stand up for their beliefs and rights. Another T-
shirt depicted Marley's image and the words "Uprising." (ER Vol.3, 508-509.)
This T-shirt also expresses a message for social change.

[10]     Other examples of Marley's influence as a political and religious icon
include: In 1978, Marley was awarded the Peace Medal of the Third World from
the United Nations.  (ER Vol.3, 414.) Also, a representative of the Bobo Ashanti
order, a Rastafarian group, stated "Bob Marley was and still is a stepping stone for
many around the world who seek Rastafari roots and culture." (ER Vol.3, 539-
540.) In February 1981, before his death, Marley was awarded Jamaica's third
highest honor – the Jamaican Order of Merit (ER Vol.3, 414.). In 2006, the State of
New York established "Bob Marley Boulevard" in East Flatbush in Brooklyn, New
York  (ER Vol.3, 415.) In 2006, the Bank of Jamaica issued 1,000 Bob Marley
gold and silver coins made by the British Royal Mint and Bob Marley's home was
declared a national monument  (ER Vol.3, 414) The Associated Press writes,
"Marley's lyrics promoting social justice made him an icon." (ER Vol.3, 539-540);
As Zion Rootswear's advertisements proclaim, Time Magazine called Bob Marley
a "political and cultural nexus" (ER Vol.3, 537); Bob Marley's own website notes
that "when you need to refer to a certain situation or crisis, there will always be a
Bob Marley song that will relate to it" (ER Vol.3, 538).

29

because any commercial aspect of the T-Shirts are "inextricably entwined" with expressive elements[11], the T-shirts should be categorized as noncommercial speech.[12] Indeed, courts have held that T-shirts are like "personal billboards," which "carry phrases that convey meanings that can range from entirely personal to political to humorous." *Juicy Couture, Inc. v. L'Oreal USA, Inc*., No. 04 Civ. 203, 2006 WL 1012939 at *17-18 (S.N.D.Y April 19, 2006).[13] Therefore, the government interest in regulation of the T-shirts must be substantial.[14]

---

[11] Any commercial aspects that are "inextricably entwined" with expressive elements cannot be separated out "from the fully protected whole." *Gaudiya Vaishnava Soc'y v. City & County of San Francisco,* 952 F.2d 1059, 1064 (9th Cir. 1991) (as amended).

[13] Even if the speech has a mixture of commercial and expressive elements, it is still given the highest level of protection under the First Amendment. *ETW Corp.,* 332 F.3d at 924 (a painting created and sold for profit was given strict scrutiny under the First Amendment because it contained expressive elements); *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180, 1185 (9th Cir. 2001) (holding a photograph in a magazine featuring the head of Dennis Hoffman superimposed on a fashion model wearing Ralph Lauren was fully protected under the First Amendment, even though the magazine listed where the clothes in the photograph could be purchased, because it was a humorous comment on fashion, celebrities, and movies); *Cf. Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir. 1989) (holding "because overextension of the Lanham Act restrictions…might intrude on 'First Amendment values, we must construe the Act narrowly to avoid such conflict).

[14] In conducting this analysis, the court must determine the intent of Congress in enacting the Lanham Act.  In codifying the Lanham Act, the Legislature provided in part:  "The intent of this chapter is . . . to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in commerce; . . .and . . .to protect persons engaged in such commerce against unfair competition. . . [.]"    15 U.S.C. §1127. The Supreme Court has

While protecting consumer confusion as to sponsorship or approval could be a substantial interest, the law is not sufficiently tailored to prevent the stifling of speech. It is unlikely that the T-shirts are purchased by consumers purely because of quality or source. Rather, consumers purchase T-shirts for a variety of reasons, including liking the design on the shirt, and expressing an affinity towards the person, product or character on the shirt. In this vein, this Court has noted that:

> Our jewelry, clothing and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include names and emblems that are also used as collective marks or trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies.

*International Order of Job's Daughters v. Lindeburg & Co*., 633 F.2d 912, 917 (9th Cir. 1980), cert. denied, 452 U.S. 941 (1981). The broad application of §1125(a) to Defendants' products is insufficient to justify restriction on expression particularly in light of the fact that Defendants' T-Shirts are not purchased because consumers believed that they were sponsored by or approved by Marley.

---

examined the purpose of trademark law and has determined that the Lanham Act is designed to protect the goodwill of businesses and the ability of consumers to distinguish among competing products. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 198, 105 S. Ct. 658, 663, 83 L. Ed. 2d 582 (1985).

Given that Defendants have articulated a colorable claim that their T-shirts are protected by the First Amendment, the likelihood of confusion test is not appropriate because it fails to adequately address the interests protected by the First Amendment. *See ETW Corp*., 332 F.3d at 926. Instead, the Court should use the balancing test *Rogers v. Grimaldi*, which weighs the "public interest in avoiding confusion "against the "public interest in free expression." 875 F.2d 994, 999 (2d Cir. 1989).

Under the *Rogers* Test, the proper balance between trademark law and free expression will not support application of the Lanham Act unless the mark has: (1) "no artistic relevance" to the underlying work and (2) if there is artistic relevance, use of the mark in the accused work "explicitly misleads as to the source or the content of the work." *Id.; see also* 6 McCarthy on Trademarks and Unfair Competition §31:144.50 (4th ed.)  Courts have expanded the *Rogers* test beyond its application to titles of creative works.  *See ETW Corp.*, 332 F.3d at 936-37 (applying the test to a commemorative sports painting of Tiger Woods' victory at the Masters golf tournament in 1997).  Acknowledging that the traditional likelihood of confusion test "fails to account for the full weight of the public's interest in free expression," this Court has adopted the *Rogers* test in *Mattel, Inc. v. MCA Records, Inc*., 296 F.3d 894 (9th Cir. 2002).

