**U.S. COURT OF APPEALS CASE NOS. 12-17502 AND 13-15407**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

FIFTY-SIX HOPE ROAD MUSIC LIMITED AND ZION ROOTSWEAR, LLC

*Plaintiffs-Appellees and Cross-Appellants,*

v.

A.V.E.L.A., INC., X ONE X MOVIE ARCHIVE, INC., LEO VALENCIA, CENTRAL MILLS, INC. (FREEZE), AND JEM SPORTSWEAR, INC.

*Defendants-Appellants and Cross-Appellees.*

———————

On Appeal From The United States District Court
For The Nevada District of California
District Court Case 2:08-cv-00105-PMP-GWF

———————

**PLAINTIFFS-APPELLEES/CROSS APPELLANTS FIFTY-SIX HOPE
ROAD MUSIC LTD.'S AND ZION ROOTSWEAR, LLC'S SECOND BRIEF
ON CROSS APPEAL**

———————

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Jill M. Pietrini (Cal. Bar No. 138335)
Paul A. Bost (Cal. Bar No. 261531)
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
TEL: (310) 228-3700

GALLANT & ERVIN
Timothy J. Ervin
One Olde North Road, Suite 103
Chelmsford, MA 01824
TEL: (978) 256-6041

*Attorneys for Plaintiff-Appellees/Cross-Appellant Fifty-Six Hope Road Music
Limited and Zion Rootswear, LLC*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee and Cross-Appellant Fifty-Six Hope Road Music Limited ("Fifty-Six Hope Road") hereby certifies pursuant to FRAP 26.1, that it does not have parent corporations and that no publicly held corporations own 10% or more of its stock.

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee and Cross-Appellant Zion Rootswear, LLC hereby

certifies, pursuant to FRAP 26.1, that it does not have a parent corporation and that

no publicly held corporations own 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

I.  PLAINTIFFS' 43(A) CLAIM IS LEGALLY VIABLE .................................5

    A.  Celebrities Have Trademark-Like Rights in Their Personas ...............5

    B.  Celebrity 43(a) Claims Are Not Limited to False Endorsements .......11

    C.  The *Cairns* Cases Support the Viability of Plaintiffs' 43(a) Claim ..................................................................................13

    D.  The Judgment is Not Tantamount to the Creation of a Federal Right of Publicity .................................................................16

    E.  Defendants' Use of Bob Marley's Persona is Not Protected by the First Amendment ........................................................19

        1.  Defendants Waived Any First Amendment Defense ...............19

        2.  Defendants' Use is Not Subject to *Rogers v. Grimaldi* Scrutiny ..................................................................20

    F.  Plaintiffs' 43(a) Claim is Not Barred by the Aesthetic Functionality Defense .......................................................22

    G.  Plaintiffs' 43(a) Claim Does Not Conflict with the Copyright Act .................................................................................26

II.  DEFENDANTS WAIVED THEIR RIGHT TO APPEAL THE SUFFICIENCY OF THE EVIDENCE FOR PLAINTIFFS' 43(A) CLAIM ................................................................................29

III.  EVEN IF THERE IS NO WAIVER, THE JURY'S VERDICT ON PLAINTIFFS' 43(A) CLAIM IS SUPPORTED BY SUBSTANTIAL EVIDENCE ...........................................................30

    A.  Dr. Jay's Survey is Probative of Likelihood of Confusion ................30

    B.  The Other *Downing* Factors Support a Finding of a Likelihood of Confusion .....................................................35

1.  The Level of Recognition that Bob Marley has Among the Segment of Society for Whom Defendants' Products Are Intended ............................................................... 35

2.  The Relatedness of the Fame or Success of the Bob Marley to Defendants' Products ................................. 36

3.  The Similarity of the Likenesses Used by Defendants to Bob Marley ............................................................. 36

4.  Marketing Channels Used ........................................... 37

5.  Likely Degree of Purchase Care ................................. 37

6.  Protection of Rights in Bob Marley's Identity and Persona ....................................................................... 38

7.  Actual Confusion ....................................................... 39

8.  Defendants' Intent and Willfulness ........................... 39

C.  The Jury's Verdict that JEM and Freeze Willfully Violated Section 43(a) is Supported by Substantial Evidence ......................... 43

IV.  PLAINTIFFS' ENTITLEMENT TO DEFENDANTS' PROFITS ............... 47

A.  Plaintiffs Are Entitled to a Jury Determination of Defendants' Profits ....................................................................... 47

B.  The Trial Court's Accounting of AVELA's Profits Should Be Upheld ....................................................................... 48

C.  The Court Abused its Discretion in its Accounting of JEM's Profits ....................................................................... 51

D.  Plaintiffs Are Entitled to Increased Profits ......................... 55

V.  PLAINTIFFS' ENTITLEMENT TO ATTORNEYS' FEES ...................... 58

A.  The Court's Award of Plaintiffs' Attorneys' Fees as to AVELA Should Be Affirmed ....................................................... 58

B.  The Court Erred by Denying Plaintiff's Motion for Attorneys' Fees as to JEM and Freeze ................................................ 61

VI.    DEFENDANTS FORFEITED THEIR RIGHT TO SEEK APPELLATE REVIEW OF THE MAGISTRATE JUDGE'S ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO REOPEN DISCOVERY ................................................................63

VII.   PLAINTIFFS OWN A VIABLE NEVADA REGISTRATION OF BOB MARLEY'S RIGHT OF PUBLICITY .................................................64

VIII.  PLAINTIFFS' CLAIM FOR PROSPECTIVE ECONOMIC ADVANTAGE ................................................................................70

       A.    The Jury's Verdict that AVELA Intentionally Interfered With Plaintiffs' Prospective Economic Advantage is Supported By the Record..........................................................................70

       B.    The Court's Entry of Judgment as a Matter of Law as to Plaintiffs' Claim for Punitive Damages Was Erroneous ...................74

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Abdul-Jabbar v. General Motors Corp.*
  85 F.3d 407 (9th Cir. 1996) ....................................................................17

*Adidas Am., Inc. v. Payless Shoesource, Inc.*
  546 F. Supp.2d 1029 (D. Or. 2008) ....................................................23, 47

*Allen v. National Video, Inc.*
  610 F. Supp. 612 (S.D.N.Y. 1985) .....................................................7, 18

*ALP Petfoods, Inc. v. Ralston Purina Co.*
  913 F.2d 958 (D.C. Cir. 1990) ................................................................18

*Anheuser-Busch, Inc. v. Balducci Publications*
  28 F.3d 769 (8th Cir. 1994) .....................................................................20

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*
  457 F.3d 1062 (9th Cir. 2006) ....................................................23, 24, 25

*Bach v. Forever Living Prods. U.S., Inc.*
  473 F. Supp.2d 1110 (W.D. Wash. 2007) ..................................27, 28, 33

*Bambu Sales v. Ozak Trading*
  58 F.3d 849 (2d Cir. 1995) ......................................................................49

*Banjo Buddies, Inc. v. Renosky*
  399 F.3d 168 (3d Cir. 2005) ....................................................................44

*Boston Professional Hockey v. Dallas Cap & Emblem Manufacturing, Inc.*
  597 F.2d 71 (5th Cir. 1979) .....................................................................56

*Branca v. Mann*
  2012 U.S. Dist. LEXIS 112574 (C.D. Cal. 2012) ...................................30

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*
  2011 U.S. Dist. LEXIS 36406 (S.D.N.Y. 2011).......................................7

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*
  2013 U.S. Dist. LEXIS 31155 (S.D.N.Y. 20130).....................................6

*Business Trends Analysts, Inc. v. Freedonia Group, Inc.*
887 F.2d 399 (2d Cir. 1989) ...............................................................57

*Cairns v. Franklin Mint Co.*
107 F. Supp.2d 1212 (C.D. Cal. 2000) ("*Cairns II*") .......... 11, 13, 14, 15, 16, 33

*Cairns v. Franklin Mint Co.*
24 F. Supp.2d 1013 (C.D. Cal. 1998) ........................................13, 15

*Cairns v. Franklin Mint Co.*
292 F.3d 1139 (9th Cir. 2002) .................................................13, 14

*Central Office Tel. v. AT&T*
108 F.3d 981 (9th Cir. 1997), *overruled on other grounds, AT&T v.
Central Office Tel.*, 524 U.S. 214, 118 S. Ct. 1956 (1998) ...............75

*Cher v. Forum International, Ltd.*
213 U.S.P.Q. 96 (C.D. Cal. 1982) ..................................................18

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*
696 F.3d 206 (2d Cir. 2012) ..........................................................22

*Citizens for Cold Springs v. City of Reno*
2009 Nev. LEXIS 53 (2009).............................................................69

*Clicks Billiards, Inc. v. Sixshooters Inc.*
251 F.3d 1252 (9th Cir. 2001) .........................................................23

*Coca-Cola Co. v. Rodriguez Flavoring Syrups, Inc.*
89 U.S.P.Q. 36 (Chief Examiner 1951) ...........................................27

*In re Collins*
141 F. Supp. 25 (S.D. Cal. 1956), *rev'd on other grounds* 247 F.2d 607 .........72

*Consol. Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*
114 Nev. 1304 (1998) .....................................................................74

*Cruz v. International Collection Corp.*
673 F.3d 991 (9th Cir. 2012) ....................................................19, 74

*Dastar Corp. v. Twentieth Century Fox Film Corp.*
539 U.S. 23, 123 S. Ct. 2041 (2003)......................................26, 27, 28

*Downing v. Abercrombie & Fitch*
    265 F.3d 994 (9th Cir. 2001) ..........................................................15, 30, 35, 42

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*
    547 F.3d 1095 (9th Cir. 2008) ...................................................................26

*ETW Corp. v. Jireh Pub., Inc.*
    332 F.3d 915 (6th Cir. 2003) ..................................................9, 10, 12, 17, 18

*Experience Hendrix, LLC v. Electric Hendrix, LLC*
    90 U.S.P.Q.2d 1883 (W.D. Wash. 2008).....................................................37

*Exxon Corp. v. Texas Motor Exchange, Inc.*
    628 F.2d 500 (5th Cir. 1980) .....................................................................32

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*
    344 U.S. 228, 73 S. Ct. 222 (1952)...........................................................57

*Facenda, Jr. v. N.F.L. Films, Inc.*
    542 F.3d 1007 (3d Cir. 2008) .........................................................13, 16, 21

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*
    2012 U.S. Dist. LEXIS 186136 (C.D. Cal. 2012) .........................................24

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*
    636 F.3d 1115 (9th Cir. 2011) ...................................................................24

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*
    654 F.3d 958 (9th Cir. 2011) .....................................................................24

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*
    772 F. Supp.2d 1155 (C.D. Cal. 2009).........................................................24

*Fleischmann Distilling Corp. v. Maier Brewing Co.*
    314 F.2d 149 (9th Cir. 1963) .....................................................................32

*Ford Motor Company v. Lloyd Design Corp.*
    184 F. 2d 665 (E.D. Mich. 2002)................................................................41

*In re Gabapentin Patent Litig.*
    312 F. Supp.2d 653 (D.N.J. 2004)..............................................................63

*Geisel v. Poynter Products, Inc.*
  283 F. Supp. 261 (S.D.N.Y. 1968) .................................................. 18

*Gracie v. Gracie*
  217 F.3d 1060 (9th Cir. 2000) ........................................................ 59

*H-D Michigan, Inc. v. Biker's Dream, Inc.*
  48 U.S.P.Q.2d 1108 (C.D. Cal. 1998) ............................................. 49

*Hamil Am., Inc. v. GFI, Inc.*
  193 F.3d 92 (2d Cir. 1999.) ........................................................... 51

*Hard Rock Café Licensing Corp. v. Concession Servs.*
  955 F.2d 1143 (7th Cir. 1992) ....................................................... 44

*Herbko Intern., Inc. v. Kappa Books, Inc.*
  308 F.3d 1156 ("Fed. Cir. 2002) ...................................................... 7

*Hopkins v. Saunders*
  199 F.3d 968 (8th Cir. 2000) ......................................................... 19

*Hunting World, Inc. v. Reboans, Inc.*
  1994 U.S. Dist. LEXIS 19961 (N.D. Cal. 1994) .............................. 48

*in Secalt S.A. v. Wuxi Shenxi Construction Machinery Co.*
  668 F.3d 677 (9th Cir. 2012) ......................................................... 22

*International Order of Job's Daughters v. Lindeburg & Co.*
  633 F.2d 912 (9th Cir. 1980) .............................................. 22, 23, 24

*J. Gallo Winery v. Corzorzio Del Gallo Nero*
  782 F. Supp. 472 (N.D. Cal. 1992) ................................................ 43

*Jada Toys, Inc. v. Mattel. Inc.*
  518 F.3d 628 (9th Cir. 2008) .................................................... 30, 32

*Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*
  589 F.3d 1027 (9th Cir. 2009) ....................................................... 58

*Krueger Int'l, Inc. v. Nightingale Inc.*
  915 F. Supp. 595 (S.D.N.Y. 1996) ................................................ 22

*Landham v. Lewis Galoob Toys, Inc.*
227 F.3d 619 (6th Cir. 2000) ............................................................. 12

*Lieberman v. Matson Nav. Co.*
300 F.2d 661 (9th Cir. 1962) ............................................................. 72

*Limisco v. U.S. I.N.S.*
951 F.2d 210 (9th Cir. 1991) ............................................................. 73

*Lindy Pen Co, Inc. v. Bic Pen Corp.*
982 F.2d 1400 (9th Cir. 1993) ....................................... 45, 46, 51, 55

*List v. Whistler*
99 Nev. 133 (1983) ........................................................................... 69

*Medic Alert Found. U.S. v. Corel Corp.*
43 F. Supp.2d 933 ............................................................................. 31

*Mutual of Omaha Ins. Co. v. Novak*
836 F.2d 397 (8th Cir. 1987) ............................................................. 21

*Nitco Holding Corp. v. Boujikian*
491 F.3d 1086 (9th Cir. 2007) ........................................................... 29

*O'Brien Intern., Inc. v. Mitch*
1980 U.S. Dist. LEXIS 16638(N.D. Cal. 1980) ............................... 61

*Ocean Garden, Inc. v. Marktrade Company, Inc.*
953 F.2d 500 (9th Cir. 1991) ............................................................. 57

*Parks v. LaFace Records*
329 F.3d 437 (6th Cir. 2003) ........................................... 6, 7, 10, 12

*Pebble Beach Co. v. Tour 18 I Ltd.*
155 F.3d 526 (5th Cir. 1998) ...................................................... 33, 34

*Petersen v. Bruen*
106 Nev. 271 (1990) ......................................................................... 68

*Pillsbury Co. v. Southard*
682 F. Supp. 497 (D. Okla. 1987) ..................................................... 48

*Pirone v. MacMillan*
    894 F.2d 579 (2d Cir. 1990) .......................................................8, 13

*Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*
    692 F.2d 1272,1275 (9th Cir. 1982) ..............................................55

*Pom Wonderful LLC v. Purely Juice, Inc.*
    2008 U.S. Dist. LEXIS 55426 (C.D. Cal. July 17, 2008)...................44

*R&R Partners, Inc. v. Tovar*
    2007 U.S. Dist. LEXIS 29819 (D. Nev. 2007)..................................44

*Reebok International, Ltd. v. Marnatech Enterprises, Inc.*
    970 F.2d 552 (9th Cir. 1992) ..........................................................55

*Rogers v. Grimaldi*
    875 F.2d 994 (2d Cir. 1989) ...............................................17, 20, 21

*Saman v. Robbins*
    173 F.3d 1150 (9th Cir.1999) ..........................................................74

