**Docket Nos. 12-17502 (L), 12-17519, 12-17595, 13-15407 and 13-15473**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————— ·•· ————————

FIFTY-SIX HOPE ROAD MUSIC, LTD. and ZION ROOTSWEAR, LLC,

*Plaintiffs-Appellees,*

v.

A.V.E.L.A., INC., X ONE X MOVIE ARCHIVE, INC., CENTRAL MILLS, INC.
(FREEZE), LEO VALENCIA and JEM SPORTSWEAR, INC.,

*Defendants-Appellants.*

———————————————————

*Appeal from a Decision of the United States District Court for the District of Nevada,*
*No. 2:08-cv-00105-PMP-GWF · Honorable Philip M. Pro*

## APPELLANT JEM SPORTSWEAR, INC.'S
## THIRD BRIEF ON CROSS-APPEAL

JOHN R. YATES, ESQ.
GREENBERG & BASS LLP
16000 Ventura Boulevard
Suite 1000
Encino, California 91436
(818) 382-6200 Telephone
(818) 986-6534 Facsimile

*Attorney for Appellant,*
*Jem Sportswear, Inc.*



COUNSEL PRESS · (800) 3-APPEAL

PRINTED ON RECYCLED PAPER



## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, defendant and appellant Jem Sportswear, Inc. hereby certifies that it has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................iv

SUMMARY OF ARGUMENT ...............................................................ix

I.    THE DISTRICT COURT CORRECTLY RULED THAT ZION
      HAS NO ACTIONABLE RIGHT OF PUBLICITY IN THE
      MARLEY *PERSONA* UNDER NEVADA LAW ...........................................1

      A.    The Nevada Publicity Rights Law Did Not Revive The
            Publicity Rights That Died With Marley Long Before
            The Law Was Enacted..........................................................2

      B.    The Nevada Legislature Strictly Limited The Right of
            Publicity It Created And Incentivized Claimants To Provide
            Timely Notice Of Their Rights ..........................................3

            (i)     The publicity rights law is limited to unauthorized
                    uses in Nevada ....................................................3

            (ii)    Publicity rights are not actionable in Nevada without
                    prior registration by the claimed owner....................................4

            (iii)   The claimant's time to register the claimed publicity
                    rights is strictly limited by knowledge of
                    unauthorized use ..........................................5

II.   THE TRIAL COURT'S DECISION TO ADJUDICATE THE
      ISSUE OF PROFIT DISGORGEMENT WAS CORRECT, AND
      JEM PROVED THE EXACT AMOUNT OF ITS NET PROFITS BY
      SUBSTANTIAL EVIDENCE.............................................................8

      A.    Zion Has No Right To A Jury Trial Of The Equitable
            Issue Of Profit Disgorgement .....................................8

      B.    Jem's Profits After Deduction For Direct Costs
            Were Supported By Copius Quantities Of Detailed
            Evidence, And The Trial Court's Ruling On Jem's
            Disgorgement Should Be Affirmed If The Court Also
            Affirms That Jem's Infringement Was Willful ...................11

TABLE OF CONTENTS

Page

(i)    Jem's GMISR is an admissible and highly
reliable business record because it is generated
from a data base meeting the requirements of
Federal Rules of Evidence Rule 803(6)...........................12

(ii)    Jem's deduction for discounts and allowances to
customers was supported by substantial evidence .........15

(iii)   Jem's deduction for sales commissions was
supported by substantial evidence .................................15

(iv)   Partial manufacture of the Marley tees by Jem
Equipment does not disallow a cost deduction ..............16

(v)    Zion's claim that Jem did not produce evidence
of costs of production in pre-trial discovery
is erroneous...................................................................17

(vi)   The trial court did not abuse its discretion
in re-opening discovery on costs of production
and sales, only, for a short period of time after trial ......17

III.   THE TRIAL COURT DID NOT ERR BY ORDERING JEM TO
DISGORGE ONLY JEM'S NET PROFIT ...................................18

IV.   THE TRIAL COURT'S DENIAL OF ZION'S REQUEST FOR
A FEE AWARD AGAINST JEM WAS NOT AN ABUSE
OF DISCRETION ........................................................20

V.   IF PLAINTIFFS' SECTION 43(A) CLAIM IS LEGALLY
VIABLE THIS COURT SHOULD END THAT VIABILITY ...................24

A.   The Unregistered, Unascertainable, Potentially Perpetual
Confusion Rights Monopoly Created By The Jury's
Verdict Should Be Terminated Now...................................24

B.   The Court May Adopt The Doctrine Of Non-Trademark Use
When, As Here, The Celebrity Image Is The Product Sold...............27

C.   The Court May Adopt The Doctrine Of Descriptive Use
When, As Here, The Celebrity Image Is The Product Sold...............29

ii

TABLE OF CONTENTS

D.    A Marketplace Flooded With Existing Celebrity Product From Numerous Sources Is The Key Contextual Factor Unifying Cairns And Pirone ............................................................. 30

VI.    JEM DID NOT WAIVE ITS CHALLENGES TO SUFFICIENCY OF THE EVIDENCE BECAUSE JEM'S OPPOSITION TO ZION'S MOTION RE PROFIT DISGORGEMENT WAS IN EFFECT A RULE 50(B) MOTION ............................................... 33

VII.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A FINDING OF WILLFULNESS AGAINST JEM ...................................... 35

A.    Zion Had No Right To Exclusive Use Of The Marley Images At Issue Until The Verdict In January 2011 .................................... 36

B.    Jem's Reliance On Indemnity From Its Licensor Is Not Sufficient To Support A Finding Of Willful Infringement .............. 37

VII.    THE FIELD SURVEY IS NOT SUBSTANTIAL EVIDENCE OF THE LIKELIHOOD OF CONFUSION .................................................... 39

A.    Zion Doesn't Challenge Jem's Proof That The Survey Respondents' Verbatim Responses Primarily Reflect Respondents' Conclusions And Opinions About The Law ............. 39

B.    The Survey Respondents' Conclusions And Opinions About The Law Are Not The Perceptions That Determine Whether There Is A Likelihood Of Confusion ................................................ 40

C.    Absent Any Substantial Evidence Of Connection Between Plaintiffs And The Marley Tees At Issue The Other Downing Factors Should Be Ignored ............................................................ 40

VIII.    CONCLUSION    ............................................................................... 42

IX.    CERTIFICATE OF COMPLIANCE ......................................... 43

X.    STATEMENT OF RELATED CASES .......................................... 44

CERTIFICATE OF SERVICE ............................................................... 45

TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adidas Am., Inc. v. Payless Shoesource, Inc.*
546 F. Supp. 2d 1029 (D. Ore. 2008) ...........................................................10

*Adry v. Adry-Mart, Inc.*
68 F.3d 362 (9th Cir. 1995), as amended,
76 F.3d 984 (9th Cir. 1986) ........................................................................12

*Boynton v. TRW, Inc.*
858 F.2d 1178 (6th Cir. 1988) ....................................................................34

*Burlington Northern R.R. v. Oklahoma Tax Commission*
481 U.S. 454 (1987)......................................................................................6

*Business Trends Analysts, Inc. v. Freddonia Group, Inc.*
887 F.2d 399 (2nd Cir. 1989) .....................................................................19

*Cairns v. Franklin Mint Co.*
107 F.Supp.2d 1212 (C.D. Cal. 2000)................................................... passim

*Cairns v. Franklin Mint Co.*
292 F.3d 1139 (9th Cir. 2002) ....................................................................30

*Classic Media, Inc. v. Mewborn*
532 F.3d 978 (9th Cir. 2008) ......................................................................21

*Dairy Queen v. Wood*
369 U.S. 469, 82 S. Ct. 894,
8 L. Ed. 2d 44 (1962)............................................................................. 9, 10

*Davis v. First Nat'l Bank*
976 F.2d 944 (5th Cir. 1992) ......................................................................35

*Dobbin v. Wells Fargo Auto Fin., Inc.*
2011 U.S. Dist. LEXIS 638565 (N.D. Ill. 2011) ..........................................13

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*
109 F.3d 1394 (9th Cir. 1997) ....................................................................30

TABLE OF AUTHORITIES

Page(s)

*Earthquake Sound Corp. v. Bumper Indus.*
    352 F.3d 1210 (9th Cir. 2003) .......................................................20

*Emmert Industrial Corp. v. Artisan Associates*
    497 F.3d 982 (9th Cir. 2007) ............................................................6

*Experience Hendrix, L.L.C. v. HendrixLicensing.com, Ltd.*
    2011 U.S. Dist. LEXIS 107083 (W.D. Wash. 2011) ...................... 21, 22, 24

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*
    344 U.S. 228, 73 S. Ct. 222 (1952) ...............................................19

