CONSOLIDATED CASE NOS. 12-17502 AND 13-15407

IN THE

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

FIFTY-SIX HOPE MUSIC ROAD, LTD., A BAHAMIAN CORPORATION, and
ZION ROOTSWEAR, LLC, A FLORIDA LIMITED LIABILITY COMPANY,

Plaintiffs-Appellees and Cross-Appellants,

v.

A.V.E.L.A., Inc. d/b/a/ ART & VINTAGE ENTERTAINMENT LICENSING
AGENCY, X ONE X MOVIE ARCHIVE, INC., CENTRAL MILLS, INC., and
LEO VALENCIA,

Defendants-Appellants and Cross-Appellees.

_____

Appeal from United States District Court for the District of Nevada
Civil Case No. 2:08-cv-00105-PMP-GWF (Honorable Phillip M. Pro)

_____

**DEFENDANTS-APPELLANTS/CROSS-APPELLEES A.V.E.L.A., INC., X
ONE X MOVIE ARCHIVE, INC., CENTRAL MILLS, INC., AND LEO
VALENCIA'S THIRD BRIEF ON CROSS-APPEAL**

_____

MELISSA W. WOO (SBN 192056)
2647 GATEWAY ROAD, SUITE 105-550
CARLSBAD, CA 92009
TELEPHONE: 877-787-4855
FACSIMILE: 877-787-6855

ATTORNEY FOR DEFENDANTS-APPELLANTS/CROSS-APPELLEES

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**…………………………………………………..v

**SUMMARY OF ARGUMENT**…………………………………………...1

**ARGUMENT**……………………………………………………………...2

I.   PLAINTIFFS DO NOT HAVE A VIABLE FALSE ENDORSEMENT
     CLAIM……………………………………………………………………2

    A.   Bob Marley's Identity or Persona is Not a Protectable Trademark…..2

    B.   Defendants Do Not Use Marley's Persona as a Source Indicator or to
        Imply Endorsement………………………………………………...7

    C.   Entertaining Plaintiffs' False Endorsement Claim Would
        Impermissibly Turn Section 43(a) into a Federal Right of
        Publicity………………………………………………………..13

II.  THE FIRST AMENDMENT PROTECTS DEFENDANTS' EXPRESSIVE
     USE OF MARLEY'S PERSONA………………………………………...17

    A.   Defendants Did Not Waive the First Amendment Defense…...……17

    B.   The *Rogers* Test Applies to Defendants' Marley T-Shirts Because the
        T-Shirts Are Expressive Works………………………………..21

        1.   *Defendants' Marley T-Shirts Qualify As Artistic Expression Fully
             Protected by the First Amendment*..………………………….21

        2.   *The* Rogers *Test Applies to Artistic Expression*..………………27

    C.   Plaintiffs' Lanham Act Claim Fails Under the *Rogers* Test………...29

        1.   *Marley's Persona is Artistically Relevant to the Expressive
             Marley T-Shirts*..……………………………………………….29

        2.   *Defendants Did Not Explicitly Mislead Consumers as to Marley's
             Involvement with Defendants' Products*..…………...…………30

III.    IN ANY EVENT, PLAINTIFFS CANNOT ESTABLISH LIKELIHOOD
OF CONSUMER CONFUSION AS A MATTER OF LAW……………...33

A.    Plaintiffs' 43(a) Claim Fails as a Matter of Law Because Plaintiffs
Cannot Show Consumer Confusion as to Source or Sponsorship…..33

B.    Plaintiffs' 43(a) Claim Fails as a Matter of Law Because the Evidence
Does Not Support the Jury's Verdict………………………………..34

1.    *Defendants Did Not Waive their Right to Appeal the Sufficiency of
the Evidence for Plaintiffs' 43(a) Claim Because Defendants Filed
a Rule 50(b) Motion Explicitly Addressing this Issue*...………...34

2.    *The Evidence Does Not Support the Jury's Finding of Likelihood
of Confusion Because the Factors Balance in Defendants'
Favor*.........................................................................................35

(i)    Neither Dr. Jay's Poorly Constructed Survey Nor Any
Other Evidence is Probative of Actual Confusion……....36

(ii)    The Association Between Marley's Image and Plaintiffs is
Weak Because Plaintiffs Fail to Use a Source-Identifying
Image of Marley............................................................40

(iii)    The Strength of Mark, Similarity of Marks, and
Relatedness of Goods Factors are Immaterial in this Case
Because there is a Lack of Association Between Marley's
Image and Plaintiffs…....……………………..………...43

(iv)    The Parties Do Not Use the Same Marketing Channels
Because They Target Different Shops.……....…………..44

(v)    Consumers' First Amendment Interests Mitigate the
Relevance of the Degree of Consumer Care Factor…....44

(vi)    The Evidence in No Way Shows that AVELA or Freeze
Intended to Confuse Consumers About Plaintiffs'
Endorsement of Defendants' Products.………………....45

(vii)    The Factors Balance Against a Finding of Likelihood of
Confusion.……………………………………....………47

IV.    THE AESTHETIC FUNCTIONALITY DEFENSE NEVERTHELESS
       BARS PLAINTIFFS' SECTION 43(A) CLAIM…………………………..48

       A.    The Aesthetic Functionality Defense is Not Waived………………..48

       B.    Aesthetic Functionality Remains A Viable Doctrine………………..49

       C.    Defendants' Use of Marley's Image is Aesthetically Functional…...50

V.     PLAINTIFFS' SECTION 43(A) CLAIM OVEREXTENDS TRADEMARK
       LAW INTO THE COPYRIGHT FIELD………………………………..54

VI.    PLAINTIFFS WAIVED THEIR NEVADA PUBLICITY RIGHTS BY
       FAILING TO REGISTER THE RIGHTS WITHIN SIX MONTHS OF
       BECOMING AWARE OF UNAUTHORIZED USE OF MARLEY'S
       LIKENESS………………………………………………………………59

VII.   PLAINTIFFS' PROSPECTIVE ECONOMIC ADVANTAGE CLAIM
       FAILS AS A MATTER OF LAW………………………………………63

       A.    The Evidence Does Not Support Any Finding that Defendants
             Intentionally Interfered with Plaintiffs' Prospective Economic
             Advantage……………………………………………………………...63

             1.    *The Evidence Fails to Establish that Defendants Interfered with
                   Plaintiffs' Prospective Relationship with Wal-Mart*..…………63

             2.    *The Evidence Fails to Establish that Defendants Interfered with
                   Plaintiffs' Prospective Relationship with Wet Seal*..…………...67

             3.    *The Evidence Fails to Establish that Defendants Interfered with
                   Plaintiffs' Prospective Relationship with JGR Copa, Target, Ecko,
                   C&D Visionary, Inc., JC Penney, or Kohl's*..………………….68

       B.    The Court Properly Granted Defendants Judgment as a Matter of Law
             on Plaintiffs' Punitive Damages Claim……………………………...71

VIII.  THE EVIDENCE DOES NOT SUPPORT ANY FINDING THAT FREEZE
       WILLFULLY VIOLATED SECTION 43(A)……………………………..73

IX.    PLAINTIFFS ADVANCE INCORRECT ARGUMENTS ON THE
        DISGORGEMENT OF PROFITS ISSUE…………………………………75

        A.    Plaintiffs Must Prove Willful Infringement to Recover Defendants'
               Profits……………………………………………………………..75

        B.    Accounting of Profits is an Equitable Remedy Properly Decided by
               the Court……………………………………………………………..76

        C.    The District Court Abused its Discretion by Not Deducting AVELA's
               Payments to its Licensing Agent When Accounting Profits………...77

        D.    Plaintiffs Are Not Entitled to Increased Profits……………………..77

X.     THE DISTRICT COURT IMPROPERLY AWARDED ATTORNEY FEES
        TO PLAINTIFFS……………………………………………………………..79

        A.    This Case is Not Exceptional………………………………………79

        B.    Plaintiffs Are Not the Prevailing Party in this Action…...………….80

XI.    THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION
        BY DENYING ATTORNEY FEES AS TO FREEZE……………………80

CONCLUSION………………………………………………………………..81

# TABLE OF AUTHORITIES

## CASES

*Abdul-Jabbar v. General Motors Corp.*,
    85 F.3d 407 (9th Cir. 1996) .................................................................. 10

*Allen v. Men's World Outlet, Inc.*,
    679 F.Supp. 360 (S.D.N.Y. 1988) ........................................................ 3

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979) ................................................... 33, 36, 43

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir 2011). ................................................ 22, 23, 25

*Armstrong v. Eagle Rock Entm't, Inc.*,
    655 F.Supp.2d 779 (E.D. Mich. 2009) ................................................ 56

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
    457 F.3d 1062 (9th Cir. 2006) .................................................. 50, 51, 53

*Ayers v. City of Chicago*,
    125 F.3d 1010 (7th Cir. 1997) .................................................. 22, 26, 45

*BASF Corp. v. Old World Trading Co.*,
    41 F.3d 1081 (7th Cir. 1994) ........................................................ 77, 78

*Bd. of Trs. of N.Y. v. Fox*,
    492 U.S. 469 (1989) ............................................................................ 22

*Brown v. Elec. Arts, Inc.*,
    724 F.3d 1235 (9th Cir. 2013) .................................................. 17, 27, 31

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011)................................................................... 21, 22

*Browning-Ferris Indus. v. Kelco Disposal*,
    492 U.S. 257 (1989). .......................................................................... 71

*Cairns v. Franklin Mint Co.*,
    292 F.3d 1139 (9th Cir. 2002) ......................................................... 8, 40

*Cairns v. Franklin Mint Co.*,
    107 F.Supp.2d 1212 (C.D. Cal. 2000) ........................................*passim*

*Cairns v. Franklin Mint Co.*,
    24 F.Supp.2d 1013 (C.D. Cal. 1998) ................................. 11, 12, 41, 79

*Cardtoons v. Major League Baseball Players*,
    95 F.3d 959 (10th Cir. 1996) ..................................................... 14, 22, 23

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*,
    696 F.3d 206 (2d Cir. 2012) ........................................................... 48, 50

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*,
    886 F.2d 490 (2d Cir. 1989) ........................................................... 27, 28

*Comedy III Prods. Inc. v. New Line Cinema*,
    200 F.3d 593 (9th Cir. 2000) ........................................................... 3, 41

*Connick v. Myers*,
    461 U.S. 138 (1983) ............................................................................. 20

*Contessa Food Prods. v. Lockpur Fish Processing Co.*,
    123 Fed. Appx. 747 (9th Cir. 2005) ..................................................... 75

*Cruz v. Int'l Collection Corp.*,
    673 F.3d 991 (9th Cir. 2012) ............................................................... 69

*Curtis Publ'g Co. v. Butts*,
    388 U.S. 130 (1967) ................................................................. 17, 19, 20

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962) ..................................................................... 76, 77

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979) ................................................................. 5

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003) ........................................................................*passim*

*Dillinger, LLC v. Elec. Arts, Inc.*,
    2011 WL 2457678 (S.D. Ind. June 16, 2011) ................................. 31, 32

*Donovan v. Crisostomo*,
     689 F.2d 869 (9th Cir. 1982) ............................................................ 18

*Downing v. Abercrombie & Fitch*,
     265 F.3d 994 (9th Cir. 2001) ........................................................... 36

*E.J. Gallo Winery v. Gallo Cattle Co.*,
     967 F.2d 1280 (9th Cir. 1992) ......................................................... 36

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
     547 F.3d 1095 (9th Cir. 2008) ...................................................*passim*

*Earthquake Sound Corp. v. Bumper Indus.*,
     352 F.3d 1210 (9th Cir. 2003) ......................................................... 79

*Emmert Indus. Corp. v. Artison Assocs.*,
     497 F.3d 982 (9th Cir. 2007) ........................................................... 59

*Estate of Presley v. Russen*,
     513 F.Supp. 1339 (D.N.J. 1981) ........................................................ 4

*ETW Corp. v. Jireh Publ'g, Inc.*,
     332 F.3d 915 (6th Cir. 2003) ......................................................*passim*

*F.D.I.C. v. Lee*,
     130 F.3d 1139 (5th Cir. 1997) ......................................................... 18

*Faberge, Inc. v. Saxony Prods., Inc.*,
     605 F.2d 426 (9th Cir. 1979) ........................................................... 78

*Facenda v. N.F.L. Films, Inc.*
     542 F.3d 1007 (3d Cir. 2008) ..................................................... 20, 28

*Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*,
     2010 U.S. Dist. LEXIS 94500 (S.D.N.Y. Sept. 10, 2010). ................... 58

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
     925 F.Supp.2d 1067 (C.D. Cal. 2012). .............................................. 49

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
     636 F.3d 1115 (9th Cir. 2011) ......................................................... 49

*Gen. Universal Sys., Inc. v. Lee*,
    379 F.3d 131 (5th Cir. 2004). ................................................................ 56

*Gibson by Gibson v. Cnty. Of Riverside*,
    132 F.3d 1311 (9th Cir. 1997). ............................................................... 76

*Gracie v. Gracie*,
    217 F.3d 1060 (9th Cir. 2000). ............................................................... 80

*Harrington v. Syufy Ent.*,
    113 Nev. 246 (1997). .............................................................................. 63

*Hoffman v. Capital Cities/ABC*,
    255 F.3d 1180 (9th Cir. 2001) ......................................................... 21, 26

*Humana Inc. v. Forsyth*,
    545 U.S. 299 (1999) ............................................................................... 71

*Indus. Rayon Corp. v. Dutchess Underwear Corp.*,
    92 F.2d 33 (2d Cir. 1937) ............................................................ 4, 14, 15

*Int'l Order of Job's Daughters v. Lindeburg & Co.*,
    633 F.2d 912 (9th Cir. 1980) ......................................................... *passim*

*Inwood Labs, Inc. v. Ives Labs., Inc.*,
    456 U.S. 844 (1982) ............................................................................... 48

*Keller v. Elec. Arts Inc.*,
    724 F.3d 1268 (9th Cir. 2013) ............................................................... 13

*Landham v. Lewis Galoob Toys, Inc.*,
    227 F.3d 619 (6th Cir. 2000) ................................................................. 12

*Las Vegas-Tonopah-Reno Stages Lines v. Gray Line Tours*,
    106 Nev. 283 (1990) .............................................................................. 65

*Lindy Pen v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993) ....................................................... *passim*

*Mattel, Inc. v. MCA Records*, Inc.,
    296 F.3d 894 (9th Cir. 2002) ........................................... 27, 28, 29, 30

*Meloff v. New York Life Ins. Co.*,
    240 F.3d 138 (2d Cir. 2001) ........................................................ 66, 67

*Network Automation, Inc. v. Advanced Sys. Concepts*,
    638 F.3d 1137 (9th Cir. 2011) ............................................................ 44

*New Kids on the Block v. News Am. Publ'g, Inc.*,
    971 F.2d 302 (9th Cir. 1992) ........................................................ 19, 20

*Newton v. Thomason*,
    22 F.3d 1455 (9th Cir. 1994) ........................................................ 36, 47

*Nitco Holding Corp. v. Boujikian*,
    491 F.3d 1086 (9th Cir. 2007) ............................................................ 35

*Palko v. Connecticut*,
    302 U.S. 319 (1967). ............................................................................ 19

*Parks v. LaFace Records*,
    329 F.3d 437 (6th Cir. 2003) .................................................. 4, 5, 12, 28

*Peri & Sons Farms, Inc. v. Jain Irrigation, Inc.*,
    933 F.Supp.2d 1279 (D. Nev. 2013) .................................................... 71

*Pennekamp v. Florida*,
    328 U.S. 331 (1946) ...................................................................... 20, 21

*Pirone v. MacMillan*,
    894 F.2d 579 (2d Cir. 1990) ....................................................... *passim*

*Qualitex Co. v. Jacobsen Prods.*,
    514 U.S. 159 (1995) ............................................................................ 52

*Riley v. Nat'l Fed. of the Blind of N.C.*,
    487 U.S. 781 (1988) ............................................................................ 22

*Rock & Roll Hall of Fame v. Gentile Prods.*,
    134 F.3d 749 (6th Cir. 1998) ..................................................... *passim*

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ....................................................... *passim*

*Ruiz v. Affinity Logistics Corp.*,
     667 F.3d 1318 (9th Cir. 2012) .................................................... 17, 49, 54

*Santiago v. Rumsfeld*,
     425 F.3d 549 (9th Cir. 2005). ........................................................ 17, 20

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
     668 F.3d 677 (9th Cir. 2012) ................................................................ 49

*Singleton v. Wulff*,
     428 U.S. 106 (1976) ............................................................................. 19

*Smith v. Wal-Mart Stores, Inc.*,
     537 F.Supp.2d 1302 (N.D. Ga. 2008) .................................................. 28

*Tiffany (NJ) Inc. v. eBay, Inc.*,
     576 F.Supp.2d 463 (S.D.N.Y. 2008) .................................................... 74