In applying the first prong of the *Rogers* test to the Marley images, there is no question that the images of Marley have artistic relevance.[15] The images were artistically modified from photographs which were not owned by Plaintiffs, and then placed on apparel, towels and other merchandise. (*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 688 F. Supp. 2d 1148, 1152 (D. Nev. 2010) (photographs were taken by Roberto Rabanne and acquired by Leo Valencia). In some cases, the images were creatively cropped, distressed or retouched, or combined with other artistic or expressive elements, such as titles from Bob Marley's songs. (ER Vol.3, 506-510, 536.) This undoubtedly constitutes an artistic level "above zero." *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc*., 547 F.3d 1095, 1100 (9th Cir. 2008).

Regarding the second prong of the *Rogers* test,[16] the use of the Marley images do not explicitly mislead consumers as to the source of the work.

---

[15]    This Court has emphasized that a court should not make an artistic analysis of how relevant the mark is to the content of the accused expressive work. All that is needed is that "the level of relevance merely must be above zero." *See E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc*., 547 F.3d 1095, 1100 (9th Cir. 2008) (holding a video game featuring a strip club very similar to plaintiff's had enough artistic relevance to the video game to qualify as artistic.)

[16]    As to the second prong of the *Rogers* test, this Court has noted that the deception or confusion must be relatively obvious and express, not subtle and implied. *E.S.S. Entertainment 2000*, 547 F.3d at 1100 ("[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading," referencing *Mattel, Inc.*, 296 F.3d at 901.

Defendants do not explicitly suggest or imply that Plaintiffs were the source of their products. Indeed, the district court noted AVELA, and not Plaintiffs, were listed as the source of their products on the product hang-tags. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc*., 688 F. Supp. 2d 1148, 1154 (D. Nev. 2010). While Plaintiffs will likely argue their survey showed levels of consumer confusion under an ordinary *Sleekcraft* test, the application of this test is insufficient to account for the full weight of the public's interest in free expression, and would render the *Rogers* test a nullity. (ER Vol.3, 529.)

If the district court's interpretation of §1125(a) stands, the effect would be an indefinite monopoly on any expression involving Marley, in contravention of free speech principles. Members of the public would be prohibited from using any images of Marley to express appreciation for the life and music of Marley. As one court has reasoned, when a "persona has become thoroughly ingrained in our cultural heritage…that persona should be freely available to those who seek to appropriate it as part of their own expression, even in tasteless ads." *Hebrew Univ. of Jerusalem v. Gen. Motors LLC*, CV10-03790 AHM JCX, 2012 WL 4868003 (C.D. Cal. Oct. 15, 2012) (discussing the term limits for the Einstein celebrity rights). Along similar lines, one commentator explained, celebrities are "common points of reference for millions of individuals who may never interact with one another, but who share, by virtue of their participation in a mediated culture, a

34

common experience and a collective memory." John B. Thompson, *Ideology and Modern Culture: Critical Social Theory in the Era of Mass Communication* 163 (1990). "[T]hrough their pervasive presence in the media, sports and entertainment celebrities come to symbolize certain ideas and values…Celebrities, then, are an important element of the shared communicative resources of our cultural domain." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 972 (10th Cir. 1996). For these reasons, this Court should conclude the use of the Marley image is protected by the First Amendment.

## D.    Defendants' Use Of Bob Marley Is Aesthetically Functional

In *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912 (9th Cir. 1980), a defendant jeweler produced rings and pins that bore a fraternal organization's trademarked insignia. This Court examined whether the use was an actionable "trademark use" or some other kind of use, noting that trademark law is primarily concerned with identification of the maker of the product so as to avoid confusing consumers. *Id.* Trademark law "does not prevent a person from copying so-called 'functional' features of a product which constitute the actual benefit that the consumers wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *International Order of Job's Daughters*, 633 F.2d at 917.

To determine whether a use is an "aesthetically functional" use or a trademark use, "a court must closely examine the articles themselves, the defendant's merchandising practices, and any evidence that consumers have actually inferred a connection between the defendant's product and the trademark owner." *Id.* at 919. In *International Order of Job Daughters*, this Court concluded that although the insignia at issue was trademarked by the Job's Daughter organization, nothing about the jeweler's use of the mark would have led a "typical consumer . . . to infer[] from the insignia that the jewelry was produced, sponsored, or endorsed by Job's Daughters." *Id.* Because customers purchased the insignia only for its value as a symbol and not because it believed that the organization endorsed the jewelry, the use of the mark was functional and not an infringing trademark use.[17]

---

[17]     Although some have argued the aesthetic functionality doctrine is no longer a viable defense, the Ninth Circuit noted "the doctrine, albeit restricted over the years, retains some limited vitality." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1070 (9th Cir. 2006); *See also Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 221 (2d Cir. 2012) (stating it is clear that the combined effect of *Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995) and *TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001) was to validate the aesthetic functionality doctrine as it had already been developed by this Court).