*In re Seagate Technology, LLC*
    497 F.3d 1360 (Fed. Cir. 2007) ......................................................44

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*
    562 F.2d 1157 (9th Cir. 1977) ........................................................47

*Sierra Club v. SCM Corp.*
    747 F.2d 99 (2d Cir. 1984) .............................................................20

*Simpson v. Lear Astronics Corp.*
    77 F.3d 1170 (9th Cir. 1995) ..........................................................64

*Singleton v. Wulff*
    428 US 106, 96 S. Ct. 2868 (1976)..................................................19

*Smith v. Wal-Mart Stores, Inc.*
    537 F. Supp.2d 1302 (N.D. Ga. 2008)..............................................21

*Sony Corp. of Am. v. Universal City Studios, Inc.*
    464 U.S. 417, 104 S. Ct. 774 (1984)................................................26

*Taco Cabana International, Inc. v. Two Pesos, Inc.*
  932 F.2d 1113 (5th Cir. 1991), *aff'd* 505 U.S. 763, 112 S. Ct. 2753 ...........55, 56

*Tahoe Regional Planning Agency v. McKay*
  769 F.2d 534 (9th Cir. 1985) ...............................................................70

*Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*
  282 F.3d 23 (9th Cir. 2002) ...........................................................59, 62

*Thane, Int'l v. Trek Bicycle Corp.*
  305 F.3d 894 (9th Cir. 2002) ...............................................................32

*Thomas v. State*
  88 Nev. 382 (1972) .............................................................................68

*Tiffany (NJ) Inc. v. eBay, Inc.*
  600 F.3d 93 2d .....................................................................................46

*Torres-Lopez v. May*
  111 F.3d 633 (9th Cir. 1997) .........................................................47, 65

*TrafficSchool.com, Inc. v. Edriver Inc.*
  653 F.3d 820 (9th Cir. 2011) ...............................................................58

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*
  532 U.S. 23, 121 S. Ct. 1255 (2001)...................................................22

*Travelers Cas. & Sur. Co. of America v. Brennete*
  551 F.3d 1132 (9th Cir. 2009) .............................................................64

*Tull v. U.S.*
  481 U.S. 412, 107 S. Ct. 1831 .............................................................47

*U.S. Olympic Committee v. Union Sport Apparel*
  220 U.S.P.Q. 526 (E.D. Va. 1983) .......................................................55

*U.S. v. Ordonez*
  737 F.2d 793 (9th Cir. 1983) ...............................................................53

*Waits v. Frito-Lay, Inc.*
  978 F.2d 1093 (9th Cir. 1992) .........................................................5, 11

*Wendt v. Host Int'l, Inc.*
    125 F.3d 806 (9th Cir. 1997) ...................................................................6, 12

*White v. Ford Motor Co.*
    2002 U.S. App. LEXIS 28133 (9th Cir. 2003) ............................................74, 75

*Winterland Concessions Co. v. Fenton*
    835 F. Supp. 529 (N.D. Cal. 1994) ....................................................................51

<u>Statutes</u>

15 U.S.C. § 1072 .........................................................................................................40

15 U.S.C. §§ 1114 ........................................................................................................1

15 U.S.C. § 1117 .............................................................................................48, 56, 59

15 U.S.C. § 1117(a) ..........................................................................43, 44, 47, 48, 55

15 U.S.C. § 1125(a) ...............................................................................................1, 44

17 U.S.C. § 102 ...........................................................................................................26

17 U.S.C. § 106 ...........................................................................................................26

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. §§ 1331 and 1338 ........................................................................................1

28 U.S.C. § 1367 ...........................................................................................................1

Lanham Act § 32 and 43(a) ........................................................................................24

NRS § 42.001 ..............................................................................................................74

NRS § 42.005.1 ...........................................................................................................74

NRS § 597.770, *et seq.* ..........................................................................................65, 66

NRS § 597.790.1 ..............................................................................................65, 67, 68

NRS § 597.800.3 ...................................................................................................65, 69

NRS § 597.800.4 ..........................................................................................................65

NRS § 597.800.5 ..................................................................64, 65, 66, 67

NRS § 597.800.5's ......................................................................66

Trademark Law Revision Act of 1988 ...............................................18

<u>Other Authorities</u>

ER 409 ....................................................................................36

ER 410 ................................................................................37, 72

ER 411, 400-403, 661, 295-296 ......................................................41

ER 611 ....................................................................................64

Fed.R.Civ.P. 72 .........................................................................63

Fed.R.Civ.P. 72(a) .....................................................................63

First Amendment .............................................4, 10, 13, 19, 20, 21

FRAP 4(a)(3) ..............................................................................1

FRAP 28.1(c)(2) ..........................................................................2

FRE 1006 .................................................................................54

*McCarthy on Trademarks and Unfair Competition* § 24:9 (4th Ed. 2010)............34

Ninth Circuit Model Civil Jury Instruction No. 15.27, "Trademark Damages – Intentional Infringement."...............................................44

Rule 50 ...........................................................................19, 22, 26

Rule 50(b) ...............................................................................29

S. Rep. 93-1400 .........................................................................62

S. Rep. No. 93-1400 ....................................................................60

Seventh Amendment ...............................................................5, 48

# JURISDICTIONAL STATEMENT

The trial court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 based on Fifty-Six Hope Road's and Zion's (collectively "Plaintiffs") claims under 15 U.S.C. §§ 1114 and 1125(a) ("43(a) Claim"), and had supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

Final judgment in Plaintiffs' favor was entered on July 3, 2012. Defendants A.V.E.L.A., Inc., Leo Valencia, and Sci-Fi Productions, Inc. dba X One X Movie Archive, Inc. (collectively, "AVELA") and defendant Central Mills, Inc. ("Freeze") filed a Notice of Appeal on November 7, 2012, and defendant JEM Sportswear, Inc. ("JEM") (together with AVELA and Freeze, "Defendants") filed a Notice of Appeal on November 9, 2012. Plaintiffs timely filed a Notice of Cross Appeal on November 21, 2012. (Excerpts of Record "ER" 72-79.)

Final judgment in Plaintiffs' favor awarding attorneys' fees was entered against AVELA on January 30, 2013. AVELA filed a Notice of Appeal on February 28, 2013. Plaintiffs timely filed a Notice of Cross Appeal on March 15, 2013. (ER 80-136.)

This Court has jurisdiction over these appeals under 28 U.S.C. § 1291 and the notices of appeal are timely pursuant to FRAP 4(a)(3).

## STATEMENT OF THE ISSUES

Plaintiffs contest each issue identified in Defendants' respective statements of the issues and briefs.

On its appeal, Plaintiffs submit the following issues for review:

1.     Did the trial court err in refusing to allow the Jury to decide the amount of profits to be awarded to Plaintiffs under their 43(a) Claim?

2.     Did the trial court abuse its discretion in allowing JEM to deduct its costs from its gross revenue earned from its sale of infringing products?

3.     Did the trial court abuse its discretion by refusing to award increased profits against Defendants?

4.     Did the trial court abuse its discretion by refusing to award attorneys' fees against JEM and Freeze?

5.     Did the trial court err in summarily adjudicating Plaintiffs' right of publicity claim in Defendants' favor?

6.     Did the trial court err in granting Defendants' judgment as a matter of law on the issue of punitive damages on Plaintiffs' tortious interference claim?

## STATEMENT OF THE CASE AND FACTS

Pursuant to FRAP 28.1(c)(2), Plaintiffs adopt Defendants' respective statements of the case and facts with the following necessary clarifications and additions:

- AVELA licensed images of Bob Marley for use on apparel and merchandise other than those images it acquired or licensed from photographer Roberto Rabanne. (ER 343-344, 310-312, 616-636, 646-647.) Mr. Rabanne testified that he neither requested nor was granted permission from Bob Marley to merchandise any photographs he had taken of Mr. Marley, and was never granted permission from Mr. Marley to license his photographs for use on merchandise. (ER 345-346.)

- Both AVELA and its licensees, including JEM and Freeze, received queries regarding their claimed right to use Bob Marley's image on apparel and merchandise. . (ER 485-488, 445, 411, 400-403, 295-296, 255-265, 661.)

- Defendants did not present any evidence at trial of unauthorized third party use of manifestations of Bob Marley's identity or persona.

- On March 7, 2011 and after the Jury's verdict, the court re-opened discovery "on the issue of profits derived by Defendants from the use of Bob Marley's identity and persona which may be reasonably subject to disgorgement to Plaintiffs." (ER 231-232.)

## SUMMARY OF THE ARGUMENT

As the Jury unanimously determined at trial, Defendants' use of Bob Marley's image on apparel and merchandise is likely to cause confusion as to Defendants' affiliation, connection, or association with Plaintiffs – the undisputed owners and licensors of Bob Marley's name and likeness – or as to their sponsorship or approval of Defendants' goods under Section 43(a). The Ninth Circuit and its sister courts have consistently held that the unauthorized use of manifestations of a celebrity's identity or persona is actionable under Section 43(a) where such use results in this type of confusion. This critical element of confusion distinguishes a celebrity persona 43(a) Claim from a right of publicity claim. Although Defendants' use resulted in likely confusion as to Plaintiffs' endorsement of Defendants' products (ER 241), Section 43(a) does not only redress false endorsements; in fact, the term "endorsement" does not appear in Section 43(a).

Defendants waived their claim that use of Bob Marley's image is protected by the First Amendment; regardless, the level of scrutiny Defendants advocate has never been applied to merchandise, only artistic works. Likewise, Defendants waived their appeals as to the sufficiency of the evidence underlying the Jury's verdict of liability under Section 43(a) and willfulness. AVELA also waived its right to appeal the court's order denying its motion to re-open discovery; the order

appealed from was issued by a magistrate judge, and AVELA never sought review of that order by the court.

Plaintiffs appeal the court's refusal to allow the Jury to decide the amount of Defendants' profits to which Plaintiffs were entitled on their 43(a) Claim. The court's decision contravenes *Dairy Queen v. Wood* and Plaintiffs' right to a jury trial under the Seventh Amendment. The court also abused its discretion by allowing JEM to deduct costs and then rely on unreliable evidence of costs. Given Defendants' willful infringement, the court erred in refusing to award Plaintiffs increased profits and denying their motion for attorneys' fees as to JEM and Freeze.

Plaintiffs also appeal the court's entry of summary judgment for Defendants on their Nevada right of publicity claim. The court's interpretation of the statute is contrary to its plain language and has the effect of divesting claimants of their rights, not protecting said rights, which is its undisputed purpose.

## ARGUMENT

## I.    PLAINTIFFS' 43(A) CLAIM IS LEGALLY VIABLE

### A.    <u>Celebrities Have Trademark-Like Rights in Their Personas</u>

Defendants' contention that a celebrity or his representative cannot protect the unauthorized use of his identity or persona flies in the face of Ninth Circuit case law establishing this uncontroversial point of law. *See Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992) ("a celebrity whose endorsement of a

product is implied through the imitation of a distinctive attribute of the celebrity's identity, has standing to sue for false endorsement under Section 43(a) of the Lanham Act"); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812, n.1 (9th Cir. 1997)[1], citing *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992) ("In a case involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona.")  Other Circuits agree.  *See Parks v. LaFace Records*, 329 F.3d 437, 445 (6th Cir. 2003) ("[Section 43(a)] permits celebrities to vindicate property rights in their identities against allegedly misleading commercial use by others"); *Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, 2013 U.S. Dist. LEXIS 31155 (S.D.N.Y. 20130) (*Bruce Lee II*) ("In the Second Circuit, a celebrity may assert a false endorsement claim where the defendant uses the celebrity's persona without permission to suggest false association or endorsement.")  Although the degree to which a persona or identity is known may be relevant to the strength or, even, existence of the persona rights,

---

[1]    The plaintiffs in *Wendt* were the individuals who played the characters Norm and Cliff on *Cheers*, not the owners of the copyrights in those characters.  These plaintiffs claimed that "by using an imitation of ***their*** unique physical characteristics, [defendant] misrepresented their association and endorsement of the Cheers bar concept."  *Wendt*, 125 F.3d at 812.  (emphasis added.)

no court has ever held this fact to suggest that identities or personas were not subject to protection under the Lanham Act.[2]

Plaintiffs' rights in Bob Marley's identity are not any less valid merely because such rights may not be registrable with the U.S. Patent & Trademark Office ("PTO"). *See Parks*, 329 F.3d at 447 (plaintiff has valid claim based on unauthorized use of her identity "even though Rosa Parks' name might not be eligible for registration as a trademark"); *Allen v. National Video, Inc.*, 610 F. Supp. 612, 625 (S.D.N.Y. 1985) ("[Section 43(a)] has therefore been held to apply to situations that would not qualify formally as trademark infringement, but that involve unfair competitive practices resulting in actual or potential deception."). That celebrities' identities are subject to protection under Section 43(a), but may not be registerable is analogous to titles of movies or books, which are not registerable as trademarks but, with proof of secondary meaning, are protected under Section 43(a). *See Herbko Intern., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1163, n.2 ("Fed. Cir. 2002) ("While titles of single works are not registrable, they

---

[2]     Plaintiffs are not asserting rights in – as Defendants' claim – each and every image of Bob Marley but, instead, his identity and persona. *See Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, 2011 U.S. Dist. LEXIS 36406, *16-17 (S.D.N.Y. 2011) (*Bruce Lee I*) ("Plaintiff need not allege trademark rights in a particular image of Lee because the mark at issue is Lee's persona.") Of course, images of Bob Marley evoke Bob Marley's persona.

may be protected under section 43(a) of the Lanham Act upon a showing of secondary meaning.")

Tellingly, Defendants do not cite any Ninth Circuit cases to support their proposition that a 43(a) Claim cannot be grounded upon rights in a celebrity's persona.  The nonbinding cases Defendants cite do not establish the contrary but, at most, hold that not all uses of a celebrity's image or likeness on a product are actionable.

In *Pirone v. MacMillan*, 894 F.2d 579, 581 (2d Cir. 1990), the daughters of Babe Ruth sued the producer of a baseball-themed calendar for its inclusion of, among many other photographs of baseball legends, two photographs of Babe Ruth and one of a ball bearing his signature.  The court in *Pirone* never addressed the viability of plaintiff's 43(a) Claim but, instead, held that consumers were unlikely to believe that the plaintiff sponsored the calendar given the defendant's use of a mere three photographs in a compilation of other photographs and images.  "In the context of such a compilation, an ordinarily prudent purchaser would have no difficulty discerning that these photos are merely the subject matter of the calendar and do not in any way indicate sponsorship." *Id*. at 805.  In contrast, Defendants used Bob Marley's image – either alone or with Bob Marley's music titles – prominently on apparel and other merchandise in a manner essentially identical to that of Plaintiffs and their authorized licensees.  The Jury agreed. *See also Bruce*

*Lee II*, 2013 U.S. Dist. at *61-62 ("while Babe Ruth's likeness appeared as one of many photographs of baseball players, AVELA's t-shirts feature *only* an image of Bruce Lee; indeed this image is the primary reason a consumer would decide to purchase the t-shirt.") (emphasis in original)

In *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 925 (6th Cir. 2003), the Sixth Circuit affirmed the grant of summary judgment to defendant on plaintiff's 43(a) Claim "that the presence of [golfer Tiger] Woods's image in [the defendant's] print implies that he has endorsed [the defendant's product]." The products at issue in *ETW* were "limited edition prints" – 250 serigraphs and 5,000 lithographs – commemorating Woods's victory at the 1997 Masters Tournament. *Id*. at 918-19. Woods is depicted in three direct poses, as is his caddy, the famed Masters' clubhouse, and the "likeness of famous golfers of the past looking down on Woods." *Id*. at 918. Each print is accompanied by a 28-line narrative describing the scenes depicted on the print. *Id*. at 919.