*Foster v. Arcata Associates*
    772 F.2d 1453 (9th Cir. 1985) .......................................................18

*Global-Tech Appliances, Inc., v. SEB S.A.*
    131 S. Ct. 2060, 179 L. Ed. 2d 1167 (2011)........................................ 37, 38

*Hokto Kinoko Co. v. Concord Farms, Inc.*
    810 F. Supp. 2d 1013 (C.D. Cal. 2011)........................................37

*Hunting World, Inc. v. Reboans, Inc.*
    1994 U.S. Dist. LEXIS 19961 (N.D. Cal. 1994)................................... 10, 11

*Lindy Pen Co. v. Bic Pen Co.*
    982 F.2d 1400 (9th Cir. 1993) .......................................................12

*Manolovich v. Bethel Park*
    461 Fed. Appx. 187 (3rd Cir. 2012) .............................................13

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*
    2001 U.S. Dist. LEXIS 23416 (D. Nev. 2001)...............................9

*Navigant Consulting, Inc. v. Wilkinson*
    508 F.3d 277 (5th Cir. 2007) .............................................. 33, 34

*New Kids on the Block v. News America Publishing, Inc.*
    971 F.2d 302  (9th Cir. 1991) .......................................................27

*O'Brien International, Inc. v. Mitch*
    1980 U.S. Dist. LEXIS 16638 (N.D. Cal. 1980).................................. 23, 24

TABLE OF AUTHORITIES

Page(s)

*Parks v. LaFace Records*
   329 F.3d 437 (6th Cir. 2003) ................................................ 28, 29

*People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*
   111 Nev. 615, 895 P.2d 1269 (1995) ....................................................1

*Pirone v. MacMillan, Inc.*
   894 F.2d 579 (2nd Cir. 1990) ................................... 24, 29, 30, 32

*Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*
   692 F.2d 1272 (9th Cir. 1982) ....................................................19

*Rambus Inc. v. Nvidia Corp.*
   2011 U.S. Dist. LEXIS 156378 ....................................................38

*SEC v. Commonwealth Chem. Sec., Inc.*
   574 F.2d 90 (2nd Cir. 1977) ....................................................9

*SEC v. Rind*
   991 F.2d 1486 (9th Cir. 1993) ....................................................8

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*
   562 F.2d 1157 (9th Cir. 1977) .................................................. 9, 10

*SIL-FLO, Inc. v. SFHC, Inc.*
   917 F.2d 1507 (10th Cir. 1990) ....................................................18

*Swofford v. B & W, Inc.*
   336 F.2d 406 (5th Cir. 1964) ....................................................10

TrafficSchool.com, Inc. v. eDriver Inc.,
   653 F.3d 820, 2011 U.S. App. LEXIS 15536,
   2011 WL 3198226 (9th Cir. July 28, 2011) ...........................................21, 22

*U.S. v. Catabran*
   836 F.2d 453 (9th Cir. 1988) ....................................................12

*U.S. v. Ordoñez*
   737 F.2d 793 (9th Cir. 1983) .................................................. 14, 15

TABLE OF AUTHORITIES

Page(s)

*U-Haul Int'l, Inc. v. Lumberman's Mut. Cas. Co., Inc.*
  2007 WL 809989 (D. Ariz. 2007) ...................................................12

*United States v. Fujii*
  301 F.3d 535 (7th Cir. 2002) ........................................................13

*Unitherm Food Sys. v. Swift-Eckrich, Inc.*
  546 U.S. 394, 126 S. Ct. 980 (2006) ...........................................33

*Waits v. Frito-Lay, Inc.*
  978 F.2d 1093 (9th Cir. 1992) .....................................................28

*Wing v. Asarco Inc.*
  114 F.3d 986 (9th Cir. 1997) .......................................................20

**Statutes**

15 U.S.C.

  Section 1114 ............................................................... 22, 23

  Section 1117(a) ....................................................... 20, 21, 22

  Section 1125(a) ........................................................... passim

17 U.S.C.

  Section 504(b) ................................................................. 18, 19

Cal. Civ. Code

  Section 3344 .........................................................................2

  Section 3344.1 ......................................................................2

**N.R.S.**

  Section 587.800.3 ................................................................1

  Section 597.770 ..................................................... viii, 1, 3

  Section 597.780 ..................................................................3

## TABLE OF AUTHORITIES

Page(s)

Section 597.790.1 ................................................................2

Section 597.800(4)...............................................................4

Section 597.800.1 ................................................................2

Section 597.800.3(e) ...........................................................7

Section 597.800.5 ........................................................ 5, 6, 7

Section 597.810 ......................................................... viii, 1, 3

**Rules**

Fed. R. Civ. P.

Rules 50(a) .......................................................... 32, 34

Rules 50(b) ......................................................32, 34, 35

Fed. R. Evid.

Rule 803(6) ........................................................ 12, 13, 14

## <u>SUMMARY OF ARGUMENT</u>

Plaintiffs Fifty Six Hope Road Music Ltd. and Zion Rootswear, LLC's publicity rights claim under N.R.S. §§597.770 through 597.810 was correctly adjudicated by the district court in favor of Jem Sportswear, Inc. and the other defendants for two independent reasons. First, Bob Marley died long before the Nevada publicity rights statute was enacted and the statute includes no provision restoring the publicity rights of deceased celebrities. Second, plaintiffs failed to timely register their claims to Marley's publicity rights with the Nevada Secretary of State within six months of becoming aware of unauthorized use of the rights in Nevada. As a result, plaintiffs claimed publicity rights in the Marley *persona* are permanently non-actionable in Nevada under the statute as currently written.

The district court's decision to try the equitable issue of profit disgorgement, and its denial of an award of either enhanced disgorgement or attorneys' fees against Jem Sportswear are all judged by an abuse of discretion standard. The district court had good reasons for its rulings as to Jem Sportswear and, as such, the rulings were all within the court's discretion and should be affirmed.

## I.    THE DISTRICT COURT CORRECTLY RULED THAT ZION HAS NO ACTIONABLE RIGHT OF PUBLICITY IN THE MARLEY *PERSONA* UNDER NEVADA LAW

The Nevada publicity rights law, N.R.S. §§597.770 through 597.810, was enacted in 1989, and provides the complete and exclusive remedy for publicity rights torts committed in Nevada. <u>People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.</u>, 111 Nev. 615, 895 P.2d 1269, 1284 (1995). Plaintiffs Fifty Six Hope Road Music Ltd. and Zion Rootswear, LLC (collectively "Zion") claim that they own an actionable publicity right in the Marley *persona* under the publicity rights law. Zion also contends that its right to sue for alleged unauthorized use of the Marley *persona* has not been waived, despite Zion's failure to register its ownership claim under N.R.S. §587.800.3 within six months of first learning of an unauthorized use. (Zion Brief, p. 64.) The trial court rejected Zion's claim of non-waiver and granted summary judgment for Jem Sportswear ("Jem") and all other defendants on Zion's Nevada publicity rights claim. [Zion Excerpts of the Record ("Zion ER") Vol. I, 33 – 36] The trial court's ruling was correct and should be affirmed.

A.    **The Nevada Publicity Rights Law Did Not Revive The Publicity Rights That Died With Marley Long Before The Law Was Enacted**

Plaintiffs concede that the Nevada publicity rights law is modeled on California's statutes. (Zion Brief, p. 69, fn.22.) Comparison of the Nevada and California statutes demonstrates that Nevada's publicity rights law does not revive the publicity right of celebrities, like Marley, who died before its enactment.

California's publicity rights law was enacted in 1971 through the addition of §3344 to the California Civil Code. In 1984, this statutory publicity right was extended to the *personae* of deceased celebrities, and those rights were made freely transferable and descendible, both by contract and by operation of law. Cal. Civ. Code §3344.1. In 2008, Cal. Civ. Code §3344.1 was amended to revive publicity rights for celebrities who had pre-deceased the enactment of this statute, by providing that "the rights recognized under this section shall be deemed to have existed at the time of death of any deceased personality who died prior to January 1, 1985. . .."

The Nevada publicity rights law tracks Cal. Civ. Code §3344.1 in permitting publicity rights to survive the celebrity's death, and making such rights freely transferable and descendible. N.R.S. §§597.790.1, 597.800.1. In contrast with California's publicity rights law, the Nevada law contains no language expressly or

impliedly reviving the publicity rights of celebrities who pre-deceased its enactment in 1989. The inescapable inference is that Marley's publicity rights in Nevada expired with him in 1981, and have not been revived. Zion never had an actionable claim under the Nevada publicity rights law. The trial court's ruling granting summary judgment to Jem can and should be affirmed on this ground.