*Time, Inc. v. Hill*,
     385 U.S. 374 (1967) ............................................................................. 25

*TrafficSchool.com, Inc. v. Edriver, Inc.*,
     653 F.3d 820 (9th Cir. 2011) ............................................................... 81

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
     532 U.S. 23 (2001) ................................................................... 49, 50, 52

*Tull v. United States*,
     481 U.S. 412 (1987) ............................................................................. 76

*Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*,
     546 U.S. 394 (2006) ............................................................................. 35

*Vanguard Piping Sys. v. Eighth Judicial Dist. Court*,
     2013 Nev. LEXIS 76 (2013) ................................................................ 61

*Va. Pharmacy Bd. v. Va. Consumer Council*,
     425 U.S. 748 (1976) ....................................................................... 22, 25

*Visible Sys. Corp. v. Unisys Corp.*,
     551 F.3d 65 (1st Cir. 2008) .................................................................. 76

*Vuitton et Fils S.A. v. J. Young Enters., Inc.*,
    644 F.2d 769 (9th Cir. 1981) ................................................................ 51

*Waits v. Frito-Lay, Inc.*,
    978 F.2d 1093  (9th Cir. 1992) ....................................................*passim*

*Wal-Mart Stores v. Samara Bros.*,
    529 U.S. 205 (2000). .......................................................................... 57

*Watec Co. v. Liu*,
    403 F.3d 645 (9th Cir. 2005) ....................................................... 79, 80

*Wendt v. Host. Int'l, Inc.*,
    125 F.3d 806 (9th Cir. 1997) ........................................................ 6, 10

*White v. Samsung Electronics Am.*,
    971 F.2d 1395 (9th Cir. 1992)  ....................................................*passim*

*Williams v. Univ. Med. Ctr. of S. Nev.*,
    688 F.Supp.2d 1134 (D. Nev. 2010)................................................. 65

*Zuffa, LLC v. Justin.tv, Inc.*,
    838 F.Supp.2d 1102 (D. Nev. 2012)................................................. 54

## STATUTES

15 U.S.C. § 1117(a) ................................................................ 76, 78, 79

Lanham Act § 43(a) .......................................................................*passim*

Nev. Rev. Stat. § 597.790 ...................................................................... 62

Nev. Rev. Stat. § 597.800.4 ................................................................... 60

Nev. Rev. Stat. § 597.800.5 ................................................ 59, 60, 61, 62

Nev. Rev. Stat. § 597.800.7 ................................................................... 61

Nev. Rev. Stat. § 42.005 ................................................................. 71, 72

## Other Authorities

Barbara A. Solomon, *Can the Lanham Act Protect Tiger Woods? An Analysis of Whether the Lanham Act is a Proper Substitute for a Federal Right of Publicity*, 94 TMR 1202 (2004)................................................................ 14, 15, 16

M. Thurmon, *Ending the Seventh Amendment Confusion: A Critical Analysis of the Right to a Jury Trial in Trademark Cases*, 11 TEX. INTELL. PROP. L.J. 1 (2002) ................................................................................................ 76

Marci A. Hamilton et al., *Rights of Publicity: An In-Depth Analysis of the New Legislative Proposals to Congress*, 16 CARDOZO ARTS & ENT. L.J. 209 (1998) .................................................................................................... 14

Mark P. McKenna, *Dastar's Next Stand*, 19 J. INTELL. PROP. L. 357 (2012)........................................................................................ 55, 57

Roger Steffens, *Bob Marley*, American Masters, PBS.org (Jan. 14, 2001), http://www.pbs.org/wnet/americanmasters/episodes/bob-marley/about-bob-marley /656/. ............................................................................ 23, 24

Sheldon W. Halpern, *Trafficking in Trademarks: Setting Boundaries for the Uneasy Relationship Between "Property Rights" and Trademark and Publicity Rights*, 58 DEPAUL L. REV. 1013 (2009).................................... 37, 38

Thomas Storey, *Bob Marley: Anatomy of an Icon*, Jamaica: The Best of Its Art and

Culture (Sep. 12, 2013), http://theculturetrip.com/caribbean/jamaica/

articles/ .......................................................................................................... 23

T<small>REATISES</small>

1 Thomas McCarthy, *Rights of Publicity and Privacy* (2d ed. 2002)........... 5, 15, 61

4 Thomas McCarthy, *Trademarks and Unfair Competition*

(4th ed. 2007) ................................................................................. 37, 38, 75, 76

## SUMMARY OF THE ARGUMENT

Plaintiffs do not have a viable Section 43(a) claim because Bob Marley's persona or identity is not a protectable trademark. Defendants' use of Marley's image also does not imply Plaintiffs' sponsorship of Defendants' goods. Allowing any unauthorized use of any aspect of one's identity to be the basis for a Section 43(a) claim would make Section 43(a) indistinguishable from a right of publicity.

Further, the inherently communicative nature of Marley's image coupled with the products' artistic elements renders Defendants' products First Amendment protected expressive works. The First Amendment defense is not waived because Defendants raised it in their answer and to oppose Plaintiffs' motion for a preliminary injunction. Regardless, this Court has discretion to address this significant constitutional issue.

The evidence nonetheless does not support the jury's verdict on likelihood of confusion because the factors balance in Defendants' favor. Defendants did not waive the insufficiency of evidence for the Section 43(a) argument because Defendants filed a Rule 50(b) motion explicitly addressing this issue.

The District Court properly granted summary judgment for Defendants on Plaintiffs' Nevada Right of Publicity claim because Plaintiffs failed to timely register publicity rights with Nevada.

1

Plaintiffs' prospective economic advantage claim fails as a matter of law because the evidence does not establish that Defendants interfered with any of Plaintiffs' business relationships.

The district court also did not err by determining disgorgement of profits, an equitable issue that makes damages case, *Dairy Queen v. Wood*, distinguishable. The court did not err by refusing to award Plaintiffs increased profits and denying attorney fees as to Freeze as the relief awarded adequately compensates Plaintiffs.

## ARGUMENT

I.    **PLAINTIFFS DO NOT HAVE A VIABLE 43(A) CLAIM.**

A.    **Bob Marley's Identity or Persona is Not a Protectable Trademark.**

In response to Defendants' argument that Plaintiffs cannot have a protectable trademark in each and every image of Bob Marley, Plaintiffs assert they are not claiming a trademark right in every image of Marley, but are instead asserting rights in his identity and persona.  (Pls.' Br.7 n.2.)  Plaintiffs' argument is counterintuitive as "identity" and "persona" not only encompass a person's likeness and thus every image, but also any identifying characteristics associated with that person.  While Plaintiffs correctly acknowledge that the Ninth Circuit permits false endorsement claims based on a "distinctive attribute of the celebrity's identity," *see Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992), Plaintiffs ignore the key term, "distinctive."  *Id.*

2

Contrary to Plaintiffs' suggestion, this Court has never permitted far-reaching trademark claims over a celebrity's identity or persona generally. *See, e.g.*, *Comedy III Prods. Inc. v. New Line Cinema*, 200 F.3d 593, 594-96 (9th Cir. 2000) (holding that unlike Tom Waits' distinctive voice in *Waits*, 978 F.2d 1093, there was no distinctive aspect of the Three Stooges that deserved trademark protection).

Further, a celebrity's likeness does not qualify as a distinctive attribute of his identity unless a particular image is used consistently on specific goods. *See, e.g.*, *Pirone v. MacMillan*, 894 F.2d 579, 582-83 (2d Cir. 1990). The *Pirone* court explained that:

> an individual's likeness is not a consistently represented fixed image – different photographs of the same person may be markedly dissimilar. Thus a photograph of a human being, unlike a portrait of a fanciful cartoon character, is not inherently "distinctive" in the trademark sense of tending to indicate origin.

*Id.* at 583 (citing *Allen v. Men's World Outlet, Inc.*, 679 F.Supp. 360, 366 n.12 (S.D.N.Y. 1988)).

Likewise, in *ETW Corp. v. Jireh Publ'g, Inc.*, the Sixth Circuit declined to protect Tiger Woods' likeness as a trademark because every image of Woods would not serve to identify him as the source of the goods. 332 F.3d 915, 922 (6th Cir. 2003). The court concluded that no reasonable consumer would believe the countless pictures containing Woods' likeness all originated with him. *Id.* at 922.

3

To hold otherwise would turn Woods into "a walking, talking trademark."  *Id.* Instead, it held that only a particular image of a celebrity regularly used to identify specific goods could receive trademark protection.  *Id.* at 923; *see also Estate of Presley v. Russen*, 513 F.Supp. 1339, 1363-64 (D.N.J. 1981) (rejecting estate's claim to trademark rights in Elvis Presley's likeness, but giving trademark protection to a specific image of Presley striking a characteristic singing pose that was used repeatedly in advertising materials).

Plaintiffs' attempt to distinguish Woods' trademark claim from his Section 43(a) claim in *ETW* and their reliance on *Parks v. LaFace Records,* 329 F.3d 437, 446 (6th Cir. 2003) for the proposition that a trademark use is unnecessary for a Section 43(a) claim directly contravenes trademark law and Ninth and Sixth Circuit precedent.

First, inapposite to the Lanham Act's purpose, *Parks* held that Section 43(a) "permits celebrities to vindicate [their] property rights."  329 F.3d at 445.  But trademarks are not property rights, but rather indicia of a product's source. *See Indus. Rayon Corp. v. Dutchess Underwear Corp.*, 92 F.2d 33, 35 (2d Cir. 1937), *cert. denied*, 303 U.S. 640 (1937).  Trademark law's main function is to protect the consuming public by preventing competitors from copying another's source-identifying mark, *see Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32-33 (2003), not to protect a celebrity's "economic interest[s]."  *See Parks*,

4

329 F.3d at 445.  Justice Scalia emphasized in *Dastar* that, "the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers."  *Id.*  Plaintiffs' focus on celebrity property rights confuses a Section 43(a) Lanham Act claim with a state right of publicity claim. *See* 1 Thomas McCarthy, *Rights of Publicity and Privacy* §1:3 (2d ed. 2002) [hereinafter McCarthy, *Publicity*].

Second, Ninth and Sixth Circuit precedent establish that the standards for proving a Section 43(a) false endorsement claim are more stringent than those for a trademark infringement claim.  *See Waits*, 978 F.2d at 1106; *Rock & Roll Hall of Fame v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998).  The Ninth Circuit in *Waits* held that a false endorsement claim based on a celebrity's attributes requires the plaintiff to show that "those attributes amount to an unregistered commercial 'trademark.'"  978 F.2d at 1106 (quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979)).  Similarly, the Sixth Circuit in *Rock & Roll Hall of Fame* held:

> whether alleging infringement of a registered trademark, pursuant to 15 U.S.C. § 1114(1), or infringement of an unregistered trademark, pursuant to 15 U.S.C. §1125(a)(1), it is clear that a plaintiff must show that it has actually used the designation at issue *as a trademark*...[T]he plaintiff must establish a likelihood that the defendant's designation will be confused with the plaintiff's trademark, such that consumers are mistakenly led to believe that the defendant's goods are produced or sponsored by the plaintiff.

134 F.3d at 753. Thus, Plaintiffs must prove that they use Marley's image as a trademark.

But only unique, static aspects of a celebrity's identity are protectable as a trademark. *See, e.g.*, *Waits*, 978 F.2d at 1110. In *Wendt v. Host Int'l, Inc.*, the Ninth Circuit extended trademark protection to the likenesses of two actors as they appeared on the television show, *Cheers*. 125 F.3d 806, 812 (9th Cir. 1997). Similarly, in *White v. Samsung Electronics Am.*, Vanna White's appearance as the hostess of *Wheel of Fortune* qualified as a trademark. 971 F.2d 1395, 1396 (9th Cir. 1992). Unlike Plaintiffs' broad claim to Marley's every image, the *Cheers* actors' and White's likenesses were "fixed" to how they looked on *Cheers* and *Wheel of Fortune*, respectively. *See Pirone*, 894 F.2d at 583. In contrast, Marley's general persona, an evolving and vague concept because people continually change in both appearance and personality, is not "inherently distinctive" and cannot operate as a trademark. *Id.*

Like Babe Ruth and Tiger Woods are highly recognized sports icons, Marley is one of the most recognized musical icons. (ER 414-15.) There are innumerable pictures of Marley in the marketplace and no reasonable person would believe Plaintiffs are the source of each product containing his image.[1] Also, Plaintiffs do

---

[1] A *Los Angeles Times* article explained that, "The reggae star generates hundreds of millions in unlicensed sales." (ER 539-40.)

not make a consistent use of a single, identifying image of Marley that would serve to identify Plaintiffs as the source of their products.  In contrast to the image of Elvis in a unique dance pose repeatedly used in marketing Elvis merchandise, Nike's consistent use of Michael Jordan's distinctive dunk stance on Air Jordan products, or Paul Newman's smiling face that graces every Newman's Own product, Plaintiffs use 300 to 500 different images of Marley on their products. (ER 87.)  Plaintiffs are not entitled to claim sweeping trademark rights in every Marley image, even under the façade of an alleged trademark-like right in his identity and persona.  *See ETW,* 332 F.3d at 922.

Granting Plaintiffs expansive trademark rights in Marley's identity would allow Plaintiffs to bring a Lanham Act claim for the use of any characteristic representative of Marley.  Products featuring dreadlocks, marijuana, reggae music, etc., could be actionable because these are all aspects related to Marley's identity. Such a result would dramatically curb expression. Thus, judgment against Defendants on Plaintiffs' Section 43(a) claim should be reversed.

   B.    **Defendants Do Not Use Marley's Persona as a Source Indicator or to Imply Endorsement.**

Since Plaintiffs do not have a protectable trademark in Marley's persona, there is no mark for Defendants to use that would create a likelihood of confusion between their products and Plaintiffs' products.  *See Rock & Roll Hall of Fame*, 134 F.3d at 753.  But even if Plaintiffs have trademark-like rights in Marley's

persona, Plaintiffs still do not have a viable Section 43(a) claim because Defendants' use of Marley images would not cause consumer confusion as to the source or sponsorship of their products.  *See, e.g.*, *ETW*, 332 F.3d at 922, 925.

Section 43(a) "prohibits only *false endorsement*, not mere use of an image or name."  *Cairns v. Franklin Mint Co.*, 107 F.Supp.2d 1212, 1214 (C.D. Cal. 2000), *aff'd*, 292 F.3d 1139 (9th Cir. 2002) (*Cairns II*) (emphasis in original).  To have a Section 43(a) claim, Plaintiffs must prove that Defendants' use of Marley's image will likely cause consumer confusion as to the origin or endorsement of the product.  *See Pirone*, 894 F.2d at 583-84 (holding that defendants' use of Babe Ruth photographs in the subject matter of a calendar identifying defendants as the publisher did not create confusion as to sponsorship).  Like *Pirone*, Marley's image is the subject matter of Defendants' Marley t-shirts and the t-shirt tags identify Defendants as the source.  (ER 91, 506-510, 536.)  Therefore, Defendants' use of Marley's image does not indicate origin or imply endorsement.

Plaintiffs incorrectly maintain that the Sixth Circuit never addressed the viability of the Section 43(a) claim in *Pirone*.  (Pls.' Br.8.)  In fact, the court explicitly addressed this claim, ruling that the pictures of Ruth "in no way indicate origin or represent sponsorship" because the photographs "are the subject matter of the calendar."  *Pirone*, 894 F.2d at 584.

Plaintiffs also attempt to distinguish *Pirone* by arguing that Marley's image appears prominently on Defendants' apparel whereas the Ruth photographs were part of a compilation.  (Pls.' Br. 8.)  But the Ruth photographs being part of a compilation did not contribute to the court's determination that the Section 43(a) claim was not actionable.[2]  *Pirone*, 894 F.2d at 584.

Indeed, other courts have held that using another's trademark even prominently in a product's subject matter does not qualify as trademark use.  *See, e.g.*, *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919-20 (9th Cir. 1980) (holding that a Section 43(a) claim had no basis where the sorority's insignia was a "prominent feature" on defendant's jewelry); *Rock & Roll Hall of Fame*, 134 F.3d at 754 (holding the use of a picture of only the defendant museum was not trademark use because it did not indicate source or sponsorship).

In *Cairns II*, the defendants made salient use of Princess Diana's image on jewelry, commemorative plates, and dolls.  107 F.Supp.2d at 1213-14.  The court emphasized that defendants' use of "Princess Diana's image on their products rather than in advertising to sell unrelated products," such as "restaurant chains, cars, Doritos, and VCRs," made the use "clearly distinguishable from that found in

---

[2] Plaintiffs confuse the Sixth Circuit's analysis concerning the viability of the 43(a) claim with its analysis regarding the likelihood of confusion.  Despite holding the 43(a) claim had no basis, the court addressed the claim nonetheless and ruled that "[n]o reasonable jury could find likelihood of confusion" in part because the photos were part of a compilation.  *Pirone*, 894 F.2d at 584-85.