36

Applying this Court's test in *Job's Daughter*, a district court recently concluded that defendants use of the BETTY BOOP word mark was not a trademark use. *Fleischer Studios, Inc. v. A.V.E.L.A., Inc*., CV 06-6229 ABC (MANx) (C. D. Cal., Nov. 14, 2012).  Consistent with *Job's Daughters*, the court closely examined defendants' products, defendants' merchandising practices and whether there was any evidence that consumers connected defendants products with that of plaintiff. *Id.*  The court then held defendants' use of the name Betty Boop was aesthetically functional because defendants' used the mark as a decorative feature of their merchandise, and not as a source-identifying indicator. *Id.*

Similarly, applying the Court's test in *Job's Daughter*, this Court should conclude as a matter of law that Defendants' use of Marley is not a trademark use. Defendants' use Marley's image as a feature of their products, including T-shirts. The Marley image is a decorative component of Defendants' products and thus, part and parcel of the aesthetic design of those goods.  Customers purchased the Defendants' products because they are fans of Marley or believed in what Marley stood for, not because they believed that Plaintiffs endorsed or approved of the products. As for Defendants' merchandising practices, Defendants never indicated sponsorship by Plaintiffs.  Rather, Defendants' products all identify one of Defendants as their source.  Based on these considerations, Defendants use of

Marley's image cannot be viewed as source-identifying.  (ER Vol.3, 422-423.)
Indeed, even Plaintiffs' survey demonstrated that only 9% of the respondents
connected the t-shirt to Marley when asked "Who Made or Put Out the T-shirt?"
when, almost double the amount of respondents connected Defendants' T-shirts
with Defendants.  (ER Vol.3, 529.)

## E.    Plaintiffs' Lanham Act Claim Conflicts With The Copyright Act

The district court's ruling will vitiate the Copyright Act and permit Plaintiffs
to hold a perpetual monopoly over use of any and all images of Marley, even in
cases where Plaintiffs are not the copyright holder.  In *DaStar Corp. v. Twentieth
Century Fox Film Corp.*, the Court concluded that party may not assert a trademark
infringement action against an alleged infringer if that action is essentially a
substitute for a copyright infringement action. 539 U.S. 23, 33, 123 S. Ct. 2041,
2047, 156 L. Ed. 2d 18 (2003).  To do so would be to circumvent the Copyright
Act and allow trademark holders perpetual rights to exploit their creative work.  *Id.*
The Court further cautioned, "in construing the Lanham Act, we have been careful
to caution against misuse or overextension of trademark and related protections
into areas traditionally occupied by patent or copyright." [18]  *Id.*

---

[18]    This Court has explicitly interpreted *DaStar* to apply to copyrighted
materials that were not in the public domain.   *See Williams v. UMG Recordings,
Inc.*, 281 F. Supp. 2d 1177, 1185 (C.D. Cal. 2003) ("the Supreme Court's holding
did not depend on whether the works were copyrighted or not"); *Sybersound
Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008).

At issue are multiple images of Marley which are not owned by Plaintiffs. (ER Vol.3, 422.)  Rather, the images were owned by Rabanne, who assigned his rights in the images to Defendants.  (ER Vol.3, 422.)  An affirmation of the district court's ruling by this Court would be akin to a finding that the Lanham Act creates a perpetual copyright to all images of Marley, which contravenes the scope of Congress' authority.

Indeed, the Supreme Court's holding in *DaStar* is applicable to false endorsement claims under the Lanham Act.   In *Armstrong,* plaintiff argued defendant's use of his "image, likeness and/or performance rights [on the cover of DVDs] is likely to deceive and has deceived fans and prospective customers/audience members into believing that the defendant's products are endorsed by plaintiff." *Armstrong v. Eagle Rock Entm't, Inc.*, 655 F. Supp. 2d 779, 791 (E.D. Mich. 2009). Although plaintiff's claim was labeled as false endorsement claim under §43(a), the court noted "a false designation of origin claim brought by an entertainer under §43(a) of the Lanham Act…is equivalent to a false association or endorsement claim." *Id., citing ETW Corp., Inc.,* 332 F.3d at 926. The court then reasoned that plaintiff's claim was actually a false designation of origin claim, and "any claim based on "false designation of origin" [where copyright law is also implicated] is foreclosed by *Dastar*." In the words of the

court, "it is clear from the cover that the Executive Producer is Montreux Sounds SA," and plaintiff's picture on the DVD case cannot confuse a buyer into thinking that plaintiff was the "origin" of the tangible DVD product since the goods were clearly marked. *Armstrong,* 655 F.Supp.2d at 791. Therefore, the court concluded plaintiff's claim was not tenable under *Dastar.*

In a similar case in the Second Circuit, a photographer brought an action against a website which displays images of celebrities. The website displayed several of the photographer's images. The court held that plaintiff's "Lanham Act claims are precluded by the unanimous Supreme Court decision in *Dastar,* because [his] claims [of false designation of origin] are no more than claims of copyright infringement disguised as Lanham Act claims." The court reasoned "[s]ince *Dastar,* Lanham Act claims arising from the alleged copying of creative work have been clearly foreclosed*"* when the manufacturer of the physical product is properly labeled.[19] *Michael Grecco Photography, Inc. v. Everett Collection, Inc.*, 589 F. Supp. 2d 375, 387 (S.D.N.Y. 2008) *order vacated in part on reargument sub nom.*

---

[19] The Supreme Court did not limit its holding to uncopyrighted material in the public domain. Many courts, both in this district and others, have recognized that *Dastar* applies to copyrighted material. *Michael Grecco Photography, Inc. v. Everett Collection, Inc.*, 589 F. Supp. 2d 375, 387-88 (S.D.N.Y. 2008); *see, e.g., Silverstein v. Penguin Putnam, Inc.,* 522 F.Supp.2d 579 (S.D.N.Y.2007); *General Universal Sys., Inc. v. Lee,* 379 F.3d 131 (5th Cir.2004); *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't,* 392 F.Supp.2d 297 (D.Conn.2004); *Williams v. UMG Recordings, Inc.,* 281 F.Supp.2d 1177 (C.D.Cal.2003).