Contrary to Defendants' suggestion otherwise[3], the *ETW* court expressly acknowledged the viability of a 43(a) Claim based on the unauthorized use of a plaintiff's image:

---

[3]     Defendants note *ETW*'s rejection of the plaintiff's "trademark" claims under Section 43(a) and claim of "trademark rights in Woods's image and likeness. *Id*. at 921. The court distinguished the trademark claims from the Section 43(a) unfair competition claim, which is more akin (although not identical) to Plaintiffs'

> Courts have recognized false endorsement claims under § 43(a) of the Lanham Act where a celebrity's image or persona is used in association with a product so as to imply that the celebrity endorses the product. ¶ False endorsement occurs when a celebrity's identity is connected with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service. [Citing *Wendt*, *Waits*, *White*, *Allen*, and others approvingly.][4]

*Id.* at 925.  Given the artistic nature of the plaintiff's products, the *ETW* court

forewent the likelihood of confusion test and applied an alternative test formulated

to "give sufficient weight to the public interest in free expression." *Id.* at 926.

This is readily distinguishable from this case, where the products are mass-

produced t-shirts sold through national retail chains.  Moreover, Defendants have

waived any recourse to a First Amendment defense by failing to present evidence

on this defense or argue it to the trial court.

---

Section 43(a) claim in the present action.   Plaintiffs' 43(a) Claim is not based on trademark rights in Bob Marley's image and likeness, but, instead, trademark-like rights in Bob Marley's identity and persona.  The *ETW* court understood this difference; Defendants do not.

[4]     This should come as no surprise as the Sixth Circuit decided *ETW* only three weeks after *Parks*.  *ETW* must be read in the light of *Parks* and its recognition of Rosa Parks' 43(a) Claim despite the fact that the defendant in *Parks* did not necessarily use Parks' identity as a trademark or, for that matter, to imply an endorsement.  *ETW* did not overturn *Parks*; it relied on it.  *Id.* at 928.

-10-

### B.    Celebrity 43(a) Claims Are Not Limited to False Endorsements

Defendants' argument that Section 43(a) only protects uses of a celebrity

that communicate an endorsement by the celebrity of a product finds no support.

Section 43(a)(1)(A) does not include the word "endorsement."  Section 43(a)

subjects one to liability who "is likely to cause is confusion . . . as to the <u>affiliation</u>,

<u>connection</u>, or <u>association</u> of such person with another person, or as to the <u>origin</u>,

<u>sponsorship</u>, or <u>approval</u> of his or her goods, services, or commercial activities by

another person."  (emphasis added.)  The Ninth Circuit has held that false

endorsement falls within the broader ambit of false association.  Section 43(a)

"provid[es] two bases of liability:  (1) false representations concerning the origin,

association, or endorsement of goods or services through the wrongful use of

another's distinctive mark, name, trade dress, or other device ('false association'),

and (2) false representations in advertising concerning the qualities of goods or

services ('false advertising')."  *Waits*, 978 F.2d at 1108; *see also Cairns v.*

*Franklin Mint Co.*, 107 F. Supp.2d 1212, 1214 (C.D. Cal. 2000) ("*Cairns II*"),

*citing Wendt*, 125 F.3d at 812 ("A false endorsement claim based on the

unauthorized use of a celebrity's identity <u>is a type of false association claim</u> for it

alleges the misuse of a trademark 'which is likely to confuse consumers as to the

plaintiff's sponsorship or approval of the product.'") (emphasis added.)

43(a) Claims are not limited to instances of false commercial endorsement, but encompass use of one's identity in a manner "that causes confusion among consumers as to the 'affiliation, connection, or association' between the celebrity and the defendant's goods or services or as to the celebrity's participation in the 'origin, sponsorship, or approval' of the defendant's goods or services." *Parks*, 329 F.3d at 446, *citing* Section 43(a). In *Parks*, the plaintiff civil rights activist's 43(a) Claim was upheld based on defendants' use of her name as a title for a song, not in advertisements for its albums or other products. Stickers on the defendants' CDs listing Rosa Parks' name were not advertisements for a separate product, but the product – the song – itself. Likewise, in *Wendt*, the defendant used the celebrities' likenesses on robots that were inside and part of its airport bars, not on advertisements for said bars. *Wendt*, 125 F.3d at 809.

The Sixth Circuit has held that the sale of an action figure bearing the plaintiff's likeness was potentially actionable under Section 43(a). *See Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 627 (6th Cir. 2000) (summary judgment entered for defendants because the balance of likelihood of confusion factors weighed against plaintiff.) As *Landham* finds, whether the use of a celebrity's identity or persona falsely suggests approval, sponsorship, affiliation, or endorsement, is determined by weighing and balancing the likelihood of confusion factors (as the Jury was instructed to do – and did – in this case). Again, *ETW* and

*Pirone* are distinguishable because the respective plaintiffs' claims failed not because their identities were the subject matter of the goods, but because other considerations – e.g., freedom of expression, materiality, and the relationship between the products at issue and the fame of the plaintiffs, among other things – rendered consumer confusion unlikely.  Those considerations are not present here. Defendants' actions are not protected by the First Amendment; their merchandise consists substantially and only of Bob Marley's image; and Plaintiffs presented substantial evidence from which the Jury could (and did) conclude that the fame of Bob Marley bears a close relationship to t-shirts.

## C.    The *Cairns* Cases Support the Viability of Plaintiffs' 43(a) Claim

It is well established that the estate of a *deceased* celebrity may also assert a claim under Section 43(a) based on the unauthorized use of a deceased celebrity's identity or persona.  *See Cairns v. Franklin Mint Co.*, 24 F. Supp.2d 1013, 1033 (C.D. Cal. 1998) (*Cairns I*); *Facenda, Jr. v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1014 (3d Cir. 2008) (43(a) Claim brought by estate of deceased broadcaster for use of his voice in a television show); *Bruce Lee I*, 2011 U.S. Dist. at *15-16.

In *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1149 (9th Cir. 2002) (*Cairns III*), this Court clarified that the "determinative issue" in a Section 43(a) case is "likelihood of customer confusion."  Based on the first factor, the strength of Princess Diana's identity as a mark, this Court specifically held that the *Cairns*

-13-

plaintiff's – Princess Diana's estate – 43(a) Claim was meritless because it and

Princess Diana had failed to take any actions concerning unendorsed, unapproved

Princess Diana-related merchandise, particularly against the defendant:

> Between 1981 and 1997, many products, including some
> that were largely indistinguishable from Franklin Mint
> products, bore the name and likeness of Princess Diana,
> who neither endorsed nor objected to any of these
> products.  Consumers, therefore, had no reason to believe
> Franklin Mint's Diana-related products were endorsed by
> the Princess. This did not change when, following
> Princess Diana's death in 1997, the Fund endorsed
> approximately twenty products — but not Franklin
> Mint's — amidst a flood of un-endorsed Diana-related
> memorabilia.

*Id*. at 1149-50.  The defendants had "been selling products bearing Princess

Diana's image and title since about 1981" and "others have sold such products

since that date."  *Cairns II*, 107 F. Supp.2d at 1217.  This "evidence . . .

demonstrates that the association between the image of Princess Diana and

plaintiffs is negligible" (*Id*.), and "[u]nder these circumstances, there was no

likelihood of confusion as to the origin of [defendant's] Diana-related products."

*Cairns III*, 292 F.3d at 1150.

This case could not be more different as Plaintiffs presented substantial

evidence to the Jury establishing the extraordinary strength of Bob Marley's

identity and persona as a protectable right or "mark."  Plaintiffs presented

undisputed evidence regarding the significant resources they and their predecessors

have expended to police the unauthorized use of Bob Marley's name and image, including sending more than 400 cease and desist letters and filing 20-plus lawsuits. (ER 479-483, 422-429.) Defendants did not produce any evidence of unauthorized third party merchandise or any other evidence suggesting that due to unauthorized use, Bob Marley's identity had been divested of its trademark-like significance. Likewise, JEM has not cited any authority for its position that Plaintiffs' policing efforts themselves are evidence of any such divestiture, which is not only counter-intuitive, but contradicted by this Court's holding in *Cairns III*.

AVELA mistakenly construes *Cairns I* as holding that a 43(a) Claim may only be asserted when a defendant falsely represents that a deceased celebrity endorsed a product while he was alive. The *Cairns* court opined that <u>one example</u> of a claim for false endorsement by a deceased celebrity – as opposed to the celebrity's estate – would be when advertising suggests that the products were endorsed by a celebrity before his death. *Cairns I*, 24 F. Supp.2d at 1032. The court further noted that this was not the issue because the claim asserted by Princess Diana's estate was whether "defendants are falsely implying that plaintiffs endorse defendants' products." *Id*. In such a case, the relationship between the celebrity and the goods at issue is not a predicate to maintaining a 43(a) Claim but, instead, the second factor in the likelihood of confusion balancing test. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001) ("the

relatedness of the fame or success of the plaintiff to the defendant's product"); *see also Cairns II*, 107 F. Supp.2d at 1220-21 ("[D]efendant's [jewelry, plates, sculptures, and dolls depicting Princess Diana] are closely related to Princess Diana's fame associated with her status as a member of Britain's Royal family"; this factor would weigh "in favor of finding a likelihood of confusion" but for Princess Diana's divestiture of rights in her identity and persona.)  Consequently, it is irrelevant that Bob Marley died more than 20 years before Defendants' first use of his identity.  *See Facenda,* 542 F.3d at 1014 (court reversed summary judgment for plaintiff–estate of football broadcaster who died 21 years before the use of his voice – on its 43(a) Claim because "likelihood of confusion is predominantly factual in nature.")  In any event, Rohan Marley testified, without contradiction, that his father sold apparel and merchandise during his lifetime bearing his name, image, and music titles (ER 464-465) such that even under the hypothetical posited in *Cairns I*, Plaintiffs would have a 43(a) Claim.

## D. The Judgment is Not Tantamount to the Creation of a Federal Right of Publicity

Defendants' argument that the judgment and verdict created a federal right of publicity is premised on misunderstanding the substantial differences between rights of publicity and the rights protected under Section 43(a).  A right of publicity claimant need only establish that his personality was used without authorization, whereas a 43(a) Claim hinges on establishing that one's personality

was used without authorization in a manner likely to result in consumer confusion. This is not an insignificant difference. *See Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989) ("Because the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement, it is potentially more expansive than the Lanham Act"); *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996), *citing Eastwood v. Superior Court*, 198 Cal. Rptr. 342, 347-48 (1983) ("California [common and statutory right of publicity] law has not imposed any requirement that the unauthorized use or publication of a person's name or picture be suggestive of an endorsement or association with the injured person.")

Defendants contend that this difference is undermined because "it is difficult to fathom a consumer who would not associate the deceased celebrity's image with that of his or her estate if the celebrity was popular." (AVELA Brief, pg. 26.) Even assuming this is true, such an association – relevant to strength of the celebrity's identity – is only one piece of the eight-factor likelihood of confusion test. Defendants also contend that the survey in *ETW*[5] proves that consumer confusion tests are inherently unreliable in 43(a) celebrity claims. On this point,

---

[5]     In *ETW*, respondents were handed the print in question, without being shown the packages for the print, and leadingly asked, "Do you believe that Tiger Woods has an affiliation or connection with this print or that he has given his approval or has sponsored it?" 62% of respondents answered "yes." *ETW*, 332 F.3d at 937, n.19.

*ETW* only proves that an overbroad, poorly constructed survey should not be considered or given much weight in the likelihood of confusion analysis.

Congress' action (and inaction) <u>supports</u> the application of Section 43(a) to celebrities. Use of Section 43(a) to vindicate a celebrity's rights against misleading use of his identity predated the Trademark Law Revision Act of 1988 ("TLRA"). *See Allen*, 610 F. Supp. at 627 (granting summary judgment for Woody Allen on 43(a) Claim based on defendant's advertisement trafficking on his identity); *Cher v. Forum International, Ltd.*, 213 U.S.P.Q. 96, 102 (C.D. Cal. 1982) (entertainer Cher prevailed on 43(a) Claim based on confusing use of Cher's name; "liability under Section 43(a) may arise for a false description or representation even though no trademark is involved"); *Geisel v. Poynter Products, Inc.*, 283 F. Supp. 261, 268 (S.D.N.Y. 1968) ("defendants do not possess the right to represent that their goods were sponsored or authorized by the [author of the Dr. Seuss books].") With the enactment of the TLRA in 1989, "Congress intended that the section 43(a) amendments largely codify pre-1988 case law." *ALP Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 963, n.6 (D.C. Cir. 1990). Accordingly, there is good reason to believe that Congress intended for the revised and broadened Section 43(a) reflected in the TLRA to continue to encompass celebrity unfair competition claims under Section 43(a). Defendants offer no authority that Congress took any action to limit its application in these instances.

In sum, Section 43(a) undeniably can protect the identities and personas of celebrities – alive and deceased.

### E.    Defendants' Use of Bob Marley's Persona is Not Protected by the First Amendment

#### 1.    Defendants Waived Any First Amendment Defense

Although Defendants pleaded a First Amendment affirmative defense and briefly mentioned it in their oppositions to Plaintiffs' motions for temporary restraining order and preliminary injunction, Defendants never presented nor argued this defense at trial court or in their summary judgment motion or Rule 50 motion.  Thus, the trial court rendered no ruling on it and Defendants waived their right to appeal it.  "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."  *Singleton v. Wulff*, 428 US 106, 120, 96 S. Ct. 2868, 2877 (1976); *Cruz v. International Collection Corp.*, 673 F.3d 991, 998-99 (9th Cir. 2012) ("To have been properly raised below, the argument must be raised sufficiently for the trial court to rule on it . . . Because this argument was not raised in the debt collectors' motion for summary judgment below and the trial court did not decide it, this court declines to resolve the question for the first time on appeal").

Specifically, First Amendment claims and defense may be waived by a party's failure to raise them in the trial court.  *See Hopkins v. Saunders*, 199 F.3d 968, 974-75 (8th Cir. 2000), *citing Porterco, Inc. v. Igloo Products Corp.*, 955

-19-

F.2d 1164, 1173 (8th Cir.1992) ("To obtain appellate review of a trial court's acts or omissions a party must have made known to the trial court the action which the party desires the court to take . . . Although Hopkins' second amended complaint marginally set forth [his First Amendment and Title VII claims], the record is devoid of any evidence that Hopkins otherwise asserted them to the trial court"; claims deemed waived); *Sierra Club v. SCM Corp.*, 747 F.2d 99, 107-08 (2d Cir. 1984) ("Neither Sierra's motion for a protective order permitting it to delay answering or objecting to the interrogatories served on it by SCM nor its arguments to the trial court on the motions for summary judgment made any suggestion that Sierra was asserting a constitutional privilege . . . The First Amendment contentions have thus been waived.")

Defendants cannot resurrect a defense only mentioned in passing below and not a subject of the trial.