## B.    The Nevada Legislature Strictly Limited The Right of Publicity It Created And Incentivized Claimants To Provide Timely Notice Of Their Claimed Rights

Even assuming that Marley's personal publicity rights survived his death and passed to Zion, the rights created by the Nevada publicity rights law are limited. Zion waived those limited rights by untimely registration of its claim to Marley's publicity rights with the Nevada Secretary of State.

### (i)    The publicity rights law is limited to unauthorized uses in Nevada.

N.R.S. §597.780 limits the scope of Nevada's publicity rights law to unauthorized uses of publicity rights within Nevada by providing that "[t]he provisions of NRS 597.770 to 597.810, inclusive, apply to any commercial use within this state of a living or deceased person's name, voice, signature, photograph or likeness regardless of the person's domicile." Thus, the absence of an actionable

publicity right in Nevada does not prevent an aggrieved publicity rights claimant from seeking relief in other states for unauthorized use of the rights.

### (ii) Publicity rights are not actionable in Nevada without prior registration by the claimed owner.

Zion may not bring suit in Nevada under the Nevada publicity rights law against any unauthorized user of the Marley publicity rights without first registering its claim to the rights with the Nevada Secretary of State. N.R.S. §597.800(4) ("A successor in interest . . . of a deceased person may not assert any right against any unauthorized commercial use of the deceased person's name, voice, signature, photograph or likeness that begins before the filing of an application to register his or her claim.") The fact that a claimant to a deceased celebrity's publicity rights need not register its claim to exclusive use does not make the Nevada publicity rights law "permissive" as Zion asserts.  Choosing the "permissive" option of not registering the claim is in fact highly restrictive, because choosing that option renders the purported rights completely non-actionable in Nevada. Plainly, the Nevada legislature intended to incentivize claimed owners of publicity rights of deceased celebrities to register their claim and put the world on notice.

### (iii)   The claimant's time to register the claimed publicity rights is strictly limited by knowledge of unauthorized use.

Nevada's publicity rights law further provides that when a claimant is on notice of an unauthorized use of the decedent's publicity rights by any person, the claimant must register its rights with the Nevada Secretary of State within six months of notice of the use. Absent registration, the claimant loses the ability to enforce its rights against the unauthorized user it knows about, as well as against any other unauthorized user. This limitation is plainly stated in N.R.S. §597.800.5, which provides that:

> "A person claiming to be a successor in interest to a deceased person must, within 6 months after the date he or she becomes aware or should reasonably have become aware of an unauthorized commercial use of the deceased person's name, voice, signature, photograph or likeness, register a claim with the Secretary of State pursuant to subsection 3. Failure to register shall be deemed a waiver of any right of publicity."

This six month limitations period for registration after notice is perfectly consistent with the overall statutory ban on publicity rights lawsuits without registration. Again, the Nevada legislature incentivized claimants to put the world on notice of their claimed rights, and to do so sooner, not later. The penalty for failure to register, even after notice of unauthorized use, is that the rights claimed become permanently non-actionable in Nevada.

While Zion characterizes the permanent loss of actionable rights in Nevada as "draconian" a more accurate characterization would be "reasonable." The only rights eliminated are the claimant's rights against unauthorized users in Nevada. Failure to register within six months of knowledge of unauthorized use is fairly interpreted to signal that the claimant is disinterested in acting upon the claimed rights. Nevada's six month window for registration is merely a garden-variety statute of limitations, no harsher than any other statute of limitations.

Zion errs again in asserting that the statutory rights waiver of N.R.S. §597.800.5 applies only to the specific unauthorized use of which Zion obtained knowledge, but not to all unauthorized uses. Zion's interpretation is inconsistent with the plain language of the statute -- "any right" means just what it says. "[W]here a statute is complete and unambiguous on its face, additional terms should not be read into the statute." Emmert Industrial Corp. v. Artisan Associates, 497 F.3d 982, 987 (9th Cir. 2007), citing Burlington Northern R.R. v. Oklahoma Tax Commission, 481 U.S. 454, 463 (1987). If the Nevada legislature had intended the waiver to apply only to the specific unauthorized use of which the rights claimant obtained knowledge, it could easily have made that clear by making minor changes to the statute.

Interpretation of the six month deadline imposed by N.R.S. §597.800.5 in accordance with its plain language prevents a claimant to a celebrity decedent's

publicity rights from ambushing unknowing users of the rights. Ambush would be simple to achieve merely by delaying registration until an unauthorized use significant enough to warrant litigation arises, while letting minor unauthorized uses pass untouched. Instead of permitting ambush, Nevada encourages claimants to let the world know of their claim to exclusive use at the earliest possible time, and penalizes the failure to do so. This result is both fair and reasonable. What is unfair and unreasonable is to permit a claimant to sue on unregistered and hence unknown rights at the claimant's convenience. Nevada's publicity rights law is rationally and specifically designed to prevent that result, and was correctly interpreted by the trial court's ruling granting summary judgment.

Zion's additional claim that the phrase "any right" in N.R.S. §597.800.5 refers not to the publicity right in general, but rather to one of the five aspects of the publicity right (name, voice, signature, photograph, likeness) is as untenable as Zion's general theory of the Nevada publicity rights law. Under Zion's proposed interpretation, a claimant would be able to register its claim piecemeal, right by right, within six months of notice of an unauthorized use of each particular aspect of a publicity right. This is clearly inconsistent with Nevada's registration statute, which requires a claimant to state, among other things, "[a] description of the rights claimed."  N.R.S. §597.800.3(e). The fact that "rights" must be identified

means that a claimant must state all rights claimed, not merely some of them, in order to preserve the claim to exclusive use of a decedent's publicity rights.

The trial court's interpretation of the Nevada publicity rights law was correct, and its order granting summary judgment to Jem on Zion's publicity rights claim under Nevada law should be affirmed.

## II.    THE TRIAL COURT'S DECISION TO ADJUDICATE THE ISSUE OF PROFIT DISGORGEMENT WAS CORRECT, AND JEM PROVED THE EXACT AMOUNT OF ITS NET PROFITS BY SUBSTANTIAL EVIDENCE

### A.    Zion Has No Right To A Jury Trial Of The Equitable Issue Of Profit Disgorgement

Zion neither sought nor attempted to prove at trial actual damages arising from infringement by Jem, because there were none. The issue of profit disgorgement arose solely to prevent unjust enrichment of Jem after the jury found that Jem willfully infringed. The trial court's decision to adjudicate the disgorgement issue itself should be affirmed, along with its specific findings as to the amount of Jem's disgorgement.

The Ninth Circuit and many other courts have held that disgorgement of profits is a subject of equity, which does not require determination by a jury. SEC v. Rind, 991 F.2d 1486, 1493 (9ᵗʰ Cir. 1993) (no jury trial of disgorgement of

- 8 -

profits in SEC enforcement action, as "the court is not awarding damages to which plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment"); <u>SEC v. Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 96 (2nd Cir. 1977) (disgorgement of profits equitable in nature, and does not require jury determination); <u>Mikohn Gaming Corp. v. Acres Gaming, Inc.</u>, 2001 U.S. Dist. LEXIS 23416 *56 - *58 (D. Nev. 2001) (distinguishing profit disgorgement from determination of reasonable royalty in patent case, and holding that disgorgement does not require jury determination).

The principal decision relied on by Zion, <u>Dairy Queen v. Wood</u>, 369 U.S. 469, 477-78, 82 S. Ct. 894, 8 L. Ed. 2d 44 (1962) does not require a jury trial of the disgorgement issue in this case. <u>Dairy Queen</u> is nothing more than a breach of contract case, although the contract at issue happened to be a contract for payment of royalties under a trademark license. <u>Dairy Queen</u> held that jury trial of the actual damages arising from defendant's breach of contract was required. <u>Dairy Queen</u> does not hold that profit disgorgement awarded in the absence of actual damages, as in this case, requires a jury trial. Disgorgement when no actual damages exist is an equitable remedy to prevent unjust enrichment, and may be adjudicated by the court alone.

Zion also relies on <u>Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.</u>, 562 F.2d 1157 (9th Cir. 1977), which never actually decided whether

disgorgement of profits in a trademark infringement case was subject to jury determination. The jury in Krofft had already determined plaintiff's actual damages, and the court then ruled that the parties had agreed and intended that the court, not the jury, determine disgorgement of profits. Krofft, 562 F.2d at 1175. In not ruling on the issue, the Krofft court quoted with approval a Fifth Circuit patent infringement case, Swofford v. B & W, Inc., 336 F.2d 406 (5th Cir. 1964). That court interpreted Dairy Queen as holding that when a case presents both legal and equitable issues, the factual issues common to each are tried to a jury, and concluded its analysis by noting that Dairy Queen had not "converted typical non-jury claims, or remedies, into jury ones." Swofford, 336 F.2d at 414. The unjust enrichment that profit disgorgement is meant to address is an excellent example of the kind of "typical non-jury . . . remed[y]" that the Swofford court had in mind.