9

[Section 43(a)] false endorsement cases." *Id.* at 1215 (citing *Wendt*, 125 F.3d at 809; *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 409 (9th Cir. 1996); *Waits*, 978 F.2d at 1096; *White*, 971 F.2d at 1396). Therefore, the court held that defendant's use did "not imply endorsement by plaintiffs," and fell "outside the scope of § 1125(a)…as a matter of law." *Id.* at 1216.

Plaintiffs contend that *Wendt* undermines the proposition that Section 43(a) claims are only viable where the defendant's use communicates an endorsement because the defendant there "used the celebrities' likenesses on robots that were inside and part of its airport bars, not on advertisements for said bars." (Pls.' Br. 12.) But the Ninth Circuit in *Wendt* explicitly framed the issue as whether the defendant misrepresented the actors' "endorsement of the Cheers bars concept." *See* 125 F.3d at 812. As the *Cairns II* court elucidated, the *Cheers* actors' likenesses were indeed used in "advertising" an unrelated product—a chain of airport bars. 107 F.Supp.2d. at 1215. While the robots were part of the bar's theme, the robots' main purpose was to attract travelers to the bar. *See Wendt*, 125 F.3d at 812. Such a function suggests sponsorship, whereas the uses in *Pirone*, *Job's Daughters*, *Rock & Roll Hall of Fame*, and *Cairns* do not because, like Defendants' use of Marley's persona here, the marks at issue in those cases were in essence the product itself—there would be no calendar of baseball greats without the players' images, no sorority necklaces without the sorority's emblem, no

10

museum poster without a museum photograph, no Princess Diana dolls without Diana's likeness, and no Bob Marley t-shirts without Marley's image.

Additionally, similar to Babe Ruth, the sorority emblem, the Rock n' Roll museum, and Princess Diana, the inherently expressive nature of Marley's image is the reason consumers purchase Defendants' products. Consumers do not buy Defendants' t-shirts because they believe the goods somehow originated or are sponsored by Plaintiffs. *See Job's Daughters*, 633 F.2d at 918 ("it would be naïve to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization"). This fact is especially true considering there is no reference whatsoever to Fifty-Six Hope Road or Zion Rootswear on any of Defendants' products. (ER 91.)

Moreover, it is unlikely that consumers would believe a celebrity endorses a product if the celebrity is deceased. *Cairns v. Franklin Mint*, 24 F.Supp.2d 1013, 1032 (C.D. Cal. 1998) ("*Cairns I*"). The court in *Cairns I* stated one could "theoretically" assert a deceased celebrity false endorsement claim where "advertising might falsely suggest a particular product was endorsed by the celebrity before his or her death." *Id.* This limited circumstance does not apply here because Defendants began using Marley's image 23 years after his death and Plaintiffs offered no evidence of advertising falsely suggesting that Marley endorsed Defendants' products before his death. (ER 86, 336-37.) Plaintiffs

11

nevertheless maintain they have a viable 43(a) claim under this one example because Rohan Marley testified that his father sold merchandise bearing his image during his lifetime. (Pls.' Br. 16.) This argument misses the mark. The *Cairns I* example concerns a situation where advertising misleads consumers about the celebrity's endorsement of *the defendant's* products before his death, not a situation where the celebrity sells products during his lifetime. *See* 24 F.Supp.2d at 1032. False endorsement is an issue because consumers buy products they believe their favorite celebrities use. If advertising falsely suggests a music legend sponsored a product before his death, such advertising would likely mislead consumers into purchasing that product. That is not the situation here.

Further, it is absolutely relevant that Marley died more than 20 years before Defendants first used his image because no reasonable consumer would believe he endorsed Defendants' products given the length of time since his death. For these reasons, the *Cairns II* court recognized "it is not clear that a deceased celebrity's estate possesses the same scope of endorsement rights" and "hesitate[d] to import, en masse, the analysis employed in Ninth Circuit's false endorsement cases" to a case concerning a deceased celebrity. 107 F.Supp.2d at 1215.

Plaintiffs, however, cite two Sixth Circuit cases, namely *Parks*, 329 F.3d 437, and *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 627 (6th Cir. 2000), to assert that any use of a celebrity's likeness is actionable under Section 43(a).

12

(Pls.' Br. 12.)  This argument not only contravenes the Ninth and Sixth Circuit cases discussed above, but also muddles Plaintiffs' Section 43(a) claim with a right of publicity claim, a claim the District Court dismissed.  (ER 352-54.) Despite Plaintiffs' efforts to conflate the two, the protections offered by Section 43(a) are distinct from a right of publicity.   Section 43(a) prohibits false endorsement, whereas infringing a right of publicity requires only a showing of unauthorized use of a person's identity.  *See Cairns II*, 107 F.Supp.2d at 1214.  Indeed, the Ninth Circuit recently refused to follow the Sixth Circuit in the trademark arena because the circuit's inconsistent application of trademark principles. *See Keller v. Elec. Arts Inc.*, 724 F.3d 1268, 1281-82 (9th Cir. 2013) (rejecting the Sixth Circuit's application of the Lanham Act's *Rogers* test to right of publicity claims largely because the Sixth Circuit applied it inconsistently).  The Ninth Circuit should refuse to do so again here and should instead rule that Plaintiffs do not have a viable Section 43(a) claim.

C. **Entertaining Plaintiffs' False Endorsement Claim Would Impermissibly Turn Section 43(a) into a Federal Right of Publicity.**

Plaintiffs understate the significant distinctions between a Section 43(a) Lanham Act claim and a right of publicity claim.  The Lanham Act is a trademark statute with the primary purpose of preventing consumer confusion.  *See Keller*, 724 F.3d at 1280.  Conversely, the right of publicity focuses on the celebrity's

13

interests and "is not founded on an allegation that *consumers* are being illegally misled into believing that [the celebrity] is *endorsing* [the defendant's] products." *Id.* at 1281 (emphasis added). Accordingly, Lanham Act claims face obstacles, including lack of protectable rights and no likelihood of confusion, that right of publicity claims do not. *See* Barbara A. Solomon, *Can the Lanham Act Protect Tiger Woods? An Analysis of Whether the Lanham Act is a Proper Substitute for a Federal Right of Publicity*, 94 TMR 1202, 1206-07 (2004); *see also Cardtoons v. Major League Baseball Players,* 95 F.3d 959, 967 (10th Cir. 1996), *cert. denied,* 531 U.S. 873 (2000) ("although publicity rights are related to laws preventing false endorsement, they offer substantially broader protections"); *White,* 989 F.2d at 1515 (Kozinski, J., dissenting) ("The right of publicity isn't aimed at or limited to false endorsements; that's what the Lanham Act is for"). The District Court's judgment and Plaintiffs' arguments ignore these obstacles by penalizing any unauthorized use of Marley's identity. Adopting Plaintiffs' reasoning would improperly transform Section 43(a) into a federal right of publicity.

There have been repeated unsuccessful efforts to implant a federal right of publicity claim into the Lanham Act. *See, e.g.*, Marci A. Hamilton et al., *Rights of Publicity: An In-Depth Analysis of the New Legislative Proposals to Congress*, 16 CARDOZO ARTS & ENT. L.J. 209 (1998). But the Lanham Act only protects celebrity images that serve as indicia of a product's origin. *See Indus. Rayon*

14

*Corp.*, 92 F.2d at 35.  Federalizing the right of publicity through the Lanham Act not only would create a federal right greatly exceeding the existing law's scope, but would also threaten First Amendment expression and impose a descendible right of publicity on many states that have refused to enact laws granting such expansive rights.  *See* Solomon, *supra*, at 1211; *see also* McCarthy, *Publicity* §§6:3-6:8 (the right of publicity is recognized by only 28 states).  In light of these concerns, Congress appropriately refused to enact a federal right of publicity.

Nonetheless, as Plaintiffs are doing here, celebrities and their representatives often use Section 43(a) of the Lanham Act as a façade for a federal right of publicity claim.  *See* Solomon, *supra*, at 1206.  Throughout this case, Plaintiffs confounded the two claims by focusing on their property rights in Marley's identity when discussing Section 43(a). In their summary judgment motion, Plaintiffs argued that they "clearly have a commercial interest in the exploitation of aspects of Bob Marley's identity." (SR 1.)  But a celebrity's pecuniary interest in his persona is "typically of no consequence to purchasers" and therefore falls outside the Lanham Act's scope. *See Dastar*, 539 U.S. at 32-33.

Plaintiffs further muddle Section 43(a) with a right of publicity claim by arguing that Marley's persona functions as a trademark or alternatively that his persona does not need to be a trademark to receive Section 43(a) protection.  (Pls.' Br. 6-7.)  A persona cannot be a trademark because one's persona is not a fixed

15

image that serves to identify the source of a product.  Plaintiffs also made no showing that a particular image of Marley acquired a meaning beyond merely identifying the musician that could function as a trademark.  Unlike a Section 43(a) claim, a right of publicity claim does not require Plaintiffs to own a protectable trademark because such ownership is irrelevant for determining whether a person's likeness was commercially exploited without consent.  *See* Solomon, *supra*, at 1221. By making an untenable trademark claim in every aspect of Marley's identity, Plaintiffs inaptly frame a right of publicity claim as a Section 43(a) claim.

Additionally, Plaintiffs confuse Section 43(a) with a publicity right by maintaining that Defendants do not need to use Marley's image to falsely imply endorsement.  (Pls.' Br. 11-13.)  A right of publicity is infringed by the "unpermitted use of a person's identity," whereas a Section 43(a) claim "prohibits only *false endorsement*."  *Cairns II,* 107 F.Supp.2d at 1214.  Plaintiffs argue that the only difference between a Section 43(a) claim and right of publicity claim is the likelihood of confusion requirement.  (Pls.' Br. 17.)  Plaintiffs fail to recognize that there can be no likelihood of confusion without the misuse of a source identifying mark or false suggestion of endorsement.  *See Waits*, 978 F.2d at 1110. Employing Plaintiffs' rationale would allow any unauthorized use of a celebrity's persona to be the basis for a Section 43(a) claim, making Section 43(a) indistinguishable from a right of publicity.  Indeed, instead of focusing on whether

Defendants' products deceive consumers, Plaintiffs emphasized that Defendants used Marley's image without his family's permission, which is more pertinent to a right of publicity claim.  (SR 14-16.)

Plaintiffs' assertion of publicity rights under the guise of Section 43(a) should be rejected.  Otherwise, Section 43(a) will become a vehicle for vindicating celebrities' publicity rights.

## II.    THE    FIRST    AMENDMENT    PROTECTS    DEFENDANTS' EXPRESSIVE USE OF MARLEY'S PERSONA.

Even if this Court entertains Plaintiffs' Section 43(a) claim, Plaintiffs cannot prevail because the First Amendment protects Defendants' expressive Marley products.  *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241-42 (9th Cir. 2013).

### A.    Defendants Did Not Waive the First Amendment Defense.

Defendants preserved the First Amendment defense for appeal by raising the defense in their answer and in opposition to Plaintiffs' motion for a preliminary injunction.  (ER 465; SR 6-7.) An issue is not waived on appeal where, as here, the argument was raised sufficiently for the trial court to rule on it.  *See Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012).  But even if the defense was not adequately addressed below, the Ninth Circuit should exercise discretion to review this important constitutional issue.  *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967); *Santiago v. Rumsfeld*, 425 F.3d 549, 559 n.10 (9th Cir. 2005).

17

The Ninth Circuit has held that issues raised in the pleadings but not argued during the trial proceedings are nevertheless preserved for appeal. *See, e.g.*, *Donovan v. Crisostomo*, 689 F.2d 869, 874 (9th Cir. 1982). This Court held in *Donovan* that a defendant preserved its statute of limitations defense although the trial court did not consider the issue because the defendant raised the defense in its answer and pre-trial order. *Id.* Similarly, the Fifth Circuit in *F.D.I.C. v. Lee* considered an argument not raised during summary judgment proceedings because the issue was pled almost one year before the entry of summary judgment. 130 F.3d 1139, 1141-42 (5th Cir. 1997).

Like *Donovan*, Defendants raised the First Amendment defense in their answer and in opposition to Plaintiffs' pretrial motion for a preliminary injunction. Additionally, as in *Lee*, Defendants originally raised the defense to oppose Plaintiffs' motion for a preliminary injunction in February 2008, over a year before Plaintiffs filed for summary judgment in November 2009. (SR 5, 8.) This opposition coupled with Defendants' answer sufficiently put Plaintiffs on notice of the First Amendment defense as demonstrated by Plaintiffs expending four pages in their summary judgment motion arguing against this defense. (SR 2-5.) Accordingly, raising the First Amendment defense on appeal does not unfairly prejudice Plaintiffs because they've already fully addressed the issue. Thus, Plaintiffs' waiver argument fails.

Even if the First Amendment defense was waived, however, the Ninth Circuit has discretion to consider this important constitutional issue. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976). Courts of appeals exercise discretion when not addressing the issue would result in substantial injustice, especially when the issue involves an important constitutional protection. *See Curtis Publ'g Co.*, 388 U.S. at 145. In *Curtis Publ'g Co.*, defendants raised a First Amendment defense for the first time on appeal. *Id.* at 143. The Court emphasized that justice supported finding no waiver because the defense concerned "a freedom which is the 'matrix, the indispensable condition, of nearly every other form of freedom.'" *Id.* at 145 (quoting *Palko v. Connecticut*, 302 U.S. 319, 327 (1967)). The Court held that waiving a First Amendment defense would result in a miscarriage of justice unless compelling circumstances supported the waiver.

Not addressing the First Amendment defense would be a miscarriage of justice because ignoring the expressive aspects of Defendants' Marley products would unfairly penalize Defendants and may deter others from using celebrity images in a communicative manner. As Ninth Circuit Chief Judge Kozinski warned over two decades ago, "[m]uch useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302,

307 (9th Cir. 1992). The Supreme Court in *Curtis Publ'g Co.* recognized that the First Amendment's free speech guarantees are of utmost importance and that waiving a defense based on this significant freedom requires showing clear and compelling circumstances. 388 U.S. at 145. Plaintiffs have made no such showing or identified how they are prejudiced by Defendants' pursuit of this defense. Instead, Defendants provided Plaintiffs an opportunity to address the First Amendment issue by raising it in their answer and in opposition to Plaintiffs' motion for a preliminary injunction. (ER 465; SR 6-7.) Plaintiffs took advantage of this opportunity by arguing the defense's merits in their summary judgment motion. (SR 2-5.)

The Ninth Circuit also exercises discretion when the issue raised on appeal is purely legal and the pertinent record is fully developed. *See, e.g.*, *Santiago*, 425 F.3d at 559 n.10. Before considering a Section 43(a) First Amendment defense not addressed by the trial court, the Third Circuit in *Facenda v. N.F.L. Films, Inc.* held that "the categorization of speech is a question of law that we must resolve through independent review." *See* 542 F.3d 1007, 1016 (3d Cir. 2008). In *Connick v. Myers*, the Supreme Court emphasized that a court of appeals is "'compelled to examine for [itself] the statements in issue and the circumstances under which they are made to see whether they are of a character which the principles of the First Amendment…protect.'" 461 U.S. 138, 150 n.10 (1983) (quoting *Pennekamp v.*

20

*Florida*, 328 U.S. 331, 335 (1946)).  Thus, the First Amendment argument is a purely legal issue that the Court can resolve by examining Defendants' Marley products and the circumstances under which the products were distributed.  These relevant facts are in the record.  (ER 496-500, 506-510, 536.)  Thus, the Ninth Circuit should exercise discretion over the First Amendment defense.

### B.    The *Rogers* Test Applies to Defendants' Marley T-Shirts Because the T-Shirts Are Expressive Works.

Plaintiffs assert that the likelihood of confusion test, and not the *Rogers* test, is the proper framework for analyzing Defendants' products.  (Pls.' Br. 20-21, 30.) This argument is untenable under Ninth Circuit precedent.  *See, e.g.*, *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008).

### 1.  *Defendants' Marley T-Shirts Qualify As Artistic Expression Fully Protected by the First Amendment.*

The First Amendment fully protects Defendants' expressive Marley t-shirts. *See Hoffman v. Capital Cities/ABC*, 255 F.3d 1180, 1185 (9th Cir. 2001).  The First Amendment "looks beyond written or spoken words,"[3] and protects a broad range of expressive mediums, including photographs, music, films, drawings, video games, t-shirts and even tattoos.[4]  Contrary to Plaintiffs' argument, selling

---

[3] *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

[4] *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011) (fully protecting video games because they "communicate ideas"); *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and

expressive material as merchandise does not make the material commercial speech and diminish its First Amendment protection. *See Bd. of Trs. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989). Instead, when a product's commercial aspects are "inextricably intertwined" with its expressive elements, the product receives full First Amendment protection. *See Riley v. Nat'l Fed. of the Blind of N.C.*, 487 U.S. 781, 796 (1988); *Rogers v. Grimaldi*, 875 F.2d 994, 997-98 (2d Cir. 1989).