*Grecco v. Everett Collection*, 07 CIV 8171(CM)(JCF), 2009 WL 969928 (S.D.N.Y. Apr. 7, 2009) (reversing ruling based on an inconsistent deposition, only in relation to the Frankenstein images); *citing Hudson v. Universal Studios, Inc*., 04 CIV 6997(GEL), 2008 WL 4701488, *8 (S.D.N.Y. Oct. 23, 2008)*, aff'd,* 369 F. App'x 291 (2d Cir. 2010).

Although "Congress enacted the copyright and trademark statutes to protect different types of intellectual property and redress different types of harm," the Supreme Court has also cautioned "against misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright" so as not to create "mutant copyright law" or "perpetual patent and copyright, which Congress may not do." *Zuffa, LLC v. Justin.tv, Inc.,* 838 F. Supp. 2d 1102, 1104-05 (D. Nev. 2012) citing *Dastar v.Twentieth Century Fox Film Corp*., 539 U.S. 23, 34, 37, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003).

Here, Defendants use photographs of Marley on their products. These photographs are copyrightable subject matter. Defendants then label them with their own brands and clearly identified themselves as the source of the tangible goods. As the court notes in *Armstrong,* Plaintiffs' false association claim is essentially a false designation of origin claim. As in *Armstrong,* no consumer would be confused as to the origin of the goods simply because the product featured a celebrity's photograph. Rather, when the goods are properly labeled,

*Dastar* prevents such a claim. Moreover, allowing Plaintiffs' claims under the Lanham Act would create the parade of horribles the Supreme Court was concerned with in *Dastar*. Plaintiffs would be able to control every image, depiction, or likeness of Bob Marley in perpetuity because under the Lanham Act, they are able to prove consumers "associate" any depiction of Bob Marley with Bob Marley or his estate.

## F.    There Was Insufficient Evidence In The Record To Substantiate Any Finding That AVELA Defendants Interfered With Plaintiffs' Prospective Economic Advantage

The substantial evidence in the record does not support the district court ruling which denied Defendants' Motion for Judgment and Renewed Motion for Judgment on Plaintiffs' claim for interference with prospective economic advantage. *Syufy Enterprises v. American Multi-cinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986); *Lancer Ins. Co. v. D.W. Ferguson & Associates*, 46 F.3d 1142 (9th Cir. 1995).

In order to establish a claim for interference with prospective economic advantage in Nevada, a plaintiff must establish the following elements: 1) a prospective contractual relationship between the plaintiff and a third party; 2) the defendant's knowledge of this prospective relationship; 3) the intent to harm the plaintiff by preventing this relationship; 4) the absence of privilege or justification by the defendant; and 5) actual harm to the plaintiff as a result. *See Wichinsky v.*

*Mosa*, 109 Nev. 84, 88 (1993); *Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 1173, 1180-81 (D. Nev. 2003); *Leavitt v. Leisure Sports Inc.*, 103 Nev. 81, 88 (1987).

Under Nevada law, a plaintiff must show that the means used to divert the prospective advantage was unlawful, improper, or was not fair and reasonable. *Custom Teleconnect, Inc.*, 254 F. Supp. 2d at 1180-81 *citing Crockett v. Sahara Realty Corp.*, 95 Nev. 197 (1979). Additionally, the plaintiff must "offer proof of an essential element of [intentional interference with prospective economic advantage]." *Bally Technologies, Inc. v. Bus. Intelligence Sys. Solutions, Inc.*, 2:10-CV-00440-PMP, 2012 WL 3656498 (D. Nev. Aug. 23, 2012) (holding counterclaimant failed to offer proof of actual harm, an essential element of the counterclaim, and thus the issue can be dismissed on summary judgment). As demonstrated below, the record does not support a finding of interference with prospective economic advantage.

Plaintiffs have solely relied on the testimony of Ms. Crujeiras to establish that they lost an opportunity with Wal-Mart as a result of Defendants' licensing activity. However, Ms. Crujeiras' admitted that she had no personal knowledge as to why Wal-Mart decided not to purchase Plaintiffs' licensed products. (ER Vol.2, 206-207.) In fact, Ms. Crujeiras "could not remember exactly who" was complaining about Defendants competing in the market with Plaintiffs, and when

43

Defendants counsel asked if Ms. Crujeiras had "any knowledge that AVELA or anybody from the Defendants went in and undercut [Plaintiffs' sublicensee's] efforts to sell to Wal-Mart," Ms. Crujeiras answered ambiguously that she "did have that one conversation with [Plaintiffs' sublicensee]" as a "conference call." (ER Vol.2, 206-207.)   However, Ms. Crujeiras did not offer any other evidence other than that of Plaintiffs' own sublicensee. This clearly self-interested testimony is not "substantial evidence" demonstrating actual harm. *Lancer Ins. Co*., 46 F.3d 1142. Moreover, Ms. Crujerias did not know the exact amount of harm Plaintiffs' suffered, stating Defendants' actions cost Plaintiffs "Approximately $250,000" in lost sales at Wal-Mart. Such speculative evidence also does not establish that Plaintiffs suffered actual harm.