## 2.  Defendants' Use is Not Subject to *Rogers v. Grimaldi* Scrutiny

Even if this Court does not find waiver, *Rogers* by its very terms and in all of its subsequent applications is reserved for "artistic works." 875 F.2d 994, 999 (2d Cir. 1989); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 776 (8th Cir. 1994) (expressive work "contained in an obvious editorial context is less likely to confuse, and thus more deserving of protection than those displayed on a product."). Defendants have not cited <u>one</u> case where *Rogers* has been applied to

apparel or merchandise bearing allegedly First Amendment-protected content. In

product cases, courts routinely apply the likelihood of confusion test to balance any

interest in free expression. "[T]he Lanham Act customarily avoids violating the

First Amendment, in part by enforcing a trademark only when consumers are likely

to be misled or confused by the alleged infringer's use." *Facenda*, 542 F.3d at

1018, *citing Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,

447 U.S. 557, 561, 100 S. Ct. 2343 (1980); *Smith v. Wal-Mart Stores, Inc.*, 537 F.

Supp.2d 1302, 1317 (N.D. Ga. 2008) (vocal critic of Wal-Mart created and sold

"Walocaust" merchandise, including t-shirts; ruled non-infringing based on

likelihood of confusion analysis, not *Rogers* scrutiny); *Mutual of Omaha Ins. Co.*

*v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987) (likelihood of confusion analysis

applied to t-shirts bearing logos allegedly parodying plaintiff's logos.)[6]

---

[6]     Defendants were free to introduce evidence or argument to support the
allegedly expressive nature of their use of Bob Marley's identity for consideration
in the likelihood of confusion analysis. They did not. It is undisputed that
Defendants' products are simply Bob Marley merchandise, and Defendants and
retailers considered their t-shirts "licensed music t-shirts." (ER 407-409.)
Valencia testified that he did not know why AVELA was using Bob Marley titles
and songs on its products. (ER 327-328.)

**F.    Plaintiffs' 43(a) Claim is Not Barred by the Aesthetic Functionality Defense**

First, Defendants never pleaded or raised aesthetic functionality as a defense[7], presented no evidence at trial on the unpled defense, and did not assert it in their summary judgment motion or Rule 50 motion as grounds for denying Plaintiffs' 43(a) Claim.  Defendants never mentioned this defense until their appeal brief.  As such, it is waived.

Second, even if the Court finds no waiver, Defendants' claim that the aesthetic functionality defense remains viable in the Ninth Circuit is greatly exaggerated.  The aesthetic functionality doctrine stems from the utilitarian functionality doctrine, which was adopted to prevent parties from monopolizing patentable articles, and holds that a feature is functional "if it is essential to the use or purpose of the article," "if it affects the cost or quality of the article," or if "exclusive use of the [the feature] would put competitors at a significant non-reputation-related advantage."  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32, 121 S. Ct. 1255 (2001), *citing Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165, 115 S. Ct. 1300 (1995).  In *International Order of Job's*

---

[7]     Aesthetic functionality is generally termed a defense.  *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 219 (2d Cir. 2012); *Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F. Supp. 595, 605 (S.D.N.Y. 1996) (referring to functionality as "defense"), *cited approvingly in Secalt S.A. v. Wuxi Shenxi Construction Machinery Co.*, 668 F.3d 677, 685 (9th Cir. 2012).

*Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980), the Ninth Circuit adapted this doctrine to aesthetically "functional features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." It noted, however, that a name or emblem can "serve simultaneously as a functional component of a product and a trademark." *Id.* at 919.

Since *Job's Daughters*, the aesthetic functionality doctrine "has been limited, if not rejected, in favor of the 'utilitarian functionality' test." *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp.2d 1029, 1083 (D. Or. 2008) (summary judgment for plaintiff on defense that the stripes on its shoes were aesthetically functional); *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1260 (9th Cir. 2001) (aesthetic functionality "is internally inconsistent and at odds with the commonly accepted view that functionality denotes utility. Nor has this circuit adopted the 'aesthetic functionality' theory, that is, the notion that a purely aesthetic feature can be functional".) This Court has "squarely rejected the notion that 'any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product.'" *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1073 (9th Cir. 2006), *citing Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d

769, 773 (9th Cir.1981).  Accordingly, this Court has narrowed the defense to "product features that serve an aesthetic purpose wholly independent of any source-identifying function."  *Au-Tomotive*, 457 F.3d at 1073.

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 2012 U.S. Dist. LEXIS 186136 (C.D. Cal. 2012) does not a constitute a reemergence of the doctrine.  In *Fleischer*, which addressed AVELA's use of the name and image of the cartoon character Betty Boop, the trial court granted summary judgment for AVELA on the plaintiff's Lanham Act Section 32 and 43(a) claims because it had failed to establish common law rights in Betty Boop's image and had not established that it was the sole owner of the BETTY BOOP trademark based on the "fractured history" of those rights.  *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 772 F. Supp.2d 1155, 1168, 1171 (C.D. Cal. 2009).  Originally, this Court upheld the trial court's ruling based on *Job's Daughters* and the aesthetic functionality doctrine.  *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 636 F.3d 1115, 1122 (9th Cir. 2011).  Shortly thereafter, the Court withdrew that opinion and published a superseding opinion, totally erasing any reference to *Job's Daughters* or the aesthetic functionality doctrine, and remanded the matter to the trial court for "further proceedings on [plaintiff's] trademark infringement claims."  *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958 (9th Cir. 2011).

Even if Defendants have not waived the aesthetic functionality defense (they have) and it remains a viable doctrine (it is not), the defense does not exonerate Defendants. Plaintiffs have presented a mountain of evidence establishing that they own trademark-like rights in Bob Marley's identity and persona. Use of Bob Marley's identity on or with items began with Bob Marley himself. (ER 464-465, 471-472.) Likewise, Plaintiffs and their predecessors have offered goods bearing Bob Marley's name and image for decades. (ER 472, 415-416.) Plaintiffs and their successors have policed unauthorized use of Bob Marley's identity as an indicator of source or sponsorship (ER 479-483, 422-429.), and have registered their exclusive right to use manifestations of his identity, such as his name, as indicators of source and sponsorship. (ER 483-484, 825-887.) This and other evidence presented at trial substantiated the verdict that Defendants' use of Bob Marley's identity on t-shirts and other merchandise is likely to cause confusion as to Plaintiffs' association or connection therewith.

Defendants have produced no evidence supporting their bald proposition that "[c]ustomers purchased the Defendants' products because they are fans of Marley or believed in what Marley stood for, not because they believed that Plaintiffs endorsed or approved of the product." (AVELA Brief, pg. 37.).[8] There is no

---

[8]     The successful assertion of the aesthetic functionality defense depends, in part, on the reasons consumers purchase Defendants' products. *See Au-Tomotive*, 457 F.3d at 1073-74.

evidence that Defendants' infringing uses were commenced for purely aesthetic purposes and not to capitalize on Bob Marley's and his successors' brand equity. Many of Defendants' products were very similar to Plaintiffs' licensed products. (ER 899-902.)  At points of sale, Defendants referred to the unauthorized t-shirts as "licensed," strongly suggesting that the appeal of the merchandise was not merely ornamental, but its connection to a licensor, i.e., Plaintiffs.  (ER 329-330, 651.)

### G.   Plaintiffs' 43(a) Claim Does Not Conflict with the Copyright Act

Again, Defendants never pleaded or raised any copyright-related defenses, did not argue such defense in their summary judgment motion or Rule 50 motion, and never mentioned it before this appeal.  Consequently, Defendants waived their right to appeal on this issue.

Even if there is no waiver, Defendants' argument that Plaintiffs' 43(a) Claim conflicts with the Copyright Act under *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S. Ct. 2041 (2003) fails.  Trademark and copyright law have fundamentally different aims and purposes.  Copyright law grants authors exclusive rights, such as reproduction and distribution (17 U.S.C. § 106), in their exploitation of "original works of authorship" (17 U.S.C. § 102).  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S. Ct. 774 (1984). Trademark law exists to protect consumers against confusion as to source, sponsorship, or affiliation.  *See E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,

547 F.3d 1095, 1100 (9th Cir. 2008). Although a single work may be protected as an original work of authorship and as a trademark (e.g., the Starbucks logo), the rights protected under each body of law are not dependent on the other, e.g., when the copyright in the Starbucks logo falls into the public domain, it may still operate as a trademark. *See Coca-Cola Co. v. Rodriguez Flavoring Syrups, Inc.*, 89 U.S.P.Q. 36, 40 (Chief Examiner 1951) (rejection of defendant's argument that the COCA-COLA trademark passed into the public domain when a copyright registration on one form of the label expired; "The mere statement of the proposition is sufficient to show its absurdity"); *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp.2d 1110, 1118 (W.D. Wash. 2007) (distinguishing plaintiff's trademark rights in the book title *Jonathan Livingston Seagull* from his rights in the book itself, which is protected under copyright law.)

In *Dastar*, the defendant copied and edited a television series produced by the plaintiff that had passed into the public domain and marketed it to the public as its own product without any reference to the plaintiff. *Id*. at 27-28. The plaintiff filed suit, claiming, under Section 43(a), that the defendant's lack of attribution misrepresented the "origin" of the underlying work. *Id*. The Court held that the term "origin," as used in the Lanham Act, "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id*. at 37. The plaintiff's claim, at its

-27-

core, was a copyright claim, which the Court ruled cannot be vindicated through the Lanham Act's prohibition on false claims of origin, sponsorship, or approval by claiming a failure to properly attribute. Such a requirement would undermine the policy goal of copyright by, in effect, creating a perpetual copyright in the creative work. *Id*. In *Dastar*, "the plaintiffs were attempting to use trademark law to prosecute plagiarism of their creative work." *Bach*, 473 F. Supp.2d at 1118.

Here, Plaintiffs are not claiming that Defendants are marketing Plaintiffs' creative works[9] without proper attribution. The claim is -- by appropriating Plaintiffs' trademark-like rights in Bob Marley's identity and persona, Defendants' use is likely to result in consumer confusion as to Plaintiffs' sponsorship or approval of, or affiliation or association with, Defendants' goods. It is irrelevant that one of the means by which Defendants are using Bob Marley's identity is by reproducing his image as embodied in certain creative works. By Defendants' logic, Coca Cola would be barred from recourse against a soda manufacturer who adorns its cans with public domain Coca Cola art including the COCA COLA mark. Defendants cannot leverage any alleged right to reproduce creative works

---

[9]     Notably, Defendants and their licensees have used Bob Marley's identity by means other than reproducing creative works. For example, Defendants' licensee Funko created and sold bobblehead and plush dolls resembling Bob Marley (ER 375.) and Defendants used many of Bob Marley's song and album titles. (ER 378-392.)

into a right to unfairly compete with Plaintiffs by capitalizing on consumer confusion.

## II. DEFENDANTS WAIVED THEIR RIGHT TO APPEAL THE SUFFICIENCY OF THE EVIDENCE FOR PLAINTIFFS' 43(A) CLAIM

Defendants waived their right to appeal the sufficiency of the evidence underlying the Jury's verdict of Section 43(a) liability and willfulness. "[A] post-verdict motion under Rule 50(b) is an absolute prerequisite to any appeal based on insufficiency of the evidence." *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). JEM did not file a post-verdict Rule 50(b) motion, thereby waiving its appeal of the sufficiency of the evidence underlying the Jury's verdict of liability under Section 43(a) and willfulness. AVELA's and Freeze's post-verdict Rule 50(b) motion directed to Section 43(a) was limited to issues of law. Thus, AVELA and Freeze also waived any appeal of the sufficiency of the evidence underlying the Jury's verdict of liability under Section 43(a) and Freeze's appeal of the jury's determination of willfulness. In short, Defendants are precluded from arguing a lack of substantial evidence to support the Jury's findings of liability under Section 43(a) and of willfulness as to all Defendants.

## III.  EVEN IF THERE IS NO WAIVER, THE JURY'S VERDICT ON PLAINTIFFS' 43(A) CLAIM IS SUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    Dr. Jay's Survey is Probative of Likelihood of Confusion

The only evidence Defendants dispute concerning the Jury's finding of likelihood of confusion (even though they are precluded from doing so) is Dr. E. Deborah Jay's survey demonstrating actual confusion as to the association of Defendants' unauthorized shirt with Plaintiffs and Bob Marley.  This is but one factor of the eight likelihood-of-confusion factors set forth in *Downing*, 265 F.3d at 1007-08 for application in persona/identity cases.  Because the standard in a 43(a) Claim is "likelihood of confusion," a plaintiff need not introduce evidence of actual confusion to prevail.  *See Branca v. Mann*, 2012 U.S. Dist. LEXIS 112574, *17-18 (C.D. Cal. 2012) ("the absence of evidence of actual confusion is not dispositive . . . Plaintiffs have set forth convincing evidence as to a number of the other relevant factors, sufficiently establishing a high likelihood of confusion"; entering summary judgment on 43(a) Claim brought by executors of Michael Jackson's estate based on unauthorized use of his persona); *Jada Toys, Inc. v. Mattel. Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) ("…[W]e have never countenanced a likelihood of confusion based on a consideration of dissimilarity alone, or indeed, on the consideration of any one factor.")

Nevertheless, Dr. Jay's survey constitutes substantial evidence in determining whether Defendants' use of Bob Marley's identity constituted unfair competition under Section 43(a).[10]  Importantly, Plaintiffs' 43(a) Claim is not based on consumer confusion as to the source or origin of Defendants' merchandise, but confusion as to Plaintiffs' approval or sponsorship of, or association or connection with, Defendants' merchandise.  Accordingly, Dr. Jay's testing as to the source of Defendants' shirt – i.e., who put the shirt out – is not dispositive to Plaintiffs' theory.  (ER 454-459.)

Instead, the key query in Dr. Jay's survey is her second series of questions, i.e., do you think the makers of the t-shirt received permission or approval to make or put out the t-shirt[11] and, if so, who gave this permission or approval?  (ER 459-460.)  Of the entire test group (the survey respondents viewing Defendants' shirt),

---

[10]    AVELA's critique of the methodology of Dr. Jay's survey is particularly meritless due to its application of the same survey methodology in another case where it was sued based on its unauthorized use of the deceased celebrity Bruce Lee's identity and persona.  "[AVELA's expert] modeled his survey after one used in a similar case filed against AVELA involving t-shirts featuring images of Bob Marley . . . Participants were asked various questions, including who they believed made, endorsed, and approved the t-shirt."  *Bruce Lee II*, 2013 U.S. Dist. at *66.

[11]    This is to be distinguished from questioning whether Defendants received permission to use the image on the shirt.  *See Medic Alert Found. U.S. v. Corel Corp.*, 43 F. Supp.2d 933, 937 ("The approval at issue, therefore, is not whether [plaintiff] approved of the use (or alleged use) of its trademarked image, but rather, whether [plaintiff] approved of [defendant's goods bearing the trademark].")  For this reason alone, Defendants' argument that the survey merely tested the

30% of respondents believed that Bob Marley, his estate, agents, or heirs[12] gave their approval or permission for the shirt to be made or put out, and an additional 7% believed that the person on the shirt gave permission; the amounts for the control group were, respectively, < 1% and 19%. (ER 460-462.) The net confusion rate as to whether permission or approval was given by Bob Marley, his estate, agents, or heirs was 29%. Defendants' misstate the quantum of confusion measured by the survey. The rate of confusion as to permission or approval is still a healthy 17% when controlled for responses indicating that permission is necessary regardless of whose image is on the shirt. (ER 462.) *See Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% and 23% rate in survey constituted strong evidence of a likelihood of confusion); *Thane, Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (27.7% confusion rate established that "a reasonable jury could conclude that a likelihood of confusion exists); *Jada Toys,* 518 F.3d at 636 (28% and 7% association rates for word and

---

respondents' legal conclusions, to the extent this is even a valid grounds to objection to the survey, is without basis.