Zion briefly mentions Adidas Am., Inc. v. Payless Shoesource, Inc., 546 F. Supp. 2d 1029 (D. Ore. 2008), as supporting a right to a jury trial of profit disgorgement. In fact, Adidas held only that plaintiff had the right to a jury trial on actual damages because plaintiff had adduced sufficient evidence to support a claim for actual damages. Adidas, 546 F.Supp.2d at 1087.

Zion cites finally to Hunting World, Inc. v. Reboans, Inc., 1994 U.S. Dist. LEXIS 19961 (N.D. Cal. 1994) for the proposition that Zion has a right to a jury trial as to compensatory remedies under the Lanham Act but not as to punitive

remedies. Zion fails to mention that the <u>Hunting World</u> court then found that remedies for non-willful infringements were "compensation" while remedies for willful infringement were "punitive." <u>Id</u>. at *16. In this case, of course, the jury found that Jem's infringement Jem was willful, disgorgement was imposed because of that finding, and Jem's disgorgement is thus "punitive" under <u>Hunting World</u>. <u>Hunting World</u> supports affirming of the trial court's decision.

The trial court could have, but was not required, to let the jury decide the disgorgement issue. The court's decision to adjudicate the issue itself was therefore within the court's discretion and should be affirmed.

> **B.**    **Jem's Profits After Deduction For Direct Costs Were Supported By Copius Quantities Of Detailed Evidence, And The Trial Court's Ruling On The Amount Of Jem's Disgorgement Should Be Affirmed If The Court Also Affirms That Jem's Infringement Was Willful**

Zion claims that Jem's Gross Margin Invoice Summary Register ("GMISR") is unreliable and an inadmissible summary, and that some of Jem's direct cost deductions from revenues on the Marley tees is not supported by substantial evidence. Zion argues as well that the trial court erroneously re-opened discovery after trial to assist the court in ruling on disgorgement. Zion and Jem's submissions

on these issues were voluminous and the trial court's ruling that disgorgement of net profit by Jem should be in the amount of $413, 638.29 should be affirmed[1].

> **(i)**     **Jem's GMISR is an admissible and highly reliable business record because it is generated from a data base meeting the requirements of Federal Rules of Evidence Rule 803(6).**

It is well settled in the Ninth Circuit that it is the underlying digital and electronically stored data base that is subject to Fed. R. Evid. Rule 803(6) requirements for admissibility as a business record, rather than the reports generated from the data base. *See, e.g.*, U.S. v. Catabran, 836 F.2d 453, 456 (9th Cir. 1988). "Rule 803(6) allows for the admission of a 'data compilation' in any form so long as the compilation meets the requirements of the rule." Catabran, 836 F.2d at 457. Indeed, "[t]he term 'data compilation' ensures the admissibility of records not kept in conventional written form, including electronic computer storage." U-Haul Int'l, Inc. v. Lumberman's Mut. Cas. Co., Inc., 2007 WL 809989 *6 (D. Ariz. March 15, 2007).

Once the data base is found to meet the criteria of Rule 803(6), any and all reports generated from the data base, such as Jem's GMISRs in this case, are also

---

[1] If the Court reverses the finding of willful infringement against Jem, then as a matter of law Jem's disgorgement should be zero under the Ninth Circuit rule that willful infringement is a condition of disgorgement of profits. Adry v. Adry-Mart, Inc., 68 F.3d 362 (9th Cir. 1995), *as amended*, 76 F.3d 984, 988 (9th Cir. 1986); Lindy Pen Co. v. Bic Pen Co., 982 F.2d 1400, 1405 - 1409 (9th Cir. 1993).

admissible as business records. <u>Manolovich v. Bethel Park</u>, 461 Fed. Appx. 187 (3rd Cir. 2012). <u>Dobbin v. Wells Fargo Auto Fin., Inc.</u>, 2011 U.S. Dist. LEXIS 638565*8 (N.D. Ill. 2011) *citing,* <u>United States v. Fujii</u>, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business.")

As regards computerized data bases, the criteria for admissibility into evidence are stated in F.R.E. Rule 803(6):

> **Records of regularly conducted activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . .. unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

In considering Jem's GMISR reports as evidence of Jem's sales revenues from the Marley tees and the cost of production and marketing, the trial court had before it the detailed declaration of Jem's controller Linda Lazore Lyth. [Supplemental Excerpts of the Record ("Supp. ER") 1 - 24] Jem's evidence proved beyond doubt that Jem's data base is a Rule 803(6) business record, and that the GMISR is admissible because it is generated from the Rule 803(6) qualified data

base. In particular, Jem demonstrated that its data base is (a) a "record" or "data compilation"; (b) of "acts, events, [or] conditions"; (c) made at or near the time of the transmission or creation of the information; (d) by persons with knowledge of the information whose job was entering or storing the information; and (e) that the data base was kept in the regular conduct of Jem's business, relied upon by Jem and regularly checked for accuracy. [Supp. ER 3 – 9, 11 - 13] All of the tiny number of alleged inaccuracies in the GMISRs now raised by Zion were addressed by competent evidence submitted in the trial court. [Supp. ER 23 - 24] The trial court did not err in admitting the GMISRs and rejecting Zion's cavils.

Zion cites to U.S. v. Ordoňez, 737 F.2d 793 (9th Cir. 1983) in support of its argument that the GMISR is inadmissible. In Ordoňez, the purported business record at issue was a ledger written in Spanish seized in a cocaine-related arrest. The government's expert testified that the ledger was written in code, and represented the detail of money paid for cocaine, quantity of cocaine sold, and so on. No witnesses at trial testified concerning how the ledger was created, who created it, or the circumstances of its creation. Ordoňez, 737 F.2d at 797 – 798, 805. Unsurprisingly, the Court of Appeals held that the admission of the ledger was error because the requirements of F.R.E. Rule 803(6) had not been met. Zion's suggestion that the complete absence of foundation to support admissibility in Ordoňez is comparable to the detailed foundational declaration of Ms. Lyth [Supp.

ER 1 – 24] in this case is astonishing. Nothing about <u>Ordoñez</u> prevented the trial court from accepting Jem's GMISRs as reliable, substantial evidence of Jem's revenues and costs for the Marley tees Jem produced and sold. [Supp. ER 12, 14, 202 – 211]

### (ii)    Jem's deduction for discounts and allowances to customers was supported by substantial evidence.

The Lyth declaration also authenticated relevant portions of Jem's customer contracts with Sears, Bealls, Shopko, Kohl's, Target, Walmart and Wet Seal, the terms of which document Jem's deductions for discounts and allowances from total revenue on the Marley tees. [Supp. ER 17, 163 – 186] Ms. Lyth also double-checked Jem's invoice registers to take proper account of variation in discounts caused by varying shipping arrangements. [Supp ER 22, 187 - 188]  Zion cites to no evidence that the deductions were not in fact given, or putting into question the accuracy of the deductions claimed. The trial court properly accepted and credited Jem's evidence of deductions from gross revenue of $72, 989.64.

### (iii)    Jem's deduction for sales commissions was supported by substantial evidence.

Jem's deduction of $130,271.47 for sales commissions paid was supported by the contract for one commissioned sales agent, authenticated by Ms. Lyth. The deduction was also supported by Ms. Lyth's personal knowledge of the

commission percentages paid to both outside contractors and inside employees, and her knowledge of sales volume based on Jem's GMISRs. [Supp ER 22 – 23, 189 – 194]] Again, Zion has no evidence that the commissions stated are inaccurate or were not paid. The trial court did not err in permitting Jem to take this deduction.

### (iv)    Partial manufacture of the Marley tees by Jem Equipment does not disallow a cost deduction.

The Marley tees were printed and screened at Jem Equipment in Ensenada, Mexico, at a cost of $0.80 per unit, of a total price per unit varying between $2.38 and $2.81. [Supp. ER  15 – 17, 58 – 80] Zion argues that Jem did not submit evidence that this was a competitive price in comparison to other vendors. After Jem carried its burden of submitting evidence of this cost, it was Zion's burden to submit evidence that the $0.80 for printing was not a competitive price. Zion argued the point but submitted no evidence rebutting Ms. Lyth's declaration explaining why the printing cost was competitive. [Supp. ER 17] The trial court had evidence supporting this deduction and the evidence supporting it, and properly accepted it.