Selling expressive materials does not change the degree of First Amendment protection the materials receive. *See Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 761 (1976). The Tenth Circuit in *Cardtoons* rejected the plaintiffs' argument that parody trading cards are merely commercial merchandise opposed to protected artistic works, stating there is "no principled distinction between speech and merchandise that informs our First Amendment analysis." 95 F.3d at 969-70.

Defendants' Marley t-shirts qualify as protected artistic expression because the t-shirts "communicate ideas" to viewers. *See Brown*, 131 S. Ct. at 2733. Similar to fully protected mediums such as music, films, and tattoos, people use t-shirts to convey a myriad of messages. Indeed, t-shirts often contain "pure

---

communication, is protected under the First Amendment."); *Kaplan v. California*, 413 U.S. 115, 119-120 (1973) ("Pictures, films, paintings, drawings, and engravings … have First Amendment protection[.]"); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2011) (analogizing a tattoo to a "pen-and-ink drawing" and holding that tattoos are "forms of pure expression" entitled to full First Amendment protection); *Ayers v. City of Chicago*, 125 F.3d 1010, 1015-17 (7th Cir. 1997) (holding that t-shirts, like newspapers, are an important "vehicle of …ideas and opinions").

expression," such as "words, realistic or abstract images, [and] symbols." *See Anderson*, 621 F.3d at 1061.

Defendants' t-shirts revolve around a particularly meaningful image, Bob Marley. (ER 506-510, 536, 538-40.) Because of "their pervasive presence in the media,…celebrities come to symbolize certain ideas…[and] are an important element of the shared communicative resources of our cultural domain." *Cardtoons*, 95 F.3d at 972. Marley is an icon whose image represents multifarious principles to society, including reggae music, Rastafarian ideology, Jamaican culture, revolution, freedom, and smoking marijuana.[5] (ER 414, 538-40.) His image transcends the symbolic value given to most, if not all, other celebrities.[6] In his documentary "Marley," film director Kevin MacDonald describes Marley as an icon of rebellion against the status quo—"there's a reason why he's on every student wall."[7] Marley historian Roger Steffens explains,

> [Y]ou don't witness phalanxes of youth wandering the world sporting Louis Armstrong t-shirts. In fact, big as the Beatles were, you hardly see any Beatle shirts around anymore, except

---

[5] Thomas Storey, *Bob Marley: Anatomy of an Icon*, Jamaica: The Best of Its Art and Culture (Sep. 12, 2013), http://theculturetrip.com/caribbean/jamaica/articles/bob-marley-anatomy-of-an-icon-/.

[6] Roger Steffens, *Bob Marley*, American Masters, PBS.org (Jan. 14, 2001), http://www.pbs.org/wnet/americanmasters/episodes/bob-marley/about-bob-marley/656/.

[7] Andrew Pulver & Henry Barnes, *Macdonald on Marley: 'There's a reason why he's on every student wall' video*, The Guardian (April 18, 2012), http://www.theguardian.com/film/video/2012/apr/18/kevin-macdonald-marley-video.

> for those few featuring John Lennon's sorrow-inducing visage.
> Can you imagine an image of Elvis sewn onto the sleeve of an
> armed guerilla? When was the last time you saw a Michael
> Jackson flag or a Bob Dylan sarong or Madonna rolling papers?
> All of these exist in Marleyite forms, his iconography well nigh
> a new universal language, the symbol…of freedom throughout
> the world.[8]

Marley's image has become so revered and influential around the world that his

image, in and of itself, communicates a message.  (ER 538-40.)

Defendants artistically transformed Marley's image to make his message

more apparent to viewers.  (ER 171, 506-510, 536.)  Defendants modified many

photographs by adding psychedelic designs in the Rastafarian red, yellow, and

green color palette to convey the experience of using cannabis and feeling liberated

from life's common restraints.  (ER 506-510; Pls.' ER 637-44.)  On one image,

Defendants explicitly impart the message of smoking marijuana by putting a

marijuana joint in Marley's hand and mouth with red, yellow, and green smoke

emitting from the joint.  (Pls.' ER 642.)  Another t-shirt combines three images of

Marley with a chromatic design and includes his famous lyrics advocating

revolution, "Get Up, Stand Up, Stand Up for Your Rights."  (ER 506.)  The

inherently communicative nature of Marley's image coupled with these artistic

elements renders the t-shirts artistic expression fully protected by the First

Amendment.

---

[8] Steffens, *supra*.

Plaintiffs argue that Defendants' products are not expensive artistic works, but instead "bargain bin t-shirts priced to sell." (Pls.' Br. 10; SR 5.) But this Court held in *Anderson* that the surface upon which speech is applied to is irrelevant for determining constitutional protection. *See* 621 F.3d at 1061. Further, the Supreme Court has consistently held that a product's price tag has no bearing on the degree of First Amendment protection it receives. *See*, e.g*., Va. Pharmacy Bd.*, 425 U.S. at 761. Otherwise, the First Amendment would not protect mass-produced newspapers, books, prints, or the trading cards in *Cardtoons*. *See Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967). Additionally, t-shirts are an important means of distributing information because "a message may reach a different segment of the public when disseminated on T-shirts…than in traditional media."[9]

Further, t-shirts reflect not only the speech of its producer, but also the speech of its wearer. By donning an expressive t-shirt in public, the wearer explicitly endorses the t-shirt's message and thereby communicates something about his personality. "T-shirts often serve as personal billboards in our culture 'carrying phrases that convey meanings that can range from entirely personal to political to humorous.'"[10] For example, a young man wearing Defendants' Marley t-shirt emblazoned with the phrase "True Rebels Always Walk Alone"

---

[9] Lisa P. Ramsey, *Increasing First Amendment Scrutiny of Trademark Law*, 61 SMU L. Rev. 381, 401 (2008).

[10] *Id.* (quoting *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 2006 WL 1012939, at *17-18 (S.D.N.Y. April 19, 2006)).

25

communicates his independence and desire to be nonconforming.  (ER 536.) Like the t-shirts at issue in *Ayres*, Defendants' Marley t-shirts "are a medium of expression prima facie protected by the…First Amendment." *See* 125 F.3d at 1014.

Moreover, Defendants' use of Marley's image on t-shirts constitutes non-commercial speech because the t-shirts' expressive purpose.  Marley's image is an "integral element" of the t-shirt's expression as well as a means of marketing the product to the public.  *See Hoffman*, 255 F.3d at 1185-86; *Rogers*, 875 F.3d at 998. Thus, because the t-shirts' expressive and commercial elements are "inextricably intertwined," Defendants' Marley t-shirts should receive full First Amendment protection as expressive works.  *Rogers*, 875 F.3d at 997-98.

A consumer purchases Defendants' Marley products because the "inherent meaning" of his image, not because the product identifies Marley as the sponsor.[11] For example, if a publisher used Oprah Winfrey's image to sell a book having nothing to do with her persona, that would be commercial use.  But if the publisher sold a book about Oprah Winfrey, that would not be commercial use because she is the subject matter of an expressive work.  Defendants' use is equivalent to the latter example—it uses Marley's image as the subject matter of its product.

---

[11] *Id.* at 400 ("A consumer may purchase the merchandise because of the inherent meaning of the phrase claimed as a mark or because that trademark has intrinsic value—the mark is the product—not because it identifies the source or official sponsor of the merchandise.")

Accordingly, Defendants' use is noncommercial.  Therefore, Defendants' Marley t-shirts warrant heightened scrutiny because the t-shirts are expressive works fully protected by the First Amendment.

### 2. The *Rogers* Test Applies to Artistic Expression.

Because the Marley t-shirts are expressive works subject to full First Amendment protection, the *Rogers* test is the proper framework for evaluating Defendants' use of Marley's image. *See Brown*, 724 F.3d at 1241-42; *White*, 971 F.2d at 1396, 1401. Contrary to Plaintiffs' argument, the likelihood of confusion test is inappropriate for analyzing trademark use in expressive products because it fails to adequately balance the goals of trademark law with the public's interest in free expression.  *See Mattel, Inc. v. MCA Records*, Inc., 296 F.3d 894, 900 (9th Cir. 2002).

In *Rock Star Videos,* the Ninth Circuit extended the *Rogers* test to trademark uses in the body of expressive works.  547 F.3d at 1099.  More recently, the Court ruled that video games constituted expressive works and used *Rogers* in *Brown* to analyze the use of football player Jim Brown's likeness in the video game, Madden NFL.  724 F.3d at 1242.  The Sixth and Second Circuits also apply the *Rogers* test to "all cases involving literary or artistic works where the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment." *See ETW*, 332 F.3d at 928 n. 11; *see also Cliffs Notes, Inc. v.*

*Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 494 (2d Cir. 1989) (ruling that the *Rogers* test applies "in any case where an expressive work is alleged to infringe a trademark").

Plaintiffs failed to cite any Ninth Circuit authority to support their proposition that the likelihood of confusion test adequately balances First Amendment concerns in expressive product cases. (Pls.' Br. 21.) Instead, Plaintiffs rely on *Facenda* and *Mut. of Omaha Ins. Co. v. Novak*, which both applied the likelihood of confusion test only after determining that the works at issue were commercial speech opposed to fully protected artistic expression. *See* 542 F.3d at 1017; 836 F.2d 397 (8th Cir. 1998). Plaintiffs also cite *Smith v. Wal-Mart Stores, Inc.*, which directly contravenes Ninth Circuit precedent because the court applied the likelihood of confusion test to parodic t-shirts despite holding that the t-shirts were expressive works. *See* 537 F.Supp.2d 1302, 1316, 1340 (N.D. Ga. 2008). The Ninth Circuit has explicitly rejected the application of the likelihood of confusion test to expressive works because the test "fails to account for the full weight of the public's interest in free expression." *Mattel*, 296 F.3d at 900. Other circuits have likewise rejected the likelihood of confusion approach for expressive works because "the approach ignores the fact that the artistic work is not simply a commercial product but is also a means of communication." *Parks*, 329 F.3d at 449.

28

The *Rogers* test, on the other hand, "accommodates consumer and artistic interests…[by] insulat[ing] from restriction titles with at least minimal artistic relevance that are ambiguous or only implicitly misleading but leaves vulnerable to claims of deception titles that are explicitly misleading as to source or content, or that have no artistic relevance at all." *Rogers*, 875 F.2d at 1000. Accordingly, the *Rogers* test is the appropriate standard for evaluating expressive works and applies to Defendants' Marley products.

C.    **Plaintiffs' Lanham Act Claim Fails Under the *Rogers* Test.**

Under the two-pronged *Rogers* test, Section 43(a) of the Lanham Act will not apply to an expressive work "unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work." *Rock Star Videos*, 547 F.3d at 1099 (citing *Mattel*, 296 F.3d at 902 (quoting *Rogers*, 875 F.2d at 999)).

1.    ***Marley's Persona is Artistically Relevant to the Expressive Marley T-Shirts.***

Plaintiffs cannot meet the first prong of the *Rogers* test because Marley's image is "artistically relevant" to Defendants' expressive Marley products. *Rogers*, 875 F.2d at 999. The "level of relevance merely must be above zero" for the use of a mark to be artistically relevant to the underlying work. *Rock Star Videos*, 547 F.3d at 1100. Applying this low threshold, this Court held that a video

29

game manufacturer's use of a L.A. strip club's trademark was artistically relevant to the video game Grand Theft Auto although the video game was not about the strip club or even adult entertainment generally. *Id.*

Considerably more so than the strip club in *Rock Star Videos*, Marley's persona is artistically relevant to Defendants' t-shirts because the t-shirts revolve around the values Marley's image represents. The t-shirt designs would lose their powerful messages without the use of Marley's image. Thus, the level of artistic relevance Marley's image has to Defendants' Marley products greatly exceeds the "above zero" threshold. *See Rock Star Videos*, 547 F.3d at 1100.

### 2. *Defendants Did Not Explicitly Mislead Consumers as to Marley's Involvement with Defendants' Products.*

Plaintiffs cannot meet the second prong of the *Rogers* test because no facts support the claim that Defendants "explicitly misled" consumers about Marley's endorsement of their merchandise. *Rogers*, 875 F.2d at 999.

The use of a trademark alone does not suffice to make a trademark use explicitly misleading because a "trademark infringement claim presupposes a use of the mark [and] [i]f that necessary element in every trademark case vitiated a First Amendment defense, the First Amendment would provide no defense at all." *Rock Star Videos*, 547 F.3d at 1099 (quoting *Mattel*, 296 F.2d at 902). Further, evidence, such as a consumer confusion survey, showing that a trademark's use "might implicitly suggest endorsement or sponsorship to some people is

30

outweighed by the danger of restricting artistic expression" and thus is irrelevant for determining whether a trademark use is explicitly misleading. *Rogers*, 875 F.2d at 999-1001. To be explicitly misleading, a "defendant's work must make some affirmative statement of the plaintiff's sponsorship or endorsement, beyond the mere use of plaintiff's name or other characteristic." *Dillinger, LLC v. Elec. Arts, Inc.*, 2011 WL 2457678, at *6 (S.D. Ind. June 16, 2011) (citing *Rock Star Videos*, 547 F.3d at 1101; *Rogers*, 875 F.2d at 1001).

In *Brown*, the Ninth Circuit rejected Brown's argument that "the use of his likeness in the [NFL Madden] game coupled with a consumer survey demonstrating that a majority of the public believes that identifying marks cannot be included in products without permission…raises a triable issue as to the second prong of the Rogers test." 724 F.3d at 1245. The court underscored that "[i]t is well established that the use of a mark alone" is not enough to satisfy the *Rogers* test's explicitly misleading prong. *Id.* The court also rejected Brown's survey evidence, stating that "survey evidence changes nothing" because the "evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use." *Id.* at 1245-46. Accordingly, survey evidence has no validity when determining whether a trademark use is explicitly misleading. *Id.*

Rather, statements in materials accompanying the product that plainly suggest the celebrity endorsed or was the source of the product would tend to show

31

that the user tried to explicitly mislead consumers. *Id. at 1246*. Brown argued that the video game's materials stated that the game included "[f]ifty of the NFL's greatest players and every All-Madden team" and since he was one of the fifty greatest players and part of the "All Madden" team, the materials explicitly misled consumers about his endorsement of the game. *Id.* The Ninth Circuit rejected this argument, ruling that Brown had to prove that "EA explicitly misled consumers about Brown's endorsement of the game, not that EA used Brown's likeness in the game." *Id.* The court held that the materials were not explicitly misleading because "nothing in EA's promotion suggests that the fifty NFL players who are members of the All Madden, All Millennium team endorse EA's game." *Id.* Thus, the product or its accompanying materials must unequivocally indicate that the celebrity endorsed the product. *Id.*

Defendants' use of Marley's image and Plaintiffs' consumer confusion survey do not suffice to show that Defendants "explicitly misled" consumers. The Marley t-shirts also make no "affirmative statement[s]" suggesting that Marley endorsed or was the source of the t-shirts. *See Dillinger*, 2011 WL 2457678, at *6. Rather, the district court acknowledged that the t-shirts' tags identify Defendants as the source. (ER 91.) Therefore, Defendants' use of Marley's image is not explicitly misleading and is not subject to the Lanham Act.

III. **IN ANY EVENT, PLAINTIFFS CANNOT ESTABLISH LIKELIHOOD OF CONSUMER CONFUSION AS A MATTER OF LAW.**

Although the *Rogers* test is the correct standard in this case, Plaintiffs' Section 43(a) claim nonetheless fails on the likelihood of confusion issue.

A. **Plaintiffs' 43(a) Claim Fails as a Matter of Law Because Plaintiffs Cannot Show Consumer Confusion as to Source or Sponsorship.**

Plaintiffs' 43(a) claim cannot succeed as a matter of law because Defendants' use of Marley images on their products does not suggest source or sponsorship. *See Pirone*, 894 F.2d at 584. The court in *Pirone* forwent analyzing the factors in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979), instead concluding as a matter of law that no reasonable jury could find likelihood of confusion over the use of Ruth's image because "an ordinarily prudent purchaser would have no difficulty discerning that [the Ruth] photos are merely the subject matter of the calendar and do not in any way indicate sponsorship." *Id.* The court distinguished the use of Ruth's image from cases where a "specific arbitrary symbol…had been used over time and had become associated in the public mind with the plaintiffs" and thus consumers might "believe that the owners of those symbols authorized the challenged use." *Id.* at 585. Contrary to Plaintiffs' argument, the Ruth photos being part of a compilation was only one consideration contributing to the court's conclusion that the photos were the subject matter of the work. *Id.*

33

Similar to *Pirone*, Plaintiffs failed to regularly use a "specific arbitrary symbol" representative of Marley that would identify their goods to the public and suggest their approval when others use the symbol. *See id*. Additionally, an ordinarily prudent purchaser would recognize that Marley's image is merely the subject matter of the work because the product tags identify Defendants as the source and Marley's image is essentially the product. (ER 91.) Accordingly, evaluating the likelihood of confusion factors is unnecessary and Plaintiffs' Section 43(a) claim should fail as a matter of law.