Furthermore, Plaintiffs boldly asserted during their opening statement that the jury was "going to hear that [Wet Seal] used to sell Mr. Conley's [Zion] products and then they started buying the defendants' products because they were cheaper." (ER Vol.2, 293.) However, there is also no evidence that demonstrates this claim. Ms. Baker, the buyer for Wet Seal, testified the reason she stopped buying licensed music t-shirts in general was because "it was an unprofitable business." (ER Vol.2, 191.)  Ms. Barker did acknowledge that before Wet Seal's decision to cease buying licensed music t-shirts, Wet Seal purchased Marley products from two vendors, Crystal Group, supplied by Zion, and Awake [JEM]

44

(ER Vol.2, 192-193.)  The cost per unit was higher by "several dollars" for the Bob Marley products purchased from Crystal Group. (ER Vol.2, 192-193.)  Ms. Barker then agreed that she replaced the Crystal Group product with the Awake product because the Awake product was cheaper. (ER Vol.2, 193-194.)   Ms. Barker's testimony, however, failed to establish that AVELA knew of Plaintiffs' business expectancy or prospective business relationship with Wet Seal.

Plaintiffs also, albeit unsuccessfully, attempted to put forth evidence that AVELA knew of Plaintiffs' business expectancy or prospective business relationship with JRG Copa, Target, and Ecko. The evidence cited by Plaintiffs, however, does not establish that AVELA knew of Plaintiffs' business expectancy or prospective relationship with the aforementioned parties. For example, Jacob Goldszer, the president of JRG Copa, testified that he spoke to Zion about getting a license for towels bearing the image of Bob Marley between April 2000 and April 26th, 2006. (ER Vol.2, 289-290.)  However, he stated JRG Copa's rationale for not entering a license agreement with Zion was that they "did not agree with [Zion's] license agreement." (ER Vol.2, 291.)  In fact, the chain of emails between Zion and JRG Copa ended April 26th, 2006 (ER Vol.2, 290), but Mr. Goldszer did not meet AVELA until 2007. (ER Vol.2, 285-286.)  Further, Mr. Goldszer asserted that the fact that Zion sold Bob Marley beach towels did not affect JRG Copa's decision to enter a license agreement with AVELA. (ER Vol.2, 292.)   While Plaintiffs

introduced evidence that the Zion royalty rate was 17 percent, and the AVELA royalty rate was 10 percent, this is not evidence that Defendants knew Plaintiffs were speaking with JRG Copa. This also does not demonstrate that Plaintiffs suffered actual harm from AVELA and JRG Copa's agreement. In fact, Mr. Goldszer's  testimony shows he rejected Zion's license agreement even before AVELA came into the picture.

Ms. Kinneberg, a buyer for Target Men's, also stated she was unfamiliar with Zion's business. (ER Vol.2, 198.)  She went on to explain that the only communication she had with Zion involved a series of emails between October 24, 2008 and February 4, 2009.  (ER Vol.2, 199-200.)  These emails were between Ms. Kinneberg and Zion's licensee, Neil Maddox. *Id.* The emails only demonstrate that Mr. Maddox wanted to sell Bob Marley shirts to Target. (ER Vol.2, 199.)  Ms. Kinneberg told Mr. Maddox that she "did not want to add a new vendor…any vendor" to her vendor list at the time. (ER Vol.2, 201.)  She also stated Zion never offered Ms. Kinneberg a price for its Marley products in the emails. (ER Vol.2, 201.)  When Heather Vogel, the buyer for Target Women's, was asked if she was familiar with Zion, she answered "no." (ER Vol.2, 190.)  Consequently, Plaintiffs did not establish with substantial evidence that Defendants interfered with its relationship with Target.

In contrast to Plaintiffs' lack of evidence supporting its claim for interference, Defendants put forth the testimony of Ms. Acuna and Mr. Valencia to demonstrate that they did not intentionally interfere with Plaintiffs' prospective economic relationships. Ms. Acuna testified that until recently, Zion and JEM sold the Bob Marley products in different types of stores. (ER Vol.2, 202.)  She further stated that she did not know that Zion was selling its products in specialty boutiques for its infant wear.  (ER Vol.2, 205.)

Moreover, Mr. Valencia stated that he never intended to create consumer confusion between Hope Road or Zion. (ER Vol.2, 187.)  When Defendants' counsel asked if Mr. Valencia was "ever aware of the existence of an agreement or a potential business relationship between the plaintiff and JRG Copa…Wet Seal...[or] C & D Visionary," Mr. Valencia answered "Never." (ER Vol.2, 188.) Mr. Valencia also stated he "never" intended to interfere with any existing agreement or potential business relationship of Plaintiffs. (ER Vol.2, 189.)

For these reasons, this Court should find that there is insufficient evidence to support the finding that AVELA Defendants interfered with Plaintiffs' business and reverse the judgment entered in favor of Plaintiffs on this claim.