[12]    It is well established that Plaintiffs need not establish that consumers know or are familiar with their actual names or identities as long as consumers identify Bob Marley's identity and persona with a single source, i.e., his rights holders. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1963) (fact that consumers do not know the names of the maker and distributor of BLACK & WHITE branded scotch whiskey is irrelevant to their identification of that product with a single source.)

design marks, respectively were probative of likelihood of dilution and precluded entry of summary judgment for defendant.)[13]

Dr. Jay's survey is not faulty for using the term "permission." "For a party to suggest to the public, through its use of another's mark or a similar mark, that it has received permission to use the mark on its goods or services suggests approval, and even endorsement, of the party's product or service and is a kind of confusion the Lanham Act prohibits." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 544 (5th Cir. 1998). JEM argues that "approval," not "permission," is relevant to Section 43(a) liability, and defines the former as "to view favorably." (JEM Brief, p. 20.) Of course, that type of "approval" is irrelevant to likelihood of confusion. "Approval," as the term is used in Lanham Act, is essentially synonymous with "permission." *Id.*, *citing* William C. Burton, Legal Thesaurus 30, 383 (2d ed. 1992). Furthermore, since *Cairns II*, other trial courts have correctly opined that "whether a defendant has permission to use a plaintiff's mark is probative of and relevant to the likelihood of confusion question." *Bach*, 473 F. Supp.2d at 1115.

Notably, Dr. Jay did not ask respondents if Defendants "needed to get permission" to use Bob Marley's image. She asked respondents if they believed the makers of the shirt did or did not receive permission or approval, and, if yes,

---

[13]    Whether the rate of confusion elicited by the survey indicates a likelihood of confusion should not be judged against the Robert Sorenson test mentioned (for the first time) in AVELA's opening brief, which lacks foundation.

who gave permission or approval.  (ER 459-460.)  This type of questioning is expressly allowed under Defendants' cited authority.  *See Pebble Beach*, 155 F.3d at 544 (distinguishing problematic "needed to get permission" question from acceptable "did or did not get permission" question.)

JEM argues that the survey respondents' verbatim explanations for why they believed Bob Marley, his estate, agents, or heirs gave their permission or approval for Defendants' t-shirt to be put out merely reflect the respondents' legal conclusions, which, JEM claims, is not evidence of actual confusion.  JEM offered no authority to support this position.  On the contrary, the respondents' perceptions and – particularly, their understanding as to the licensed merchandise industry – are the very perceptions that determine whether there is a likelihood of confusion:

> [I]t is consumer perception that creates "the law" of whether permission is needed. In trademark law, it is consumer perception that creates a likelihood of confusion. And it is likelihood of confusion that creates "the law" that requires permission for a given use of a mark. Thus, if a significant number of consumers think that permission is needed, then permission is needed.

*McCarthy on Trademarks and Unfair Competition* § 24:9 (4th Ed. 2010).

The respondents' statements about the legal consequences of using Bob Marley's image on merchandise <u>without authorization</u> *is* indicative of actual confusion.  Such beliefs from consumers are tantamount to saying that Bob Marley

-34-

or his heirs, estate, or agent have a protectable interest in his image as used on, at least, t-shirts.

Finally, the potential harm of an unchecked "merchandising right" identified in Professors Lemley's and Dogan's paper, cited by AVELA, is not at issue here. Plaintiffs prevailed by proving to the Jury that Defendants' use was likely to result in actionable consumer confusion as delineated by the eight *Downing* factors and was not based on merely establishing that consumers believe that all Marley merchandise must be sponsored or approved by Bob Marley's rights holders.

**B.  The Other *Downing* Factors Support a Finding of a Likelihood of Confusion**

Plaintiffs' presented substantial evidence at trial supporting the Jury's finding of a likelihood of confusion under the *Downing* factors.

**1.  The Level of Recognition that Bob Marley has Among the Segment of Society for Whom Defendants' Products Are Intended**

Plaintiffs' presented undisputed evidence of Bob Marley's fame in general. AVELA, its licensees, and the retailers of the infringing products all admitted Bob Marley's fame; many agreed that Bob Marley was a famous brand and that there was significant consumer demand for Bob Marley products.  (ER 406-408, 399, 376-377, 256, 313, 305, 302-303.)  Valencia agreed that "[i]f Bob Marley's image and persona wasn't famous, no one would want to license his image from [AVELA]."  (ER 314.)  He also described the deal memo he proposed to Rohan

-35-

Marley as a deal to "secure the brand, Bob Marley." (ER 334-335.) Kim Cauley of Freeze admitted that Bob Marley's fame was why it "decided to accept the Bob Marley images from [AVELA] and put them on merchandise.") (ER 273.)

**2.    The Relatedness of the Fame or Success of the Bob Marley to Defendants' Products**

The fame of Bob Marley was directly related to Defendants' products and their decision to merchandise Bob Marley's image. Bob Marley has long been associated with apparel and t-shirts, beginning with his own sale of merchandise bearing his image (ER 464-465, 471-472) which has been continued with great success by his successors-in-interest, including Plaintiffs. (ER 472, 415-416.) Ms. Cauley of Freeze testified to the link between merchandise and famous musicians, generally, noting that it is "not uncommon for . . . merchandise to be sold with the image of a famous musician or musical group." (ER 266.) Nicole Barker of Wet Seal testified that JEM's Marley products were on JEM's "roster of licenses and music properties" they offered. (ER 409.)

**3.    The Similarity of the Likenesses Used by Defendants to Bob Marley**

There is no question that Defendants' products use actual images of Bob Marley. Many of the actual t-shirts offered by Defendants used images, designs, and text strikingly similar to those used on authorized t-shirts offered by Plaintiffs. (ER 899-902.)

-36-

### 4.    Marketing Channels Used

Plaintiffs' authorized Bob Marley products and Defendants' unauthorized Bob Marley products were offered in the same channels of trade.  Most notably, Wet Seal sold Plaintiffs' products, but switched them out for Defendants' products because they were cheaper.  (ER 410.)  Ms. Spieker testified that JEM sold Marley products to J.C. Penney, Kohl's, Wal-Mart, Target, and Wet Seal (ER 293-294), whereas Mr. Conley testified that Zion sold its products to J.C. Penney, Kohl's, and Wet Seal, and other of Fifty-Six Hope Road's licensees sell to Wal-Mart and Target.  (ER 417-418, 477.)  Ms. Cauley testified that Freeze sold Marley products to Wal-Mart and to specialty and discount stores (ER 267-268), which, again, are the same stores to which Plaintiffs sell their products.  (ER 420-421, 398, 405.)

### 5.    Likely Degree of Purchase Care

Because Defendants' products are inexpensive, consumers are presumed to exhibit a lower degree of purchase care than they would with a more expensive item. *Experience Hendrix, LLC v. Electric Hendrix, LLC,* 90 U.S.P.Q.2d 1883, 1896 (W.D. Wash. 2008) ("Consumers of T-shirts and ball caps are likely to exercise relatively little care" in purchasing said goods.)  Regarding two of AVELA's licensed shirts priced at retail at, respectively, $7.50 and $12.99, Liza Acuna, AVELA's licensing agent, testified that she did not believe these prices to be expensive.  (ER 394-395.)  Ms. Cauley testified that Freeze's Bob Marley

products were around $10 to $15, which is "not expensive." (ER 274.) Jacob Goldszer of JGR Copa, AVELA's beach towel licensee, testified that beach towels are an impulse buy. (ER 446.) Heather Vogel of Target testified that graphic t-shirts, such as Defendants' Marley t-shirts, retailed from $9.99 to $14.99 at Target and referred to them as "a good value" and "an impulse purchase." (ER 298.) Finally, Valencia admitted that by looking at one of AVELA's t-shirts, a consumer has no way of knowing whether it was produced under a license with Fifty-Six Hope Road. (ER 340-341.)

### 6.    Protection of Rights in Bob Marley's Identity and Persona

Plaintiffs produced uncontroverted evidence establishing the significant resources they and their predecessors have expended to protect their rights in Bob Marley's identity and persona, including more than 400 cease and desist letters and over 20 lawsuits. It was commonly known in the licensing industry – including by AVELA's licensing agent and their licensees – that Plaintiffs owned and controlled the Bob Marley rights. (ER 443, 393.) Ms. Cauley based her (and Freeze's) awareness of Zion's license to sell Bob Marley merchandise on "market knowledge." (ER 269-271.) The Jury was justified in finding a strong association between Plaintiffs and Bob Marley's identity and persona.

### 7.    Actual Confusion

In addition to Dr. Jay's survey, Plaintiffs presented substantial evidence of actual confusion as to Plaintiffs' association with, or sponsorship or approval of, Defendants' products engendered by Defendants' use of Bob Marley's image. Ms. Crujeiras testified that an employee of Catch a Fire clothing, an entity related to Plaintiffs, purchased one of Defendants' t-shirts at Target believing that it was Plaintiffs' licensed product.  (ER 491-492, 495, 501.)  Mr. Conley of Zion testified that his sales agents at New World, who also represented Balzout, one of Defendants' licensees – contacted him wondering if Zion had lost its exclusive licensee with Fifty-Six Hope Road because of Defendants' sale of unauthorized products.  (ER 431-432, 435-436.)  Ms. Cauley and Mr. Goldszer both testified that Freeze's and JGR Copa's respective retailers questioned their right to sell Bob Marley merchandise.  (ER 272, 445.)

### 8.    Defendants' Intent and Willfulness

The Jury's likelihood of confusion determination, as well as its subsequent determination that Defendants' actions were undertaken intentionally and willfully, is amply supported by the record.

**First**, it was common knowledge in the licensing industry, and known to Defendants, that Plaintiffs owned Bob Marley's rights and that Bob Marley was considered a "brand."  Defendants were also on constructive notice of Plaintiffs'

rights in manifestations of Bob Marley's identity by virtue of their trademark registration of Bob Marley's name for t-shirts and other merchandise. (ER 483-484, 825-887.) 15 U.S.C. § 1072.

As of 2005, AVELA knew that Zion had the license for Bob Marley. (ER 393.) In 2007, Plaintiffs sent AVELA a cease and desist letter and sued it based on its display of Bob Marley designs at a trade show in Las Vegas. (ER 299-301.) Defendants commenced their infringement in spite of this knowledge.

As of December 2005 and well before its infringement, Ms. Cauley of Freeze was aware that Zion had a license to sell Bob Marley merchandise based on "market knowledge" and prior contacts with Zion. (ER 269-271.) Prior to Freeze's first sale of infringing products, Ms. Crujeiras personally called Ms. Cauley to inform her of Plaintiffs' rights– and AVELA's lack of rights – to Bob Marley's likeness. Ms. Cauley testified that she had no reason to doubt the validity of Ms. Crujeiras' claims, and she informed Ms. Crujeiras that Freeze would not sell the infringing products. Ms. Cauley broke her promise, and at trial claimed blind reliance on Freeze's indemnity from AVELA. (ER 255-265, 485-488.)

Likewise, Zion contacted Target and Wet Seal to inform them that the JEM products were infringing, both of whom, in turn, separately questioned JEM's

rights to use Bob Marley's image.  (ER 411, 400-403, 661, 295-296.)  JEM

conducted no meaningful investigation into their merit and continued selling

infringing products to retailers throughout this dispute.  (ER 295-296.)

Ms. Spieker of JEM admitted that a precondition of using a celebrity's image on

merchandise is obtaining "a license agreement with the celebrity's estate."

(ER 286.)

 **Second**, AVELA sought to obtain a license from Rohan Marley to use Bob

Marley's "rights of publicity."  (ER 466-467, 469, 315-323, 334-335, 645.)  No

such license was granted, but AVELA still used Bob Marley's image.  *See Ford*

*Motor Company v. Lloyd Design Corp.*, 184 F. 2d 665, 685 (E.D. Mich. 2002)

(willfulness and attorneys' fees award established, in part, by defendant's

intentional commercial use of plaintiff's trademarks despite being denied a license).

Thereafter, Valencia sought to conspire with Roberto Rabanne, the photographer

of the most of the images AVELA was licensing, to manufacture false evidence to

establish a color of right to use Bob Marley's image, namely:  (1) advising

Rabanne to delete emails (ER 366); (2) attempting to backdate AVELA's

agreement with Rabanne from July 2006 to 2003 or 2004 (ER 362-366, 662-680,

336-339); and (3) strong-arming Rabanne to write emails in which he falsely

represented that used his photographs of Bob Marley on merchandise during Bob

Marley's lifetime, and that Mr. Marley was aware and approved of this practice. (ER 347-361, 325-326, 659-660, 888-898.)

**Third**, Valencia told Rabanne, upon being sued by Plaintiffs, that he was going to flood the market with Bob Marley merchandise in an attempt to devalue Plaintiffs' intellectual property and fund his defense with the proceeds. (ER 367-368.) Valencia never disputed this allegation despite having the opportunity to do so on the stand.

**Fourth**, AVELA and JEM attempted to usurp Plaintiffs' market by collaborating to sell a t-shirt bearing the image of Bob Marley that was very similar in design to a Zion's shirt that it had sold for ten years. (ER 433-434, 899.)

**Fifth**, AVELA did not prove that it received and relied on advice of its counsel, Gregg Paradise, much less advice-of-counsel evidence sufficient to outweigh the other *Downing* factors. Mr. Paradise testified that he was never provided with any artwork developed for merchandise or product prototypes by AVELA, (ER 276-277); he and AVELA never discussed AVELA's use of Bob Marley song or album titles or song lyrics with Bob Marley images, much less the false association consequences thereof (ER 279-280); and he had no recollection of either considering or rendering an opinion to AVELA as to its potential false association liability for using Bob Marley's image on merchandise. (ER 278-279.)

**Sixth**, JEM and Freeze evidenced willful blindness as to the illegality of their actions. Both JEM and Freeze admitted at trial that they conducted no due diligence or meaningful investigation to confirm AVELA's purported right to license photographs of Bob Marley for use on apparel despite having questions raised as to the legitimacy of AVELA's purported rights and knowing that Plaintiffs owned those rights.

## C.     The Jury's Verdict that JEM and Freeze Willfully Violated Section 43(a) is Supported by Substantial Evidence

Both Freeze and JEM were aware of Plaintiffs' rights in Bob Marley's identity and persona prior to and during their unauthorized use of his image and music titles on apparel. Despite this, neither party ever independently researched whether AVELA had the rights to use Bob Marley's image on apparel or demanded proof from AVELA that it had such rights. (ER 288, 295-296, 265, 253-254.) Neither JEM nor Freeze introduced into evidence any objective reason why they were entitled to rely on AVELA's representation that it had the rights to use Bob Marley's image on merchandise. From this evidence, the Jury was entitled to believe that Freeze and JEM used Bob Marley's image despite knowing that such use infringed Plaintiffs' rights.[14] *See J. Gallo Winery v. Corzorzio Del*

---

[14]     As noted above, Freeze and JEM waived their rights to challenge the sufficiency of the evidence underlying the Jury's finding of willfulness. In any event, a disgorgement of profits for a 43(a) Claim is not dependent on a showing of willfulness. Instead, under 15 U.S.C. § 1117(a), willful <u>dilution</u> is a predicate to

*Gallo Nero*, 782 F. Supp. 472, 475 (N.D. Cal. 1992) ("Use of an infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement). This evidence also supports the Jury conclusion that, short of actual knowledge, Freeze's and JEM's willfully blinded themselves to their and AVELA's wrongdoing by refusing to meaningfully investigate AVELA's purported rights despite evidence to the contrary. *See In re Seagate Technology, LLC*, 497 F.3d 1360, 1370-71 (Fed. Cir. 2007) (proof of willful patent infringement requires a showing of objective recklessness); *see also Hard Rock Café Licensing Corp. v. Concession Servs.*, 955 F.2d 1143, 1149 (7th Cir. 1992) (to be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate), cited by Ninth Circuit Model Civil Jury Instruction No. 15.27, "Trademark Damages – Intentional Infringement."