> **(v)    Zion's claim that Jem did not produce evidence of costs of**
>
> **production in pre-trial discovery is erroneous.**

Zion asserts that Jem produced no evidence of its costs of production of the Marley tees in pre-trial discovery. This claim is a gross distortion of the facts. Jem's total gross sales of the Marley tees were $2,791,231.80. [Supp. ER 12 – 13, 202 – 211] Not later than March 1, 2010 – ten months before trial and long before plaintiffs' motion *in limine* to exclude cost evidence not produced – Jem had produced to plaintiffs its GMISRs showing total sales (as of February 26, 2010) of $2,261,161.00 and total costs of $1,608,507.20. [Supp. ER 212 - 214] Additionally, Jem had produced its royalties report up to March 1, 2010. [Supp ER 214]  The only available cost information not produced by March 1, 2010 was the evidence of Jem's allowances and discounts to its customers, and evidence of sales commissions paid, which together total $203,261.11 on the total final sales of $2,791,231.80, and all of which were documented by Ms. Lyth. [Supp. ER 13, 17 – 23, 163 – 194]

> **(vi)    The trial court did not abuse its discretion in re-opening**
>
> **discovery on costs of production and sales, only, for a short**
>
> **period of time after trial.**

After the trial court determined that it would adjudicate the issue of disgorgement, the court made the rational decision that it wished to have all

evidence on sales and costs available to it. Accordingly, the court ordered the re-opening of discovery on these issues only for a short time. [Zion ER 231 - 232] There was no abuse of discretion by the court doing so. "A district [court] has wide latitude in controlling discovery, and its ruling will not be overturned in the absence of a clear abuse of discretion." Foster v. Arcata Associates, 772 F.2d 1453, 1467 (9th Cir. 1985); *see also,* SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990) ("A district court has wide discretion in its regulation of pretrial matters, including whether to reopen discovery.") The trial court's decision in this case was well within its discretionary powers and should be left undisturbed.

## III.    THE TRIAL COURT DID NOT ERR BY ORDERING JEM TO DISGORGE ONLY JEM'S NET PROFIT

The trial court ordered Jem to disgorge Jem's total net profit of $413,638.29. That sum did not include an allocation of $216,000 for general overhead expenses attributable to the Marley tees portion of Jem's output in 2009. [Supp ER 23] Jem's disgorgement of $413, 638.29 is more than enough to make Zion whole, particularly when Jem's infringement caused Zion not one cent of actual damages.

Zion cites no Lanham Act cases holding that disgorgement of 100% of net profit is inadequate to make Zion whole or to discourage Jem from future infringement. Zion instead relies on two decisions involving Section 504(b) of the Copyright Act, 17 U.S.C. §504(b). One case held that the trial court was not

prohibited by defendant's proven net profit of only $899.12 from also awarding statutory damages under Section 504(b) in the sum of $5000, where there was evidence that the unintentional copyright infringement had ultimately caused significant harm to plaintiff's small animal statuette business. F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233, 73 S. Ct. 222 (1952). The other case reversed the trial court's award for "lost market value" while not ruling out that such an award might constitute a "profit" under Section 504(b) if proven. Business Trends Analysts, Inc. v. Freddonia Group, Inc., 887 F.2d 399, 406 – 407 (2nd Cir. 1989). No issue in this case is governed by 17 U.S.C. §504(b) and the results of Contemporary Arts and Freddonia are irrelevant to the adequacy of Jem's disgorgement.

Relying on Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc., 692 F.2d 1272, 1274 (9th Cir. 1982), Zion asserts a purported rule that "it is a per se abuse of discretion to fail to award relief under §1117 that is adequate to make willful trademark infringement unprofitable." This Court's context for that statement was the trial court's refusal to give plaintiff more relief than an injunction, even though plaintiff had proven willful infringement. That context does not exist here, as Zion has received far more relief than a mere injunction.

Finally, Zion presented no evidence at trial or during the briefing of the disgorgement issue that trademark infringement is a practice commonly engaged in

by Jem, or in any way part of Jem's business model. Jem's disgorgement of its entire net profit is sufficient. The trial court's denial of enhanced profit disgorgement against Jem was not an abuse of discretion and should be affirmed.

## IV.  THE TRIAL COURT'S DENIAL OF ZION'S REQUEST FOR A FEE AWARD AGAINST JEM WAS NOT AN ABUSE OF DISCRETION

The trial court's decision not to award fees against Jem must be affirmed, unless "not justified by the evidence," or "clearly against the logic and effect of the facts as are found." Wing v. Asarco Inc., 114 F.3d 986, 988 (9th Cir. 1997). Considered against these high standards for reversal, the trial court's ruling must affirmed.

Fee awards are discretionary, not mandatory, even if a particular case is found to be "exceptional." 15 U.S.C. §1117(a) ("[t]he court in exceptional cases **may** award reasonable attorney fees to the prevailing party.")  While willful infringement is one of the bases upon which a case may be found exceptional and fees awarded, the decisions in the Ninth Circuit concerning exceptionality and fee awards typically demonstrate far worse behavior by defendant than anything Jem did in connection with its production and sale of the Marley tees. *See, e.g.,* Earthquake Sound Corp. v. Bumper Indus., 352 F.3d 1210, 1213 - 1214 (9th Cir. 2003) (fees awarded where defendant intentionally copied plaintiff's trademark

and personally contacted plaintiff's customers to advise them that defendant's product was the same as plaintiff's, but less expensive).

The closest case factually to this one is Experience Hendrix, L.L.C. v. HendrixLicensing.com, Ltd., 2011 U.S. Dist. LEXIS 107083 (W.D. Wash. 2011), in which the plaintiffs owned "various trademarks incorporating the legendary performer's name, image, signature, song titles, and/or lyrics," but owned no rights of publicity in Hendrix's image or likeness. Hendrix at *2. Defendant created and sold various products incorporating Hendrix's image, but also sometimes using one or more of plaintiff's registered word marks in Hendrix's name or song titles, as well as incorporating one of plaintiff's marks into its internet domain name. Id. Before trial, defendants were granted summary judgment on plaintiff's publicity rights claim and the court also dismissed plaintiff's claim for false designation of origin. Id. at *3. At trial, plaintiff prevailed on its trademark infringement claim and was awarded $306,500 in damages and $60,000 of defendant's profits. Id. at 5. Plaintiff's motion for a fee award under 15 U.S.C. §1117(a) was denied. The court's reasoning and conclusions are apposite here, id. at *29 - *31:

> "Under the Lanham Act, attorney fees may be awarded to a prevailing party, but only in an "exceptional" case. 15 U.S.C. §1117(a). The "exceptional" requirement is construed narrowly. Classic Media, Inc. v. Mewborn, 532 F.3d 978, 990 (9th Cir. 2008). A case may be considered "exceptional" when the infringement at issue was malicious, fraudulent, deliberate, or willful, or when a party's case is groundless, unreasonable, vexatious, or pursued in bad faith. See id.; see also TrafficSchool.com, Inc. v. eDriver Inc., 653 F.3d 820, 2011 U.S. App. LEXIS 15536, 2011 WL 3198226 at *8 (9th Cir. July 28,

2011). The Court does not find this case "exceptional" within the meaning of §1117(a).

Plaintiffs' contentions that defendant Andrew Pitsicalis knew about plaintiffs' trademarks from prior litigation and did not consult with a trademark attorney before using the business and domain names and logos at issue prove nothing. Knowledge about a competitor's business and failure to seek a lawyer's advice are as consistent with innocent behavior (e.g., attempts to avoid confusing similarity between trademarks, efforts to save expenses for a fledgling enterprise) as with the type of misconduct warranting an award of attorney fees. Plaintiffs' further assertion that Mr. Pitsicalis did not fully comply with the preliminary injunction entered in this case rings hollow given that plaintiffs never bothered to seek any relief for such alleged disobedience. In casting these aspersions in Mr. Pitsicalis's direction, plaintiffs ignore the fact that this dispute, which extends well beyond the trademarks at issue, was largely resolved prior to trial, for the most part in favor of defendants.  .  .  .  .  . In light of defendants' overall success in this action, the Court sees no basis for attributing to defendants the sort of bad faith necessary under the Lanham Act to sustain an award of attorney fees in favor of plaintiffs. The Court DENIES plaintiffs' motion for attorney fees under the Lanham Act."

This case provides an even weaker basis for an award of fees against Jem than present in <u>Hendrix</u>. Zion's initial request for a preliminary injunction was denied. [ER Vol. III, 541 (Dkt. #19)] All of Zion's trademark infringement claims under 15 U.S.C. §1114 and Zion's Nevada right of publicity claim were resolved in favor of Jem. [Zion ER 33 – 36, 37 – 71] Jem disputed before trial, and continues to dispute now, that a false association claim under 15 U.S.C. §1125(a) even exists when the product and the celebrity image are one and the same thing. No evidence was presented at trial that Jem was acting in bad faith toward Zion, and in fact Jem was unaware of Zion's existence when it began producing Marley

tees under license from Avela. [ER Vol. II, 326 - 327] Zion's evidence of the likelihood of confusion is weak, at best. The trial court's ruling is not "clearly against the logic and effect of the facts" and should be affirmed.