**B.    Plaintiffs' 43(a) Claim Fails as a Matter of Law Because the Evidence Does Not Support the Jury's Verdict.**

Even if this Court analyzes the likelihood of confusion factors, the evidence fails to establish that consumers will likely be confused about Plaintiffs' endorsement of Defendants' products.

1.   ***Defendants Did Not Waive their Right to Appeal the Sufficiency of the Evidence for Plaintiffs' 43(a) Claim Because Defendants Filed a Rule 50(b) Motion Explicitly Addressing this Issue.***

Defendants did not waive their right to appeal the sufficiency of the evidence for Plaintiffs' Section 43(a) claim. Defendants identified both law and facts in their Rule 50(b) motion entitling them to a judgment as a matter of law on the Section 43(a) claim. (SR 9.) Specifically, Defendants pointed to facts by arguing that "the record is devoid of any evidence which would substantiate any theory that Marley endorsed the shirts before he died decades ago," "[t]he images

34

of Marley are part of the goods," and "the source of the goods here is clearly indicated as being from AVELA." (SR 9.)  Defendants also made clear it was challenging the sufficiency of evidence underlying Plaintiffs' 43(a) claim by concluding that "there is insufficient evidence presented by Plaintiffs to support the claims asserted against Defendants at trial." (SR 17.)

Plaintiffs cite *Nitco Holding Corp. v. Boujikian* for the proposition that "a post-verdict motion under Rule 50(b) is an absolute prerequisite to any appeal based on insufficiency of the evidence." 491 F.3d 1086, 1089 (9th Cir. 2007).  In *Nitco Holding*, the Court held that the defendant waived its insufficient evidence challenge by failing to file a post-verdict Rule 50(b) motion. *Id.*

*Nitco Holding* is readily distinguishable because Defendants filed both a Rule 50(b) motion and a Rule 59 motion for new trial.  Thus, Defendants gave the judge the first opportunity to consider the relevant evidence in accordance with Rule 50(b)'s underlying purpose. *See Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006).  Accordingly, Defendants preserved this argument for appeal.

> ### 2. ***The Evidence Does Not Support the Jury's Finding of Likelihood of Confusion Because the Factors Balance in Defendants' Favor.***

This Court should reverse the jury's verdict because the evidence is insufficient to support the finding of likelihood of confusion.  Courts evaluate the

eight factors set forth in *Downing v. Abercrombie & Fitch* to determine the likelihood of confusion regarding a celebrity's endorsement.  *See* 265 F.3d 994, 1007-08 (9th Cir. 2001).  The *Downing* factors are not exhaustive and each factor is not "necessarily of equal importance" or will "necessarily apply in every case." *See* 265 F.3d at 1008; *E.J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).  "Other variables may come into play depending on the particular facts presented."  *AMF*, 599 F.2d at 348 n.11.  For example, the Ninth Circuit emphasizes that an additional factor, the strength of association between the mark and plaintiffs, is necessary and even determinative when analyzing the likelihood of confusion in celebrity endorsement cases.  *See Cairns II*, 107 F.Supp.2d at 1216. Additionally, likelihood of confusion is tantamount to probable confusion; the "mere possibility" of consumer confusion is insufficient to prevail on an endorsement claim.  *Id.* at 1221 (quoting *Newton v. Thomason*, 22 F.3d 1455, 1461 (9th Cir. 1994)).  Applying the factors to this case highlights that there is no likelihood of confusion as to the origin or endorsement of Defendants' products.

(i) Neither Dr. Jay's Poorly Constructed Survey Nor Any Other Evidence is Probative of Actual Confusion.

Plaintiffs' consumer survey fails to establish actual confusion as to source, sponsorship, or association.  The district court recognized that the responses to the question, "Who made or put out the t-shirt?" indicated "no source confusion as between Defendants' and Plaintiffs' products."  (ER 115.)  Of the 256 test group

respondents, 17% said AVELA or X One X Archive, while only 9% answered Marley, his heirs or estate, or the person on the shirt.[12]  (ER 234-35, 528-29.) Accordingly, nearly twice as many respondents believed Defendants were the source of the shirt.  (ER 267-68.)

Plaintiffs argue that the key query in the survey was whether "the makers of the t-shirt received permission or approval to make or put out the t-shirt and, if so, who gave this permission or approval?"  (Pls.' Br. 31.)  But the court in *Cairns II* explicitly rejected such a survey inquiry for measuring actual confusion regarding deceased celebrities, stating that a "customers' assumption that [defendants] get permission from families or estates before producing products is not evidence of actual confusion."  107 F.Supp.2d at 1219.  Indeed, Dr. Jay conceded that she has completed no other surveys relating to deceased celebrities and is thus inexperienced in measuring actual confusion in such a case.  (ER 255-56.) Moreover, 91.2% of consumers automatically believe that "no product can bear the name of an entertainer…unless permission is given for its use by the owner." *See* 4 Thomas McCarthy, *Trademarks and Unfair Competition* §24:12 (4th ed. 2007) [hereinafter McCarthy, *Trademarks*]; *see also* Sheldon W. Halpern, *Trafficking in*

---

[12] When tabulating the responses to questions 1 and 2 regarding confusion as to source and permission, Dr. Jay's survey combined the responses answering Bob Marley, the person on the shirt, and any responses naming Marley's estate, agents, or heirs, including responses naming Bob Marley's famous children.  (ER 256-57, 529-30.)  For example, respondents named Ziggy Marley, who is also a celebrity. Yet Dr. Jay's survey failed to distinguish such responses.  (ER 256-57.)

*Trademarks: Setting Boundaries for the Uneasy Relationship Between "Property Rights" and Trademark and Publicity Rights*, 58 DePaul L. Rev. 1013, 1023-24 (2009) (stating that because the public incorrectly believes that permission is required to use another's trademark, the law will improperly grant trademark owners rights based on people's misapprehension as to what the law requires). Accordingly, this Court should not give much weight, if any, to the survey's "permission" questions when evaluating this factor.

If this Court considers the "permission" survey results, Plaintiffs' proffered 29% confusion rate as to these results is completely off base. (Pls.' Br. 32.) When asked who gave the t-shirt maker permission to put out the t-shirt, 37% of the test group answered Marley or the person on the shirt, whereas 20% of the control group answered Marley or the person on the shirt. (ER 530.) Accordingly, the net confusion rate regarding permission was only 17%, not 29%.[13] (ER 530.) Regardless, both 17% and 29% are well below the 91.2% norm for confusion among consumers regarding the featured celebrity's permission. *See* McCarthy, *Trademarks* §24:12.

---

[13] Thirty percent of respondents answered "Bob Marley, his heirs, estate, agents" gave permission when viewing the t-shirt bearing Marley's highly popular image. (ER 530.) Unsurprisingly, less than one percent said "Bob Marley, his heirs, estate, agents" gave permission when viewing the T-shirt bearing an image of an unknown Black male. (ER 519, 530.) Plaintiffs arrive at the 29% rate by inappropriately taking the difference between these results. (Pls.' Br. 32.) Notably, Dr. Jay's survey does not discuss these figures, but instead focuses on the difference between 37% and 20%, which is 17%. (ER 530.)

Additionally, not a single respondent in the entire survey named Zion or Fifty-Six Hope Road as the source or sponsor of the shirt. (ER 277-78.) In fact, respondents named AVELA or X One X more than any other single entity when responding to survey questions. (ER 269.)

Further, Dr. Jay's third set of questions regarding "affiliation" between Defendants' products and Plaintiffs showed absolutely "no affiliation confusion." (ER 284, 515, 530-31.)

Plaintiffs next argue that they offered substantial evidence of actual confusion in addition to the survey. This purported substantial evidence included testimony of Doreen Crujeiras, Plaintiffs' employee, alleging that a single employee of an entity related to Plaintiffs believed that Plaintiffs licensed one of Defendants' Target t-shirts. (Pls.' Br. 39.) The alleged belief of just one person does not suffice to establish actual confusion. *See Cairns II*, 107 F.Supp.2d at 1219-20 (ruling that less than a dozen instances of actual confusion was insignificant evidence). Additionally, this alleged confusion was not a result of any representations made by the Defendants and thus, is immaterial evidence. *Id.* ("Only actual consumer confusion…based on defendants' representations is relevant to the Court's analysis of this factor"). Plaintiffs' evidence also included testimony of Michael Conley, Zion's owner, that Zion's sales agents at New World contacted him asking if Zion lost its exclusive license with Fifty-Six Hope Road

39

because Defendants sold Marley products.  (Pls.' Br. 39.)  If anything, this evidence establishes that people recognized that Defendants, not Plaintiffs, were the source of their own products and did not falsely imply otherwise.  Defendants have never received correspondence indicating there has been consumer confusion as to the source, affiliation, or sponsorship of their Marley products.  (ER 329, 424.)  Accordingly, Plaintiffs cannot establish actual confusion and this factor weighs strongly against the jury's verdict.

      (ii)<u>The Association Between Marley's Image and Plaintiffs is Weak Because Plaintiffs Fail to Use a Source-Identifying Image of Marley.</u>

The *Cairns II* court established and the Ninth Circuit reinforced on review that the strength of the association between the alleged mark and the plaintiffs is a "critical factor" in analyzing the likelihood of confusion in deceased celebrity cases. 107 F.Supp.2d at 1217; 292 F.3d at 1149-50 (exclusively addressing the strength of association factor before determining that there was "no likelihood of confusion as to the origin of Franklin Mint's Diana-related products").  "If the association is weak, there is little likelihood of confusion."  *Cairns II*, 107 F.Supp.2d at 1217.  Plaintiffs have presented no evidence that consumers associate Marley products with either Fifty-Six Hope Road or Zion Rootswear.  On the contrary, Plaintiffs fail to use one image of Marley to distinguish their goods from

40

those of others.  Accordingly, there is no symbol or image representative of Marley that consumers could associate with Plaintiffs.

Section 43(a) cases based on a deceased celebrity's alleged false endorsement often fail because it is unlikely the public would believe a deceased celebrity produces or endorses the products in question.  *See Cairns I*, 24 F.Supp.2d at 1032; *see also Comedy III*, 200 F.3d at 594-95 (holding that images of the Three Stooges from a film clip did not function as a trademark because plaintiffs made no showing that the images acquired secondary meaning). In *Cairns I*, the plaintiffs recognized "the fragility" of a deceased celebrity false endorsement claim and accordingly, argued that the defendants were falsely implying that plaintiffs, as opposed to Princess Diana herself, endorse defendants' products.  24 F.Supp.2d at 1032.

The court in *Cairns II* followed suit by focusing only on whether there was a strong association "between the image of Princess Diana and plaintiffs." 107 F.Supp.2d at 1217.  The court emphasized that "[p]ervasive unauthorized use of a celebrity's persona will tend to dull the popular perception that use of that persona signifies an endorsement at all, weakening the initial automatic association between the celebrity and his or her estate." *Id.*  Because the defendant and many others sold products bearing Princess Diana's image, the court recognized that her image on a product "provides consumers with no suggestion that the product is

associated with her…[or the plaintiffs].  Her image has truly lost any significance as a mark identifying the source of a product."  *Id.*  Accordingly, the court held that the association between Diana's image and the plaintiffs was "negligible" and weighed "heavily" against finding a likelihood of confusion.  *Id.*

As in *Cairns*, the association between Marley's image and Plaintiffs is weak. Over the years, there has been "pervasive unauthorized use" of Marley's image as demonstrated by Plaintiffs filing 20-plus lawsuits and sending more than 400 cease and desist letters.  (ER 87, 329.)  Indeed, a *Los Angeles Times* article acknowledged that "[t]he reggae star generates hundreds of million in unlicensed sales," amounting to "as much as $600 million" in unauthorized  Marley merchandise.  (ER 539-40.)  According to *Forbes* magazine, sales by Plaintiffs totals just $4 million, less than one percent of all Marley product sales. (ER 539-40.)  Plaintiffs argue, however, that they have expended significant resources to police the unauthorized use of Marley's image and that it is "commonly known in the licensing industry…that Plaintiffs owned and controlled the Bob Marley rights."[14]  (Pls.' Br. 38.)  This argument misses the mark.  The issue here is the likelihood of *consumer* confusion and whether *consumers* associate Marley's image with Plaintiffs, not association within the licensing industry.  Because the

---

[14] Plaintiffs' "commonly known in the licensing industry" claim is an overstatement.  Heather Vogel and Elizabeth Kinneberg, buyers for Target, both testified that they had never heard of Zion before this litigation.  (ER 190, 199.)

market is flooded with Marley memorabilia, consumers would not automatically associate such products with Plaintiffs.  Like Princess Diana's image, Marley's image "has truly lost any significance as a mark identifying the source of a product." *Cairns II*, 107 F.Supp.2d at 1217.

Additionally, Plaintiffs failed to establish that Marley's persona functions as a protectable "trademark."  In fact, Plaintiffs admit that they use at least 300 to 500 different images of Marley on their products.  (ER 87.)  Thus, there is no identifiable Marley mark that consumers could associate with Plaintiffs. Accordingly, the association between Marley's image and Plaintiffs is negligible and this factor weighs heavily against finding a likelihood of confusion.

> (iii) The Strength of Mark, Similarity of Marks, and Relatedness of Goods Factors are Immaterial in this Case Because there is a Lack of Association Between Marley's Image and Plaintiffs.

The strength of mark, similarity of marks, and relatedness of goods factors are irrelevant in this case because there is a weak association between Marley's image and Plaintiffs.  *See Cairns II*, 107 F.Supp.2d at 1221.  In regard to related goods, "the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *AMF*, 599 F.2d at 350.  Because consumers would not likely associate Marley's image with Plaintiffs, the fact that Plaintiffs' and Defendants' goods are related "is of no consequence" to a likelihood of confusion analysis.  *See Cairns II*,

107 F.Supp.2d at 1221.  Accordingly, these three factors should have "no bearing" on the likelihood of confusion determination.  *Id.*

### (iv) The Parties Do Not Use the Same Marketing Channels Because They Target Different Shops.

Plaintiffs maintain that this factor weighs in their favor because they use the same trade channels as Defendants.  (Pls.' Br. 37.)  But Plaintiffs avowed that they only target small shops opposed to mass market retailers and have completely different customers than Defendants.  (ER 90; SR 20.)

The district court erroneously ruled, however, that there was a genuine issue of material fact as to this factor mainly because the "Plaintiffs and Defendants use the internet to advertise and sell their products." (ER 114.)  But the Ninth Circuit has emphasized that Internet advertising does not suffice for establishing this factor.  *See, e.g.*, *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1151 (9th Cir. 2011). "[I]t would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Id.*  Accordingly, this factor weighs against likelihood of confusion.

### (v) Consumers' First Amendment Interests Mitigate the Relevance of the Degree of Consumer Care Factor.

Defendants do not contest that some of their products are inexpensive and that consumers may impulsively buy Marley t-shirts or towels.  Indeed, the

reasonable price of Defendants' products allows more people to use the Marley t-shirts as a "vehicle of…ideas and opinions" and to disseminate their political, individualistic, or social message to a "different segment of the public" than traditional media. *See Ayers*, 125 F.3d at 1015-17; Ramsey, *supra*, at 401. Marley's image is on "every student wall" and on most low-income 20-somethings' t-shirts largely because such products are a thrifty means of expression. *See* Pulver & Barnes, *supra*.

> (vi) <u>The Evidence in No Way Shows that AVELA or Freeze Intended to Confuse Consumers About Plaintiffs' Endorsement of Defendants' Products.</u>

Plaintiffs contend "it was common knowledge in the licensing industry, and known to Defendants, that Plaintiffs owned Bob Marley's rights, and that Bob Marley was considered a 'brand.'" (Pls.' Br. 39-40.) Plaintiffs make no record references to support this proposition. On the contrary, Kim Cauley, Freeze's Vice President of Licensing, testified that she neither knew of Doreen Crujeiras nor her association with Bob Marley. (ER 172, 184.) Further, Plaintiffs' trademark registration of only Marley's name, not his image, did not put Defendants on constructive notice of Plaintiffs' rights in manifestations of Marley's identity. (Pls.' Br. 39-40.) Instead, because Plaintiffs failed to register a specific, identifying image of Marley as a trademark, Defendants had no reason to believe his persona was owned by a single entity that monopolized all representations of

Marley.  Rohan Marley even confirmed that Mr. Valencia did not believe he needed permission to use Marley images.  (SR 19.)