## G.   The District Court Erred By Not Permitting AVELA Defendants To Deduct Certain Expenses In Determining Its Net Profits

On July 3, 2012, the district court entered an award concluding that AVELA Defendants' net profits of $348,543 was attributable to their infringement and

47

hence, should be disgorged to Plaintiffs. (ER Vol.1, 7.) The district court erroneously concluded that beyond the $15,000 royalty paid to Roberto Rabanne, the AVELA Defendants failed to demonstrate entitlement to deductions against gross revenue incurred with respect to V. International Publishing, Inc. ("V International"). (ER Vol.1, 7.)

Under AVELA's agreement with V International, AVELA pays V International 40% of all gross royalties it receives as compensation as V International's exclusive license agent services, including the service of all licensee clients on a day-to-day basis and the management of all such accounts. (ER Vol.2, 157.) This agency fee is typical to the industry. (ER Vol.2, 157-158.) Under this Agreement, AVELA was required to pay V International the sum of $144,912 (40% of the revenue derived from the licensing of Marley images). (ER Vol.2, 158.) In addition to AVELA's obligation to V International, it incurred $222,771 in deductible business expenses attributable directly to Marley licensing activities– of which $161,466 were incurred in deductible marketing, travel and overhead expenses and $61,305 in deductible trade show expenses.[20] (ER Vol.2, 157-159.) The district court, without analysis, concluded that AVELA Defendants failed to

---

[20] Marley licensing activities accounted for approximately 14.5% of AVELA's total profits. This figure was calculated by dividing the sum of royalties received by AVELA for Marley by the total royalties received by AVELA for all artwork and images it licensed covering the same 2007-2010 time period. (ER Vol.2, 157-159.)

meet their burden of demonstrating that these are deductible expenses. This finding was an abuse of discretion.

## H.   The District Court Abused Its Discretion By Denying Defendants' Motion For Leave To Reopen Discovery

The district court's denial of Defendants' motion to reopen discovery prohibited Defendants from fully and fairly defending Plaintiffs' §1125(a) claim at trial.[21] From the inception of the action, Plaintiffs' primary theory of the case centered around their allegations that Defendants infringed on their BOB MARLEY word mark. It was not until after discovery cut-off and during the filing of their Motion for Summary Adjudication that Plaintiffs alleged they owned trademark rights in all images of Bob Marley (i.e., his "identify/persona") and that Defendants' unpermitted use of Bob Marley's persona constituted false association under 15 U.S.C. §1125(a).

Prior to filing their dispositive motion, Plaintiffs argued that their trademark rights in the name "Bob Marley" were infringed under the doctrine of picture-word equivalency – that Defendants' use of an image of Bob Marley was the legal

---

[21]     Prior to trial, Defendants sought to reopen discovery for the limited purpose of (1) conducting discovery as to the existence and extent of the unauthorized use of Bob Marley's image and likeness on merchandise during his lifetime and following his death and (2) designating an expert witness to (i) present survey evidence as to whether consumers of the type of t-shirt merchandise at issue were likely to believe that Bob Marley or his estate endorsed the t-shirts containing images licensed by AVELA and/or (ii) present evidence to rebut testimony of Plaintiffs' retained survey expert regarding newly alleged false association/endorsement of any and all images of Bob Marley.

equivalent of the use of Plaintiffs' trademark BOB MARLEY. Under this theory, a consumer-confusion survey would not have been required, and Defendants would not have needed to conduct discovery on whether Marley exploited his rights during his lifetime. Defendants acted reasonably under these circumstances as the district court had previously determined that Plaintiffs BOB MARLEY word mark was the only viable trademark at issue in this case. (ER Vol.1, 103.)

Following the discovery cut-off date, Plaintiffs shifted the theory of their case and asserted a "celebrity association" claim. Plaintiffs objected to Defendants document demand requesting evidence which reflected or identified persons or entities who have licensed the use of Marley's name or image, whether or not authorized. Plaintiffs claimed that the production of documents reflecting or evidencing unauthorized use on the grounds that it was "irrelevant" to any of the claims or defenses in the case. (ER Vol.2, 393-394.) After Plaintiffs sought summary adjudication of their "celebrity association" claim, Defendants sought leave from the district court to obtain additional discovery so that they could fairly defend against Plaintiffs' §1125(a) claim at trial. The district court, however, erroneously concluded that Defendants were on notice of Plaintiffs' false association claim, and refused to permit limited discovery following the discovery cut-off date.

50

The denial of Defendants' motion to either present survey evidence or at a minimum present evidence to rebut Plaintiffs' survey expert, was unfairly prejudicial given that the survey evidence is the one of the only forms of evidence in association claims.  *See* 1 McKenney and Long, Federal Unfair Competition: Lanham Act 43(a) §8:2. Moreover, allowing discovery of all documents and other evidence demonstrating the existence and extent of unauthorized use of Bob Marley's image and likeness on merchandise could have precluded Plaintiffs' false association claim.

Plaintiffs also successfully convinced the district court that they would be unfairly prejudiced by the Defendants discovery request because it would significantly alter the trial date. (ER Vol.2, 385-386.)  However, the allowance of discovery would not have had that effect.  Moreover, because Plaintiffs previously objected to discovery of unauthorized use on the grounds that it was irrelevant, the probative value of the evidence requested as a result of Plaintiffs' own actions significantly outweighed any potential prejudice plaintiffs asserted in their reply. *See* Fed. R. Evid. 403.  Thus, the district court abused its discretion in denying defendants motion to reopen discovery for the limited purpose of establishing prior unauthorized use and providing a rebuttal survey

**I.     There Is Insufficient Evidence To Demonstrate That Freeze Willfully Infringed On Marley's Intellectual Property Rights**

In determining "willful infringement," this Court has stated that "willfulness and bad faith" "require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense." *Lindy Pen Co., Inc.*, 982 F.2d at 1406 *quoting ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 966 (D.C. Cir.1990) (court reversed trial court's finding that a false advertising violation of Lanham Act was willful or in bad faith). The Court then concluded that plaintiff's "attenuated" evidence only demonstrated that the defendant had knowledge of the existence of the plaintiff's mark, which was not enough for a finding of willful infringement. *Id.* at 1406.