JEM and Freeze argue their failure to cease production and sale of the unauthorized Bob Marley products or meaningfully investigate Plaintiffs' claims is

---

disgorgement. This reasoning has been adopted by trial courts in the Ninth Circuit and sister courts. *See Pom Wonderful LLC v. Purely Juice, Inc.*, 2008 U.S. Dist. LEXIS 55426, *39 (C.D. Cal. July 17, 2008) ("Moreover, an award of defendant's profits under 15 U.S.C. § 1117(a) for a violation of 15 U.S.C. § 1125(a) is not dependent upon a showing that the violation was 'willful' [citing Quick Technologies]"); *see also R&R Partners, Inc. v. Tovar*, 2007 U.S. Dist. LEXIS 29819, *4-5 (D. Nev. 2007); *see Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 174 (3d Cir. 2005) ("The plain language of the amendment indicates that Congress intended to condition monetary awards for § 43(c) violations, but not § 43(a) violations, on a showing of willfulness").

justified by their reliance on the indemnification provision of their respective license agreements with AVELA, which, they claim, is industry custom. (ER 287-292, 252-254.) Although not clearly elucidated by either party, JEM's and Freeze's argument is based on the notion that their lack of initial due diligence or subsequent investigation into the validity of AVELA's claimed rights was not willful because, as between them and AVELA, AVELA was charged with the responsibility of securing the relevant rights. This argument is untenable. A licensor's and licensee's determination as to who bears the burden of securing the licensed rights is a private, contractual matter and is irrelevant to whether either party has engaged in willful infringement. Were this argument accepted, indemnified licensees would be emboldened to recklessly and carelessly rely on the representations of licensors, despite evidence to the contrary, in the hope of making a quick, indemnified profit. The indemnity provision cannot excuse JEM's and Freeze's initial failure to conduct due diligence into AVELA's claimed rights, and under no circumstances can it excuse their failure to take meaningful action after they specifically became aware of Plaintiffs' claims.

The above evidence is far more probative of willfulness than the evidence at issue in *Lindy Pen Co, Inc. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993), on which AVELA relies. In *Lindy*, this Court held that defendant's knowledge of the plaintiff's rights was "attenuated at best" because the defendant's outside counsel –

not defendant itself – learned of the plaintiff's trademark rights on one occasion 14 years before its adoption of the confusingly similar mark. *Id*. at 1406. The weakness of the *Lindy* plaintiff's mark and lack of actual confusion also supported the trial court's finding that the infringement was not willful. *Id*. This is not the case here, as both JEM and Freeze were specifically made aware of Plaintiffs' rights in Bob Marley's images and persona as used on merchandise before they commenced, or shortly after they commenced, their infringing activities.

Freeze's and JEM's <u>specific</u> knowledge that Plaintiffs claimed exclusive rights to use Bob Marley's image on apparel is far different than the "generalized knowledge" referenced in *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 2d Cir. (2010), upon which JEM relies. In *Tiffany*, the plaintiff's generalized notice that some portion of the thousands of Tiffany goods sold on its auction website by third parties was counterfeit was insufficient to trigger liability. Instead, "[s]ome contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary." *Id*. at 106-107. JEM and Freeze were specifically made aware that all of their Marley products infringed Plaintiffs' rights; this is contemporary knowledge, not generalized notice. Just as importantly, eBay invested millions of dollars in anti-counterfeiting measures, removed items from its website, and banned sellers of counterfeit goods. *Id*. at 98-100. This is in pointed

contrast to JEM's and Freeze's position that, as indemnitees, they have no responsibility to do anything, and are free to sell blatantly infringing merchandise.

## IV.  PLAINTIFFS' ENTITLEMENT TO DEFENDANTS' PROFITS

### A.  Plaintiffs Are Entitled to a Jury Determination of Defendants' Profits

The determination as to whether Plaintiffs are entitled to a jury trial on their claim for recovery of Defendants' profits under 15 U.S.C. § 1117(a) is a legal issue subject to *de novo* review.  *See Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997).

Plaintiffs demanded jury consideration of their claim for Defendants' profits under 15 U.S.C. § 1117(a), which the court denied.  (ER 27.)  In *Dairy Queen, Inc. v. Wood*, the Supreme Court held that a claim for an accounting of profits under 15 U.S.C. § 1117(a) gives rise to a right to a trial by jury.  369 U.S. 469, 477, 82 S. Ct. 894 (1962).  *See Adidas*, 546 F. Supp.2d at 1087 ("After *Dairy Queen*, it is clear that a claim for an accounting of profits is treated as the equivalent of a claim for damages for jury trial purposes"; plaintiff entitled to jury trial on request for an accounting of profits); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977) (in reliance on *Dairy Queen*, copyright plaintiff had right to jury trial on claim for damages and accounting of profits.)  *Dairy Queen* was not abrogated by the Supreme Court's decision in *Tull v. U.S.*, 481 U.S. 412, 107 S. Ct. 1831, as an accounting under 15

U.S.C. § 1117(a) is fundamentally compensatory in nature, not penal. *See Hunting World, Inc. v. Reboans, Inc.*, 1994 U.S. Dist. LEXIS 19961, \*14-15 (N.D. Cal. 1994) (defendants have right to jury trial on 15 U.S.C. § 1117(a) compensatory remedy, but not § 1117(b) punitive remedy.) Further, "despite language in the Lanham Act that refers to *the court* as the assessor of profits and damages, this language must not be interpreted to override the guarantee of the Seventh Amendment." *Id*. at \*16 (emphasis in original). In light of the foregoing, the court's decision not to submit the issue of Defendants' profits to the jury constituted legal error.

### B.   The Trial Court's Accounting of AVELA's Profits Should Be Upheld

AVELA contends that the trial court abused its discretion by not deducting from its gross revenue payments made to its purported licensing agent, V. International Publishing, Inc. ("V. International"), whose sole employee is Valencia's live-in girlfriend and the mother of his child, Liza Acuna. Plaintiffs submitted substantial evidence to the trial court grounding its exercise of discretion that AVELA's purported 40% licensing fee to V. International is an improper deductible expense.[15]

---

[15]    AVELA bore the burden of establishing its deductible costs. 15 U.S.C. § 1117. This burden is "not met by by a blanket, undifferentiated, unidentified category of 'overhead' or 'checks written.'" *Pillsbury Co. v. Southard*, 682 F. Supp. 497, 501 (D. Okla. 1987), *citing Maltina Corporation v. Cawy Bottling Co.,*

First, Plaintiffs submitted evidence establishing that the 40% fee was not an arms-length transaction with a third party licensing agent, but a ruse to shift taxable income out of AVELA or to shield such income from creditors. Plaintiffs submitted a declaration from Mr. Conley, a veteran of the licensing world, establishing that a 40% fee is grossly exorbitant; most agency fees are around 10-15%. (ER 227-230.) At her post-trial deposition, Acuna testified that she essentially functions as an AVELA employee: she works for AVELA 40 hours a week managing AVELA's licensees. (ER 186-191, 370-371.) This accords with her trial testimony that she uses an AVELA email address and that AVELA is the only company for which she purports to operate as a licensing agent. (ER 369, 372.) Acuna also testified and produced documents reflecting that she invoices AVELA for the time she spends assisting its litigation counsel with the various lawsuits in which AVELA is a defendant. (ER 183, 186-191.) More importantly, Valencia effectively works as his own licensing agent. Acuna testified that Valencia is directly involved in meeting with the licensees in the first instance

---

*Inc.*, 613 F.2d 582, 586 (5th Cir. 1980); *see also Bambu Sales v. Ozak Trading*, 58 F.3d 849, 854 (2d Cir. 1995) (defendants failed to "produce any of the documents routinely used to prove expenses [and] failed . . . to explain why they produced no documentary proof of bill payment;" court refused to "deduct expenses that were not proven by documentary evidence.") Where the infringer's cost data is "incomplete and contradictory," the court will refuse to guess and will resolve doubts against the infringer. *H-D Michigan, Inc. v. Biker's Dream, Inc.*, 48 U.S.P.Q.2d 1108, 1113, 1115 (C.D. Cal. 1998).

(ER 186-191) and solicited most of the licenses at issue in this case, including JEM's and Freeze's licenses. (ER 373-374.) Lastly, Acuna and Valencia have a personal relationship, a fact about which Valencia initially lied. (ER 307-309.)

Second, AVELA did not produce satisfactory evidence that it actually made payments totaling $144,912 to V. International. Plaintiffs' financial expert, Tina Skaggs, submitted a declaration stating that based on AVELA's total royalties earned from 2007-2010 (no documents evidencing this amount were ever produced), AVELA owed Acuna $1,000,372 pursuant to her 40% royalty (for all AVELA properties, not just Marley). (ER 224.) However, AVELA only produced proof of payment to Acuna in the amount of $539,787, of which $166,645 was attributed to "legal and other" expenses. (ER 224.) Thus, Acuna's total payment from AVELA appeared to be $373,142[16], leaving her a royalty payment of $54,052.69 in Marley royalties. (ER 224.) Acuna did not produce any tax returns showing that V. International ever booked any income from AVELA (or any other source). (ER 182.)

The trial court properly determined that AVELA was not entitled to deduct purported overhead expenses of $161,466 and $61,305 in trade show expenses.

---

[16]     $373,142 is 14.9% of AVELA's total royalties, which casts doubt on whether Acuna was actually paid a 40% license fee or was, in reality, paid a 15% fee. Although AVELA did not produce any profit and loss statements reflecting royalties earned from its infringing products, those it did produce evidence reflect payments to Acuna far below 40%. (ER 183-184, 193-219.)

First, AVELA did not produce any documents substantiating either of these amounts, i.e., no receipts, invoices, bank statements, or any other documents evidencing either an expense or a payment. (ER 183, 224-225.) Second, AVELA did not make any showing that these phantom amounts actually assisted in the licensing of the Marley images. *See Winterland Concessions Co. v. Fenton*, 835 F. Supp. 529, 533 (N.D. Cal. 1994) (defendant may only deduct overhead expenses if it can demonstrate they were of actual assistance in the production, distribution, or sale of the infringing product.) When infringement is found to be willful, as is the case here, "the trial court should give extra scrutiny to the categories of overhead expenses." *Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 107 (2d Cir. 1999.)

## C.    The Court Abused its Discretion in its Accounting of JEM's Profits

An appeal of a trial court's accounting of profits is reviewed for abuse of discretion. *See Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993).

The court's decision to allow JEM, *after* the jury trial, to produce proof of its alleged deductible costs expended in its manufacture and sale of its infringing products was inconsistent with its prior rulings. Furthermore, the court's post-trial accounting took into account certain alleged costs which JEM did not meet its burden of establishing. The court abused its discretion on both accounts.

-51-

JEM's production of documentary evidence of its alleged deductible costs during discovery was woefully deficient.  Despite appropriate discovery requests, JEM did not produce a witness capable of testifying to its alleged deductible costs or documents reflecting said costs other than a summary document.  (ER 507, 509-521.)  Based thereon, Plaintiffs filed a motion *in limine* to preclude JEM from producing at trial any evidence of deductible costs, which the court granted by precluding JEM from presenting evidence of its costs at trial not produced in discovery.  (ER 935.)  The court then denied Defendants' motion to bifurcate trial of liability on Plaintiffs' 43(a) Claim from damages.  (ER 936.)  Despite this, JEM was granted leave <u>after the Jury rendered its verdict of willful infringement</u> to produce previously unproduced evidence of its alleged deductible costs.  (ER 231.)  This alone constitutes an abuse of discretion.

Additionally, JEM failed to meet its burden of establishing certain costs it alleged it incurred in producing and selling the infringing products:

- JEM alleged that it paid $130,271.47 for commissions to outside and inside salespersons on the sale of infringing products.  (ER 143.)  However, JEM did not produce any checks or proof of payment to any of these salespersons but relied only on the declaration of its controller, who admitted she had no personal knowledge of these payments, and a copy of its contract with one of the salespersons.

(ER 172-177.)  JEM's controller could not specify the documents she reviewed to "calculate[] the commissions paid."  The court abused its discretion by allowing these deductions without sufficient corroboration.

- Likewise, JEM did not produce any documents, including remittance advices, reflecting that its retail customers made payments at discounted rates, which JEM claimed as an expense totaling $72,989.64.  Again, JEM's controller admitted she had no personal knowledge of these discounted rates or JEM's compliance therewith.  (ER 143.)  JEM's controller reached the $72,989.64 by simply multiplying JEM's total sales to each of these retailers by their respective rebates.  There is no showing that she actually confirmed that the discounts were applied, much less the conditions precedent to certain of the rebates were satisfied.  (ER 143, 146-171.)  The court abused its discretion by allowing these deductions without sufficient corroboration.

- JEM mainly relies on a document entitled the Gross Margin Invoice Summary Register ("GMISR") to establish its cumulative production costs for its infringing products.  The GMISR is inadmissible for its unreliability.  *See U.S. v. Ordonez*, 737 F.2d 793, 805 (9th Cir. 1983)

-53-

("The record will not be admissible, however, if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness…")  For example, the GMISR does not reflect sales of at least three style nos., sales of which are reflected in other JEM documents.  (ER 138.)  Likewise, the GMISR underreports sales of a style no. sold to Wet Seal by 5,000 units, (ER 139) and underreported revenue earned by JEM on four style nos. it sold to WalMart by over $100,000.  (ER 138-139.)  The GMISR is also inadmissible under FRE 1006 because JEM refused to produce all of the backup documents used to create the summary.  (ER 222-223.)  The court abused its discretion by relying on the GMISR despite its obvious flaws.

- JEM admits that one of its affiliates, JEM Equipment, was its vendor for the outside processing costs associated with its infringing shirts, i.e., screen printing, neck label, and finishing.  (ER 142, 144.)  These processing expenses cost roughly $.80 per garment.  JEM did not produce any documents corroborating its claim that these prices were competitive compared to unassociated vendors of these services in the clothing industry, but only relied on its controller's bald contention that its affiliate "is not captive production facility of JEM."  (ER 142.)

The court abused its discretion by not disregarding JEM's claimed outside processing costs or significantly discounting them.

In short, JEM should not have been allowed to deduct any costs not produced in discovery, and even if JEM could deduct costs, its evidence thereof was wholly lacking and unreliable.

### D.    Plaintiffs Are Entitled to Increased Profits[17]

Under 15 U.S.C. § 1117(a), "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."  Factors courts consider in adjusting the profits include:  (1) whether the amount adequately compensated Plaintiffs for Defendants' infringement (*see Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272,1275 (9th Cir. 1982)); (2) whether Defendants' actions were willful (*see U.S. Olympic Committee v. Union Sport Apparel*, 220 U.S.P.Q. 526, 530 (E.D. Va. 1983); *Taco Cabana International, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991), *aff'd* 505 U.S. 763, 112 S. Ct. 2753); (3) whether the amount of the award was sufficient to make the infringement unprofitable (*see Reebok International, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th

---

[17]    This issue is reviewed for abuse of discretion.  *See Lindy Pen*, 982 F.2d at 1405.

Cir. 1992) ("it is a per se abuse of discretion to fail to award relief under § 1117 that is adequate to make willful trademark infringement unprofitable"); and (4) whether the imprecise profit award fails to do justice, particularly where the imprecision results from the infringer's conduct, e.g., withholding or insufficient sales records. *See Boston Professional Hockey v. Dallas Cap & Emblem Manufacturing, Inc.*, 597 F.2d 71, 77 (5th Cir. 1979); *Taco Cabana*, 932 F.2d at 1127.