The sole case cited by Zion to support its claim that the trial court abused its discretion by not awarding fees against Jem is O'Brien International, Inc. v. Mitch, 1980 U.S. Dist. LEXIS 16638 (N.D. Cal. 1980), which has facts quite different than those involved in this case. For example, in O'Brien the defendant was fully aware of plaintiff's registered mark and chose to adopt and begin using a virtually identical mark. O'Brien at *5, *7. Defendant was also notified three times of the infringement by plaintiff or plaintiff's counsel, but refused to quit using his infringing mark. O'Brien at *9, *13 - *14. Under these circumstances, the court found that the "intent of defendants to infringe was clearly demonstrated" and that "deliberate use of a competitor's trademark after clear notice of infringement makes this case 'exceptional.'" O'Brien at *30 - *31.

Here, Jem had never heard of Zion before being named as a defendant in the action in January 2009 and was producing Marley tees under a license with Avela. [ER Vol. II, 326 - 327] Zion had no registered trademarks in the Marley images at issue in the case. Zion's traditional infringement claims under 15 U.S.C. §1114 and plaintiffs' Nevada state law right of publicity claim were both eliminated on summary judgment as the litigation proceeded, just as in the Jimi Hendrix

litigation. [Zion ER 33 – 36, 37 – 71] Zion's false association claim under 15 U.S.C. §1125(a) in factual circumstances quite similar to this case had been rejected, when Zion filed this action, by the Second Circuit. Pirone v. MacMillan, Inc., 894 F.2d 579, 584 (2nd Cir. 1990). Additionally, the availability of this claim to Zion was clearly called into question by the Central District decisions in the lengthy litigation over use of the image of Princess Diana. All of the intentionality factors present in O'Brien are absent here as to Jem, as is the bad faith element found so significant by the Washington District Court that decided Hendrix. The trial court's decision to deny Zion an award of attorneys' fees against Jem was within the court's discretion and should be affirmed.

## V.     IF PLAINTIFFS' SECTION 43(A) CLAIM IS LEGALLY VIABLE THIS COURT SHOULD END THAT VIABILITY

### A.     The Unregistered, Unascertainable, Potentially Perpetual Confusion Rights Monopoly Created By The Jury's Verdict Should Be Terminated Now

Zion claims disingenuously that it is not asserting rights in each and every image of Bob Marley "but, instead, his identity and persona." (Brief p. 7, fn.1.) Of course, since Marley's identity and *persona* are embodied in each and every image recognizable as Marley, Zion is indeed asserting rights in each Marley image. Zion is relentless in this pursuit, and has sent more than 400 "cease and desist" letters

and filed more than twenty lawsuits challenging various allegedly unauthorized uses of the Marley *persona*. (Brief, p. 15.) The goal is to exclude all but Zion from using the Marley *persona*, or alternatively, to extract payment to Zion for each use by third parties. A right to exclusive use is usually described as a monopoly.

Limited monopolies through use of the copyright, patent and trademark systems, and through publicity rights statutes, are encouraged by the law. Obtaining a legal monopoly through one of these methods initially requires the registrant to meet defined legal thresholds of varying difficulty. Third parties typically are able to determine whether a registered trademark, copyright, publicity right, or patent exists and the scope of the rights claimed through consulting official government registries or databases. Each of these monopolies also has a defined termination point: the date of abandonment for a trademark; 17 years from issuance for a patent; life of the author plus 70 years for a copyright; and life of the person plus 50 years for rights in that person's *persona* under Nevada law.

The confusion rights monopoly conferred on Zion by the jury's verdict in Zion's favor on its 15 U.S.C. §1125(a) claim lacks the safeguards pursuant to which legal monopolies are normally conferred.

The kinds of uses of the Marley *persona* that may cause consumers to believe that Zion approves or is associated with the use are not easily ascertainable. May Zion prevent a restaurant chain from using a décor of Marley tees hung on the

wall? May Zion prevent a Marley look-alike from publicly performing Marley's hit songs? May Zion prevent the production and sale of clothing printed with images of six reggae music legends if Marley's image is one of the six? May a college have a week long reggae festival if images of Marley are used to create interest and remind the public of what reggae is? There is no means for a third party to determine answers to these questions when considering the use of a Marley image, and even Zion doesn't know the answers without commissioning a consumer survey.

The rights conveyed by the jury's verdict are not registered in any publicly accessible registry or data base. The litigation itself demonstrated the futility of researching any such data bases, as the trial court found that none of the Marley images at issue were Zion's trademarks, Zion never claimed a copyright in the images, and the Nevada publicity rights registration Zion did file was ruled invalid. [Zion ER 33 – 36]

The rights conveyed by the verdict are also potentially perpetual, so long as a small portion of the tee-shirt buying, music-enjoying public recognizes Marley as a deceased celebrity, and believes that any use of Marley's image signifies some ill-defined association with Marley, his heirs, or their licensees. Zion's own marketing and publicity efforts can go far in keeping the Marley image

recognizable, and thus maintain Zion's §1125(a) confusion rights monopoly intact indefinitely.

The Court should not permit the creation of an unascertainable, undefined, and potentially perpetual confusion rights monopoly under 15 U.S.C. §1125(a) when, as in this case, the celebrity image is the product sold. Existing precedent provides ample authority for the Court to prevent this without diminishing in any way the well-established right of celebrities to exercise very significant control the use and monetization of their *personae* through other aspects of trademark law, and through copyright and right of publicity law.

**B.    The Court May Adopt The Doctrine Of Non-Trademark Use When, As Here, The Celebrity Image Is The Product Sold**

Consumers purchase tee-shirts, plates, jackets, lighters, key chains and myriad other products printed with celebrity images because they want the decorative image, not because the consumer believes that the celebrity is the source of the product or guaranteeing its quality. This is a non-trademark use of the image which does not suggest association, affiliation or endorsement with or by the celebrity. Over a decade ago, District Judge Cooper reached the same conclusion by adopting and adapting this Court's nominative fair use defense from New Kids on the Block v. News America Publishing, Inc., 971 F.2d 302  (9th Cir. 1991), stating:

- 27 -

> "Although the New Kids court reached the above conclusion in analyzing defendants' fair use defense, the same threshold consideration is applicable to this case: does defendants' use of the image and title of Princess Diana serve to identify the source of any product? In short, are they used as trademark? If not, defendants' use cannot amount to use as an endorsement." <u>Cairns v. Franklin Mint Co.</u>, 107 F.Supp.2d 1212, 1216 (C.D. Cal. 2000).

The litigation of this action established that Zion's own use of Marley images was not a trademark use. Although Zion initially claimed that Jem's use of the Marley images was a trademark use, that claim failed both legally and factually. Moreover, the Field Survey commissioned by Zion also demonstrated that no source or trademark message was conveyed by Jem's use, as none of the survey respondents identified Jem in response to the question "who made or put out this shirt?"[2]

This Court's adoption of Judge Cooper's rule of non-trademark use when the celebrity image is the product being purchased would reverse the confusion rights monopoly conferred by the verdict in this action, without diminishing any of the protections offered by §1125(a) in the much more typical case in which the *persona* of a celebrity is used without authorization to market a separate product, such as fritos or music. *See, e.g.,* <u>Waits v. Frito-Lay, Inc.</u>, 978 F.2d 1093, 1110 (9th Cir. 1992) (Tom Waits' distinctive voice used in Fritos commercial); <u>Parks v.</u>

---

[2] Of the 256 test group respondents, 17% guessed Avela or X One X Archive, 9% guessed Marley or his heirs or estate, 9% guessed Hot Topic, 7% guessed Spencer's, 2% guessed "a fan of Bob Marley," 31% of the responses were classed as "miscellaneous other," and 29% of the respondents didn't know or didn't answer. [ER Vol III, 384]

LaFace Records, 329 F.3d 437, 441 (6th Cir. 2003) (use of Rosa Park's name used as a song title for a song having nothing to do with Rosa Parks).

### C.    The Court May Adopt The Doctrine Of Descriptive Use When, As Here, The Celebrity Image Is The Product Sold

In factual circumstances quite similar to those of Cairns, the Second Circuit a decade earlier reached the same result of no §1125(a) liability through the slightly different avenue of adopting a descriptive use test. In Pirone, 894 F.2d at 584, the Second Circuit held that images of several baseball greats in a calendar was descriptive of the content of the calendar, rather than an endorsement of the calendar by one or more of the greats depicted, or an indication that the heirs of one or more of them were the source of the calendar. As articulated by the Second Circuit, the descriptive use test includes the non-trademark use test adopted by Judge Cooper in Cairns.