Additionally, Plaintiffs misrepresent Ms. Cauley's testimony.  (Pls.' Br. 40.)  Ms. Cauley testified that she believed AVELA owned the rights to the Marley properties Freeze licensed.  (ER 177-178.)  She also testified that she didn't know who Ms. Crujeiras was and only spoke to her for a few minutes.  (ER 184.)  When asked if she believed Ms. Crujeiras's claim that she was associated with Marley, Ms. Cauley answered, "I didn't know if she was right or wrong. That's why I referred it to Avenue L.A."  (ER 184.)  Further, Ms. Cauley never informed Ms. Crujeiras that Freeze would not sell Marley products.  Rather, Ms. Cauley stated that Freeze was not selling any Marley products "at the time" and refused to provide Ms. Crujeiras with a representation in writing that Freeze was not going to sell Marley products in the future.  (ER 180-82.)

But even if Defendants knew Plaintiffs owned rights in Marley's identity, this argument misconstrues the intent factor.  In determining AVELA and Freeze's intent in using Marley's image, "the relevant question is whether defendants 'intended to profit by confusing consumers' concerning the endorsement of" their products.  *See White*, 971 F.2d at 1400.  In *Cairns II*, the court rejected similar evidence of knowledge because it only showed that the defendants intended "to produce products bearing Princess Diana's image for sale to collectors."  *See* 107

46

F.Supp.2d at 1218.  There was "no evidence that defendants intended to imply the endorsement of anyone."  *Id*.

As in *Cairns*, Plaintiffs provided no evidence that AVELA or Freeze intended to confuse consumers regarding Marley's false endorsement of their products.    Indeed, Mr. Valencia testified, "We never intended to confuse consumers."  (ER 187.)  The fact that Defendants do not make a trademark-use of Marley's image and the t-shirt tags prominently identify Defendants as the source supports Valencia's testimony.  (ER 91.) AVELA and Freeze merely intended to produce goods bearing Marley's image.  Accordingly, this factor weighs against finding likelihood of confusion.

(vii) The Factors Balance Against a Finding of Likelihood of Confusion.

Most of the factors, including the critical factors of actual confusion and strength of association between Marley's image and Plaintiffs, weigh against finding likelihood of confusion.   The actual confusion factor is particularly relevant because the "'mere possibility' that consumers may be misled is insufficient to prevail on an endorsement claim." *Cairns*, 107 F.Supp.2d at 1221 (citing *Newton*, 22 F.3d at 1261).  The weakness of association between Marley's image and Plaintiffs also "severely undermines plaintiffs' claim that defendants' use will cause confusion as to plaintiffs' endorsement."  *Id.* at 1221. Thus, the evidence is insufficient to support the jury's verdict on likelihood of confusion.

47

IV.    **THE AESTHETIC FUNCTIONALITY DEFENSE NEVERTHELESS
BARS PLAINTIFFS' SECTION 43(A) CLAIM.**

Plaintiffs also cannot prevail on their Section 43(a) claim because Marley's
image is an aesthetically functional component of Defendants' products.   *See
Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206,
217 (2d Cir. 2012).

A.    **The Aesthetic Functionality Defense is Not Waived.**

Plaintiffs incorrectly maintain that Defendants waived their aesthetic
functionality argument by alleging, "Defendants never pleaded or raised aesthetic
functionality as a defense." (Pls.' Br. 22.)   Defendants raised the "ornamental"
nature of Plaintiffs' alleged mark as an affirmative defense in their Answer, (ER
466), a term courts and scholars use interchangeably with "aesthetic
functionality."[15]  *See, e.g.*, *Christian Louboutin*, 696 F.3d at 221 ("Lanham Act
protection does not extend to configurations of ornamental features").

Nonetheless, a symbol must be non-functional to receive trademark
protection.  *See Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853 (1982).
The party asserting trademark rights to an unregistered mark bears the burden of

---

[15] The Trademark Manual of Examining Procedure uses the term "ornamentation"
as a basis for refusing trademark registration instead of "aesthetic functionality."
*See* TMEP § 1202.03; *see also* Gerald T. Tschura, *Likelihood of Confusion and
Expressive Functionality: A Fresh Look at the Ornamental Use of Institutional
Colors, Names and Emblems on Apparel and Other Goods*, 53 Wayne L. Rev. 873,
888 (Summer 2007) (calling the defense "aesthetic or ornamental functionality").

proving that it is not functional. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 27, 29-30 (2001); *see also Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 683 (9th Cir. 2012) ("Under the Lanham Act, Congress imposes a presumption of functionality, and plaintiff bears the burden of proving nonfunctionality."). It is not Defendants' duty to prove that the alleged Marley mark is functional, but rather Plaintiffs' burden to prove that it is not. *See TrafFix*, 532 U.S. at 27. Plaintiffs failed to do so at trial.

Lastly, the aesthetic functionality doctrine's applicability is a determinative issue that this Court has the power to address. *See Ruiz*, 667 F.3d at 1322. In *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, the court reviewed the defendants' aesthetic functionality argument after noting that the Ninth Circuit addressed the defense in its withdrawn opinion even though none of the parties raised it below. 925 F.Supp.2d 1067, 1070, 1073 (C.D. Cal. 2012). The Ninth Circuit evaluated the defense because the record supported a decision in the defendants' favor and resolving the issue was in the interest of judicial economy. *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 636 F.3d 1115, 1123 (9th Cir. 2011). These same factors are present here. Thus, this Court should address the aesthetic functionality argument.

### B.    Aesthetic Functionality Remains A Viable Doctrine.

Plaintiffs argue that aesthetic functionality is not a viable doctrine. (Pls.' Br. 23, 25.) Plaintiffs are wrong. The Supreme Court endorses this doctrine and the

49

Ninth Circuit continues to apply the doctrine. *See, e.g.*, *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33 (2001); *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1070 (9th Cir. 2006).

This Court in *Au-Tomotive Gold* surveyed and harmonized "forty years of trademark law scattered with references to aesthetic functionality" and concluded that "product features that serve an aesthetic purpose wholly independent of any source identifying function" are indeed immune from liability. 457 F.3d at 1072. The Second Circuit in *Christian Louboutin* likewise held "where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection." 696 F.3d at 222. Thus, aesthetic functionality remains a viable doctrine.

## C. Defendants' Use of Marley's Image is Aesthetically Functional.

In determining the aesthetic functionality of a mark, "a court must closely examine the articles themselves, the defendant's merchandising practices, and any evidence that consumers have actually inferred a connection between the defendant's products and the trademark owner." *Job's Daughters*, 633 F.2d at 919. In light of the Defendants' products, merchandising practices, and Plaintiffs' lack of evidence of actual consumer confusion, it is undeniable that Marley's image is an aesthetically functional feature of Defendants' products.

50

A defendant makes an aesthetically functional use of a trademark when a consumer desires the defendant's product featuring the mark because of its aesthetic appeal as opposed to its indication of source or quality. *See Job's Daughters*, 633 F.2d at 917-18. When evaluating the defendant jeweler's use of a sorority's popular insignia on its jewelry, the Ninth Circuit in *Job's Daughters* emphasized, "trademark law does not prevent a person from copying so-called 'functional' features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Id.* at 914, 917. The Court held that the defendant's use of the insignia was non-infringing because "the name and emblem are functional aesthetic components of the jewelry, in that they are being merchandised on the basis of their intrinsic value, not as a designation of origin or sponsorship." *Id.* at 918.

The Ninth Circuit in *Au-Tomotive* likewise emphasized that the aesthetic functionality doctrine prevents "'the use of a trademark to monopolize a design feature which, *in itself and apart from its identification of source*, improves the usefulness or appeal of the object it adorns.'" 457 F.3d at 1073 (citing *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 774 (9th Cir. 1981)).

Here, Plaintiffs, not Defendants, bear the burden because Marley's identity is an unregistered trademark, if it qualifies as a mark at all. Plaintiffs cannot meet

this burden because their exclusive use of Marley's image would undoubtedly put competitors, including the Defendants, at a significant non-reputation-related disadvantage. Plaintiffs are claiming ownership over each and every Marley image under the guise of an alleged trademark-like right in his persona. (Pls.' Br. 25.) There is no "alternative design" that Defendants or others can adopt to remain competitive in the Marley product market because Plaintiffs are candidly attempting to monopolize any designs incorporating Marley's persona. *See Qualitex Co. v. Jacobson Prods.*, 514 U.S. 159, 170 (1995). If licensees do not receive permission from Plaintiffs before using any facet of Marley's persona regardless of its source-identifying function, they will be foreclosed from competing in the high demand Marley product market. As a result, consumers will lose the benefit of lower prices and choice variety that arises from competition.

Additionally, the competitive disadvantage Defendants and others will suffer is "non-reputation-related." *See TrafFix*, 532 U.S. at 32-33; *Qualitex*, 514 U.S. at 165. As in *Job's Daughters*, Marley's image is a prominent feature on Defendants' products. *See* 633 F.2d at 920. Further, Defendants never indicated sponsorship by Plaintiffs. Rather, the products identify Defendants as the source. (ER 91.) Accordingly, Defendants do not use Marley's image as a source-identifier and thus, do not trade on Plaintiffs' alleged "brand equity."

Instead, consumers purchase Marley merchandise to express "allegiance" to his transcendent message, not because his image assures consumers that Plaintiffs produced or sponsor the goods. *See Job's Daughters*, 633 F.2d at 917-18. Marley's inherently expressive image and Defendants' artistic modifications is the main appeal of Defendants' products. (ER 506-510, 536.) Thus, the use of Marley's image "in itself and apart from its identification[] improves the…appeal" of Defendants' products. *See Au-Tomotive*, 457 F.3d at 1073.

Plaintiffs argue that Defendants have produced no evidence supporting this proposition. (Pls.' Br. 25 n.8.) While the proposition that consumers desire Marley shirts because they are Marley fans is evident on its face,[16] Defendants do not bear the burden of showing functionality in this case as the defendant did in *Au-Tomotive*. In *Au-Tomotive*, Volkswagen and Audi's logos were presumed non-functional because they were registered trademarks, whereas Marley's identity is presumed functional because it is unregistered. *See* 457 F.3d at 1072. Accordingly, it is Plaintiffs who must show that Defendants' use caused actual consumer confusion between the parties' products. *See Job's Daughters*, 633 F.2d at 918.

---

[16] "It would be naïve to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies." *Job's Daughters*, 633 F.2d at 918.

However, Plaintiffs' survey demonstrated that 17% of respondents connected AVELA or X One X Archive to Defendants' shirt, whereas no respondents connected the t-shirt directly to Plaintiffs and only 9% connected the t-shirt to Marley, his heirs, or the person on the shirt when asked "Who Made or Put Out the T-shirt?" (ER 529-30.) Nearly twice as many respondents believed Defendants were the source of the shirt. As the district court recognized, such results indicate "no source confusion as between Defendants' and Plaintiffs' products." (ER 115.) Defendants never received a complaint regarding consumer confusion about their products bearing Marley images. Similarly, Plaintiffs have offered no evidence of consumer complaints. (ER 329.) Thus, Plaintiffs have not met their burden. Instead, Defendants' products and merchandising practices and the lack of actual consumer confusion demonstrate that Marley's image is an aesthetically functional component of Defendants' products.

## V.  PLAINTIFFS' SECTION 43(A) CLAIM OVEREXTENDS TRADEMARK LAW INTO THE COPYRIGHT FIELD.

The Ninth Circuit exercises discretion to address an issue raised for the first time on appeal: (1) when the issue is purely legal and the pertinent record is fully developed; or (2) when necessary to prevent the miscarriage of justice. *See, e.g.*, *Ruiz*, 667 F.3d at 1322. *Dastar*'s preclusion of Plaintiffs' Section 43(a) claim is a purely legal issue. *See Zuffa, LLC v. Justin.tv, Inc.*, 838 F.Supp.2d 1102, 1106 (D. Nev. 2012). Additionally, not addressing this issue would be a miscarriage of

justice because Plaintiffs are using trademark law to assert a "right in gross" in all copyrightable "reproductions" of Marley, even where Plaintiffs are not the copyright holder.   *See ETW*, 332 F.3d at 921.  This Court should address Defendants' copyright argument under *Dastar*.

*Dastar* bars Lanham Act claims based on the content of "communicative products" to avoid overextending trademark into the copyright realm.  539 U.S. at 33-34; *see also* Mark P. McKenna, *Dastar's Next Stand*, 19 J. INTELL. PROP. L. 357, 363 (2012).  In *Dastar*, Dastar copied, modified, and released as its own product a television series produced by Twentieth-Century Fox that entered the public domain after Fox failed to renew the copyright.  539 U.S. at 26.  Fox sued Dastar for falsely representing the origin of the goods in violation of Section 43(a). *Id.* at 27.  The Supreme Court held that "goods" in Section 43(a)(1)(A) referred to the actual tangible goods, not the "idea, concept, or communication embodied in those goods."  *Id.* at 37.  Fox's Lanham Act claim failed because Dastar was indisputably the "origin" of the physical videotapes, although it was not the source of the footage embodied in the tapes.  *Id.* at 38.  The Court emphasized that it could not accord "special treatment to communicative products" because it would cause the Lanham Act to conflict with copyright law.  *Id.* at 33-34.  It cautioned "against misuse or over-extension of trademark…into areas traditionally occupied

by patent or copyright" so as not to create "perpetual" copyright protections that would limit the public's right to copy and use creative material.[17]  *Id.* at 34, 37.

Plaintiffs argue that *Dastar* does not apply to their Section 43(a) claim because there is no lack of "proper attribution" and it is "irrelevant" that Defendants use Marley's identity in "creative works." (Pls.' Br. 28.)  This argument misconstrues *Dastar*.  The Supreme Court's recognition in *Dastar* that requiring attribution could cause the alleged infringer to face Lanham Act liability for false sponsorship evidences that *Dastar* was not about the lack of proper attribution.  *See* 539 U.S. at 26.  Instead, the Court focused on the negative implications for copyright law of extending trademark protection to intellectual property embodied in creative products.  *Id.* at 33-34.  That is the issue present here.  Defendants used Plaintiffs' alleged intellectual property, Marley's identity,[18] as the content of their products.  (ER 496-500, 506-510, 536.)  Fox's claim in *Dastar* is identical to Plaintiffs' claim that consumers would likely be confused about the origin, sponsorship, or approval[19] of Defendants' goods because the Marley-related content.  A consumer, however, "typically does not care" whether

---

[17] *Dastar*'s holding applies to copyrighted and uncopyrighted works.  *See, e.g.*, *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 148-49 (5th Cir. 2004).

[18] Plaintiffs do not own the copyrights to the photographs Defendants use on their products. Roberto Rabanne owned the photographs and he assigned his rights to Defendants.  (ER 418, 422.)

[19] Plaintiffs concede that *Dastar* is not limited to "false designation of origin" claims. (Pls.' Br. 28.) *See also ETW Corp., Inc.*, 332 F.3d at 926; *Armstrong v. Eagle Rock Entm't, Inc.*, 655 F.Supp.2d 779, 791 (E.D. Mich. 2009).

the brand-name company is the source of the product's content and thus it is "not trademark law's job to regulate the content of a creative work." *Dastar*, 539 U.S. at 32; McKenna, *supra*, at 363.

Plaintiffs wrongly argue that under Defendants' logic "Coca Cola would be barred from recourse against a soda manufacturer who adorns its cans with public domain Coca Cola art including the COCA COLA mark." (Pls.' Br. 28.) But the Coca Cola art is part of the product packaging, not part of the product itself.[20] The product is the soda, whereas here the product is a Marley t-shirt, towel, etc. Marley's image is the product's central feature. By using the COCA COLA mark on the product packaging, the soda manufacturer would be passing off its soda as a Coca-Cola product. In contrast, Defendants label their goods with their own brand name. (ER 91.) Accordingly, Plaintiffs' Lanham Act claim should fail because Defendants are indisputably the origin of the physical products at issue and do not falsely imply otherwise.

Plaintiffs also maintain that Defendants do not use Marley's identity exclusively in creative works because Defendants sold Marley bobbleheads and used Marley song and album titles. (Pls.' Br. 28 n.9.) Plaintiffs, however, repeatedly acknowledged that Defendants used Marley's photographs in "artwork"

---

[20] In *Wal-Mart Stores v. Samara Bros.*, the Supreme Court distinguished product design from product packaging: "In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist." 529 U.S. 205, 213 (2000).

and added creative elements to his images. (Pls.' ER 378, 380, 385, 388.) Plaintiffs also cannot show that a bobblehead is not a creative work. Indeed, Defendants transformed Marley's image into a new, creative medium.[21]

Plaintiffs' emphasis on Defendants' use of song and album titles further manifests that their Lanham Act claim conflicts with the Copyright Act. The song and album titles are an "idea, concept, or communication embodied in [Defendants'] goods." *Dastar*, 539 U.S. at 37. A district court recently held that Plaintiffs did not own the copyrights in many popular Marley songs because the recordings were works made for hire. *Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc*., 2010 U.S. Dist. LEXIS 94500, at *37 (S.D.N.Y. Sept. 10, 2010). By focusing on the song and album titles, Plaintiffs are attempting to evade this holding under the façade of a Lanham Act claim.