McCarthy also clarifies, "[t]o obtain an accounting of profits, the courts almost always require that defendant's infringement imply some connotation of intent, or a knowing act denoting an intent, to infringe or reap the harvest of another's mark and advertising." 5 McCarthy on Trademarks and Unfair Competition §30:62 (4th ed.) Courts have agreed with McCarthy's interpretation. The Third Circuit stated that "[k]nowing or willful infringement consists of more than the accidental encroachment on another's rights. It involves an intent to infringe or a deliberate disregard of a mark holder's rights." *SecuraComm Consulting, Inc. v. Securacom, Inc*., 166 F.3d 182 (3d Cir. 1999) (holding trebling

damages in a trademark infringement action was unreasonable since a defendant's actions in failing to conduct a trademark search could, at worst, only be characterized as "careless.").  The record simply does not support a finding of willful infringement against Freeze.

Ms. Cauley is the Vice President of Licensing at Freeze. (ER Vol.2, 172-73.) Freeze's licensing business, which consists of about 100 licenses, constitutes approximately 80 percent of its business. (ER Vol.2, 175.)  Ms. Cauley established that it was standard policy for Freeze not to conduct an investigation to determine who owned the rights of a licensed property because it relies on its indemnification agreements in its licenses. (ER, Vol 2, 176, 186.) Notably, other industry witnesses at trial testified that they relied on indemnity from vendors or licensors.  These include Jacob Goldszner from JGR Copa, Ecko Vice President Stephen Fefferman, and Target buyer Heather Vogel.  (ER Vol.2, 169-171.) Ms. Cauley also testified that Freeze never investigated whether AVELA had the rights to the Bob Marley images. (ER Vol.2, 177.)

Ms. Cauley testified that although she received two phone calls from Ms. Crujeiras sometime in January 2008, wherein Ms. Crujeiras stated that Hope Road or the Marley family owned the rights in Bob Marley, she did not know who Ms. Crujeiras was.  (ER Vol.2, 179-181, 184.) Moroever, Ms. Cauley only spoke to Ms. Crujeiras on the phone for a few minutes. (ER Vol.2, 184.) Based on such

evidence, the jury improperly determined that Freeze willfully infringed on Plaintiffs' Intellectual Property Rights.

Similarly, the evidence does not establish that Freeze was aware of Zion or that its sale of Marley products was at Zion's expense. If anything, the record shows only "attenuated" evidence that Freeze had knowledge of Zion's existence. Such evidence is insufficient for a finding of willful infringement. The evidence is also insufficient to establish a "willful blindness" after having suspected wrongdoing. Accordingly, the judgment against Freeze should be reversed and remanded to the district court for further proceedings to determine whether Freeze should be required to disgorge its profits absent evidence of willful infringement.

## J.     The District Abused Its Discretion In Awarding Attorney's Fees To Plaintiffs

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a). "[A] case is exceptional within the meaning of 15 U.S.C. §1117(a) where the infringement is willful, deliberate, knowing or malicious." *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003). Even if a case is exceptional, the Court may in its discretion, not award attorney fees. *Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000). An award is within the discretion of the trial court and will not be disturbed absent abuse of that discretion. *Transgo, Inc. v. Ajac*

54

*Transmission Parts Corp*., 768 F.2d 1001, 1026 (9th Cir. 1985), cert. denied, 474 U.S. 1059 (1986).

> 1.   The District Court Erred In Concluding the Case Was Exceptional

Defendants' use of Bob Marley images was not "malicious, fraudulent, deliberate or willful."   Indeed, Defendants prevailed on Plaintiffs' claim for infringement arising out of the word mark BOB MARLEY and infringement of Bob Marley's persona or identity under the Nevada Right of Publicity statute.   As to Defendants' "celebrity false endorsement" action under the Lanham Act, under existing law, Defendants' use of Marley images (without the word Bob Marley) was predicated on a reasonable interpretation of existing law.

While at least one court in the Ninth Circuit has held that it is theoretically possible for the estate of a *recently* deceased celebrity to make a claim of false endorsement, the possibility was premised on the condition that the celebrity endorsed a product prior to her death. *See Cairns*, 24 F. Supp. 2d at 1032.   Here, Bob Marley died nearly 23 years ago.

Indeed, Plaintiffs admit in their fee motion that a claim for infringement of rights in a deceased celebrity's identity and persona "is a developing area of the law and not the subject of many judicial opinions."   (ER Vol.2, 155.) Given the novelty of the issue presented and the unsettled nature of this particular area of

law, Defendants' use of Bob Marley's image on t-shirts could hardly be said to rise to the level or "malicious, fraudulent, deliberate, or willful."