All of these factors support an award of increased profits. First, the trial court's award of profits failed to take into account the reputational damage suffered by Plaintiffs by having the market flooded with cheap Bob Marley merchandise that did not meet its standards. (ER 473-478, 489, 493.) Defendants' infringement hastened Plaintiffs' entrance into mass market stores and subverted Plaintiffs' long term business plans, which is also not reflected in the award of profits. (ER 496-498, 467-468, 418-419.) *See Taco Cabana*, 932 F.2d at 1127, n.20 (enhanced damages awarded in part based on infringer's expansion into markets within plaintiff's "natural zone of expansion.")

Second, Defendants' infringement was clearly willful.

Third, the award is not sufficient to make the infringement unprofitable to Defendants, particularly JEM and Freeze who, as indemnified parties, which apparently found the risk of infringement liability and profit disgorgement only a

slight deterrent to the revenue they stood to gain from the infringing activity. *See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S. Ct. 222 (1952) ("A rule of liability which merely takes away profits from an infringement would offer little discouragement to infringers.")  An award of profits does not account for advantages gained by Defendants related to their infringement of Marley's persona, including increased market advantage and goodwill. *See Business Trends Analysts, Inc. v. Freedonia Group, Inc.*, 887 F.2d 399, 404 (2d Cir. 1989).

Fourth, AVELA has not disclosed all of its earnings from licensing images of Bob Marley for use on merchandise.  AVELA never produced license agreements or royalty statements for some of its domestic licensees.  (ER 180-181, 225.)  AVELA never produced license agreements or royalty statements for licenses entered to exploit Marley's persona outside the U.S.  (ER 181, 225.)  At their depositions after the Jury trial, both Valencia and Acuna were instructed not to answer questions relating to AVELA's earnings from foreign sales and licensing (ER 181), even though AVELA is collectively U.S. businesses and individuals and the infringement originated from the U.S. *See Ocean Garden, Inc. v. Marktrade Company, Inc.,* 953 F.2d 500, 503-04, 506 (9th Cir. 1991).  Absent an increased award of profits, AVELA's attempt to shield certain profits from Plaintiffs will not be thwarted.

## V.    PLAINTIFFS' ENTITLEMENT TO ATTORNEYS' FEES

An award of attorneys' fees is reviewed for abuse of discretion and must be affirmed unless the trial court applied the wrong legal standard or its findings were illogical, implausible, or without support in the record.  *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

### A.    The Court's Award of Plaintiffs' Attorneys' Fees as to AVELA Should Be Affirmed

The court applied the correct legal standard in determining that Plaintiffs were the prevailing party, namely, a party prevails if it has "achieved a material alteration in the legal relationship of the parties that is judicially sanctioned." *Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 589 F.3d 1027, 1030 (9th Cir. 2009).  AVELA does not dispute that Plaintiffs have achieved such a material alteration.  Instead, AVELA argues that Plaintiffs are not the prevailing party because they did not prevail on all of their claims.  It is well established that winning all claims is not a prerequisite to prevailing party status.  *See San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 741 (9th Cir. 2009).  Also, the court did not base its determination that Plaintiffs were the prevailing party on their submission of statements from the media casting them as the prevailing party.  (ER 2-16.)

The court's determination of exceptionality was legally sound and within its discretion.  The court noted the Jury's determination that AVELA's violation of

-58-

Plaintiffs' rights under Section 43(a) was willful, "[t]he evidence [adduced at trial] was sufficient to support the jury's finding of willfulness as to all Defendants," and the court "agreed with and adopted the jury's findings." (ER 7.) Later, the court recited specific examples of AVELA's intent and bad faith, none of which AVELA protests in its appeal. (ER 9.) The court's finding of exceptionality as to AVELA is therefore sound. *See Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000) (a trial court's finding of exceptionality may "flow[] quite naturally from the jury's finding of willful infringement and the legal standard for 'exceptional cases' under § 1117"); *Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 31 (9th Cir. 2002) ("the trial court referred to both the jury finding of willfulness and to other record evidence before it, so there was no automatic conversion of a jury willfulness finding into a finding of exceptional circumstances . . . Where the facts of record amply explain the decision, we will not find that the mere failure of the trial judge to be more explicit amounts to an abuse of discretion.")

AVELA does not dispute the propriety of the above. Rather, it contends that its infringement of Plaintiffs' rights was not malicious, fraudulent, deliberate, or willful because it was "predicated on a reasonable interpretation of existing law." (AVELA Brief, p. 55.) AVELA has not provided any evidence to support this contention. In any event, the court's order reflects its consideration, not ignorance, of the "novel legal questions" presented in this dispute. (ER 14.)

-59-

AVELA's three other arguments contesting the award of attorneys' fees do not call into question the legal standard underlying, or logic or plausibility of, the court's determination.  First, it is irrelevant that Plaintiffs only prevailed on two of the five claims asserted against AVELA.  Plaintiffs' clear litigation goal was to obtain an injunction prohibiting Defendants from using Bob Marley's images and persona on apparel and a disgorgement of Defendants' wrongfully earned profits. Plaintiffs got both.  The court accounted for Plaintiffs' other claims by apportioning the award to account only for fees spent pursuing the 43(a) Claim.

Second, Plaintiffs' recovery of compensatory damages against AVELA on their *interference claim* is unrelated to Plaintiffs' entitlement to their attorneys' fees on their 43(a) Claim.  Likewise, Plaintiffs' recovery of AVELA's profits is irrelevant to their entitlement to attorneys' fees, as the respective awards address different injuries.  *See* S. Rep. No. 93-1400 ("Effective enforcement of trademark rights is left to the trademark owners and they should, in the interest of preventing purchaser confusion, be encouraged to enforce trademark rights.  It would be unconscionable not to provide a complete remedy including attorneys' fees for acts which courts have characterized as malicious, fraudulent, deliberate, and willful.")

Third, even if relevant to an award of attorneys' fees, AVELA has not presented any evidence that Plaintiffs' 43(a) Claim and underlying theory was

"merely an afterthought and not the primary litigation objective." Plaintiffs' 43(a) Claim has been in this case since its inception.

**B.    The Court Erred by Denying Plaintiff's Motion for Attorneys' Fees as to JEM and Freeze**

In determining that the matter was "exceptional" with respect to JEM and Freeze, the court – as it did with respect to AVELA – recounted the Jury's verdict of willfulness, recited the sufficiency of the evidence underlying it, and expressly agreed with and adopted it. Despite this finding of exceptionality expressly premised on JEM's and Freeze's willfulness, the court declined to award attorneys' fees against them. In so doing, the court abused its discretion. *See O'Brien Intern., Inc. v. Mitch*, 1980 U.S. Dist. LEXIS 16638, *31(N.D. Cal. 1980) ("Defendants' deliberate use of a competitor's trademark after clear notice of infringement makes this case 'exceptional'"; attorneys' fees awarded.)

First, the trial court's decision is, by its very terms, illogical and inconsistent as to JEM. The court, on one hand, holds that the evidence is sufficient to support the Jury's finding of willfulness, but, on the other hand, holds that the evidence that JEM "acted with an intent to deceive consumers or that [it] caused actual money or reputational damages to Plaintiffs or to the Marley persona is weak." The court does not explain this inconsistency.

Second, the court cites Plaintiffs' success on "only one Lanham Act claim" as a basis to deny their motion for attorneys' fees as to JEM and Freeze. Notably,

-61-

Plaintiffs' entitlement to attorneys' fees derives from this "one Lanham Act claim." Plaintiffs also only succeeded on one Lanham Act claim against AVELA, against whom the court awarded fees. By apportioning Plaintiffs' attorneys' fees, the court already accounted for attorneys' fees expended on other claims.

Third, the court abused its discretion by considering Plaintiffs' recovery of profits from JEM and Freeze as a factor mitigating an award of attorneys' fees. Attorneys' fees are awarded for a significantly different reason than a defendant's profits; the former accounts for a plaintiff's investment in protecting its rights and the public's interest against confusion, whereas the latter accounts for a plaintiff's lost profits and/or a defendant's unjust enrichment. The court's award of profits and entry of an injunction against JEM and Freeze indicate that Plaintiffs' attorneys' fees were not spent in vain.

Fourth (and related to the above), the court abused its discretion by considering any actual damage caused by JEM or Freeze to Plaintiffs in its attorneys' fees determination. Actual damages and attorneys' fees are unrelated. The relevant legislative history suggests that attorneys' fees awards are "partly to encourage the enforcement of trademark rights in cases where 'the measurable damages are nominal.' S. Rep. 93-1400 . . . When a trademark is infringed, trademark owners have more at stake than just the damages or loss of profits in that case." *Tamko*, 282 F.3d at 34.

-62-

## VI.  DEFENDANTS FORFEITED THEIR RIGHT TO SEEK APPELLATE REVIEW OF THE MAGISTRATE JUDGE'S ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO REOPEN DISCOVERY

The right to appellate review of a magistrate judge's order necessarily depends on the appellant filing objections to the order to the trial court. Fed.R.Civ.P. 72(a) sets forth the procedure for seeking review of a magistrate's decision:

> When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision.  A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to.  The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Although the "rule calls for a written order of the magistrate's disposition to preserve the record and facilitate review, [a]n oral order read into the record will satisfy this requirement."  Advisory Committee Notes to Fed.R.Civ.P. 72, 97 F.R.D. 165, 228; *see In re Gabapentin Patent Litig.*, 312 F. Supp.2d 653, 658 (D.N.J. 2004) (magistrate's "decision is clearly reflected in the transcript of the proceedings and the docketed minute entry of same.  [citation omitted].  Thus, a written order is not necessary to preserve review.")  If a party "fails to file timely objections to a magistrate judge's nondispositive order with the district judge to

-63-

whom the case is assigned," it "forfeits its rights to appellate review of that order." *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1995).

The Magistrate Judge issued his order on the record at the hearing on Defendants' motion on March 22, 2010 (ER 611), which decision is reflected in a docketed minute entry. (ER 930.) Defendants never objected to nor sought review of the Magistrate Judge's order. Thus, Defendants cannot now seek review of that order from this Court.

## VII. PLAINTIFFS OWN A VIABLE NEVADA REGISTRATION OF BOB MARLEY'S RIGHT OF PUBLICITY

An order granting or denying summary judgment generally is reviewed *de novo*. *Travelers Cas. & Sur. Co. of America v. Brennete*, 551 F.3d 1132, 1137 (9th Cir. 2009).

There are no factual disputes about the basis for granting summary judgment for Defendants on Plaintiffs' right of publicity claim. Plaintiffs admit that they were aware of a third party's unauthorized commercial use of Bob Marley's personality for more than six months before their registration of his right of publicity with the Nevada Secretary of State. (ER 34.) The only question is whether, under NRS § 597.800.5,[18] Plaintiffs' failure to register its claim in Bob

---

[18]    "A person, firm or corporation seeking to use the name, voice, signature, photograph or likeness of a deceased person for commercial purposes must first make a reasonable effort, in good faith, to discover the identity of any person who qualifies as a successor in interest to the deceased person. A person claiming to be

Marley's right of publicity within <u>this</u> six-month window constitutes a waiver of any claim to any unauthorized use. The court's holding that it does is an erroneous interpretation and application of NRS § 597.770, *et seq.*, and should be reversed.

NRS § 597.790.1. recognizes each individual's right of publicity in his or her "name, voice, signature, photograph <u>or</u> likeness" (emphasis added) from birth until 50 years after death. *See* NRS § 597.790.1. To facilitate the protection and use of *post-mortem* rights of publicity, the Nevada enacted a <u>permissive</u> registration scheme by which claimants of such rights *<u>may</u>* register their claim with the Secretary of State. NRS § 597.800.3 ("A successor in interest or a licensee of a deceased person may file in the Office of the Secretary of State, on a form prescribed by the Secretary of State and upon the payment of a filing fee of $25, a verified application for registration of his or her claim.") NRS § 597.800.4 bars a claimant from "assert[ing] any right against any unauthorized commercial use of the deceased person's name, voice, signature, photograph or likeness that begins before the filing of an application to register his or her claim." Similarly, NRS § 597.800.5., the key provision at issue, immunizes particular unauthorized users

---

a successor in interest to a deceased person must, within 6 months after the date he or she becomes aware or should reasonably have become aware of an unauthorized commercial use of the deceased person's name, voice, signature, photograph or likeness, register a claim with the Secretary of State pursuant to subsection 3. Failure to register shall be deemed a waiver of any right of publicity."

from liability to the extent their use is known to the claimant, but it does not

register its claim within 6 months of such knowledge:

> A person claiming to be a successor in interest to a deceased person
> must, within 6 months after the date he or she becomes aware or
> should reasonably have become aware of **an** unauthorized commercial
> use of the deceased person's name, voice, signature, photograph or
> likeness, register a claim with the Secretary of State pursuant to
> subsection 3.  (emphasis added.)

Conversely, this same provision grants claimants a 6-month period upon

learning of a particular unauthorized use to register their claims, and users are

required to first "make a reasonable effort, in good faith, to discover the identity of

any person who qualifies as a successor in interest to the deceased person," i.e., to

check the registry for a prior claim.  NRS § 597.800.5.

In short, NRS § 597.770, *et seq.*, sets forth a reasonable balance between, on

the one hand, individuals' and their successors' in interest's right to protect against

the unauthorized use of manifestations of their personality, and, on the other hand,

particular unauthorized users' immunity from liability for uses before the publicity

registration and – in the event of a failure to register within 6 months of knowledge

of an unauthorized use – immunity for all uses by that particular user.

The court's interpretation of NRS § 597.800.5 – i.e., that a claimant forfeits

its *post-mortem* rights of publicity *vis a vis* the world if it does not register its claim

within 6 months of any unauthorized use – violates the language and purpose of

the statute.  The court's error stems from the last sentence of NRS § 597.800.5's

use of the phrase "any right of publicity":  "Failure to register shall be deemed a waiver of any right of publicity."  The court erroneously gives effect to this provision by interpreting it to mean a waiver of future right of publicity claims as to any unauthorized user.  This interpretation is not reflected in the plain language of the statute.  Instead, to the extent the last two sentences of the provision should be interpreted together,[19] the waiver must relate to the particular unauthorized use – "an unauthorized commercial use" – identified in the prior sentence.  In the context of the provision, the phrase "any right of publicity" refers to any of the five manifestations of persona that compose the right of publicity.  In other words, a claimant's failure to register its claim after knowledge of an unauthorized use of a "deceased person's name, voice, signature, photograph or likeness" shall be deemed a waiver as to future use of *any* of those enumerated manifestations of the deceased person's persona by that user.

The court's interpretation is also inconsistent with the statute's manifest purpose.  First, the statute bestows, not forfeits, rights.  *See* NRS § 597.790.1.  The statute's subject class is individuals and their successors in interest, not unauthorized users.  Second, registration under the statute is permissive, not

---

[19]     It makes sense for the three sentences constituting NRS § 597.800.5 to be construed together or for each sentence to be construed separately, but the trial court's interpretation of the provision such that the first sentence and the last two sentences of the provision are construed independently is patently arbitrary.

mandatory.  *See Thomas v. State*, 88 Nev. 382, 384 (1972) ("may" is construed as

permissive and "shall" is construed as mandatory).  *Post-mortem* rights are not

created by registration but, instead, perfected by registration in Nevada.  *See* NRS

§ 597.790.1  These statutory purposes are at odds with the draconian scheme

devised by the court requiring registration within 6 months of a single

unauthorized use lest the claimant forever waive the rights conferred by the statute

as to all future unauthorized uses.  Plaintiffs' interpretation promotes the

conference of rights and is consistent with the statute's permissive registration

scheme.

　　　The court's interpretation promotes unfair, unjust, and absurd results

inconsistent with the intent and policy objectives of the legislature.[20]  The plain

language of the statute justly balances the rights of claimants to recover for

unauthorized uses with the rights of unauthorized users, who have done their

statutorily-mandated due diligence, to avoid being ambushed by rights holders.