Zion attempts to distinguish Pirone on the basis that the calendar at issue included images of several baseball stars, and the Marley tees at issue in this case have only the image of Marley. That is a difference, but not one important to the Pirone court. What was decisive to the Second Circuit was the decades long intensive merchandising of Babe Ruth's name and image during the 60 years before Pirone's lawsuit was filed. Much like Marley, "Ruth was one of the most photographed men of his generation, a larger than life hero to millions and an

historical figure in whom interest still runs high." <u>Pirone</u>, 894 F.2d at 581, 583. In other words, the calendar at issue in <u>Pirone</u> was launched into a pre-existing flood of existing Ruth merchandise, thus making absurd any claim that Ruth's image in the calendar could be interpreted by any reasonable person as meaning that Ruth sponsored, approved or endorsed the calendar.

**D.    A Marketplace Flooded With Existing Celebrity Product From Numerous Sources Is The Key Contextual Factor Unifying <u>Cairns</u> And <u>Pirone</u>**

This Court addressed exactly the same "flood of merchandise" factual context present in <u>Pirone</u> in <u>Cairns v. Franklin Mint Co.</u>, 292 F.3d 1139, 1149 – 1150 (9th Cir. 2002), and held that in a marketplace long flooded with Princess Diana merchandise from many sources, the defendant's incorporation of Diana's image into a variety of memorabilia products could not possibly cause consumer confusion. Simply put, in this context few if any consumers will be so dim-witted as to incorrectly believe that Diana's heirs were associated with, or sponsored or approved the Franklin Mint's Princess Diana merchandise:

> "Under the law of false endorsement, likelihood of customer confusion is the determinative issue. *See Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997) ("'Likelihood of Confusion' is the basic test for … trademark infringement."). Between 1981 and 1997, many products, including some that were largely indistinguishable from Franklin Mint products, bore the name and likeness of Princess Diana, who neither endorsed

nor objected to any of these products. Consumers, therefore, had no reason to believe Franklin Mint's Diana-related products were endorsed by the Princess. This did not change when, following Princess Diana's death in 1997, the Fund endorsed approximately twenty products - but not Franklin Mint's - amidst a flood of unendorsed Diana-related memorabilia. Under these circumstances, there was no likelihood of confusion as to the origin of Franklin Mint's Diana-related products."

Zion argues that Cairns is vastly different than this case because Zion "presented substantial evidence to the Jury establishing the extraordinary strength of Bob Marley's identity and persona as a protectable right or 'mark.'" (Brief, p. 14.)  In fact, Zion's lack of both trademark rights and an actionable right of publicity in Nevada in the Marley *persona* was demonstrated before trial. Additionally, the relevant inquiry is not the strength of Marley's *persona*, but what a reasonably prudent consumer could reasonably believe about the source or affiliation of a product purchased because it bears the *persona*.

In that regard, Zion proved at trial that Marley while alive was a well-known reggae musician with an international following, and that Zion had engaged in merchandising the Marley *persona* in a variety of ways since re-acquiring whatever Marley intellectual property rights existed a decade after Marley's death. For example, Zion-approved Marley products include incense, novelty license plates, magnets, watches, stickers, decals, calendars, postcards, mugs, textile wall hangings, cloth patches, bats and caps in addition to tee shirts. [Zion ER 830 –

887] Zion also proved more than 400 instances of unauthorized use[3] of the Marley *persona*, 120 of which related to sales of Marley tee shirts [ER Vol. III, 511 – 527.24; Vol. II, 111, 120], and presented testimony from Michael Conley concerning the enormous quantity of bootleg Marley goods in the market. [ER Vol. II, 279.1 – 279.2] Just as this Court held in <u>Cairns</u> that in a sea of Princess Diana merchandise "there was no likelihood of confusion as to the origin of Franklin Mint's Diana-related products," in a sea of Marley-themed products there is no likelihood of confusion that all such products originate with, or are affiliated with, approved or sponsored by Zion.

The <u>Cairns</u> decisions and <u>Pirone</u> have two critical factors in common: (a) the challenged uses of images of Princess Diana and Babe Ruth had as background vast quantities of pre-existing merchandise emanating from many sources; and (b) consumers buy the challenged products to obtain the image printed on them, that is, the image was the product rather than separate and distinguishable from product. These key facts that differentiate this case from the many §1125(a) cases that uphold a celebrity's right to prevent the use of the celebrity's image to

---

[3] Jem does not claim that Zion's enforcement efforts are evidence that Marley's image doesn't function as a mark. Jem does claim that Zion's extensive enforcement efforts demonstrate an equally extensive flood of Marley merchandise that isn't sourced from Zion. In any event, failure to enforce is a defense only to trademark infringement and is irrelevant here, where Zion has no trademark in the Marley images at issue.

promote a separate product, and permit this Court to draw a bright line rule that will eliminate Zion's §1125(a) confusion rights monopoly conferred by the jury's verdict, yet preserve the more typical §1125(a) action in which the celebrity *persona* is used to promote a separate product.

## VI.    JEM DID NOT WAIVE ITS CHALLENGES TO SUFFICIENCY OF THE EVIDENCE BECAUSE JEM'S OPPOSITION TO ZION'S MOTION RE PROFIT DISGORGEMENT WAS IN EFFECT A RULE 50(B) MOTION

The purpose of Fed. R. Civ. P. Rules 50(a) and (b) is to permit the trial judge, who is more familiar with any given action than an appellate court can ever become, to have two opportunities to determine the sufficiency of the evidence. Unitherm Food Sys. v. Swift-Eckrich, Inc., 546 U.S. 394, 401, 126 S. Ct. 980 (2006). Jem satisfied this purpose and has not waived its right to challenge the sufficiency of the evidence to support the verdict. Navigant Consulting, Inc. v. Wilkinson, 508 F.3d 277, 288 (5th Cir. 2007) (". . . Rule 50(b) is construed liberally, and we may excuse 'technical noncompliance' when the purposes of the rule are satisfied.")

Jem made an oral motion for judgment as a matter of law pursuant to Fed.R.Civ.P. Rule 50(a) at the close of evidence on January 18, 2011. [ER Vol. I, 40 - 62] The oral motion included argument concerning the sufficiency of Zion's

evidence of likelihood of confusion as presented by the Field Survey, and the sufficiency of Zion's evidence that Jem (or any other defendants) willfully infringed Zion's rights.

Jem once again argued to the District Court that the same evidence was not substantial evidence to support the verdict in Jem's Opposition to Plaintiffs' Motion for Award of Profits, filed on July 1, 2011 – five months post-verdict. [ER Vol. I, 63 - 72] The District Court's ruling and order filed on July 3, 2012 expressly states that the court considered and rejected Jem's argument concerning substantial evidence: "[t]he Court rejects JEM's argument that the evidence at trial was insufficient to support the jury's verdicts." [ER Vol. I, 23]

Jem's re-filing of the same arguments and evidence already twice rejected by the trial court, within 28 days after entry of final judgment on November 9, 2012, would have been empty formalism serving no purpose. This Court may and should consider Jem's Opposition filed on July 1, 2011 to be Jem's post-judgment Rule 50(b) motion, and consider Jem's arguments on appeal concerning sufficiency of the evidence. *See, e.g.,* Boynton v. TRW, Inc., 858 F.2d 1178, 1185 - 1186 (6th Cir. 1988) (counsel's oral renewal after conclusion of evidence of motion for directed verdict first made at the close of plaintiff's evidence held to satisfy purpose of Rule 50(b) motion and preserve appellate review of the sufficiency of the evidence); Navigant Consulting, 508 F.3d at 288 (Rule 50(a)

motion and objections to jury instructions jointly held to constitute Rule 50(b) motion and preserve appellate review of sufficiency of the evidence); <u>Davis v. First Nat'l Bank</u>, 976 F.2d 944, (5th Cir. 1992) (motion for directed verdict held equivalent to a Rule 50(b) motion and sufficient to preserve appellate review of sufficiency of evidence).

## VII.   THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A FINDING OF WILLFULNESS AGAINST JEM

Zion argues that Jem knew of Zion's claimed rights in the Marley *persona* "prior to" Jem's use of Marley's image. (Brief, p. 43.) The evidence at trial was actually that Jem was unaware of Zion's existence until Jem had already begun producing the Marley tees under its license from Avela. Jem vice president Randi Speiker received an inquiry from one of Jem's customers, Wet Seal, about the Marley tees, but there was no testimony that that conversation included any references to Zion. [ER Vol. II, 302, 323 – 324, 326 – 327, 329]  Understandably, Zion changes its focus from "prior knowledge" to Jem's continued production of Marley tees after Jem became a defendant in the action, and Jem's reliance on indemnity, as the primary evidence of Jem's willfulness.