If this Court rules that Defendants' use of Marley photographs and song titles infringed on Plaintiffs' alleged trademark in Marley's identity, all creative material associated with Marley would never enter the public domain. Such a result would directly contravene the *Dastar* holding.

---

[21] The defendant's act of selling Diana dolls did "not imply endorsement by plaintiffs" in *Cairns II*. 107 F.Supp.2d at 1216.

VI.  **PLAINTIFFS WAIVED THEIR NEVADA PUBLICITY RIGHTS BY FAILING TO REGISTER THE RIGHTS WITHIN SIX MONTHS OF BECOMING AWARE OF UNAUTHORIZED USE OF MARLEY'S LIKENESS.**

N.R.S. § 597.800(5) states:

> [a] person claiming to be a successor in interest to a deceased person must, within 6 months after the date he becomes aware or should reasonably have become aware of an unauthorized commercial use of the deceased person's name, voice, signature, photograph or likeness, register a claim with the Secretary of State pursuant to subsection 3. Failure to register shall be deemed a waiver of any right of publicity.

The Ninth Circuit holds, "where a statute is complete and unambiguous on its face, additional terms should not be read into the statute." *Emmert Indus. Corp. v. Artison Assocs.*, 497 F.3d 982, 987 (9th Cir. 2007).  The plain meaning of N.R.S. § 597.800(5) makes clear that a successor "must" register a right of publicity claim within six months of becoming aware of the first unauthorized use in Nevada. Failure to register within these six months waives "any" right of publicity.

Plaintiffs maintain that the statute requires registration within six months of the particular unauthorized use, and failure to register within six months results in a waiver only to that particular use.  (Pls.' Br. 65-66.)  Plaintiffs' strained interpretation finds no support in the language of the statute.  The statute refers to "an" unauthorized use, not "particular" or even "the" unauthorized use.  N.R.S. § 597.800(5).  Plaintiffs arrive at this arbitrary interpretation by reading the key

59

provision at issue, N.R.S. § 597.800(5), alongside N.R.S. § 597.800(4). N.R.S. § 597.800(4) bars a successor in interest from "assert[ing] any right against any unauthorized commercial use…that begins before the filing of an application to register his or her claim." Plaintiffs argue that N.R.S. § 597.800(5) similarly immunizes particular unauthorized users from liability if the successor does not register its claim within six months of discovering such unauthorized use. (Pls.' Br. 65-66.) Such a reading would make N.R.S. § 597.800(5) superfluous because N.R.S. § 597.800(4) already precludes claims against unauthorized uses that begin before the successor registers the claim.

Additionally, N.R.S. § 597.800(4) bars claims against "any" unauthorized use that "begins before" filing, regardless of whether the use begins five years or just one day before the successor files. Plaintiffs' interpretation of § 597.800(5), however, would allow successors in interest to bring a claim against a particular unauthorized user if the successor registers its claim within 6 months of becoming aware of that use. Such a reading directly contradicts N.R.S. § 597.800(4).

The proper reading of these two clauses is, first, N.R.S. § 597.800(4) bars claims against all unauthorized uses that begin before registration because those users did not have proper notice via Nevada's registration system. Second, N.R.S. § 597.800(5) requires a successor in interest to register its right of publicity claim

within six months of discovering any unauthorized use in order to preserve its right of publicity against all future unauthorized users.

Plaintiffs also incorrectly argue that "the statute bestows, not forfeits, rights" and "registration under the statute is permissive, not mandatory." (Pls.' Br. 67-68.) First, the statute unambiguously states, "Failure to register *shall* be deemed a *waiver* of any right of publicity." N.R.S. § 597.800(5) (emphasis added).

Second, the purpose of the statute's registration requirement is to notify the public that the decedent's successor in interest is claiming publicity rights in Nevada. N.R.S. § 597.800(7); *see also* McCarthy, *Publicity* §6.70. Professor McCarthy states: "[T]he Nevada system...¶...expressly puts upon the successor in interest the duty to register the claim within 6 months of the time that that person becomes aware...of an unauthorized commercial use of the deceased person's identity." *Id.*

Lastly, the statute explicitly states a successor "must" register a claim within six months of becoming aware of unauthorized use. *See Vanguard Piping Sys. v. Eighth Judicial Dist. Court,* 2013 Nev. LEXIS 76 at *8 (2013) ("'must' means that the rule's requirements are mandatory."). Registration under the statute is "only permissive until the successor learns of an unauthorized use, at which point it becomes mandatory to preserve the successor's claim to publicity rights in Nevada." (ER 106.)

Plaintiffs further argue that "any right of publicity" refers to the five manifestations of persona. (Pls.' Br. 67.) Plaintiffs cited no authority to support this illogical interpretation. Further, N.R.S. lists these five manifestations at least seven times throughout the statutory scheme and twice in N.R.S. § 597.800(5). Accordingly, if the legislature intended for "any right of publicity" to refer to these five manifestations, it would have listed them as it had done repeatedly before.

Moreover, it is Plaintiffs' understanding of the statute that would lead to "absurd results." (Pls.' Br. 68.) Under Plaintiffs' misguided interpretation of the statute, a party claiming to be a successor could be fully aware of ongoing, multiple third party commercial uses of the deceased person's likeness for decades,[22] fail to register during this time period, and yet be able to later enforce rights against a particular defendant user as long as the claimant could show that it registered within six months of becoming aware of that particular defendant's use. The unsuspecting defendant would not be able to rely on the lack of a registered claim, and the unchallenged use by others of Marley's likeness in Nevada. Such an interpretation is contrary to the statute's intent.

It is undisputed that Plaintiffs were aware of a third-party's unauthorized commercial use of Marley's likeness in Nevada more than six months before their registration of his right of publicity. (Pls.' Br. 64; ER 364-67.) Thus, Plaintiffs

---

[22] N.R.S. § 597.790 limits the post-mortem rights of publicity to 50 years after the death of the celebrity.

waived their claim.  (ER 352-53.)

## VII.  PLAINTIFFS' PROSPECTIVE ECONOMIC ADVANTAGE CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' claim for intentional interference with prospective economic advantage is premised on Defendants' alleged infringing conduct.  Accordingly, Plaintiffs' interference claim necessarily fails because Plaintiffs cannot succeed on either their Section 43(a) or right of publicity claims.   But even if Plaintiffs somehow have a viable Section 43(a) claim, Plaintiffs' interference claim still fails because the evidence does not establish that Defendants intentionally interfered with Plaintiffs' prospective business relationships.

### A.  The Evidence Does Not Support Any Finding that Defendants Intentionally Interfered with Plaintiffs' Prospective Economic Advantage.

Defendants are entitled to judgment as a matter of law on Plaintiffs' interference claim because Plaintiffs failed to establish each required element.  *See Harrington v. Syufy Ent.*, 113 Nev. 246, 248 (1997).

#### 1.  *The Evidence Fails to Establish that Defendants Interfered with Plaintiffs' Prospective Relationship with Wal-Mart.*

Plaintiffs wrongly assert that "AVELA does not dispute that the record supports a finding that Plaintiffs had a prospective business relationship with Wal-Mart, it had knowledge of such relationship, and it intended to harm Plaintiffs by preventing this relationship."  (Pls.' Br. 70.)  Defendants made no such concession.

(Ds.' Br. 42-44, 47; SR 10-12.)  Instead, Defendants focused on the complete lack of evidence to prove any interference with Plaintiffs' prospective relationship with Wal-Mart.  (Ds.' Br. 42-43, 47.)  Indeed, the evidence fails to establish almost every element of Plaintiffs' interference claim as to Wal-Mart, even though failure to meet just one element suffices to eradicate Plaintiffs' claim.

For the first element, Plaintiffs' tendered evidence appears to contradict their claim that there was a forthcoming contractual relationship between Plaintiffs and Wal-Mart.  Plaintiffs maintained throughout the litigation that they target small shops opposed to mass-market retailers.  (ER 90.)  For example, Ms. Crujeiras testified that Plaintiffs wanted to keep Marley products "out of the mass retailers." (SR 20.)  This testimony establishes that there was no expectant business relationship between Plaintiffs and Wal-Mart, the premier mass-market retailer.

Next, Plaintiffs offered no explicit evidence to establish the second element that Defendants knew of Plaintiffs' prospective relationship with Wal-Mart. Plaintiffs' failure to point to evidence in their reply brief to counter Defendants' assertion that "they did not intentionally interfere with Plaintiffs' prospective economic relationships" shows Plaintiffs cannot prove this element.  (Ds.' Br. 47.)

Likewise, Plaintiffs set forth no evidence demonstrating the third element that Defendants intended to harm Plaintiffs' relationship with Wal-Mart.   To establish intent, Plaintiffs had to prove that Defendants were "substantially certain

that interference with a commercial relationship will occur." *See Las Vegas-Tonopah-Reno Stages Lines v. Gray Line Tours*, 106 Nev. 283, 287 (1990); *Williams v. Univ. Med. Ctr. of S. Nev.*, 688 F.Supp.2d 1134, 1140 (D. Nev. 2010) ("Nevada specifically has declined to recognize a tort for negligent interference with economic expectancies.").  Even assuming Defendants knew of Plaintiffs' intention to expand into the mass market, such knowledge does not support an interference claim.  Plaintiffs had to demonstrate that Defendants specifically knew of Plaintiffs' business expectancy with Wal-Mart, not Defendants' mere knowledge of Plaintiffs' potential relationship with a mass retailer.  Given that Defendants had no knowledge of a relationship between Plaintiffs and Wal-Mart, Defendants could not have been "substantially certain" that their actions would interfere with this relationship.  *See Las Vegas-Tonopah-Reno Stages Lines*, 106 Nev. at 287.

Plaintiffs only address the actual harm element in their reply brief.  (Pls.' Br. 70.) This element requires Plaintiffs to show: (1) that Plaintiffs suffered actual harm; and (2) that Defendants caused the actual harm. Plaintiffs failed to demonstrate either.

The actual harm to Plaintiffs and damage award in this case is based solely on Doreen Crujeiras' speculative testimony.   Ms. Crujeiras, a self-interested employee of Marley Music and licensing agent for Plaintiff Fifty-Six Hope Road,

testified that Plaintiffs lost "about $250,000 in royalties" because Plaintiffs' licensee, Hybrid, did not successfully negotiate a 1.8 million dollar deal with Wal-Mart.[23]  (SR 17-18.)  On cross-examination, Ms. Crujeiras admitted $250,000 was not an exact number, but an estimate of Plaintiffs' lost sales.  (SR 21.)  Plaintiffs did not produce any documents or unbiased testimony, from a Wal-Mart buyer for example, to corroborate this alleged estimate.

Plaintiffs also offered no evidence, other than Ms. Crujeiras' biased testimony, that Defendants caused these alleged lost sales.  Ms. Crujeiras admitted that she had no personal knowledge about why Wal-Mart decided not to purchase Plaintiffs' products. (ER 206-207.)   Instead, when asked if she had "any knowledge that AVELA…went in and undercut Hybrid's efforts to sell to Walmart," Ms. Crujeiras recalled having only "one conversation with the owner of Hybrid" during a conference call where the owner ambiguously mentioned he had a "problem."  (ER 206.)  Ms. Crujeiras merely speculated that Plaintiffs would have had a successful deal absent Defendant AVELA's relationship with Wal-Mart.  But business deals fail for a multitude of reasons.  Ms. Crujeiras' "sheer surmise and conjecture" that AVELA's conduct unraveled this business deal does not suffice to support the jury's verdict awarding $300,000 to Plaintiffs for this alleged tort.  *See Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir.

---

[23] Ms. Crujeiras first testified that the proposed Hybrid deal was lost to Target, but later changed her testimony to allege the deal was lost to Wal-Mart. (SR 22.)

2001) (stating that judgment as a matter of law is appropriate where "the jury's findings could only have been the result of sheer surmise and conjecture").

Plaintiffs failed to offer sufficient evidence for several of the necessary elements for their interference claim as to Wal-Mart.

### 2. *The Evidence Fails to Establish that Defendants Interfered with Plaintiffs' Prospective Relationship with Wet Seal.*

The record also does not support Plaintiffs' proposition that "AVELA intentionally interfered with Plaintiffs' business dealings with retailer Wet Seal." (Pls.' Br. 72.)  Plaintiffs set forth no evidence establishing Defendants' knowledge of Plaintiffs' prospective relationship with Wet Seal, Defendants' intent to prevent this relationship, or that Defendants' conduct caused Plaintiffs' harm.

To establish Defendants' knowledge of Plaintiffs' relationship with Wet Seal, Plaintiffs only rely on Ms. Acuna's testimony that she was aware Zion had a license for Marley images and that she monitored the marketplace by visiting stores to see the licensed products being sold.  (Pls.' Br. 73.)  This limited evidence in no way demonstrates that Defendants knew of Plaintiffs' relationship with Wet Seal.  The jury's contrary conclusion "could only have been the result of sheer surmise and conjecture" that Ms. Acuna somehow deduced that Zion worked specifically with Wet Seal out of hundreds of possible retailers and that she specifically saw one of Zion's shirts at Wet Seal.  *Meloff*, 240 F.3d at 145.  Further, Ms. Acuna's knowledge cannot be imputed to Defendant AVELA.  Indeed, Leo

67

Valencia, AVELA's sole employee, testified he was "never" aware of a potential business relationship between Plaintiffs and Wet Seal.  (ER 188-189.)

Next, Plaintiffs presented no evidence demonstrating Defendants' intent to prevent Plaintiffs from entering into a business relationship with Wet Seal.  Indeed, Nicole Barker of Wet Seal testified that Wet Seal sold AVELA and Zion t-shirts simultaneously.  (ER 196.)

Lastly, Defendants' conduct did not cause Wet Seal to discontinue carrying Plaintiffs' products.  Ms. Barker testified that Wet Seal stopped buying licensed music merchandise generally because "it was an unprofitable business." (ER 191.)

Plaintiffs again failed to offer sufficient evidence for several of the elements for their interference claim with respect to Wet Seal.

3. ***The Evidence Fails to Establish that Defendants Interfered with Plaintiffs' Prospective Relationship with JGR Copa, Target, Ecko, C&D Visionary, Inc., JC Penney, or Kohl's.***

The evidence in the record also does not substantiate a finding that Defendants intentionally interfered with Plaintiffs' business relationships with retailers JGR Copa, Target, Ecko, C&D Visionary, JC Penney, and Kohl's.

Plaintiffs incorrectly argue that Defendants waived any arguments concerning the lack of evidence for Plaintiffs' interference claim with respect to C&D Visionary, JC Penney, and Kohl's because Defendants did not specifically designate these retailers in their opening brief.  (Pls.' Br. 73.)  First, Defendants

explicitly addressed Defendants' lack of both intent to harm and knowledge of Plaintiffs' relationship with C&D Visionary.  (Ds.' Br. 47.)  Next, Defendants repeatedly argued in the first brief that there was insufficient evidence to support any intentional interference claim.  (Ds.' Br. 42, 43, 47.)  Plaintiffs cited no authority stating that Defendants had to specifically identify each of Plaintiffs' alleged potential relationships when establishing a complete lack of evidence to support any type of interference claim.  Instead, Plaintiffs cite *Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 998 (9th Cir. 2012), to support their waiver argument.  But in *Cruz*, the defendant completely failed to address its statute of limitations defense in its opening brief, *id.*, whereas here Defendants devoted five pages to addressing the insufficiency of evidence to support all interference claims. (Ds.' Br. 42-47.)  Thus, *Cruz* does not support Plaintiffs' waiver argument.

The evidence fails to establish almost every element of Plaintiffs' interference claim concerning retailers JGR Copa, Target, Ecko, C&D Visionary, JC Penney, and Kohl's.  Plaintiffs' failure to specify any evidence in their reply brief to support an interference claim as to these retailers demonstrates that no such evidence exists.  Rather, the negligible evidence in the record definitively establishes that Defendants committed no such interference.

For example, Target buyer Elizabeth Kinneberg, stated that she was unfamiliar with Plaintiff Zion's business and she only knew of the company

69

because a Zion licensee, Neil Maddox, emailed her about selling Marley t-shirts to Target.  (ER 198-99.)  In response, Ms. Kinneberg emailed Mr. Maddox, "I am not interested in adding screen print vendors to my business at this point."  (ER 200.)  When questioned about why she did not enter into a business relationship with Zion, Ms. Kinneberg explained that she "just didn't want to add a new vendor…[a]ny vendor" to her portfolio and that it had nothing to do with Defendants.  (ER 201.)  Heather Vogel, a buyer for Target, similarly testified that she was unfamiliar with Zion before this lawsuit.  (ER 190.)  This evidence establishes that there was no prospective contractual relationship between Plaintiffs and Target and that any harm to Plaintiffs was not caused by Defendants' conduct.