Notwithstanding the novel issue presented, there are multiple factors which also warrant a denial of attorney fees in the above-entitled action. First, Plaintiffs prevailed on only two of the five claims asserted against Defendants. Of these five claims, Defendants successfully obtained a dismissal of three of the five claims. The district court granted Defendants' motion for summary judgment on Plaintiffs' claims for trademark infringement under 15 U.S.C. §1114 and common law trademark infringement.  (ER Vol.1, 118-119.)   Thereafter, the district court entered an order granting Defendants' motion for summary judgment on Plaintiffs' claim for violation of the Nevada Right of Publicity statute.  The district court then ordered trial to proceed as to Counts Two and Five, which encompassed Plaintiffs' claim for Unfair Competition under 15 U.S.C. §1125(a) and Intentional Interference with Prospective Economic Advantage. (ER, Vol.1, 83.) Accordingly, while Plaintiffs may have succeeded on its "false endorsement" claim under 15 U.S.C. §1125(a) and intentional inference with prospective economic advantage, Plaintiffs were unsuccessful on their other Lanham Act claim as well as their claims for violation of the Nevada Right of Publicity Statute and common law trademark infringement.

Second, Plaintiffs were already awarded $300,000 in compensatory damages in connection with their interference claim.  (ER, Vol.1, 13.) In addition, this Court entered an award of Defendants' profits in the amount of $413,638.29 against JEM, $19,246.54 against Freeze, and $348,543 against AVELA.  (ER Vol.1, 4.) Under Section 35 of the Lanham Act, a prevailing plaintiff may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. §1117(a).  Since the Court already awarded to Plaintiffs damages in connection with Plaintiffs' interference claim as well as Defendants' profits, those awards are sufficient to fulfill the goal of the Lanham Act -- "making acts of deliberate trademark infringement unprofitable." *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968). The additional attorney's fees are not needed to fulfill the policy behind the Lanham Act.

Third, Plaintiffs' "celebrity endorsement" claim was merely an afterthought and not the primary litigation objective.  After determining there was insufficient evidence to demonstrate infringement of the word mark, BOB MARLEY, Plaintiffs altered the course of litigation during summary judgment proceedings and asserted that their 15 U.S.C. §1125(a) claim was predicated upon a "celebrity endorsement" theory and any use by Defendants of any image of Bob Marley infringed on Plaintiffs' trademark rights in Bob Marley's persona.

57

Defendants' use of Bob Marley's image however, presented an issue of first impression, was not a clear cut case of false endorsement, and raised debatable questions of fact and law. *See Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1300 (9th Cir. 1998). Put simply, there are but a handful of reported decisions which discuss infringement claims by a deceased celebrity's estate. Indeed, the *Cairns* decision suggests that there are only limited circumstances upon which a deceased celebrity's estate could pursue a "celebrity endorsement" claim. Therefore, Defendants reasonably believed that its use of Bob Marley's image could not constitute false endorsement under 15 U.S.C. §1125(a).

2.     Plaintiffs Are Not the Prevailing Party in this Action.

As discussed above, it is undisputed that Defendants prevailed on the majority of the claims initiated by Plaintiffs, including a claim under the Lanham Act and Plaintiffs' claim under the Nevada right of publicity statute. Plaintiffs, conveniently ignore this undisputed fact and boldly assert that they are the "prevailing party" because they prevailed on two of the five claims raised in the lawsuit.

Plaintiffs additionally relied on a media headline and statements made by Defendants' counsel to the media as evidence that Defendants' counsel, as well as the media, believed that Plaintiffs prevailed. Defense counsel's expression of disappointment in the jury verdict does not substantiate or support Plaintiffs claim

that they are the prevailing party. It is an even further stretch for Plaintiffs to assert that the media's headline for an article which discusses the trial could possibly support a finding that Plaintiffs are the prevailing party.

## CONCLUSION

The judgment below on the §1125(a) claim should be reversed and the Court should direct summary judgment in Defendants' favor. Additionally, the Court should conclude that there was insufficient evidence in the record to support the jury verdict finding AVELA Defendants interfered with Plaintiffs' prospective economic advantage. Alternatively, the Court should remand the issue of AVELA Defendants' net profits to the district court with instructions to consider AVELA Defendants' business expenses. Finally, the Court should reverse any judgment against Freeze because the record is insufficient to support a finding of willful infringement.


Dated: May 24, 2013                Respectfully submitted,

                                   /s/ Melissa W. Woo

                                   MELISSA W. WOO

## NOTICE OF RELATED APPEALS

The appeal is related to the appeal filed by co-defendant JEM and appeals filed by plaintiffs Fifty-Six Hope Music Road, Ltd, and Zion Rootswear, LLC, Case Nos. 12-17519, 12-17595, and 13-15473.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

[F.R.A.P. 32(a)(7)(C) and Circuit Rule 32-1]

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 point or more and contains 13,995 words.

Dated: May 24, 2013                    /s/ Melissa W. Woo

                                       MELISSA W. WOO

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2013, I electronically filed the foregoing:

## BRIEF OF DEFENDANTS-CROSS-APPELLANTS-APPELLEES

## A.V.E.L.A., INC., X ONE X MOVIE ARCHIVE, INC., CENTRAL MILLS,

## INC., AND LEO VALENCIA

with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I hereby certify that on March 24, 2013, I effectuated service of

## VOLUMES I, II, AND III OF THE EXCERPTS OF RECORD

Upon the Ninth Circuit Court of Appeals all participants in this case via first class mail.

/s/ L.Racquel Raymond
L. RAQUEL RAYMOND

62