The court's interpretation fosters confusion, as <u>any</u> right of publicity registration is

---

[20]　　"In order to reach the intention of the legislature, courts are not bound to
always take the words of a statute either in their literal or ordinary sense, if by so
doing it would lead to any absurdity or manifest injustice, but may in such cases
modify, restrict, or extend the meaning of the words, so as to meet the plain,
evident policy and purview of the act, and bring it within the intention which the
legislature had in view at the time it was enacted." *Petersen v. Bruen*, 106 Nev.
271, 276-77 (1990), *citing Escalle v. Mark*, 43 Nev. 172, 176 (1919).

potentially invalid if it was registered six months after a known unauthorized use.[21]

Under the court's interpretation, a potential unauthorized user conducting due

diligence cannot know if a registration is valid, and the right of publicity registry is

potentially overrun with deadwood and cannot serve any due diligence function.[22]

Finally, to the extent the Court deems the statute to be ambiguous, it should

account for the "the 'context' and 'spirit' in which [the statute] was enacted to

effect a construction that best represents the legislative intent in enacting the

statute." *Citizens for Cold Springs v. City of Reno*, 2009 Nev. LEXIS 53, *10

(2009). "If possible, legislative intent should be determined by looking at the act

itself." *List v. Whistler*, 99 Nev. 133, 139 (1983). The statutory text compels an

interpretation to effectuate its intent of granting, not limiting or forfeiting, *post-

mortem* rights of publicity to successor claimants and establishing a permissive

registration scheme. The legislative history confirms this statutory purpose. *See

Minutes of the Nev. Sen. Comm. on Commerce and Labor*, 65th Sess., June 2, 1989

---

[21]    The "verified application" for registration of a claim of a right of publicity
does *not* require a claimant to represent or warrant that it does not have knowledge
of any unauthorized use of the deceased person's name, voice, signature,
photograph, or likeness. NRS § 597.800.3.

[22]    Notably, none of the other states – i.e., California, Oklahoma, and Texas –
that maintain registries of posthumous right of publicity claims have enacted a
statute rendering such a claim forfeited if registered after actual knowledge of an
unauthorized use. There is no dispute that the Nevada statute was patterned after
the California statute. (Minutes of the Nevada Senate Committee on Commerce
and Labor, 65th Session, June 16, 1989.)

(discussion of the significant intellectual property rights potentially granted to the estates of Orson Welles and Liberace due to passage of statute); *Tahoe Regional Planning Agency v. McKay*, 769 F.2d 534, 537, n.6 (9th Cir. 1985) (resource to extrinsic sources is permissible to determine legislative intent).  The court's interpretation operates to forfeit, not grant, rights, and establishes a registration scheme that is entirely incapable of performing the notice function it is meant to have.

## VIII.  PLAINTIFFS' CLAIM FOR PROSPECTIVE ECONOMIC ADVANTAGE

### A.  The Jury's Verdict that AVELA Intentionally Interfered With Plaintiffs' Prospective Economic Advantage is Supported By the Record

AVELA does not dispute that the record supports a finding that Plaintiffs had a prospective business relationship with Wal-Mart, it had knowledge of such relationship, and it intended to harm Plaintiffs by preventing this relationship.  AVELA argues that the record does not support a finding that Plaintiffs were harmed and/or that AVELA's actions proximately caused said harm.  AVELA is wrong on both counts.

First, Ms. Crujeiras testified, without impeachment or contradiction, that Plaintiffs' sublicensee, Hybrid, lost an order of 100,000 units of t-shirts and 100,000 units of hoodies to Wal-Mart – $1.8 million in gross sales – due to AVELA's interference.  (ER 490-491.)  Ms. Crujeiras reasonably estimated

Plaintiffs' royalties lost due to AVELA's interference as "about $250,000." (*Id.*) Ms. Crujeiras' estimate was corroborated by Mr. Conley, who testified that Plaintiffs were, as a whole, entitled to a 17% royalty on Hybrid's sales, i.e., $306,000 on $1.8 million in gross sales. (ER 413-414, 430.) AVELA has not cited any authority to support its contention that Plaintiffs' witnesses must testify to the "exact amount" of harm Plaintiffs' suffered. Notably, the relevant Jury Instructions, the sufficiency of which AVELA has not contested, instruct that "the law does not require that Plaintiffs prove the amount of their losses with mathematical precision, but only with as much definiteness and accuracy as circumstances permit." (ER 250.)

Second, the record supports the Jury's determination that AVELA's actions were the proximate cause of the harm suffered by Plaintiffs. Ms. Crujeiras testified, without objection from AVELA, to Hybrid's dealings with Wal-Mart, which establishes that Hybrid's and Wal-Mart's deal for 200,000 units of products was derailed by AVELA's sale of unlicensed, unauthorized products. Ms. Crujeiras testified that Hybrid "had the large order" with Wal-Mart, but "lost" it because Wal-Mart already had AVELA's Bob Marley products in stock. (ER 499-500, 502-503.) Although AVELA complains that this is self-interested testimony, it does not cite any authority holding that such testimony is insufficient as a matter of law or under the circumstances. The Jury is entitled to consider this

-71-

testimony. *See Lieberman v. Matson Nav. Co.*, 300 F.2d 661, 661 (9th Cir. 1962) (trier of factual issue is entitled to believe or disbelieve plaintiff's testimony); *In re Collins*, 141 F. Supp. 25, 28 (S.D. Cal. 1956) ("It is the rule of the federal courts that uncontradicted testimony may be disregarded if there are in it inconsistencies, or inherent improbabilities or facts contradict it. [citation omitted.] But when such testimony is not inherently improbable or deficient in other respects, it cannot be disregarded merely because given by an interested party"), *rev'd on other grounds* 247 F.2d 607. This is especially the case here where the Jury was expressly instructed to consider a witness's interest when weighing his or her credibility. (ER 249.) Additionally, the Jury was justified in reasoning that, just as Wet Seal opted for AVELA's cheaper infringing product over Plaintiffs' authorized product, Wal-Mart ditched its deal with Hybrid in order to sell Defendants' cheaper products.

      The record also supports that AVELA intentionally interfered with Plaintiffs' business dealings with retailer Wet Seal. AVELA admits that Nicole Barker, a buyer at Wet Seal, testified that she replaced Plaintiffs' licensed product with AVELA's and JEM's unauthorized product because it was cheaper. (ER 410.) Although AVELA argues that Plaintiffs' claim with respect to Wet Seal fails because Ms. Barker did not establish that it knew of Plaintiffs' business expectancy with Wet Seal, the record is replete with evidence of <u>AVELA's</u>

<u>knowledge</u> of Plaintiffs' business expectancy.  Acuna testified that she was aware that Zion had the license for Bob Marley since 2005 (ER 393) and that she monitors and polices the marketplace by visiting malls and stores – particularly stores offering AVELA product, like Wet Seal – to see what licensed products are for sale.  (ER 371, 396.)  Under these circumstances, the Jury had good reason to believe that, at the very least, Acuna had personally seen Plaintiffs' authorized goods for sale at Wet Seal and, thus, knew of their business relationship.  Due to his self-interest *and*, more importantly, pattern of lying, the Jury was entitled to discredit Valencia's contradicted testimony that he was never aware of a potential business relationship between Plaintiffs and Wet Seal.  (ER 333.)  *See Limisco v. U.S. I.N.S.*, 951 F.2d 210, 215 (9th Cir. 1991) ("Disbelief of a defendant's testimony by the fact finder, along with other evidence, may provide the basis for a conclusion that the opposite of the testimony is true.")

Finally, although AVELA disputes the sufficiency of the record to support Plaintiffs' claim with respect to JGR Copa, Target, and Ecko, AVELA does not raise any issues concerning AVELA's interference with Plaintiffs' prospective economic relationships with C&D Visionary, Inc., JC Penney, or Kohl's, which Mr. Conley estimated as totaling, all together, $117,000 in lost profits to Zion. (ER 437-440.)  AVELA's arguments with respect to these interferences, as well as any other issues it opted to not raise in its opening brief, should be deemed waived.

*See Cruz v. International Collection Corp.*, 673 F.3d 991, 998 (9th Cir. 2012),

*citing Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only

issues which are argued specifically and distinctly in a party's opening brief." )

### B.    The Court's Entry of Judgment as a Matter of Law as to Plaintiffs' Claim for Punitive Damages Was Erroneous

An order granting a motion for judgment as matter of law is reviewed

*de novo*.  *Saman v. Robbins*, 173 F.3d 1150, 1155 (9th Cir.1999).

In order to establish their tort claim, Plaintiffs had to prove, among other

things, that AVELA intended to harm Plaintiffs by preventing the prospective

business relationship.  *Consol. Generator-Nevada, Inc. v. Cummins Engine Co.,

Inc.*, 114 Nev. 1304, 1311 (1998).  Under Nevada law, such proof of an intent to

harm is alone sufficient to potentially entitle a litigant to punitive damages.  "[I]n

an action for the breach of an obligation not arising from contract, where it is

proven by clear and convincing evidence that the defendant has been guilty of

oppression, fraud or *malice, express or implied*, the plaintiff, in addition to the

compensatory damages, may recover damages for the sake of example and by way

of punishing the defendant."  NRS § 42.005.1. (emphasis added.)  NRS § 42.001

defines "malice, express or implied" as "conduct which is intended to injure a

person or despicable conduct which is engaged in with a conscious disregard of the

rights or safety of others."  *See White v. Ford Motor Co.*, 2002 U.S. App. LEXIS

28133, *30 (9th Cir. 2003) ("The term 'malice' is a specially defined term of art in

Nevada law, and means something less than the ordinary definition, 'a desire to harm others or to see others suffer.' [citation omitted.] A Nevada statute broadens [the definition of] malice.") In sum, the type of action – i.e., conduct intended to injure – necessary to establish Plaintiffs' claim for intentional interference with prospective economic advantage is also sufficient to establish a claim for punitive damages.

Given the above, the trial court's grant of AVELA's motion for judgment as a matter of law as to Plaintiffs' claim for punitive damages is internally inconsistent with its denial of that motion as to Plaintiffs' tort claim (on which Plaintiffs prevailed). By definition, if the evidence entitled Plaintiffs to a jury determination of their tort claim, it also entitled them to a jury determination of their punitive damages claim. *See White*, 2002 U.S. App. LEXIS 28133, *34 (9th Cir. 2002) (jury's special verdict finding of intentional tort is sufficient to satisfy element of maliciousness for punitive damages); *Central Office Tel. v. AT&T*, 108 F.3d 981, 993-94 (9th Cir. 1997) (discussing Oregon law, plaintiff was entitled to instruction on punitive damages after presenting *prima* face case of intentional interference with business relationships), *overruled on other grounds, AT&T v. Central Office Tel.*, 524 U.S. 214, 118 S. Ct. 1956 (1998). Moreover, the court's determination that the evidence only permitted the conclusion that Plaintiffs were not entitled to punitive damages is contradicted its earlier finding that Plaintiff had

-75-

made a *prima facie* case for punitive damages.  (ER 331-332.)  The court made this finding during the middle of Plaintiffs' case in chief.  It makes no sense for there to be less evidence to support punitive damages at the close of Plaintiffs' case.  The court committed reversible error by refusing to allow Plaintiffs' punitive damages award to go to the Jury.

## CONCLUSION

In sum, Plaintiffs seek the following relief:

- Denial of all relief sought by Defendants in their appeals;

- Remand to the trial court for a jury determination of the amount of Defendants' profits to which Plaintiffs are entitled.  Short of the foregoing, the Court should reverse the trial court's order granting JEM's deductions of costs from its gross revenue, and should direct the trial court to award Plaintiffs JEM's gross revenue and increased profits from all Defendants.

- Reversal of the order denying Plaintiffs' motion for attorneys' fees as to JEM and Freeze.

- Remand to the trial court for trial on Plaintiffs' right of publicity claim; and

- Remand to the trial court for a jury determination of punitive damages on Plaintiffs' tortious interference claim.

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON  LLP

Dated:  August 14, 2013          By  _____ /s/ Jill M. Pietrini _____
                                        Jill M. Pietrini
                                        Paul A. Bost
                                Attorneys for Appellees and Counter-
                                        Appellants

## STATEMENT OF RELATED CASES

Other than those consolidated with the present case, Plaintiffs are not aware

of any related cases as defined by Circuit Rule 28-2.6.

# CERTIFICATE OF COMPLIANCE

This brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 32-2 and is 18,149 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

## PROOF OF SERVICE

I, Lynne Thompson, declare as follows:

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is Sheppard, Mullin, Richter & Hampton LLP, 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067-6055. On August 14, 2013, I caused the forgoing document:

### PLAINTIFFS-APPELLEES/CROSS APPELLANTS FIFTY-SIX HOPE ROAD MUSIC LTD.'S AND ZION ROOTSWEAR, LLC'S SECOND BRIEF ON CROSS APPEAL

including any and all exhibits, to be mailed by first class mail and electronically mailed to the following counsel of record in this action addressed as follows:

### SEE ATTACHED PROOF OF SERVICE LIST

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made and that the foregoing is true and correct.

Executed on August 14, 2013, at Los Angeles, California.

/s/Lynne Thompson
Lynne Thompson

-80-

SERVICE LIST FOR:

Fifty-Six Hope Road Music, Ltd., et al.
vs.
A.V.E.L.A., Inc., a Nevada corporation; et al.,
And Related Counterclaim.
Case No. 2:08-cv-00105-PMP-GWF

| | |
|---|---|
| Melissa W. Woo-Allen<br>2647 Gateway Road, Suite 105-550<br>Carlsbad, CA 92009<br>Telephone:  (877) 787-4855 | Email:  melissaw@counselatlaws.com<br><br>Counsel for Defendants and Counterclaimants A.V.E.L.A., INC., and LEO VALENCIA and for Defendant CENTRAL MILLS, INC. (FREEZE) |
| William R. Urga<br>L. Christopher Rose<br>JOLLEY, URGA, WIRTH,<br>  WOODBURY & STANDISH<br>3800 Howard Hughes Pkwy.<br>Wells Fargo Tower, 16th Floor<br>Las Vegas, NV 89169<br>Telephone:  (702) 699-7500; Facsimile: (702) 699-7555 | Email: wru@juww.com<br>Email: lcr@juww.com<br><br>Co-Counsel for Plaintiffs and Counter-Defendants FIFTY-SIX HOPE ROAD MUSIC LIMITED and ZION ROOTSWEAR, LLC |
| Timothy J. Ervin, Esq.<br>GALLANT & ERVIN, LLC<br>One Olde North Road, Suite 103<br>Chelmsford, MA 01824<br>Telephone:  (978) 256-6041; Facsimile: (978) 256-7977 | Email:  tim@gallant-ervin.com<br><br>Co Counsel for Plaintiff and Counter-Defendant ZION ROOTSWEAR, LLC |
| Jeffrey R Albregts<br>SANTORO, DRIGGS, WALCH,<br>KEARNEY, HOLLEY & THOMPSON<br>400 South Fourth Street, Third Floor<br>Las Vegas, NV 89101<br>Telephone:  (702) 791-0308; Facsimile: (702) 791-1912 | Email: jalbregts@nevadafirm.com<br><br>Counsel for Defendant JEM SPORTSWEAR |

John R. Yates
GREENBERG & BASS, LLP
16000 Ventura Boulevard
Encino, CA 90077
Telephone:  (818) 382-6200; Facsimile:
(818) 986-6534

Email: jyates@greenbass.com

Counsel for Defendant JEM
SPORTSWEAR

SMRH:409905181.4