## A.    Zion Had No Right To Exclusive Use Of The Marley Images At Issue Until The Verdict In January 2011

Had Jem contacted Zion's counsel immediately after being served with the First Amended Complaint in January 2009, and requested the evidence of Zion's rights in the Marley images at issue, there would have been no evidence. Then, as now, Zion has no copyrights or trademarks and no valid publicity rights in Nevada that would reserve exclusive use of the images to Zion.

The mere possibility that Zion might be able to exclude others from using these Marley images was created solely by the results of the Field Survey, if accepted as evidence of the likelihood of confusion. The Field Survey wasn't completed until the end of August 2009, so Zion could not have informed Jem of the results until at least that date. Even then, the answers actually given by the survey respondents demonstrated their beliefs about licensing law rather than their confusion, and different cross-examination at trial might have brought that point into greater prominence for the jury and changed the result. Only the jury's verdict made actual the possibility of exclusive rights created by the Field Survey, and the verdict occurred several months after Jem had ceased production of Marley tees. Jem's action were not willful; they were rational and factually justified under the circumstances existing, including a business and cultural climate in which claims of violation of intellectual property rights are endemic.

**B.     Jem's Reliance On Indemnity From Its Licensor Is Not Sufficient To Support A Finding Of Willful Infringement**

Zion chastises Jem for relying on its indemnity agreement with Avela and not conducting an investigation. Zion omits to mention that an investigation would have demonstrated that plaintiffs had no documented rights in the images at issue, whereas Jem's licensor Avela did.

Zion offers no rebuttal to Jem's argument, supported by unanimous trial testimony of apparel industry witnesses, that all industry participants rely on their indemnities of non-infringement from their licensors or vendors. [ER Vol. II, 191 – 195, 280 – 281, 283 – 287, 293 – 294, 297 – 299, 309 - 314] It was Zion's burden to present evidence to the jury regarding what the investigation Zion claims should have occurred would have achieved. Not a scintilla of evidence on this point was presented at trial, and none has been cited by Zion in its brief on appeal.

Zion also doesn't dispute that the standard for finding willful blindness is very high: "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." <u>Global-Tech Appliances, Inc., v. SEB S.A.</u>, 131 S. Ct. 2060, 179 L. Ed. 2d 1167, 1179 (2011)*;* <u>Hokto Kinoko Co. v. Concord Farms, Inc.</u>, 810 F. Supp. 2d 1013, 1043 (C.D. Cal. 2011). Willful blindness has two components: "(1) the defendant must subjectively believe that there is a high

probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." <u>Rambus Inc. v. Nvidia Corp.</u>, 2011 U.S. Dist. LEXIS 156378*36, *citing*, <u>Global-Tech Appliances</u>, 131 S.Ct. at 2070."

Zion presented no evidence at trial that Jem had any "subjective belief" that infringement was occurring. The only event that Zion points to as a "deliberate action" is that Jem did not conduct an investigation into Avela's rights to the Marley images. Had Jem done so, Avela had a contract with Rabanne, the photographer who took the Marley photos from which the images at issue were created. [Zion ER 672 – 680] Zion, on the other hand, had no documented trademark rights in the Marley images to display to Jem.

Jem's conduct with regard to the Marley images was no different than its conduct with regard to other images – it relies on its licensor to have the rights that it licensed, exactly like all participants in the apparel industry rely on their licensors and vendors. Engaging in standard business practices is not evidence of willful blindness, or any other form of willful infringement by Jem.

## VII.  THE FIELD SURVEY IS NOT SUBSTANTIAL EVIDENCE OF THE LIKELIHOOD OF CONFUSION

### A.    Zion Doesn't Challenge Jem's Proof That The Survey Respondents' *Verbatim* Responses Primarily Reflect Respondents' Conclusions And Opinions About The Law

Jem's First Brief on Cross-Appeal discussed in detail the actual responses of the test and control group respondents to the Field Survey second primary question: "Who do you think gave their permission or approval for this particular T-shirt to be made or put out?" Jem demonstrated that at least 62% (58 of 94) of the test group respondents selecting Marley or "the person on the shirt" as the permission-giver were making statements about their understanding of the law rather than expressing confusion. Jem demonstrated that at least 64% of the test group respondents (32 of 51) selecting the "person on the shirt" or Marley as the permission-giver were also making statements about their understanding of the law rather than expressing confusion. (Jem's Brief, pp. 23 - 24.) Thus, only 36 of 256 test group respondents (14.1%) and 19 of 253 (7.5%) control group respondents provided answers arguably related to their degree of confusion. This 6.6% difference is factually trivial and legally insignificant, especially in view of Dr. Jay's candid testimony that even an 8% difference between the test and control groups was "effectively neutral." [ER Vol. III, 285]

This trivial real difference between test and control group respondents is remarkable in view of the design of the survey to produce results that could be used to argue the existence of confusion. The only respondents allowed to answer the second primary question had already been screened to make sure they all believed that someone had to give permission to use the images displayed. The respondents were then asked to guess who gave permission. Unsurprisingly, the tee-shirt recognizable as displaying Marley's image elicited more guesses that Marley gave permission to use his picture than did the image of the unknown black male with dreadlocks.

**B.    The Survey Respondents' Conclusions And Opinions About The Law Are Not The Perceptions That Determine Whether There Is A Likelihood Of Confusion**

Zion argues that "respondents' statements about the legal consequences of using Bob Marley's image on merchandise <u>without authorization</u> *is* indicative of actual confusion." (Brief, p. 34.) Yet, in the very next sentence Zion concedes that these statements are not evidence of confusion at all, but constitute the respondents' legal opinions: "[s]uch beliefs from consumers are tantamount to saying that Bob Marley or his heirs, estate, or agent have a protectable interest in his image as used on, at least, t-shirts." (Brief, pp. 34 – 35.) Zion puts the permission cart before the confusion horse. The belief that permission is needed is

both legally erroneous and legally irrelevant unless there is confusion, and there is no requirement for Jem to obtain Zion's permission unless there is confusion when, as here, Zion has no trademark, copyright, or Nevada publicity rights in the images at issue.

### C.    Absent Any Substantial Evidence Of Connection Between Plaintiffs And The Marley Tees At Issue The Other *Downing* Factors Should Be Ignored

The Marley images at issue were found not to be Zion's trademarks because Zion never used the images as trademarks. [ER Vol. II, 141 – 147] In other words, consumers viewing the images may think of Marley, if they recognize him, but they don't associate Zion with being the source of the product or service in connection with which the Marley image is used. Similarly, the 6.6% difference between test and control groups in the Field Survey regarding who gave permission to put out the test tee, when corrected to eliminate responses not relevant to confusion, also shows that consumers do not significantly associate Jem's use of the Marley images with approval or sponsorship by Zion. The connection between these Marley images and Zion is very, very weak.

When association between the claimant and the marks is very weak, as here, the likelihood of confusion analysis ends because there is little likelihood of confusion, Cairns, 107 F.Supp.2d at 1221:

"Each of these factors in the traditional likelihood of confusion analysis would weigh in favor of finding a likelihood of confusion. In this case however, each is severely mitigated by the Court's finding that there is a weak association between the image of Princess Diana and plaintiffs.  If there is a lack of association between that image and plaintiffs, the similarity and strength of the marks are irrelevant to a likelihood of confusion as to endorsement. Similarly, the fact that goods are related is of no consequence without a showing of association between the image and the plaintiffs. The Court concludes that these factors have no bearing on the determination of whether consumers are likely to be confused as to plaintiffs' endorsement of defendants' products."

## VIII.    CONCLUSION

Jem requests that the Court vacate the jury's finding that Jem is liable for trademark infringement pursuant to 15 U.S.C. §1125(a), and additionally or in the alternative, to vacate the jury's finding that Jem willfully infringed. Absent a finding of willful infringement the disgorgement order and judgment against Jem and in favor of Zion in the sum of $413,638.29 should also be vacated under current Ninth Circuit precedents. Finally, all relief requested by Zion should be denied.

## IX.    CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in

Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief uses a

proportional typeface and 14-point font, and contains 10,227 words.

DATED:  October 21, 2013                    GREENBERG & BASS LLP
                                            A Registered Limited Liability Partnership


                                            By: s/    John R. Yates
                                                JOHN R. YATES
                                                Attorneys for Defendant and Appellant
                                                Jem Sportswear, Inc.

## X.    STATEMENT OF RELATED CASES

Jem is not aware of cases pending in this court that would be deemed related

pursuant to Ninth Circuit Rule 28-2.6.

DATED:  October 21, 2013                GREENBERG & BASS LLP
                                        A Registered Limited Liability Partnership


                                        By: s/     John R. Yates
                                            JOHN R. YATES
                                            Attorneys for Defendant and Appellant
                                            Jem Sportswear, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


s/          Kirstin Largent