Additionally, Plaintiffs offered no evidence demonstrating that Defendants knew of and intended to harm Plaintiffs' prospective business relationship with Target or any of the other retailers. Leo Valencia's testimony is the only evidence explicitly dealing with Defendants' knowledge and intent.  Valencia made clear that he was "never" aware of a potential business relationship between Plaintiffs and JGR Copa, C&D Visionary, JC Penney, or Kohl's.  (ER 188-89.)

Lastly, Plaintiffs produced no evidence establishing that any harm to Plaintiffs resulted from Defendants' conduct.  Instead, Jacob Goldszer, the President of JGR Copa, explained that JGR Copa did not enter an agreement with Zion because they "did not agree with [Zion's] license agreement." (ER 291-92.)

Further, Defendants could not have influenced this decision because Zion and JGR Copa's email exchange ended April 26th, 2006, almost a year before Mr. Goldszer met with Defendant AVELA in 2007.  (ER 285-86, 290.)

Therefore, there is a complete lack of evidence to support Plaintiffs' interference claim with respect to any of the retailers.

B. **The Court Properly Granted Defendants Judgment as a Matter of Law on Plaintiffs' Punitive Damages Claim.**

Since there is insufficient evidence to sustain Plaintiffs' interference claim, Plaintiffs cannot recover punitive damages.  *See, e.g., Peri & Sons Farms, Inc. v. Jain Irrigation, Inc.*, 933 F.Supp.2d 1279, 1294 (D. Nev. 2013).  But even if Plaintiffs succeed on the interference claim, their punitive damages claim still fails because Plaintiffs did not prove by clear and convincing evidence that Defendants were guilty of oppression, fraud, or malice.  *See Humana Inc. v. Forsyth*, 545 U.S. 299, 313 (1999) (quoting Nev. Rev. Stat. § 42.005(1)).  Appellate courts review the trial court's refusal to award punitive damages for an abuse of discretion.  *See Browning-Ferris Indus. v. Kelco Disposal*, 492 U.S. 257, 279 (1989).

Plaintiffs failed to identify any evidence that Defendants intended to harm Plaintiffs, much less clear and convincing evidence that Defendants did so with oppression, fraud or malice.

Plaintiffs incorrectly argue that proving intent for their intentional interference claim suffices for establishing a punitive damages claim.  (Pls.' Br.

74-75.)  First, Plaintiffs cite no authority for this proposition.  Second, such an argument fails to acknowledge that the standard for proving an intentional tort is different than the standard for punitive damages.  The standard for punitive damages in Nevada is clear and convincing evidence, which requires Plaintiffs to prove that it is substantially more likely than not that Defendants were guilty of oppression, fraud, or malice.  *See* Nev. Rev. Stat. § 42.005(1).  Clear and convincing evidence is a much higher burden than the preponderance of the evidence standard required for proving intentional torts.  Adopting Plaintiffs' logic would eradicate the purpose of Nevada's punitive damages statute and its designation of the clear and convincing evidence burden because it would entitle every intentional tort plaintiff to punitive damages.

The trial court's decision recognizes that Plaintiffs did not meet their heavy burden of proving by clear and convincing evidence that Defendants were guilty of oppression, fraud, or malice and is not inconsistent with its decision on Plaintiffs' tort claim.  (Pls.' ER 30.)  Additionally, the court did not make a prior finding that Plaintiffs had made a prima facie case for punitive damages.  (Pls.' Br. 75-76.)  It only offered its initial "view on punitives." (Pls.' ER 331.)  After hearing counsels' arguments, the court appropriately refused to grant punitives.  (Pls.' ER 30.)

## VIII. THE EVIDENCE DOES NOT SUPPORT ANY FINDING THAT FREEZE WILLFULLY VIOLATED SECTION 43(A).

The evidence fails to establish that Freeze willfully engaged in false association in violation of Section 43(a). "Willful infringement carries a connotation of deliberate intent to deceive." *Lindy Pen v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993). Plaintiffs argue that Freeze acted willfully because Freeze "specifically" knew of Plaintiffs' rights before using Marley's image. (Pls.' Br. 43, 45, 46.) Ms. Cauley of Freeze, however, testified that she did not know who Ms. Crujeiras was during their brief phone conversation or Ms. Crujeiras's association with Marley. (ER 184.) Ms. Cauley also testified that she believed AVELA owned the rights to the Marley material Freeze licensed. (ER 177-78.) Accordingly, even if she knew Ms. Crujeiras' affiliation with Marley, Ms. Cauley's testimony does not demonstrate that she believed Plaintiffs owned the specific Marley images Freeze licensed. Moreover, there is no evidence that Freeze was aware of Plaintiff Zion or knowingly acted at Zion's expense.

Plaintiffs also failed to offer any evidence that Freeze willfully intended to cause consumer confusion between its products and Plaintiffs' merchandise. The only evidence Plaintiffs offered on this issue was a short phone conversation between Ms. Crujeiras and Ms. Cauley in which Ms. Crujeiras alleged she was associated with Marley Music and alleged that this entity owned all rights in any reproduction of Marley. This conversation is certainly "attenuated" evidence of

Freeze's actual knowledge and does not prove that Freeze willfully attempted to confuse consumers about Plaintiffs' endorsement of its products. *See Lindy Pen*, 982 F.2d at 1406.

Recognizing the weakness in their actual knowledge argument, Plaintiffs argue that Freeze willfully blinded itself by not investigating AVELA's or Plaintiffs' rights to use Marley's image. (Pls.' Br. 43-44.) But willful blindness requires "more than mere negligence." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 515 (S.D.N.Y. 2008). A defendant is not willfully blind "unless the defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it." *Id.* Ms. Cauley testified that she had no reason to believe Ms. Crujeiras' claims and she believed AVELA owned the Marley material Freeze licensed. (ER 177-78, 184.) This demonstrates that Freeze did not have the requisite willful, deceptive "state of mind." *Lindy Pen*, 982 F.2d at 1406.

It is also unclear what any investigation by Freeze would have uncovered. Plaintiffs have no registered trademarks in any Marley image, no copyrights on the Rabanne images, and no Nevada publicity rights. Freeze also did not sit on its hands when it received Ms. Crujeiras' phone call. Instead, Ms. Cauley referred the matter to its licensor, AVELA, to help resolve the issue. (ER 182-84.)

Lastly, Freeze's reliance on its indemnification clause shows that it did not willfully act to harm Plaintiffs' trademark rights. Ms. Cauley testified that it was

Freeze's practice to rely on indemnification clauses for all licensed products. (ER 176, 186.) Indeed, as demonstrated by the testimony of JGR Copa's Jacob Goldszer, Ecko Vice President Stephen Fefferman, and Target buyer Heather Vogel, reliance on indemnity provisions is standard practice in the licensing industry. (ER 169-71.) Thus, the record does not support any finding that Freeze willfully violated Section 43(a).

IX. **PLAINTIFFS ADVANCE INCORRECT ARGUMENTS ON THE DISGORGEMENT OF PROFITS ISSUE.**

    A. **Plaintiffs Must Prove Willful Infringement to Recover Defendants' Profits.**

Contrary to their assertion, (Pls.' Br. 43 n. 14), Plaintiffs must prove that Freeze willfully infringed Plaintiffs' alleged trademark to receive disgorgement of profits under Section 43(a). *See Contessa Food Prods. v. Lockpur Fish Processing Co.*, 123 Fed. Appx. 747, 751 (9th Cir. 2005); *Lindy Pen*, 982 F.2d at 1405*; see also* McCarthy, *Trademarks* § 30:62 (criticizing circuit courts that have removed the willfulness requirement from § 1125(a) because of the 1999 amendments and arguing that such circuits "have leveraged this statutory change beyond its intended scope"). As discussed in Section VIII, Freeze did not act willfully.

B. **Accounting of Profits is an Equitable Remedy Properly Decided by the Court.**[24]

As set forth in 15 U.S.C. § 1117(a), the court shall assess the amount of profits Plaintiffs are entitled to.  *See Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 78 (1st Cir. 2008).  Plaintiffs argue, however, that courts must not interpret the Lanham Act to override the Seventh Amendment's jury trial guarantee.  (Pls.' Br. 47.)  The Seventh Amendment requires courts to examine the nature of the action and remedy sought to determine "whether the statutory cause of action is more analogous to cases tried in courts of law than to suits tried in courts of equity." *Tull v. United States*, 481 U.S. 412, 417 (1987).  Disgorgement of profits is an equitable issue.  S*ee id.* at 424; *see also* McCarthy, *Trademarks* § 30:59  (stating that an accounting of profits has its historic roots in equity jurisprudence); M. Thurmon, *Ending the Seventh Amendment Confusion: A Critical Analysis of the Right to a Jury Trial in Trademark Cases*, 11 TEX. INTELL. PROP. L.J. 1, 6 (2002) (noting that the Supreme Court has repeatedly characterized the disgorgement remedy as equitable).  Accordingly, the accounting of profits in a trademark action is an equitable remedy properly decided by the court.

Plaintiffs' reliance on *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962), is misplaced.  *Dairy Queen* was a damages case that the Court noted had been

---

[24] This issue is reviewed de novo.  *See Gibson by Gibson v. Cnty. Of Riverside*, 132 F.3d 1311, 1312 (9th Cir. 1997).

mischaracterized in the pleadings as an "accounting" case. *Id*. at 477-78.  Unlike *Dairy Queen*, it is unquestionable, and Plaintiffs do not deny, that the claim at issue is for an accounting of profits.  (Pls.' Br. 47.)  Thus, the district court did not err by determining the amount of profits Plaintiffs were entitled to.

### C.  **The District Court Abused its Discretion by Not Deducting AVELA's Payments to its Licensing Agent When Accounting Profits.**

The District Court, without analysis, concluded that AVELA failed to meet its burden of demonstrating that $144,912 (40%[25] of Marley royalty revenue) in agency fees that AVELA is contractually obligated to pay licensing agent, V. International Publishing, and $222,771 in business expenses are deductible.  (ER 7.) This Court should remand the issue of AVELA's net profits to the district court with instructions to consider AVELA's business expenses.

### D.  **Plaintiffs Are Not Entitled to Increased Profits.**

The District Court properly exercised its discretion by denying Plaintiffs' motion for enhanced profits because Plaintiffs failed to present any evidence that Defendants' profits were inadequate to compensate Plaintiffs.  (ER 7.)  This issue is reviewed for abuse of discretion. *See Lindy Pen*, 982 F.2d at 1405.

A district court has "wide discretion" in fashioning the suitable remedy under the Lanham Act. *BASF Corp. v. Old World Trading Co*., 41 F.3d 1081, 1092

---

[25] Contrary to Mr. Conley's self-interested declaration, a 40% agency fee is typical in the licensing industry.  (ER 157, 158.)

(7th Cir. 1994). 15 U.S.C. § 1117(a) permits a court to award enhanced profits for "compensation and not [as] a penalty." Even a defendant's willful infringement does not suffice to invoke the court's power to correct inadequate recovery. *See Faberge, Inc. v. Saxony Prods., Inc.*, 605 F.2d 426, 429 (9th Cir. 1979).

The jury's award of $300,000 for the interference claim, the injunctive relief, and the lost profit awards of $413,638.29 against JEM, $19,246.54 against Freeze, and $348,543.00 against AVELA adequately compensates Plaintiffs. (ER 7.) Further, Plaintiffs did not present any evidence that they suffered reputational damage as a result of Defendants using Marley's image. (Pls.' Br. 56-57.) Defendants never received complaints about the quality of their products. (ER 424.) Rather, Nicole Barker of Wet Seal testified that Plaintiffs' shirts were not a higher quality garment than Defendants' shirts. (ER 197.) Further, Defendants are not responsible for the "hundreds of millions in unlicensed sales" of Marley products that have caused the market to become flooded with his image. (ER 539-40.) Instead, Plaintiffs failure to properly police the market caused it to become inundated with Marley merchandise. (ER 539-40.) Awarding Plaintiffs lost profits adequately addresses any damage specifically caused by Defendants. Any enhancement of this relief would constitute a penalty.

X.  **THE DISTRICT COURT IMPROPERLY AWARDED ATTORNEY FEES TO PLAINTIFFS.**

The district court's award of attorney fees to Plaintiffs was improper because (1) this case is not "exceptional" and (2) Plaintiffs are not the "prevailing party." *See* 15 U.S.C. § 1117(a).  Whether a case is "exceptional" within the meaning of Section 1117(a) is a legal question this Court reviews de novo.  *See, e.g., Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003).  Where a case is exceptional, the Ninth Circuit reviews an award of attorney's fees for an abuse of discretion.  *Id.*

A.  **This Case is Not Exceptional.**

A trademark case is exceptional under Section 1117(a) where the defendant acted maliciously, fraudulently, deliberately, or willfully.  *Watec Co. v. Liu*, 403 F.3d 645, 656 (9th Cir. 2005).  Defendant AVELA's actions were not malicious, fraudulent, deliberate, or willful because AVELA used Marley images in a manner it believed permissible based on a reasonable interpretation of existing law.  (Ds.' Br. 55-58.)  Plaintiffs conceded that the viability of a false endorsement claim by a deceased celebrity's estate "is a developing area of the law and not the subject of many judicial opinions."  (ER 155.)  Indeed, the court in *Cairns I* stated one could "theoretically" assert a deceased celebrity false endorsement claim where "advertising might falsely suggest a particular product was endorsed by the celebrity before his or her death."  24 F.Supp.2d at 1032.  This limited

79

circumstance does not apply here.  Therefore, Defendants reasonably believed their actions did not constitute false endorsement.

B. **Plaintiffs Are Not the Prevailing Party in this Action.**

Only a prevailing party is entitled to attorney fees.  (Ds.' Br. 58-59.) Defendants prevailed on three of Plaintiffs' five claims, including the Lanham Act claim for the word mark BOB MARLEY and the Nevada Right of Publicity claim. Accordingly, Plaintiffs are not the prevailing party in this action.

## XI. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION BY DENYING ATTORNEY FEES AS TO FREEZE.

It is within the District Court's discretion to award attorney fees.  *See Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000).  A court is not compelled to award attorney fees even when a case is exceptional.  *Id*.

The evidence does not support the jury's finding that Freeze willfully violated Section 43(a).  Nonetheless, a jury's finding of willfulness does not make a case exceptional because that determination is a question of law for the court. *See Watec Co.*, 403 F.3d at 656.  Thus, the District Court did not abuse its discretion by deciding the case was not exceptional as to Freeze despite the jury's verdict.  *Id*.  Freeze did nothing more than rely on a license agreement with AVELA and Freeze's purported failure to conduct due diligence is not sufficiently egregious to make the case exceptional.  *Id.*

80

Next, the District Court did not abuse its discretion by considering factors the Ninth Circuit has expressly cited for determining whether to award attorney fees. *See TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 832 (9th Cir. 2011). These factors are: (1) the nature and extent of the relief obtained; (2) the unlawfulness of Defendant's conduct; (3) whether the relevant area of law is unclear; (4) whether infringement or willfulness was a close question; (5) whether Defendants intended to deceive or confuse the public; and (6) whether the plaintiffs suffered actual damage. *Id*. Thus, contrary to Plaintiffs' argument, the District Court appropriately considered (1) Plaintiffs' recovery of profits and an injunction against Freeze, (2) Plaintiffs' success on only one Lanham Act claim, (3) the novel legal questions in the case, and (6) the actual damage caused by Freeze. (Pls.' ER 8.) Accordingly, this Court should affirm the court's denial of attorney fees as to Freeze.

## CONCLUSION

In sum, Defendants ask the Court to:

- Reverse the district court's judgment and direct summary judgment in Defendants' favor on the Section 43(a) claim;

- Hold that Plaintiffs' economic advantage claim fails as a matter of law because the evidence is insufficient to support the jury's verdict;

- Remand the issue of AVELA's net profits to the district court with instructions to consider AVELA's business expenses;

- Reverse any judgment against Freeze because the evidence is insufficient to support the jury's finding of willfulness; and

- Reverse the district court's award of attorney fees.


Dated: December 5, 2013                    Respectfully submitted,

                                           /s/ Melissa W. Woo
                                           Melissa W. Woo

# CERTIFICATE OF COMPLIANCE

This brief is accompanied by a motion for leave to file an oversized brief pursuant to Circuit Rule 32-2 and is 19,042 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

84

**PROOF OF SERVICE**

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action.  My business address is 2647 Gateway Road, Suite 105-550, Carlsbad, California 92009. On this date, I electronically filed the forgoing document:

**DEFENDANTS-APPELLANTS/CROSS-APPELLEES A.V.E.L.A., INC., X ONE X MOVIE ARCHIVE, INC., CENTRAL MILLS, INC., AND LEO VALENCIA'S THIRD BRIEF ON CROSS-APPEAL; SUPPLEMENTAL EXCERPTS OF RECORD**

with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 5th day of December, 2013

/s/ Melissa W. Woo
_____
Melissa W. Woo